## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UMBERTO CAVALIERI and FLOYD MIKLIC,<br><br>                    Plaintiffs,<br><br>       v.<br><br>GENERAL ELECTRIC COMPANY, GE ASSET MANAGEMENT INCORPORATED, JOHN MYERS, JOHN J. WALKER, JEFFREY R. IMMELT, SIR WILLIAM CASTELL, ROBERT C. WRIGHT, JAMES I. CASH, JR., ANN M. FUDGE, CLAUDIO X. GONZALEZ, ANDREA JUNG, A.G. LAFLEY, ROBERT W. LANE, RALPH S. LARSEN, ROCHELLE B. LAZARUS, SAM NUNN, ROGER S. PENSKE, ROBERT J. SWIERINGA, DOUGLAS A. WARNER III, PHILIP D. AMEEN, LAWRENCE CARUSO, and JOHN DOES 1-100,<br><br>                    Defendants. | | Civil Action No.<br><br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME ACT OF 1974** |
| | | |

Plaintiffs, participants in the GE Savings & Security Program (and any other defined contribution plan sponsored by General Electric Company ("GE" or the "Company") which held GE common stock) (collectively, the "Plan") during the proposed Class Period, on behalf of the Plan, themselves, and all others similarly situated, allege as follows:

## I.    <u>NATURE OF THE ACTION</u>

1.    Plaintiffs bring this suit as a civil enforcement action under the Employee Retirement Income Security Act ("ERISA") §§ 409, 502(a)(2), (3), 29 U.S.C. §§ 1109 and 1132(a)(2)(3), for relief on behalf of the Plan.  The Plan is a 401(k) Plan operated and established by GE as a benefit for its employees to permit tax-advantaged savings for retirement

and/or other long-term goals. GE common stock is one of the investments that Plan participants may choose. According to the Company's Form 11-K filed with the SEC on June 14, 2005, more than $16 billion of the Plan's $24.9 billion or more in assets were invested in GE common stock ("GE Stock" or "Company Stock").  Moreover, upon information and belief, several of the investment options provided under the Plan include mutual funds that invest in GE Stock.

2.      Plaintiffs Umberto Cavalieri and Floyd Miklic are former employees of GE and current participants in the Plan during the Class Period (defined below).  Their respective retirement portfolios include GE Stock.

3.      Plaintiffs allege that Defendants, as fiduciaries of the Plan, breached their duties to them and to other participants and beneficiaries of the Plan during the Class Period in violation of ERISA, particularly with regard to the Plan's holdings of GE Stock.

4.      According to the Company's June 14, 2005 Form 11-K, GE is the sponsor of the Plan.

5.      Since the Plan's holdings in GE Stock comprised a significant percentage of the overall value of the assets held by the Plan, the long-term retirement savings of Plan participants were dependent to a substantial degree both on the performance of GE Stock, as well as the related need for prudent fiduciary decisions by Defendants concerning such a large, ongoing investment of Plan assets.  This action alleges that the fiduciaries of the Plan breached their fiduciary duties to the Plan and its participants under ERISA, by, *inter alia*, selecting and maintaining Company Stock as an investment alternative for participant contributions, including Company matching contributions, when it was no longer a suitable or prudent Plan investment option.

2

6.     The breaches were ongoing and arose out of Defendants' continuing duties to review, evaluate, and monitor the suitability of the Plan's investment in GE Stock, and to provide accurate material information to enable participants to make informed investment decisions concerning their contributions invested in Company Stock.

7.     As a result of Defendants' fiduciary breaches, as hereinafter enumerated and described, the Plan has suffered substantial damages, including the erosion of billions of dollars of retirement savings and anticipated retirement income for Plan participants.  Indeed, Plan participants have seen their retirement savings accounts devastated as Company Stock plummeted from a high of approximately $50 per share in the months preceding the Class Period to its current price of less than $35 per share.  Under ERISA, the breaching fiduciaries are obligated to restore to the Plan the losses resulting from these fiduciary breaches.

## II.   <u>JURISDICTION AND VENUE</u>

8.     This Court has subject matter jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

9.     This Court has personal jurisdiction over Defendants under ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), as one or more of the Defendants may be found in this District. The Court also has personal jurisdiction over Defendants because the Company is incorporated within this District, maintains executive offices (such as U.S. Employee Services) in this District, and the Plan is administered within this District (in Schenectady, New York).  Defendants systematically and continuously have done and continue to do business in this District, and this case arises out of Defendants' acts within this District.

10.    Venue is proper under ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because Defendants administer the Plan in this District, some or all of the actionable conduct for which

3

relief is sought occurred in this District, and one or more of the Defendants reside or may be found in this District.

## III.   THE PARTIES

### Plaintiffs

11.     Plaintiff Umberto Cavalieri is a retired former employee of GE and a current participant in the Plan, within the meaning of ERISA § 3(7) and 502(a), 29 U.S.C. § 1102(7). Mr. Cavalieri held GE Stock in his individual Plan account during the Class Period.

12.     Plaintiff Floyd Miklic is a retired former employee of GE and a current participant in the Plan, within the meaning of ERISA § 3(7) and 502(a), 29 U.S.C. § 1102(7). Mr. Miklic held GE Stock in his individual Plan account during the Class Period.

### Defendants

### A.     General Electric Company

13.     GE is a leading multinational technology and services company operating through various business segments, including its Insurance segment.  Through its business segments, it provides electricity, lighting, technology, industrial automation, medical imaging equipment, motors, railway locomotives, aircraft jet engine, aviation services, and materials such as plastics, silicones and abrasives.  The Company also offers financial and other services, including consumer savings and insurance services, specialty insurance and reinsurance, consumer financing, commercial and industrial financing, real estate financing, asset management and leasing, and mortgage services. GE operates in approximately 100 countries worldwide.  The Company exercises discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

14.     GE at all times acted through its officers, directors and employees, including the Chief Executive Officer ("CEO") and others who were, upon information and belief, appointed

4

by the Company.  GE had, at all applicable times, effective control over the activities of its officers and employees, including their Plan-related activities.   Through its Board of Directors (the "Board") or otherwise, GE had the authority and discretion to hire and terminate its officers and employees.

15.     By failing to properly discharge their fiduciary duties under ERISA, the officer, director, and employee fiduciaries breached duties they owed to Plan participants and their beneficiaries.   Accordingly, the actions of the Plan's officer, director, and other employee fiduciaries are imputed to GE under the doctrine of *respondeat superior*, and GE is liable for these actions.

### B.     GE Asset Management, Inc. Defendants

16.     Defendant GE Asset Management Incorporated ("GEAM") is a wholly-owned subsidiary of GE.  According to GE's Form 11-K filed on June 14, 2005, the Trustees of the GE Savings and Security Trust are officers of GEAM and GEAM is investment advisor to each of the Plan's investment options, except General Electric Common Stock, Vanguard Institutional Index Fund and United States Savings Bonds.   Defendant GEAM is a fiduciary of the Plan within the meaning of ERISA in that it exercises discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

17.     Defendant John Myers ("Myers") currently serves as President and Chief Executive Officer of GEAM and has so served since 1997.  Myers is currently a Trustee of the Plan and has so served throughout the Class Period.  Defendant Myers is a fiduciary of the Plan within the meaning of ERISA in that he exercises discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

18.     Defendant John J. Walker ("Walker") currently serves as Executive Vice President and Chief Financial Officer of GEAM and has so served since 1999.  Walker is currently a Trustee of the Plan and has so served throughout the Class Period.  Defendant Walker is a fiduciary of the Plan within the meaning of ERISA in that he exercises discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

19.     Unknown Fiduciary Defendants 1-20 are residents of the United States and are or were fiduciaries of the Plan during the Class Period.  These Defendants, whose identities are currently unknown to Plaintiffs, may include additional GEAM employees.  Once their identities are ascertained, Plaintiffs may seek leave to join them under their true names.

### C.    GE Board Defendants

20.     According to the Company's Proxy Statement filed with the SEC on or about March 4, 2005, and distributed to Plan participants ("2005 Proxy Statement"), "GE's business is conducted by its employees, managers and officers, under the direction of the CEO and the oversight of the board. . . ."  Importantly, according to the 2005 Proxy Statement, the "Board of Directors is elected by the shareowners to oversee management….  Both the board of directors and management recognize that the long-term interests of shareowners are advanced by responsibly addressing the concerns of other stakeholders and interested parties including employees…."

21.     Moreover,  according to the 2005 Proxy Statement, in addition to the "general oversight of management," the Board's functions include, among others, "reviewing, monitoring and, where appropriate, approving fundamental financial and business strategies and major corporate actions; assessing major risks facing the company - and reviewing options for their mitigation; and ensuring processes are in place for maintaining the integrity of the company - the

integrity of the financial statements, the integrity of compliance with law and ethics, the integrity of relationships with customers and suppliers, and the integrity of relationships with other stakeholders."  Additionally, the Board has the power to appoint (and the right to remove) those charged with administrative oversight of the Plan, and to appoint only those who exercise their fiduciary duties solely in favor of the Plan and the Class.  Consequently, given the Board's oversight of management and other stated functions which gave the Board discretionary authority or control over the conduct at issue in this litigation, the Board and its members were fiduciaries of the Plan.  Liability is asserted herein against the GE Board Defendants for such time periods as they served on the Board or otherwise acted as fiduciaries with respect to the Plan.

22.     Defendant Jeffrey R. Immelt ("Immelt") currently serves as the Chairman of the Board and CEO of the Company and has so served since November 2001.  In addition, Immelt serves on GE's Public Responsibilities Committee.  Defendant Immelt is a fiduciary of the Plan within the meaning of ERISA in that he exercises discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

23.     Defendant Sir William Castell ("Castell") is currently a Vice Chairman of the Board and an Executive Officer of the Company.  He has so served since 2004.  In addition, Castell serves on the Public Responsibilities Committee.  Defendant Castell is a fiduciary of the Plan within the meaning of ERISA in that he exercises discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

24.    Defendant Robert C. Wright ("Wright") is currently a Vice Chairman of the Board and an Executive Officer of the Company.  He has so served since 2000.  In addition, Wright serves on GE's Public Responsibilities Committee.  Defendant Wright is a fiduciary of the Plan within the meaning of ERISA in that he exercises discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

25.    Defendant James I. Cash, Jr. ("Cash") currently serves on the Board and has so served since 1997.  In addition, Cash serves on GE's Audit Committee and Public Responsibilities Committee.  Defendant Cash is a fiduciary of the Plan within the meaning of ERISA in that he exercises discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

26.    Defendant Ann M. Fudge ("Fudge") currently serves on the Board and has so served since 1999.  In addition, Fudge serves on GE's Public Responsibilities Committee.  Defendant Fudge is a fiduciary of the Plan within the meaning of ERISA in that she exercises discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

27.    Defendant Claudio X. Gonzalez ("Gonzalez") currently serves on the Board and has so served since 1993.  In addition, Gonzalez chairs GE's Nominating & Corporate Governance Committee and also serves on GE's Audit Committee and Management Development & Compensation Committee.  Defendant Gonzalez is a fiduciary of the Plan within the meaning of ERISA in that he exercises discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

28.     Defendant Andrea Jung ("Jung") currently serves on the Board and has so served since 1998.  In addition, Jung serves on GE's Nominating & Corporate Governance Committee and Management Development & Compensation Committee.  Defendant Jung is a fiduciary of the Plan within the meaning of ERISA in that she exercises discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

29.     Defendant A.G. Lafley ("Lafley") currently serves on the Board and has so served since 2002.   In addition, Lafley serves on GE's Nominating & Corporate Governance Committee.  Defendant Lafley is a fiduciary of the Plan within the meaning of ERISA in that he exercises discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

30.     Defendant Robert W. Lane ("Lane") currently serves on the Board and has so served since 2005.  In addition, Lane serves on GE's Audit Committee.  Defendant Lane is a fiduciary of the Plan within the meaning of ERISA in that he exercises discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

31.     Defendant Ralph S. Larsen ("Larsen") currently serves on the Board and has so served since 2002.  In addition, Larsen chairs GE's Management Development & Compensation Committee and serves on GE's Nominating & Corporate Governance Committee.  Defendant Larsen is a fiduciary of the Plan within the meaning of ERISA in that he exercises discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

32.     Defendant Rochelle B. Lazarus ("Lazarus") currently serves on the Board and has so served since 2000.  In addition, Lazarus serves on GE's Nominating & Corporate Governance Committee and Public Responsibilities Committee.  Defendant Lazarus is a fiduciary of the Plan within the meaning of ERISA in that she exercises discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

33.     Defendant Sam Nunn ("Nunn") currently serves on the Board and has so served since 1997.  In addition, Nunn chairs GE's Public Responsibilities Committee and serves on GE's Management Development & Compensation Committee.  Defendant Nunn is a fiduciary of the Plan within the meaning of ERISA in that he exercises discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

34.     Defendant Roger S. Penske ("Penske") currently serves on the Board and has so served since 1994.  In addition, Penske serves on GE's Public Responsibilities Committee. Defendant Penske is a fiduciary of the Plan within the meaning of ERISA in that he exercises discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

35.     Defendant Robert J. Swieringa ("Swieringa") currently serves on the Board and has so served since 2002.  In addition, Swieringa serves on GE's Audit Committee.  Defendant Swieringa is a fiduciary of the Plan within the meaning of ERISA in that he exercises discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

36.     Defendant Douglas A. Warner III ("Warner") currently serves on the Board and has so served since 1992.  In addition, Warner chairs GE's Audit Committee and serves on GE's Management Development & Compensation Committee and Nominating & Corporate Governance Committee.  Defendant Warner is a fiduciary of the Plan within the meaning of ERISA in that he exercises discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

### D.        GE Management Defendants

37.     Defendant Philip D. Ameen ("Ameen") currently serves as GE's Vice President and Comptroller and has so served throughout the Class Period.  Ameen signed GE's Form 11-K filings with the SEC throughout the Class Period on behalf of the Plan.  Defendant Ameen was and is a fiduciary of the Plan within the meaning of ERISA in that he exercises discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

38.     Defendant Lawrence Caruso ("Caruso") currently serves as Manager of Executive Resources for GE.  In this capacity, Caruso is responsible for non-executive compensation, retirement, and life insurance benefits.  Defendant Caruso is a fiduciary of the Plan within the meaning of ERISA in that he exercises discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

39.     Unknown Fiduciary Defendants 21-100 are residents of the United States and are or were fiduciaries of the Plan during the Class Period.  These Defendants, whose identities are currently unknown to Plaintiffs, may include additional GE employees and/or directors.  Once their identities are ascertained, Plaintiffs may seek leave to join them under their true names.

11

## THE PLAN

40.     According to GE's Form 11-K filed on June 14, 2005, the GE Savings & Security Program "is a defined contribution plan sponsored by General Electric Company" and upon information and belief covers a majority of the domestic employees of GE and its participating subsidiaries.  The Plan is subject to § 3(2)(A) of ERISA, 29 U.S.C. § 1002(2)(A).  The relief requested in this action is for the benefit of the Plan and its participants/beneficiaries.

41.     According to GE's Form 5500 filed with the Internal Revenue Service on or about October 11, 2004, the Plan is administered by GE's U.S. Employee Services Division in Schenectady, New York.

42.     Upon information and belief, the Plan's trust account is located in Schenectady, New York.

43.     Eligible employees may begin participating in the Plan by investing a portion of their earnings in one or more of the ten investment options provided by the Plan.  Throughout the class period, one of the ten investment options has been GE Stock.

44.     GE's Form 11-K filed on June 14, 2005, states that participants may invest up to 25% of their earnings in the Plan.  Moreover, GE provides a matching contribution of 50% of the employee's contribution for up to 7% of the employee's earnings.

45.     As of December 31, 2004, the Plan held 460,622,391 shares of GE Stock with a fair market value of $16,812,913,000.  This immense holding represented 67.28% of the total invested assets of the Plan.

46.     According to GE's Form 11-K filed on June 14, 2005, the Trustees of the GE Savings and Security Trust are officers of GEAM and GEAM is investment advisor to each of the Plan's investment options, except General Electric Common Stock, Vanguard Institutional Index Fund and the United States Savings Bonds.

12

## IV.    CLASS ACTION ALLEGATIONS

47.    Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and a class consisting of all current and former participants (and beneficiaries thereof) of the Plan (as defined above), whose individual accounts included investments in GE Stock during the Class Period of March 23, 2001 through the present.   Excluded from the Class are Defendants, members of the Defendants' immediate families, any officer, director, or partner of any Defendant, any entity in which a Defendant has a controlling interest, and the heirs, successors, or assigns of any of the foregoing.

48.    This action is properly maintainable as a class action because:

(a)    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown by Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe that there are, at a minimum, thousands of members of the Class.

(b)    Plaintiffs' claims are typical of those of the Class because Plaintiffs and members of the Class suffered similar harm and damages as a result of Defendants' systematic unlawful conduct described herein.  Absent a class action, the Plan and/or members of the Class may not receive restitution or other appropriate relief, will continue to suffer losses, and these violations of law will proceed without remedy.

(c)    Plaintiffs are representative parties who will fairly and adequately protect the interests of the other members of the Class and have retained counsel competent and experienced in class action litigation.  Plaintiffs have no interests antagonistic to, or in conflict with, the Class they seek to represent.

13

(d)    A class action is superior to other available methods for the fair and efficient adjudication of the claims asserted herein.  Prosecution of separate actions by members of the Class would create a risk of inconsistent adjudications with respect to individual members of the Class, which would then establish incompatible standards of conduct for Defendants.  As the damages suffered by the individual Class members, direct or indirect through their participation in the Plan may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members individually to redress the wrongs done to them and/or the Plan.  The likelihood of individual Class members prosecuting separate claims is remote.  Furthermore, Defendants' conduct affected and affects all Class members in a similar manner making declaratory and injunctive relief to the Class as a whole appropriate.

49.    The questions of law and fact common to the members of the Class predominate over any questions affecting individual members of the Class.  The questions of law and fact which are common to Plaintiffs and the Class include, among others:

(a)    Whether ERISA applies to the claims at issue;

(b)    Whether Defendants owe and owed fiduciary duties to the members of the Class;

(c)    The nature of the fiduciary duties Defendants owe or owed to members of the Class;

(d)    Whether Defendants breached their fiduciary duties; and

(e)    The extent of losses sustained by members of the Class and/or the Plan and the appropriate measure of relief.

50.    Plaintiffs anticipate no unusual difficulties in the management of this action as a class action.

## V.   **DEFENDANTS' FIDUCIARY STATUS**

51.   During the Class Period, upon information and belief, Defendants had discretionary authority with respect to the management of the Plan and/or management or disposition of the Plan's assets.

52.   During the Class Period, all of the Defendants acted as fiduciaries of the Plan pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

53.   Named Fiduciaries.  ERISA requires every plan to provide for one or more named fiduciaries of the Plan pursuant to ERISA § 402(a)(1)-(2), 29 U.S.C. § 1102(a)(1) and (2).

54.   De Facto Fiduciaries.  ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who act in fact as fiduciaries, i.e., perform fiduciary functions (including a juridical person such as GE).  ERISA § 3(2 E)(A)(i), 29 U.S.C. § 1002(21)(A)(i), makes a person a fiduciary "to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets . . . or . . . has any discretionary authority or discretionary responsibility in the administration of such plan." During the Class Period, all of the Defendants performed fiduciary functions under this standard, and thereby also acted as fiduciaries under ERISA, by, among other things, appointing plan administrators, overseeing and controlling the plan administrators, and making statements to participants with respect to the Company, its financial results and business prospects.

55.   During the Class Period, Defendants were or acted as Plan fiduciaries.  In this regard, the Defendants exercised discretionary authority over the Plan, authored and signed Plan documents, provided information required by ERISA, managed the operations of the Plan and/or managed those who, in turn, managed the operations of the Plan.

15

ERISA--Revised GE Complaint (2).DOC

56.     During the Class Period, Defendants' direct and indirect communications with Plan participants included statements regarding investments in Company Stock. These communications included, but were not limited to: SEC filings (including S-8 statements incorporating other SEC filings including 10-K annual reports[1]), annual reports, press releases, and Plan documents (including Summary Plan Descriptions and Prospectuses regarding Plan/participant holdings of GE Stock) that incorporated and/or reiterated these statements. Defendants acted as fiduciaries to the extent of this activity, as well as other activities described herein.

57.     In addition, under ERISA, in various circumstances, non-fiduciaries who knowingly participate in fiduciary breaches may themselves be liable.  To the extent any of the Defendants are held not to be fiduciaries, they remain liable as non-fiduciaries who knowingly participated in the breaches of fiduciary duty described below.

## VI.   DEFENDANTS' FIDUCIARY DUTIES UNDER ERISA

58.     ERISA is a comprehensive statute covering virtually all aspects of an employee benefit plan, including retirement savings plans, such as the Plan.  The goal of ERISA is to protect the interests of Plan participants and their beneficiaries:

> It is hereby declared to be the policy of this chapter to protect interstate commerce and the interests of participants in employee benefit Plan and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit Plan, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.

---

[1]  17 C.F.R. § 230.428(b)(1)(i) requires that the registrant filing the Form S-8 deliver to Plan participants the information incorporated into the Form S-8, as well as provide updates in writing to reflect any material changes during any period in which offers or sales are being made.

ERISA § 2(b), 29 U.S.C. § 1001(b).

59.     Under ERISA, those responsible for employee benefit plan management stand in a fiduciary relationship to Plan participants.  Pursuant to ERISA, a "fiduciary" is defined broadly to include all persons or entities that are able to exercise discretionary authority over the management of a plan or the payment of benefits.  29 U.S.C. § 1002(21)(A).  ERISA requires strict fidelity and loyalty in the execution of the plan's management.

60.     ERISA imposes on Defendants, who are responsible for the Plan, the requirement to "discharge his [or her] duties with respect to a plan solely in the interest of the participants and their beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."   ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

61.     ERISA also imposes on Defendants responsible for the Plan a duty of loyalty, requiring these Defendants to "discharge his [or her] duties with respect to a plan solely in the interest of the participants and their beneficiaries and . . . for the exclusive purpose of . . . providing benefits to the participants and their beneficiaries."   ERISA § 404 (a)(1)(A)(i), 29 U.S.C. § 1104(a)(l)(A)(i).

62.     Other duties imposed upon Defendants who are fiduciaries under ERISA by virtue of their exercise of authority or control respecting the management of the Plan or disposition of Plan assets, include but are not limited to:

        (a)     The duty to investigate and evaluate the merits of decisions affecting the use and disposition of Plan assets;

(b)     The duty to evaluate all investment decisions with "an eye single" to the interests of Plan participants and beneficiaries;

(c)     The duty to avoid placing themselves in a position where their acts as officers, directors, or employees of the Company will prevent their functioning with the complete loyalty to participants demanded of them as plan fiduciaries and, if they find themselves in such a position, to seek independent, unconflicted advice;

(d)     The duty, under appropriate circumstances, to monitor or influence the management of the companies in which the Plan owns stock including, where appropriate, the obligation to bring a derivative action if the fiduciaries were or should have been aware that the officers and directors of the entities whose stock was held by the Plan had breached fiduciary duties owed their shareholders;

(e)     To the extent that a party is responsible for appointing and removing fiduciaries, the duty to monitor those persons who have been named;

(f)     The duty to disclose and inform of any material adverse information about the Company which duty entails, among other things: (1) a duty not to make materially false and misleading statements or misinform Plan participants; (2) an affirmative duty to inform Plan participants about material adverse factors which were affecting the Company any time the fiduciary knew or should have known, pursuant to his duty to investigate, that failing to make such a disclosure might be harmful; (3) a duty to convey complete and accurate information material to the circumstances of Plan participants and their beneficiaries; (4) a duty to insure that investments were not purchased at a price above what the Defendants, but not the participants and beneficiaries, knew or should have known to be in excess of fair market value as defined in the relevant Treasury regulations and in most instances at a price which renders it

improbable that the investments will bring a fair return commensurate with the prevailing rates; and (5) a duty to diversify the Plan's investments to minimize the risk of large loss to the Plan and its participants;

(g)     When a plan is composed of various investment funds, the duty to inform and disclose also includes the duty to impart to plan participants material information which the fiduciary knows or should know is sufficient to appraise the average plan participant of the comparative risks associated with investing in any particular investment; and

(h)     The duty to diversify and/or cause to diversify Plan investments in order to minimize the risk of large losses.

63.     ERISA permits the fiduciary function to be shared among various individuals and entities.   Given ERISA's functional conception of a fiduciary, absent formal discovery it is impossible to know which fiduciaries exercised which fiduciary functions.

64.     Insofar as the Plan was not a properly diversified fund and therefore more risky to the Plan participants, the Defendants had heightened fiduciary duties to the Plan participants with respect to the Plan's investment in GE Stock, including heightened duties to disclose all material information relevant to investments in GE Stock.

## VII.   DEFENDANTS' CONDUCT

65.     At all relevant times, GE operated through 11 diverse segments, including an insurance division.   As part of its insurance business, GE operated and currently operates Employers Reinsurance (renamed GE Insurance Solutions, Inc. in 2004).

66.     Upon information and belief, from 1997 to 2001, GE misstated its earnings through material under-reserving at Employers Reinsurance.   Specifically, during the period 1997 through 2000, GE materially under-reserved Employers Reinsurance, while publicly

19

claiming a 65 cent increase in its reported earnings from 72 cents per share to $1.37 per share (a 90.2% increase).

67.     In 2001, and continuing to the present in connection with the sale of Employers Reinsurance to Swiss Re, GE took charges of billions of dollars purportedly to correct its chronic material under-reserving for Employers Reinsurance.  On November 18, 2005, GE publicly revealed that it is poised to add an additional $3.4 billion to its reserves in connection with a sale of Employers Reinsurance to Swiss Re, the world's second largest reinsurer.  Upon information and belief, the necessary additions to reserves largely relate to pre-2001 years.

68.     GE announced its sale of Employers Reinsurance to Swiss Re on November 18, 2005.  In connection with this announcement, the true nature and extent of GE's material under-reserving for Employers Reinsurance and its connection to pre-2001 periods began to come to light.

69.     During a November 18, 2005 conference call with stock market analysts to discuss the sale of Employers Reinsurance to Swiss Re, Defendant Immelt discussed the material negative financial impact that Employers Reinsurance has had on GE for the past few years.  Moreover, with the sale of Employers Reinsurance to Swiss Re fully negotiated, Defendant Immelt finally addressed that GE would have continued to take tremendous additional charges to attempt to rectify the previous under-reserving for Employers Reinsurance.  Defendant Immelt stated on the call:

> This just shows you kind of the situation with [Employers Reinsurance] and kind of the drag it has had on the Company.  We have lost $700 million over the last five years in the business.  We have had to put in $3.2 billion of capital above and beyond the parent supported debt in the business over the last five years.  We have dealt with adverse development; we've strengthened reserves on an ongoing basis, we haven't received any dividends.  The five-year return on equity has been negative and it's just added volatility

to the Company. The third quarter of this year we would have been above consensus and dealt with hurricanes and things like that, so this has been a business that has been a drag, has been a real weight on the Company and so we have been very focused on how to execute and how to achieve throughout that.

70.     As a result of the billions of dollars in charges taken to correct the under-reserving at Employers Reinsurance, GE's financial performance has been negatively impacted and GE Stock has declined in value significantly during the Class Period. Although Defendants knew, or should have known, about the material under-reserving for Employers Reinsurance and the billions of dollars necessary to correct it, Defendants never accurately disclosed to Plaintiffs or Plan participants the true nature, extent, and risks of these problems until November 18, 2005.

71.     Rather, Defendants failed to timely communicate accurate information to Plan participants concerning GE's true financial condition, including its material under-reserving in prior periods and its continuing need to materially bolster those reserves during the Class Period as a result thereof. Additionally, Defendants repeatedly omitted material information concerning its financial performance, including GE's under-reserving, from its SEC filings and press releases, which were incorporated by reference into information provided to Plan participants.

72.     It was not until November 18, 2005 that Plan participants had actual knowledge of all material facts necessary to understand the negative impact of the under-reserving at Employers Reinsurance on GE, GE Stock and/or Plan assets. Upon acquiring this knowledge, Plan participants understood that the Plan fiduciaries had breached their duties or otherwise violated ERISA.

73.     Additionally, during the Class Period, Defendants conveyed the public impression that GE had, in fact, adequately addressed its loss reserve problems and admitted to making historical underwriting mistakes. By way of example, on March 1, 2004, the Company filed with the SEC its 2003 Form 10-K, which contained the following language:

21

In 2003, we continued to monitor our reported claims activity compared with our revised expected loss levels. In a majority of our lines of business, reported claims activity in 2003 was reasonably close to expected amounts. In a few lines-principally medical malpractice, product liability and certain director and officer related coverage-reported claims volumes exceeded our revised loss expectations. Accordingly, we increased our loss reserves to the newly-indicated ultimate levels in 2003, recording adverse development of $0.9 billion pretax. ***We are confident we have worked through our historical underwriting mistakes.***

(Emphasis added in bolded italics.)

74.     A December 26, 2005, article published in *Barron's,* entitled *Jack's Magic,* discusses GE's under-reserving and states that "[w]hat was most remarkable about those years [when Welch served as the Company's CEO], however, wasn't apparent to anyone outside the company until recently.  The bar might have been set artificially high.  Under-reserving can pump up earnings.  But, eventually, sometimes years later, the piper must be paid."  The article also stated:

During the last five years of the Welch era, ended in 2001, GE's reported earnings jumped from 72 cents a share to $1.37, a rise of 65 cents a share, or 90.2% -- spectacular for a behemoth like GE. But without a massive under-reserving at its reinsurance unit, the company would have shown a cumulative earnings gain of just four cents, or 5.6%.

The under-reserving is expected to be completely corrected early next year, clearing the way for the unit's sale to Swiss Re.  By the time that occurs, General Electric (ticker: GE) will have pumped in $9.4 billion in pretax dollars since 2001 to raise the reserves to an adequate level.  When taxes are taken into consideration, the tab will come to $6.1 billion, or about 61 cents a share.  And 61 cents would have all but torched the 65 cents of earnings gains in Welch's last five years.

* * *

In the Welch era, the reinsurance unit was known as Employers Reinsurance; later, it was renamed GE Insurance Solutions.  Swiss Re announced last month that it is buying the bulk of Insurance Solutions for $6.8 billion in cash and stock.  In a conference call,

22

Swiss Re officials described both the $6 billion in reserve hits that GE had taken since 2001 and the additional $3.4 billion GE had agreed to add to finalize the transaction.

Swiss Re's Jacques Aigrain said the needed additions were "more or less entirely related to pre-2001 years, in both what they have done during the last few years [the $6 billion] and what we are asking them to do [adding $3.4 billion]....During the late 'Nineties, they had indeed gone into relatively large amounts of underwriting in business lines, which have been unpleasantly developing.  Those include the traditional mix of some workers' comp, the developments related to various financial institutions and pharmaceuticals type of activities, and a variety of other accident-related activities."

Reserving includes an important time dimension.  When a policy is issued, most of the first year's premium goes into reserves, because, for companies that reinsure "long-tail" policies like ERC, most claims probably won't show up for years.  Such insurers provide coverage for risks -- such as those stemming from workers' exposure to potentially harmful substances like asbestos -- that are long-term.…

* * *

ERC has long been part of GE Capital, a financial unit whose businesses included everything from equipment leasing and insurance to consumer and commercial finance.  Under Welch, GE Capital delivered double-digit earnings gains, year in and year out, regardless of what was going on in the financial markets.  At its peak in the 'Nineties, the unit was generating about 45% of GE's earnings.

To some observers, GE Capital was always something of a black box during its glory years.  It sailed through the late 'Eighties-early 'Nineties' collapse in commercial real estate with nary a scratch, despite having to foreclose on a number of properties.  The story was much the same for its onetime huge leveraged-buyout loan portfolio.  The collapse of Montgomery Ward in 2000 caused not a hiccup in GE Capital's earnings, even though it had loaned hundreds of millions of dollars to the retailer.  And GE Capital, a major aircraft lessor, has flown unscathed through the airline industry's crisis.  Nonrecurring capital gains from GE Capital's insurance and equity portfolios always seemed to make up for any tough quarter.

23

> Analysts covering GE, mostly manufacturing geeks, didn't delve deeply into GE Capital, even though it was the top contributor to its parent's earnings, because it was outside their sphere of expertise.

75.     On January 20, 2006, GE publicly announced that the Company's earnings for the fourth quarter of 2005 rose by less than 1 percent.  An article published by *Bloomberg* on the same day noted that this was the smallest increase since 2004 after GE exited the insurance business and that GE had recorded a loss of $2.7 billion on the sale of the insurance unit resulting in net income of $3.1 billion (a decline of 46 percent from $5.6 billion a year earlier). According to the article, "General Electric had about $3 billion in costs to bolster reserves at its reinsurance unit after agreeing to sell the business to Swiss Reinsurance Co., the last step in Chief Executive Office Jeffrey Immelt's plan to exit the industry." Mary Anne Sudol, an analyst at Caris & Co., is quoted in the *Bloomberg* article as stating:  "The exit from the insurance business is the last piece that investors were waiting for. . . .  They want to see it playing out in the earnings and other parts of the business coming through before they really become convinced that this story has legs."

### A.     Defendants Knew or Should Have Known that GE Stock was an Imprudent Investment for the Plan.

76.     At all relevant times, Defendants knew or should have known that GE's earnings from 1997 to 2001 were materially misstated by GE's under-reserving and that GE's corrective measures taken from 2001 to the present would continue to depress the value of GE Stock, making GE stock an imprudent investment for the Plan.

77.     As a result of Defendants' knowledge of and implication in creating and maintaining public misconceptions concerning the true financial health of the Company, any warnings of market and diversification risks that Defendants made to the Plan's participants

regarding the Plan's investment in GE Stock did not effectively inform the Plan's participants of the past, immediate, and future dangers of investing in Company Stock.

78.     In addition, Defendants, as the fiduciaries responsible for monitoring the Plan trustees, failed to adequately review the performance of the trustees to ensure that they were fulfilling their fiduciary duties under the Plan and ERISA.

79.     Defendants failed to conduct an appropriate investigation into whether GE Stock was a prudent investment for the Plan and, in connection therewith, failed to provide the Plan's participants with information regarding GE's plans to correct the under-reserving for Employers Reinsurance so that participants could make informed decisions regarding GE stock in the Plan.

80.     An adequate (or even cursory) investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plan in GE Stock, under these circumstances, was clearly imprudent.  A prudent fiduciary acting under similar circumstances would have acted to protect participants against unnecessary losses, and would have made different investment decisions.

81.     Because Defendants knew or should have known that GE was not a prudent investment option for the Plan, they had an obligation to protect the Plan and its participants from unreasonable and entirely predictable losses incurred as a result of the Plan's investment in GE Stock.

82.     Defendants had available to them several different options for satisfying this duty, including:  divesting the Plan of GE Stock; discontinuing further Plan contributions to and/or investment in GE Stock; removing or materially reducing GE Stock as a Plan investment option; consulting independent fiduciaries regarding appropriate measures in order to prudently and

loyally serve the participants of the Plan; and/or resigning as fiduciaries of the Plan if as a result of their employment by GE they could not loyally serve the Plan and its participants.

83.     Despite the availability of these and other options, Defendants failed to take any appropriate action to protect participants from the Plan's losses in GE Stock.   In fact, the Defendants continued to invest and to allow investment of the Plan's assets in Company stock even though they knew or should have known that GE would be taking billions of dollars in charges to earnings to correct the under-reserving for Employers Reinsurance, resulting in a decrease in the value of GE Stock.

B.     <b><u>Defendants Regularly Communicated with the Plan's Participants<br>Regarding Investments in GE Stock, But Were Not Provided With<br>Accurate Information to Assess the Imprudence of the Plan's<br>Investment in GE Stock.</u></b>

84.     The Company regularly communicated with employees, including participants in the Plan, about the performance and future financial and business prospects of the Company's common stock, which represented the single largest asset of the Plan.   During the Class Period, the Company fostered a positive attitude toward the Company's stock, and/or allowed Plan participants to follow their natural bias towards investment in the equities of their employer by not disclosing negative material information concerning investment in GE Stock.   As such, participants in the Plan could not appreciate the true risks presented by investments in the Company's stock, and therefore, could not make informed decisions regarding their investments in the Plan.

85.     The SEC filings and related Company statements and releases issued during the Class Period were inaccurate and incomplete, causing the Plan's participants to purchase, and to hold and maintain, Plan investments in GE Stock.

26

86.     Defendants and/or their individual fiduciary delegates failed to provide the Plan's participants with complete and accurate information regarding GE Stock, such that the participants could appreciate the true risks presented by investments in GE Stock and could make informed decisions.  Moreover, Defendants knew or recklessly disregarded certain basic facts about the characteristics and behavior of the Plan's participants, well-recognized in the 401(k) industry and trade press:

(a)     Out of loyalty, employees tend to invest in company stock;

(b)     Employees tend not to change their investment option allocations in the plan once made;

(c)     Lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk; and

(d)     Many employees do not recognize their exposure to massive loss from failing to diversify their investments

87.     Even though the Defendants knew or recklessly disregarded these facts, and even though they knew of the high concentration of the Plan's funds invested in GE Stock, they did failed to adequately address the problem.

### C.     Defendants Suffered from Conflicts of Interest.

88.     GE's SEC filings, including GE's Form DEF 14A Proxy Statement filed on April 27, 2005, make clear that a significant percentage of GE's officer and director compensation is in the form of stock grants or stock option grants.  In addition, GE requires its senior officers and directors to maintain ownership levels of GE stock.

89.     Specifically, the Form DEF 14A Proxy Statement notes that GE's CEO, Vice Chairmen, and Senior Vice Presidents are required to maintain an ownership level of GE Stock that is a multiple of between four and six times their salary.  In addition, the Form DEF 14A

27

Proxy Statement notes that the Officers and Directors are partially compensated in GE stock or restricted stock units ("RSUs").  GE's RSUs permit GE executives to purchase GE stock at any time over a ten year period at the price of the stock on the date that the RSUs were granted. Thus, RSUs only have value to the extent that the GE Stock price exceeds the price of GE stock on the date of the grant.

90.     GE's Form DEF 14A indicates that in 2004, many of the Defendants were granted hundreds of thousands of stock options, exercisable only if the price of GE stock increased from the date of the grant.  Moreover, GE's Form DEF 14A reveals that numerous GE directors and officers own or were compensated in GE stock in 2004 and in prior years.

91.     Because the compensation of many of the Defendants was significantly tied to the price of GE Stock, Defendants had an incentive to keep the Plan's assets heavily invested in GE Stock on a regular, ongoing basis.  Elimination of Company stock as a Plan investment option would have reduced the overall market demand for GE Stock and sent a negative signal to Wall Street analysts, which would have adversely affected the price of GE Stock, resulting in lower compensation for the Defendants.

92.     Some Defendants may have had no choice in tying their compensation to GE stock (because compensation decisions were out of their hands), but Defendants did have the choice in what information to disclose to Plan participants and whether to keep the Plan participants' and beneficiaries' retirement savings invested in GE Stock.

93.     These conflicts of interest put the Defendants in the position of having to choose between their own interests and the interests of the Plan participants and beneficiaries.

ERISA--Revised GE Complaint (2).DOC

D.     **Causation**

94.     The Plan suffered massive losses because an imprudent amount of Plan assets were invested by the Plan in GE Stock during the Class Period, and in breach of Defendants' fiduciary duties.

95.     Had Defendants properly discharged their fiduciary duties, including the provision of full and accurate disclosure of material facts concerning GE Stock and divesting the Plan from Company Stock offered by the Plan when such investment became imprudent, the Plan would have avoided all of the losses suffered in Company Stock.

96.     Furthermore, had Defendants adequately diversified the Plan, the Plan would have avoided much of the loss suffered from the investments in GE Stock.

97.     As a result of Defendants' actions, Plaintiffs and the Class, which invested in GE Stock through the Plan, were wrongfully damaged, as the Plan suffered substantial losses from Defendants' failure to fulfill their fiduciary responsibilities as described herein.  Had the fiduciaries acted prudently and in accordance with their fiduciary duties, they would have taken steps to eliminate or reduce the amount of GE Stock held by the Plan, eliminated the option for participants to place funds in GE Stock, or disclosed the material adverse facts concerning GE Stock described herein, and recommended that Plaintiffs and the Class reduce their holdings in GE stock, and invest in the alternatives available under the Plan.  Plaintiffs and the Class are entitled to the best alternative investment available to them under the circumstances, and the Plan would have achieved gains and avoided losses but for Defendants' breach of fiduciary duty as described herein.

98.     The Plan and the Plan fiduciaries do not qualify for any exemption under ERISA Section 404(c) as the Plan did not satisfy the numerous stringent requirements of Section 404(c) and the Department of Labor Regulations promulgated thereunder as set forth in 29 C.F.R. §

2550.404c-1.  This is because, among other things, Defendants failed to adequately identify the Plan as intended to qualify under Section 404(c) of ERISA and that it intended that the fiduciaries of the Plan may be relieved of liability for any losses which were a direct and proximate result of investment instructions given by the participants or beneficiaries, failed to disclose all material information necessary for the Plan participants to make informed decisions regarding their investments, and failed to provide an adequate description of the investment objectives and risks and return characteristics regarding GE's Stock. Consequently, Defendants retain liability for losses caused by their breach of fiduciary duty through imprudent management of the Plan because those losses do not result from the participants' exercise of control.

99.     The losses suffered by the Plan and Plan participants and beneficiaries, including Plaintiffs and the Class, were the direct and necessary result of the misconduct of Defendants alleged herein.  Plaintiffs and the Class were unaware, and in the exercise of reasonable diligence could not have been aware, of the true and accurate extent of GE's under-reserving, as well as Defendants' breaches of fiduciary duty in failing to disclose such material facts.

## I.     REMEDIES FOR DEFENDANTS' BREACH OF THEIR FIDUCIARY DUTIES

100.    Defendants breached their fiduciary duties in that they knew or recklessly disregarded the facts as alleged above, and therefore knew or recklessly disregarded that the Plan's assets should not have been so heavily invested in Company stock.  As a consequence of the Defendants' breaches, the Plan suffered significant losses.

101.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan."  Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate."

30

102.     With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available.  In this way, the remedy restores the values of the Plan's assets to what they would have been if the plan had been properly administered.

103.     Plaintiffs and the Class are therefore entitled to relief from the Defendants in the form of: (1) a monetary payment to the Plan in the amount of the losses to the Plan resulting from the breaches of fiduciary duties alleged above and to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA § 409(a) and 502(a)(2)-(3), 29 U.S.C. § 1109(a) and 1132(a)(2)-(3); (3) reasonable attorneys' fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs; (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

104.     Each Defendant is personally liable and jointly liable for the acts of the other Defendants as a co-fiduciary.

**FIRST CLAIM FOR RELIEF**
**For Breach of Fiduciary Duty**
**(Against All Defendants)**

105.     Plaintiffs incorporate the foregoing paragraphs herein by reference.

106.     The Plan is governed by the provisions of ERISA, 29 U.S.C. § 1001, *et. seq., and* Plaintiffs and the Class are participants and/or beneficiaries in the Plan.  Each of the Defendants

is a fiduciary or co-fiduciary with respect to the Plan pursuant to the provisions of ERISA.  As co-fiduciaries, each of the Defendants is liable for the other's conduct.

107.    Defendants violated their fiduciary duties of loyalty and prudence by: (1) failing to adequately investigate and monitor the merits of the investments in Company Stock; (2) failing to take steps to eliminate or substantially reduce the amount of Company Stock in the Plan; (3) failing to give Plaintiffs and the Class accurate information about GE's business practices so they could make informed investment choices under the Plan; and (4) failing to adequately diversify the Plan's investments in order to prudently minimize the risk.

108.    At all times relevant to the allegations raised herein, each of the Defendants was a co-fiduciary of the others.  Each Defendant knowingly or recklessly participated in the fiduciary breaches described herein, enabled its co-fiduciaries to commit such fiduciary breach by its own failure to comply with the provisions of ERISA, and/or had knowledge of the breaches of its co-fiduciaries and failed to take reasonable efforts to remedy such breaches.

109.    As a result of Defendants' breach of fiduciary duties, Plaintiffs and the Class, as well as the Plan, suffered damages, the exact amount of which will be determined at trial.

110.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants are personally liable to restore the losses to the Plan caused by their breach of fiduciary duty as alleged in this Count.

## SECOND CLAIM FOR RELIEF
### For Violations of ERISA Disclosure Requirements
### (Against All Defendants)

111.    Plaintiffs incorporate the foregoing paragraphs herein by reference.

112.    Defendants failed to advise Plaintiffs and the Class that their investment in GE Stock was at substantial risk as a result of the Company's correction of its material under-reserving in prior fiscal periods.

32

113.    Because of the disparity in knowledge between Defendants, and Plaintiffs and the Class, Plaintiffs and the Class relied on Defendants to provide them with accurate and complete information about GE, which was material to the suitability of Company Stock as a prudent investment option.

114.    By failing to convey complete and accurate information to Plaintiffs and the Class, Defendants violated their affirmative duty to disclose sufficient information to apprise Plaintiffs and the Class of the risks associated with investment in Company Stock when Defendants knew or should have known that the failure to disclose such material information would result in damages to Plaintiffs and the Class.

115.    As a result of Defendants' failure to disclose and inform, Plaintiffs and the Class suffered damages, by way of the diminution of the value of their share of the Plan, the exact amount of which will be determined at trial.

116.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), the Defendants are personally liable to Plaintiffs and the Class for these losses incurred as a result of Defendants' breach of the duty to disclose and inform.

### THIRD CLAIM FOR RELIEF
#### For Failure to Monitor Fiduciaries
#### (Against GE and the GE Board Defendants)

117.    Plaintiffs incorporate the foregoing paragraphs herein by reference.

118.    At all relevant times, as alleged above, the Defendants were fiduciaries within the mailing of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

119.    At all relevant times as alleged above, the scope of the fiduciary duties of GE and the GE Board Defendants included the oversight of GE management and the power and responsibility to appoint, and, thus, monitor the performance of Plan trustees.

120.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets; and must take prompt and effective action to protect the plan and participants when they are not.

121.    The monitoring duty further requires that appointing fiduciaries have procedures in place so that they may review and evaluate on an ongoing basis whether investment fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the Plan's performance, and by ensuring that they have a prudent process for obtaining information and resources they need).  In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to Plan participants or for deciding whether to retain or remove them.

122.    Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with all the information that they have or reasonably should have in order to prudently manage the plan and the plan assets or that may have a material impact on the Plan and the fiduciaries' investment decisions regarding the Plan.

123.    GE and the GE Board Defendants breached their fiduciary monitoring duties by, among other things: (1) failing to appoint persons with the requisite knowledge, skill, and expertise to properly administer the Plan; (2) failing to adequately monitor their appointees, to evaluate their performance, or to have an adequate system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of the appointees imprudent action; (4) failing to ensure that the monitored fiduciaries appreciated the true extent of GE's under-reserving problems and its impact on the value of the Plan's investment in GE Stock; (4) to the

extent any appointee lacked such information, failing to provide complete and accurate information to all of their appointees such that they could make sufficiently informed decisions with respect to the Plan's assets; and (5) failing to remove appointees named herein whose performance was inadequate in that they continued to make and maintain very large investments in GE Stock during the Class Period for Participants' retirement savings in the Plan, and who breached their fiduciary duties under ERISA.

124. As a result of the failure of GE and the GE Board Defendants to monitor fiduciaries, the Plan, Plaintiffs, and the Class suffered damages, the exact amount of which will be determined at trial.

125. Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), GE and the GE Board Defendants are personally liable to restore the losses to the Plan caused by their failure to monitor fiduciaries as alleged in this Count.

### FOURTH CLAIM FOR RELIEF
### For Breach of Duty to Avoid Conflicts of Interest
### (Against the GE Board Defendants and the GE Management Defendants)

126. Plaintiffs incorporate the foregoing paragraphs herein by reference.

127. At all relevant times, as alleged above, the GE Board Defendants and the GE Management Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

128. ERISA § 494(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A) imposes on a plan fiduciary a duty of loyalty, that is, a duty to discharge his or her duties with respect to the plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

129. These Defendants were heavily invested in GE Stock and had an interest in ensuring that the Plan's assets were also heavily invested in GE Stock on a regular, ongoing

basis.  Elimination of Company Stock as an investment option for the Plan would have reduced the overall market demand for GE Stock and sent a negative signal to Wall Street analysts, which would have adversely affected the price of GE Stock, resulting in losses for the Defendants named in this Count.

130.    The Defendants named in this Count placed their own interest in investing the Plan's assets in GE Stock over the Plan participants' interest in maintaining a diversified and prudently invested 401(k) plan.

131.    The Defendants named in this Count breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*: failing to engage an independent fiduciary who could make independent judgments concerning the Plan's investment in GE Stock; failing to take such other steps as were necessary to ensure that participants' interests were loyally and prudently served; and by failing to otherwise place the interests of the Plan's participants above the interests of themselves and the Company with respect to the Plan's investment in GE Stock.

132.    As a result of these Defendants' breach of their duty to avoid conflicts of interest, Plaintiffs and the Class suffered damages, the exact amount of which will be determined at trial.

133.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), the Defendants named in this Count are personally liable to restore the losses to the Plan caused by their breach of the duty to avoid conflicts of interest as alleged in this Count.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

> (1)    Determining that this is a proper class action to be certified under Rule 23 and appointing Plaintiffs class representatives on behalf of the Class;

(2)    Declaring that Defendants have violated the duties, responsibilities, and obligations imposed upon them as fiduciaries and co-fiduciaries and that they violated the ERISA disclosure and monitoring requirements as described above;

(3)    Awarding extraordinary, equitable, and/or injunctive relief as permitted by law, equity, and the federal statutory provisions set forth herein, pursuant to Fed. R. Civ. P. 64 and 65;

(4)    Awarding the Plan and/or Plaintiffs and members of the Class, restitution, disgorgement, and/or other remedial relief;

(5)    Awarding the Plan and/or Plaintiffs and members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert witness fees, and other costs; and

(6)    Awarding such other relief as this Court may deem just and proper.

Dated: March 10, 2006                   Respectfully submitted,

                                        s/ Jeffrey J. Sherrin                  .
                                        Bar Roll No. 102601
                                        **O'CONNELL & ARONOWITZ**
                                        54 State Street
                                        Albany, New York 12207-2501
                                        (518) 462-5601 (telephone)
                                        (518) 462-2670 (facsimile)

                                        Lori G. Feldman
                                        Arvind Khurana
                                        Jennifer L. Young
                                        **MILBERG WEISS BERSHAD**
                                        **  & SCHULMAN LLP**
                                        One Pennsylvania Plaza
                                        New York, New York 10119
                                        (212) 594-5300 (telephone)
                                        (212) 868-1229 (facsimile)

                                        Alfred G. Yates, Jr.
                                        Gerald L. Rutledge
                                        **LAW OFFICE OF**
                                        **  ALFRED G. YATES JR., PC**
                                        519 Allegheny Building
                                        429 Forbes Avenue
                                        Pittsburgh, PA 15219
                                        (412) 391-5164 (telephone)
                                        (412) 471-1033 (facsimile)

37

## Schedule A

**General Electric Company**
    Secretary of State
    State of New York
    41 State Street
    Albany, NY 12231

    General Electric Company
    3135 Easton Turnpike
    Fairfield, CT 06431
    (Business Address)

**GE Asset Management Incorporated**
    3001 Summer Street
    Stamford, CT 06904-7900

    c/o General Electric Company
    Secretary of State
    State of New York
    41 State Street
    Albany, NY 12231

**John Meyers**
    c/o GE Asset Management Incorporated
    3001 Summer Street
    Stamford, CT 06904-7900

    326 Hillside Rd.
    Fairfield, CT 06824
    (Home Address)


**John J. Walker**
    c/o GE Asset Management Incorporated
    3001 Summer Street
    Stamford, CT 06904-7900

    258 Steiner Street
    Fairfield, CT 06432
    (Home Address)

**Jeffrey R. Immelt**
    c/o General Electric Company
    3135 Easton Turnpike
    Fairfield, CT 06431
    (Business Address)

    705 West Rd.
    New Canaan, CT 06840-2518
    (Home Address)

**Sir William Castell**
    c/o General Electric Company
    3135 Easton Turnpike
    Fairfield, CT 06431

**Robert Wright**
    c/o General Electric Company
    3135 Easton Turnpike
    Fairfield, CT 06431

    734 Sasco Hill Road
    Fairfield, CT 06824-6345
    (Home Address)

**James I. Cash, Jr.**
    c/o General Electric Company
    3135 Easton Turnpike
    Fairfield, CT 06431

    16 Highgate
    Wellesley Hills, MA 02481-1420
    (Home Address)

**Ann M. Fudge**
c/o General Electric Company
3135 Easton Turnpike
Fairfield, CT 06431

Young & Rubicam Brands Company
258 Madison Avenue
New York, NY 10017
(Business Address)

555 S. Broadway
Tarrytown, NY 10591-6301
(Home Address)


**Claudio X. Gonzalez**
c/o General Electric Company
3135 Easton Turnpike
Fairfield, CT 06431

Kimberly-Clark de Mexico, S.A. de C.V. Mexico City,
Av.1 No.9
Industrial Alce Blanco
Naucalpan, Mexico 53370
(Business Address)


**Andrea Jung**
c/o General Electric Company
3135 Easton Turnpike
Fairfield, CT 06431

Avon Products, Inc.
1345 Avenue of the Americas
New York, NY 10105-0196
(Business Address)

1021 Park Avenue
New York, NY 10028
(Home Address)

**A.G. Lafley**

    c/o General Electric Company
    3135 Easton Turnpike
    Fairfield, CT 06431

    Procter & Gamble Company
    1 Proctor & Gamble Plaza
    Cincinnati, OH 45202
    (Business Address)

    3 Grandin Riverview St.
    Cincinnati, OH 45208-3316
    (Home Address)

**Robert W. Lane**

    c/o General Electric Company
    3135 Easton Turnpike
    Fairfield, CT 06431

    1 John Deere PL
    Moline, IL 61265-8010
    (Home Address)

**Ralph S. Larsen**

    c/o General Electric Company
    3135 Easton Turnpike
    Fairfield, CT 06431

    Johnson & Johnson
    One Johnson & Johnson Plaza
    New Brunswick, NJ 08933
    (Business Address)

    8473 Bay Colony Dr.
    Naples, FL 34108-6786
    (Home Address)

    709 Fieldstone Terrace
    Wyckoff NJ 07481-3507
    (Home Address)

**Rochelle Lazarus**

    c/o General Electric Company
    3135 Easton Turnpike
    Fairfield, CT 06431

    Ogilvy & Mater Worldwide
    One Worldwide Plaza
    309 W.49th Street Fl.12
    New York, NY 10019-7316
    (Business Address)

    106 East 78 Street
    New York, NY 10021-0302
    (Home Address)


**Sam Nunn**

    c/o General Electric Company
    3135 Easton Turnpike
    Fairfield, CT 06431

    Sam Nunn School of International Affairs
    781 Marietta Street, NW
    Atlanta, GA 30332-1610
    (Business Address)

    75 14th St. NE
    Atlanta, GA 30309-7623
    (Home Address)


**Roger S. Penske**

    c/o General Electric Company
    3135 Easton Turnpike
    Fairfield, CT 06431

    Penske Truck Leasing
    Rt.10 Green Hills
    P.O. Box 563
    Reading, PA 19603
    (Business Address)

    495 Vinewood Avenue
    Birmingham, MI 48009-1307
    (Home Address)

**Robert J. Swieringa**

c/o General Electric Company
3135 Easton Turnpike
Fairfield, CT 06431

Johnson Graduate School of Management
Sage Hall
Cornell University
Ithaca, NY 14853-6201
(Business Address)

529 Cayuga Heights Rd
Ithaca, NY 14850-1468
(Home Address)


**Douglas A. Warner III**

c/o General Electric Company
3135 Easton Turnpike
Fairfield, CT 06431

44 Gomez Rd.
Hobe Sound, FL 33455-2219
(Home Address)

520 Chicken Valley Rd
Locust Valley, NY 11560-2613
(Home Address)


**Philip D. Ameen**

c/o General Electric Company
3135 Easton Turnpike
Fairfield, CT 06431

1325 Smith Ridge Road
New Canaan, CT 06840-2337
(Home Address)


**Lawrence Caruso**

c/o General Electric Company
3135 Easton Turnpike
Fairfield, CT 06431