## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **IN RE GENERAL ELECTRIC ERISA LITIGATION** | | **No. 06-CV-315 (GLS/DRH) (Lead Case)** |

## CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974

Plaintiffs, participants in the GE Savings & Security Program (and any other defined contribution plan sponsored by General Electric Company ("GE" or the "Company") which held GE common stock) (collectively, the "Plan") during the proposed Class Period, on behalf of the Plan, themselves, and all others similarly situated, allege as follows:

## I.      NATURE OF THE ACTION

1.       Plaintiffs bring this suit as a civil enforcement action under the Employee Retirement Income Security Act of 1974 ("ERISA") §§ 405, 409, 502(a)(2), (3), 29 U.S.C. §§ 1105, 1109 and 1132(a)(2), (3), for relief on behalf of the Plan.  The Plan is a 401(k) Plan operated and established by GE as a benefit for its employees to permit tax-advantaged savings for retirement and/or other long-term goals. GE common stock ("GE Stock" or "Company Stock") is one of the investments that Plan participants may choose.   According to the Company's Form 11-K filed with the U.S. Securities and Exchange Commission ("SEC") on June 21, 2006 (the "2005 11-K"), in excess of $16 billion of the Plan's $24.7 billion or more in assets were invested in GE Stock.  Similarly, according to GE's Form 11-K filed with the SEC on June 14, 2005 (the "2004 11-K"), in excess of $16 billion of the Plan's $25 billion or more in assets were invested in GE Stock.  Indeed, the Plan was heavily invested in GE Stock at all times relevant to this action, as discussed herein.

2.       Plaintiffs Umberto Cavalieri, Floyd Miklic and Robert R. Bezio are former employees of GE and were participants in the Plan during the class period of March 23, 2001 through the present (the "Class Period").  Their respective retirement portfolios included GE Stock.

3.      Plaintiffs allege that Defendants, as fiduciaries of the Plan, breached their duties to them and to other participants and beneficiaries of the Plan during the Class Period in violation of ERISA, particularly with regard to the Plan's holdings of GE Stock.

4.      According to the 2005 11-K, the 2004 11-K, the Form 11-K filed with the SEC on June 14, 2004 (the "2003 11-K"), the Form 11-K filed with the SEC on June 23, 2003 (the "2002 11-K"), the Form 11-K filed with the SEC on June 24, 2002 (the "2001 11-K") and the Form 11-K filed with the SEC on June 21, 2001 (the "2000 11-K"), GE is the sponsor of the Plan.

5.      Since the Plan's holdings in GE Stock comprised a significant percentage of the overall value of the assets held by the Plan, the long-term retirement savings of Plan participants were dependent to a substantial degree both on the performance of GE Stock, as well as the related need for prudent fiduciary decisions by Defendants concerning such a large, ongoing investment of Plan assets.  This action alleges that the fiduciaries of the Plan breached their fiduciary duties to the Plan and its participants under ERISA, by, *inter alia*, selecting and maintaining Company Stock as an investment alternative for participant contributions and Company matching contributions, when it was no longer a suitable or prudent Plan investment option.

6.      The breaches were ongoing and arose out of Defendants' continuing duties to review, evaluate, and monitor the suitability of the Plan's investment in GE Stock, and to provide accurate material information to enable participants to make informed investment decisions concerning their holdings invested in Company Stock.

7.      The basic prudence allegations arise from the fact that Defendants knew or should have known that GE was and is still engaging in risky and improper conduct in connection with its insurance business, including material under-reserving practices that violate Generally

Accepted Accounting Principles, which have rendered GE Stock an imprudent, inappropriate and extraordinarily risky investment for Plan participants' retirement savings.  GE has disputed, minimized and/or concealed indications that its insurance business was materially under-reserved at all times relevant to the Class Period.

8.      As a result of Defendants' fiduciary breaches, as hereinafter enumerated and described, the Plan has suffered substantial damages, including the erosion of billions of dollars of retirement savings and anticipated retirement income for Plan participants.  Indeed, Plan participants have seen their retirement savings accounts devastated as Company Stock plummeted from a high of approximately $50 per share in the months preceding the Class Period to its current price of approximately $35 per share.  Under ERISA, the breaching fiduciaries are obligated to restore to the Plan the losses resulting from these fiduciary breaches.

9.       Because Plaintiffs' claims apply to the participants and beneficiaries as a whole, and because ERISA authorizes participants such as Plaintiffs to sue for Plan-wide relief for breach of fiduciary duty, Plaintiffs bring this case as a class action on behalf of all participants and beneficiaries of the Plan during the Class Period. Plaintiffs also bring this action as participants seeking Plan-wide relief for breach of fiduciary duty on behalf of the Plan.

10.      Because much of the information and documents on which Plaintiffs' claims are based are solely in Defendants' possession, certain of Plaintiffs' allegations are by necessity upon information and belief. At such time as Plaintiffs have had the opportunity to conduct additional discovery, Plaintiffs will, to the extent necessary and appropriate, further amend the Complaint, or, if required, seek leave to amend to add such other additional facts as are discovered that further support each of the claims below.

## II.   <u>JURISDICTION AND VENUE</u>

11.     This Court has subject matter jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

12.     This Court has personal jurisdiction over Defendants under ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), as one or more of the Defendants may be found in this District. The Court also has personal jurisdiction over Defendants because the Company is incorporated within this District, maintains executive offices (such as U.S. Employee Services) in this District, and the Plan is administered within this District (in Schenectady, New York).  Defendants systematically and continuously have done and continue to do business in this District, and this case arises out of Defendants' acts within this District.

13.     Venue is proper under ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because Defendants administer the Plan in this District, some or all of the actionable conduct for which relief is sought occurred in this District, and one or more of the Defendants reside or may be found in this District.

## III.   <u>THE PARTIES</u>

### <u>Plaintiffs</u>

14.     Plaintiff Umberto Cavalieri is a retired employee of GE and a participant in the Plan, within the meaning of ERISA § 3(7) and 502(a), 29 U.S.C. § 1102(7) and §1132(a). During the Class Period, Mr. Cavalieri held GE Stock in his individual Plan account.

15.     Plaintiff Floyd Miklic is a retired employee of GE and a participant in the Plan, within the meaning of ERISA § 3(7) and 502(a), 29 U.S.C. § 1102(7) and § 1132(a).  During the Class Period, Mr. Miklic held GE Stock in his individual Plan account.

16.     Plaintiff Robert R. Bezio is a retired employee of GE and a participant in the Plan, within the meaning of ERISA § 3(7) and 502(a), 29 U.S.C. § 1102(7) and § 1132(a).  During the Class Period, Mr. Bezio held GE Stock in his individual Plan account.

## Defendants

### A.     Corporate Defendants

17.     Defendant GE is a multinational technology and services company operating through various business segments.  GE's business segments offer and provide a variety of products and services, including multiple lines of insurance services, specialty insurance and reinsurance.  GE operates in approximately 100 countries worldwide.

18.     GE at all times acted through its officers, directors and employees, including the Chief Executive Officer ("CEO").  GE had, at all times relevant herein, effective control over the activities of its officers and employees, including their Plan-related activities.  GE exercises ultimate discretionary decisional authority with respect to all aspects of the administration of the Plan, management and disposition of the Plan's assets, and appointment and removal of fiduciaries through its management employees, GE's Board of Directors (the "Board"), Investment Committee, Plan Trustees, Pension Board and/or Fund Trustees (terms are defined herein).

19.     Under the Plan Document (as subsequently defined), GE was given direct control and management over any aspect of the operation, or administration of the Plan that was not specifically delegated to the named fiduciaries under the Plan and upon information and belief, exercised this control.  The Plan Document and the Plan's Summary Plan Description ("SPD") names GE as the Plan's "Administrator," as that term is defined in Section 3(16) of ERISA 29 U.S.C. §1002(16).  Under ERISA, a Plan Administrator is inherently a fiduciary.

5

20.     As a matter of corporate law, GE is imputed with the knowledge that its Board and management employees had of the misconduct alleged herein, even if not communicated to GE.

21.     Upon information and belief, GE, together with the Pension Board, exercised responsibility for communicating with participants regarding the Plan, and providing participants with information and materials required by ERISA.  In this regard GE, together with the Pension Board, drafted and disseminated various Plan documents and materials, including but not limited to, the SPD and the documents incorporated into the SPD.  Based on the allegations contained in ¶¶18-21, GE is a fiduciary with respect to the Plan because it exercised discretionary authority or discretionary responsibility in the administration of the Plan, exercised discretionary authority or control with respect to the management of the Plan's assets, and exercised discretionary authority and control with respect to the  appointment of  other Plan fiduciaries.

          *a.      The Board*.  Upon information and belief, the business and affairs of the Company are managed under the direction of the Board, including with respect to the Company's role as a fiduciary of the Plan.  One of the many roles or functions of the Board is the power to appoint the members of the Committee (as defined in subsection b. below) and the Pension Board (as defined in subsection d. below).  Upon information and belief, the Board likewise exercised management or control over the Committee, Plan Trustees (as defined in subsection c. below), Fund Trustees (as defined in subsection e. below) and Pension Board. Based on the above, the Board is a fiduciary with respect to the Plan because it exercised discretionary authority or discretionary responsibility in the administration of the Plan, exercised discretionary authority or control with respect to the management of the Plan's assets, and exercised discretionary authority and control with respect to the appointment of  other Plan

fiduciaries.

          **b.**     **The (Benefits Plan Investment) Committee.** The term "Committee," as used herein, refers to, but is not limited to, GE's Benefits Plan Investment Committee. Upon information and belief, members of the Committee are appointed by the Company's Board. The Committee is a "Named Fiduciary" under the Plan Document (as defined below)  and under §402(a) of ERISA, 29 U.S.C. §1102(a). Among the powers afforded to the Committee under the Plan Document is the ability to appoint the Plan Trustees and Fund Trustees and to direct those Trustees as to the investment of the Plan's assets, including buying or selling Company Stock. The Committee has the power to add or remove certain investment options under the Plan. The Committee also has the power to appoint an investment manager for the Plan or the Funds. Based on the above, the Committee is a fiduciary with respect to the Plan because it exercised discretionary authority or discretionary responsibility in the administration of the Plan, exercised discretionary authority or control with respect to the management of the Plan's assets, and exercised discretionary authority and control with respect to the appointment of other Plan fiduciaries.

          **c.**     **The Plan Trustees.** The Plan Trustees are appointed by the Committee. Plan Trustees are "Named Fiduciaries" under the Plan Document and under §402(a) of ERISA, 29 U.S.C. §1102(a). Absent direction from the Committee, under the terms of the Plan Document, the Plan Trustees have the sole and exclusive authority and discretion to manage and control Plan assets, including Company Stock. The Plan Document gives the Plan Trustees the explicit power to sell or dispose of any property of the Plan, including Company Stock. Under the Plan Document, the Plan Trustees are obligated to protect, in any way, the interests of the Plan's participants and their beneficiaries in connection with the management and control of the

assets of the Plan and are obligated to do all acts, whether or not expressly authorized, which are in the best interests of Plan participants and beneficiaries. Under the terms of the Plan Document, the Plan Trustees have the power to appoint an investment manager. Based on the above, the Plan Trustees are fiduciaries with respect to the Plan because they exercised discretionary authority or discretionary responsibility in the administration of the Plan, exercised discretionary authority or control with respect to the management of the Plan's assets, and exercised discretionary authority and control with respect to the appointment of other Plan fiduciaries.

        ***d.***    ***The Pension Board.***  Members of the Pension Board are appointed by the Board. The Pension Board is "Named Fiduciary" under the terms of the Plan Document and under §402(a) of ERISA, 29 U.S.C. §1102(a). Under the Plan Document, the role of the Pension Board is to establish rules and regulations regarding the administration of the Plan and its assets including, but not limited to: authorizing payments by the Plan Trustees to participants and beneficiaries; making, amending and enforcing all Plan rules and regulations; and deciding or resolving any questions that may arise under the Plan. The Pension Board was responsible for making rules regarding participant "investment switches" which governed how participants could change their investments under the Plan. Upon information and belief, the Pension Board exercised responsibility for communicating with participants regarding the Plan, and providing participants with information and materials required by ERISA. In this regard the Pension Board, together with the Company, disseminated various Plan's documents and Plan communications, including the SPD and the documents incorporated into the SPD. Based on the above, the Pension Board is a fiduciary with respect to the Plan because it exercised discretionary authority or discretionary responsibility in the administration of the Plan and

exercised discretionary authority or control with respect to the management of the Plan's assets.

    *e.*  ***The Fund Trustees.***  The General Electric Long Term Interest Fund n/k/a General Electric S&S Income Fund and the General Electric S&S Program Mutual Fund (collectively the "Funds") were separate trusts established for purposes of receiving, investing, and disbursing Plan assets from the General Electric Savings and Security Trust ("S&S Trust"). Upon information and belief, the Committee appointed Trustees to manage the Funds (the "Fund Trustees"). Under the terms of the Plan Document, the Fund Trustees possess the power and the authority, absent direction from the Committee, to control and manage the assets of the Plan invested in the Funds, including, for example, the appointment of an investment manager. The Fund Trustees are "Named Fiduciaries" under the terms of the Plan document and under §402(a) of ERISA, 29 U.S.C. §1102(a). Based on the above, the Fund Trustees are fiduciaries with respect to the Plan because they exercised discretionary authority or discretionary responsibility in the administration of the Plan, exercised discretionary authority or control with respect to the management of the Plan's assets, and exercised discretionary authority and control with respect to the appointment of other Plan fiduciaries.

    22.  Defendant GE Asset Management Incorporated ("GEAM") is a wholly-owned subsidiary of GE. The Plan Trustees appointed GEAM as an "investment manager" to the Plan as that term is defined in §3(38) of ERISA, 29 U.S.C. §1002(3)(38). An investment manager is, by definition, a fiduciary under ERISA and GEAM explicitly acknowledged its fiduciary status in an investment management agreement with the Plan Trustees. Under this agreement, GEAM was obligated to maintain a continuous and discretionary investment program with regard to the Plan's assets. Defendant GEAM is a fiduciary of the Plan within the meaning of ERISA in that

it exercises discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

> ### B.   Individual Defendants

23.   Defendant Philip D. Ameen ("Ameen") served as GE's Vice President and Comptroller during the Class Period, and was also a member of the Company's Pension Board. In addition, Ameen was a fiduciary in that, in his high-level capacity and role within the Company, he exercised discretionary authority with respect to administration, control and/or management of the Plan.  Ameen also signed the 2000 11-K, 2001 11-K, 2002 11-K, 2003 11-K, 2004 11-K and 2005 11-K.

24.   Defendant Barbara A. Beckmann ("Beckmann") was a member of the Pension Board  during the Class Period.

25.   Defendant Eugene K. Bolton ("Bolton") was, during the Class Period, a Plan Trustee.

26.   Defendant Christopher D. Brown ("Brown") held various positions within GEAM, including equities analyst, investment fund manager, vice president and senior vice president of GEAM during the Class Period.

27.   Defendant David B. Carlson ("Carlson") was, during the Class Period, a Plan Trustee and a vice president of GEAM.

28.   Defendant Lawrence S. Caruso ("Caruso") was, during the Class Period, Manager of Executive Resources for GE and a member of the Pension Board.  In addition, Caruso is a fiduciary within the meaning of ERISA because he signed GE's IRS Form 5500 - Annual Return/Report of Employee Benefit Plan as "Plan Administrator" for Plan years 2003 and 2004.

29.   Defendant William H. Cary ("Cary") was, during the Class Period, the Company's vice president of corporate investor relations and was a member of the Committee.

In his capacity and role within the Company, Cary was a fiduciary in that he exercised discretionary authority with respect to administration, control and/or management of the Plan. In addition, Cary is a fiduciary in that, in his high-level capacity and role within the Company, he exercised discretionary authority with respect to administration, control and/or management of the Plan.

30.     Defendant James I. Cash, Jr. ("Cash") was a member of the Board during the Class Period.

31.     Defendant William M. Castell ("Castell") was a member of the Board during the Class Period.

32.     Defendant Silas S. Cathcart ("Cathcart") was a member of the Board during the Class Period.

33.     Defendant Alfredo Chang ("Chang") was, during the Class Period, a vice president of GEAM.

34.     Defendant William J. Conaty ("Conaty") was, during the Class Period, the Company's senior vice president of human resources and served as a member of (and chaired) the Pension Board.

35.     Defendant Tom Conway ("Conway") was a member of the Pension Board during the Class Period.

36.     Defendant Leslie G. Cook ("Cook") was a member of the Pension Board during the Class Period.

37.     Defendant Michael J. Cosgrove ("Cosgrove") was, during the Class Period, a Trustee of the Plan. During the Class Period, Cosgrove also held various senior positions with GEAM, including executive vice president.

11

38.     Defendant Dennis D. Dammerman ("Dammerman") was, during the Class Period, the vice chairman of the Board and executive officer of the Company.  Dammerman also served as a member of the Committee.

39.     Defendant Mark Delaney ("Delaney") was a member of the Committee during the Class Period.

40.     Defendant Shane Fitzsimons ("Fitzsimons") was, during the Class Period, the Company's vice president of financial planning and analysis.  Fitzsimons was also a member of the Committee during the Class Period.

41.     Defendant Paolo Fresco ("Fresco") was a member of the Board during the Class Period.

42.     Defendant Ann M. Fudge ("Fudge") was a member of the Board during the Class Period.

43.     Defendant Claudio X. Gonzalez ("Gonzalez") was a member of the Board during the Class Period.

44.     Defendant M.J. Gorman ("Gorman") was a vice president of GEAM.

45.     Defendant Eric H. Gould ("Gould") was, during the Class Period, a vice president of GEAM.

46.     Defendant Wiley L. Harris ("Harris") was a member of the Pension Board during the Class Period.

47.     Defendant William M. Healey ("Healey") was, during the Class Period, employed by GEAM and, upon information and belief, maintained an executive position with GEAM.

48.     Defendant Robert Herlihy ("Herlihy") was, during the Class Period, Treasurer of GEAM and manager of the Mutual Fund operations at GEAM.

49.     Defendant Brian Hopkinson ("Hopkinson") was, during the Class Period, a senior vice president of GEAM.

50.     Defendant Jeffrey R. Immelt ("Immelt") served as the Chairman of the Board and CEO of the Company during the Class Period.  In addition, Immelt was a fiduciary in that he exercised discretionary authority with respect to administration, control and/or management of the Plan through his high-level management capacity within the Company.

51.     Defendant Daniel Janki ("Janki") was, during the Class Period, a member of the Committee.

52.     Defendant Lawrence R. Johnston ("Johnston") was a member of the Pension Board during the Class Period.

53.     Defendant Andrea Jung ("Jung") was a member of the Board during the Class Period.

54.     Defendant Kathryn D. Karlic ("Karlic") was a Trustee of the Plan and Executive Vice President of the GE S&S Mutual Funds' Investment Team during the Class Period.  Karlic was also a member of the Committee during the Class Period.

55.     Defendant Mark Karowiak ("Karowiak") was, during the Class Period, a member of the Committee.

56.     Defendant John Krenicki, Jr. ("Krenicki") was a member of the Pension Board during the Class Period.

57.     Defendant Alan G. Lafley ("Lafley") was a member of the Board during the Class Period.

58.     Defendant Robert W. Lane ("Lane") was a member of the Board  during the Class Period.

59.     Defendant Kenneth G. Langone ("Langone") was, during the Class Period, a member of the Board and Pension Board.

60.     Defendant Jeanne M. LaPorta ("LaPorta") was, during the Class Period, vice president and associate general counsel of GEAM, as well as vice president and assistant secretary of the Company's funds, including, without limitation, GE S&SF.

61.     Defendant Ralph S. Larsen ("Larsen") was a Director with the Company during the Class Period.

62.     Defendant Ralph R. Layman ("Layman") was, during the Class Period, a Trustee of the Plan.   During the Class Period, Layman maintained the position of vice president of international equities with the Company and was a member of GE's Institutional Funds' Investment Team.   During the Class Period, Layman held various positions with GEAM, including executive vice president.   In addition, Layman was a fiduciary of the Plan within the meaning of ERISA in that, within his capacity and roles in high level positions with the Company, he exercised discretionary authority with respect to administration, management, and/or disposition of the Plan's assets.

63.     Defendant Rochelle B. Lazarus ("Lazarus") was a member of the Board during the Class Period.

64.     Defendant T.F. Leonard ("Leonard") was a member of the Pension Board during the Class Period.

65.     Defendant Alan M. Lewis ("Lewis") was, during the Class Period, the executive vice president, general counsel and secretary of GEAM.   Lewis was a Fund Trustee during the Class Period.

66.     Defendant John D. Lockton ("Lockton") was, during the Class Period, a Fund Trustee.

67.     Defendant William J. Lucas ("Lucas") was, during the Class Period, a Fund Trustee.

68.     Defendant Robert A. MacDougall ("MacDougall") was, during the Class Period, a Plan Trustee and a Fund Trustee.  MacDougall likewise held various positions within GEAM, including equities analyst, investment fund manager, vice president and senior vice president of GEAM.

69.     Defendant Edward H. Malone ("Malone") was, during the Class Period, a Fund Trustee.

70.     Defendant Scott G. McNealy ("McNealy") was a member of the Board during the Class Period.

71.     Defendant Lee Meyer ("Meyer") was a member of the Company's Pension Board during the Class Period.

72.     Defendant Gertrude G. Michelson ("Michelson") was a member of the Board during the Class Period.

73.     Defendant John H. Myers ("Myers") was, during the Class Period, a Plan Trustee and a Fund Trustee.  Myers was also the President and CEO (and Director of) GEAM.

74.     Defendant Sam Nunn ("Nunn") was a member of the Board during the Class Period.

75.     Defendant Jonathan L. Passmore ("Passmore") was, during the Class Period, the Senior Vice President of GEAM.

76.     Defendant Roger S. Penske ("Penske") was a member of the Board during the Class Period.

77.     Defendant Susan P. Peters ("Peters") was a member of the Committee during the Class Period.

78.     Defendant Robert E. Pfenning ("Pfenning") was, during the Class Period, a Fund Trustee.

79.     Defendant Ronald R. Pressman ("Pressman") is the President and CEO of GEAM.  Upon information and belief, Pressman is a Plan Trustee and a Fund Trustee.  He was also the President and Chief Executive Officer of GE Insurance Solutions, Inc. (defined below as "GEIS") during the Class Period.

80.     Defendant Frank H. T. Rhodes ("Rhodes") was a member of the Board during the Class Period.

81.     Defendant Gary L. Rogers ("Rogers") was a member of the Board during the Class Period.

82.     Defendant Allan O. Rowe ("Rowe") was a member of the Pension Board during the Class Period.

83.     Defendant John M. Samuels ("Samuels") was a member of the Pension Board during the Class Period.

84.     Defendant Marc J. Saperstein ("Saperstein") was a member of the Committee during the Class Period.

85.     Defendant Keith S. Sherin ("Sherin") was, during the Class Period, GE's senior vice president and chief financial officer.  Also, Sherin was a member of the Committee during the Class Period.  In addition, Sherin was a fiduciary within the meaning of ERISA in that he

exercised discretionary authority with respect to administration, control and/or management of the Plan through his high-level management capacity within the Company.

86.     Defendant Andrew C. Sigler ("Sigler") was a member of the Board during the Class Period.

87.     Defendant Judith A. Studer ("Studer") was, during the Class Period, the Vice President and Treasurer of the Company and the Senior Vice President of the international equities and domestic equities of GEAM.   Studer was also a Plan Trustee during the Class Period.

88.     Defendant Robert J. Swieringa ("Swieringa") was a member of the Board during the Class Period.

89.     Defendant Donald W. Torey ("Torey") was, during the Class Period, a Plan Trustee, the Executive Vice President of the Company's Private Equities and Real Estate, and a director of GEAM.

90.     Defendant J. Wald ("Wald") was a member of the Pension Board during the Class Period.

91.     Defendant John J. Walker ("Walker") was, during the Class Period, a Plan Trustee and a Fund Trustee.   Walker was also the executive vice president and Chief Financial Officer of GEAM.

92.     Defendant Douglas A. Warner ("Warner") was a member of the Board during the Class Period.

93.     Defendant Diane M. Wehner ("Wehner") was, during the Class Period, a vice president with GEAM.

94.     Defendant John F. Welch, Jr. ("Welch") was, during the Class Period, Chairman of the Board and Chief Executive Officer of the Company.  In addition, Welch was a fiduciary in that he exercised discretionary authority with respect to administration, control and/or management of the Plan through his high-level management capacity within the Company.

95.     Defendant Robert C. Wright ("Wright") was, during the Class Period, a Vice Chairman of the Board and an executive officer of the Company.  In addition, Wright was a fiduciary in that, in his high-level capacity and role within the Company, he exercised discretionary authority with respect to administration, control and/or management of the Plan.

96.     The defendants identified in ¶¶23 through 95 are sometimes referred to herein as the "Individual Defendants."  The Individual Defendants are fiduciaries of the Plan within the meaning of ERISA.

97.     ***The Board Defendants.***  GE, as a corporate entity, cannot act on its own without any human counterpart.  In this regard, during the Class Period, GE relied and continues to rely directly on each of the Board Defendants to carry out its fiduciary responsibilities under the Plan and ERISA as specified in ¶¶18-21 of this Complaint and therefore each member of the Board is a fiduciary for the reason stated in ¶¶18-21.

98.     In addition, each member of the Board carried out the Board's role as a fiduciary with respect to the Plan as set forth in ¶21(a), engaged in the conduct and had the powers and duties alleged in ¶21(a), and was therefore, a fiduciary for the reasons set forth in ¶21(a).

99.     The individuals who served on the Board and acted as fiduciaries with respect to the Plan during the Class Period are as follows:   Defendants Cash, Castell, Cathcart, Dammerman, Fresco, Fudge, Gonzalez, Immelt, Jung, Lafley, Lane, Langone, Larsen, Lazarus,

McNealy, Michelson, Nunn, Penske, Rhodes, Rogers, Sigler, Swieringa, Warner, Welch, and Wright (collectively, the "Board Defendants").

100.   ***The Committee Defendants.***   During the Class Period each member of the Committee carried out the Committee's role as a fiduciary with respect to the Plan as set forth in ¶21(b), engaged in the conduct and had the power and duties alleged in ¶21(b) and was therefore a fiduciary for the reasons set forth in ¶21(b).

101.   The individuals who served on the Committee and acted as fiduciaries with respect to the Plan during the Class Period, include:  Defendants Cary, Dammerman, Delaney, Fitzsimons, Janki, Karlic, Karowiak, Peters, Saperstein, and Sherin (collectively, the "Committee Defendants").

102.   Plaintiffs do not currently know the identity of all the Committee Defendants during the Class Period.   Therefore, some of the members of the Committee Defendants are named fictitiously, as Defendants John and Jane Does 1 to 10. Once their true identities are ascertained, Plaintiffs will seek leave to join them under their true names.

103.   ***The Plan Trustee Defendants.***  According to the SPD, each Plan Trustee was an officer of GE Asset Management Inc.  Each  Plan Trustee carried out the Plan Trustees' role as a fiduciary with respect to the Plan as set forth in ¶21(c), engaged in the conduct and had the powers and duties alleged in ¶21(c), and was therefore a fiduciary for the reasons set forth in ¶21(c).

104.   The individuals who served as Trustees of the Plan and acted as fiduciaries with respect to the Plan during the Class Period are as follows:  Defendants Bolton, Carlson, Cosgrove, Karlic, Layman, MacDougall, Myers, Pressman, Studer, Torey, and Walker (collectively, the "Plan Trustee Defendants").

105.    Plaintiffs do not currently know the identity of all the Plan Trustee Defendants during the Class Period. Therefore, some of the Plan Trustee Defendants are named fictitiously, as Defendants John and Jane Does 11 to 20. Once their true identities are ascertained, Plaintiffs will seek leave to join them under their true names.

106.    ***The Pension Board Defendants.***    Each member of the Pension Board carried out the Pension Board's role as a fiduciary with respect to the Plan as set forth in ¶21(d), engaged in the conduct and had the powers and duties specified in ¶21(d), and was therefore a fiduciary for the reasons set forth in ¶21(d).

107.    The individuals who served on the Pension Board and acted as fiduciaries with respect to the Plan during the Class Period are as follows:  Defendants Ameen, Beckmann, Caruso, Conaty, Conway, Cook, Harris, Johnston, Krenicki, Langone, Leonard, Meyer, Rowe, Samuels, and Wald (collectively, the "Pension Board Defendants").

108.    Plaintiffs do not currently know the identity of all the Pension Board Defendants during the Class Period. Therefore, some of the members of the Pension Board Defendants are named fictitiously, as Defendants John and Jane Does 21 to 30. Once their true identities are ascertained, Plaintiffs will seek leave to join them under their true names.

109.    ***The Fund Trustees Defendants.***    Each Fund Trustee carried out the Fund Trustees' role as a fiduciary with respect to the Plan as set forth in ¶21(e), engaged in the conduct and had the powers and duties specified in ¶21(e), and was therefore a fiduciary for the reasons set forth in ¶21(e).

110.    The individuals who served as Fund Trustees and acted as fiduciaries with respect to the Plan during the Class Period are as follows:  Defendants Lewis, Lockton, Lucas,

MacDougall, Malone, Myers, Pfenning, Pressman and Walker (collectively, the "Fund Trustees Defendants").

111.    Plaintiffs do not currently know the identity of all the Fund Trustees Defendants during the Class Period.  Therefore, some of the Fund Trustee Defendants are named fictitiously, as Defendants John and Jane Does 31 to 40.  Once their true identities are ascertained, Plaintiffs will seek leave to join them under their true names.

112.    ***GEAM Defendants.***  Upon information and belief, during the Class Period, based on their high-level capacity and role within GEAM relating to the Plan's investments and GEAM's role as investment manager for the Plan, the Defendants listed in ¶113 carried out GEAM's role as a fiduciary as specified in ¶22 and influenced, managed and controlled GEAM in its role as a Plan fiduciary.  Upon information and belief, each individual identified in ¶113 had powers and duties specified in ¶22 and are therefore, fiduciaries for the reasons set forth in ¶22.

113.    The individuals who served as high-level executives with GEAM and thereby acted as fiduciaries with respect to the Plan during the Class Period are as follows:  Brown, Carlson, Chang, Colonna, Cosgrove, Gorman, Gould, Herlihy, Hopkinson, LaPorta, Layman, Lewis, MacDougall, Myers, Passmore, Pressman, Studer, Torey, Walker, and Wehner (collectively, the "GEAM Defendants").

114.    Plaintiffs do not currently know the identity of all the GEAM Defendants during the Class Period. Therefore, some of the high-level executives with GEAM are named fictitiously, as Defendants John and Jane Does 41 to 50. Once their true identities are ascertained, Plaintiffs will seek leave to join them under their true names.

115.   *GE Management Defendants.*   GE as a corporate entity cannot act on its own without any human counterpart.  In this regard, during the Class Period, GE relied and continues to rely directly on various high-level corporate officers and employees to carry out its fiduciary responsibilities under the Plan and ERISA.   Upon information and belief, during the Class Period, based on their high-level capacity and role within the Company relating to Plan administration, each Defendant listed in this paragraph carried out the Company's role as a fiduciary as specified in ¶¶18-21 as well as influenced, managed and controlled the Company in its role as a Plan fiduciary.  The following individuals are therefore fiduciaries for the reasons set forth in ¶¶18-21:  Defendants Ameen, Caruso,  Immelt,  Layman,  Sherin,  Welch, and Wright (collectively, the "GE Management Defendants").   GE and the GE Management Defendants listed in this paragraph shall collectively be referred to as the "GE Defendants."

116.   Plaintiffs do not currently know the identity of all the individual GE Management Defendants during the Class Period. Therefore, some of the GE Management Defendants are named fictitiously, as Defendants John and Jane Does 51 to 60. Once their true identities are ascertained, Plaintiffs will seek leave to join them under their true names.

## NATURE OF THE PLAN

117.   The Plan was originally adopted by the Board on October 10, 1958 and became effective on November 28, 1958.  The Plan is identified in its SPDs as Plan number 002, and the Plan year is January 1 to December 31.

118.   According to 2005 11-K and 2004 11-K, the GE Savings & Security Program "is a defined contribution plan sponsored by General Electric Company" and upon information and belief, covers a majority of the domestic employees of GE and its participating subsidiaries.  The Plan is an "employee pension benefit plan" within the meaning of ERISA.  § 3(2)(A), 29 U.S.C. § 1002(2)(A).  Further, it is an "eligible individual account plan" within the meaning of ERISA

§ 407(d)(3), 29 U.S.C. § 1107(d)(3), and also a "qualified cash or deferred arrangement" within the meaning of I.R.C. § 401(k), 26 U.S.C. § 401(k).  While the Plan is not a party to this action, pursuant to ERISA, the relief requested in this action is for the benefit of the Plan pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2).

119.   An employee benefit plan, such as the Plan, must be "established and maintained pursuant to a written instrument."   ERISA §402(a)(1), 29 U.S.C. §11102(a)(1). During the Class Period, the Plan was maintained under an instrument, entitled "GE Savings and Security Program" which, upon information and belief, was restated in July 2000 and July 2003 ("Program Document").   The Program Document also contains a separate Appendix entitled the "Rules of the Funds" which sets investment policies for several of the Plan's investment options including the GE S&S Program Mutual Fund, the GE S&S Short-Term Interest Fund, the GE S&S Income Fund and the GE S&S Money Market Fund.   No investment policies or guidelines, however, were provided for Company Stock.

120.   ERISA requires that every participant in an employee benefit plan be given a SPD.  The most recent SPD available is effective January 1, 2005 and is entitled "Your Benefits Handbook/Retirement Plans" and contains the SPD for both the Plan and the GE Pension Plan. For 2004, the SPD was contained in the GE Benefits Handbook which describes both retirement and welfare benefits offered to GE employees.

121.   According to the SPDs, the Plan provides its employees with retirement income and a way to "save for your future."  Moreover, GE has touted to its employees that the Plan "makes it easy for [participants] to save toward [their] financial goals."   The Company encouraged employees to participate in the Plan because the Plan would help the employees reach their financial goals.

122.    The assets of an employee benefit Plan must be held in "in trust by one or more trustees."  ERISA § 403(a), 29 U.S.C. § 1103(a).  During the Class Period, the assets of the Plan were held in trust pursuant to various trust agreements, including the S&S Trust and separate trust agreements for the Funds.  Under the terms of the Program Document and the trust agreements, all of these documents are to be construed as "one instrument."  Therefore the document establishing the Program, the Rules of the Funds, the S&S Trust agreement and the Funds' Trust agreements will collectively be referred to as the "Plan Document."

123.    Upon information and belief, the Plan's trust account is located in Schenectady, New York.

124.    According to GE's Form 5500 filed with the Internal Revenue Service on or about October 11, 2004, the Plan is administered by GE through its U.S. Employee Services Division in Schenectady, New York.

125.    ERISA and the Internal Revenue Code require that plans file an Annual Report, Form 5500, with the Department of Labor and the Department of the Treasury.  The Plan filed a Form 5500 on October 10, 2005, which was signed by Defendant Caruso.

126.    At all relevant times during the Class Period, the Plan had two separate components:  (1) a contributory portion, which consisted of participant contributions, and (2) a matching component, which consisted entirely of Company contributions.

127.    Eligible employees may begin participating in the Plan by investing a portion of their earnings and any GE matching contributions in one or several investment options provided by the Plan.  Prior to July 31, 2002, there were seven investment options available.  As of year-end 2005, there were ten investment options available.  Investment of participant contributions could be made among the investment options in multiples of ½% of earnings but matching

contributions by GE could only be made in one investment option.  Most of the investment options were mutual funds or index funds, including the S&S Income Fund, the S&S Program Mutual Fund, the Institutional Equity Fund, the Institutional Small-Cap Value Equity Fund, the Institutional Strategic Investment Fund, the S&S Short-Term Interest Fund and the S&S Money Market Fund.  However, throughout the Class Period, one of the investment options has always been GE Stock.  GEAM is the investment adviser to each of the Plan's investment options, except GE Stock.  In the SPD's decription of investment options available under the Plan, participants were informed that "plan fiduciaries" could "add or delete funds in the future."

128.   The 2005 11-K and the SPD states that eligible employees of GE may participate in the Plan by investing up to 30% of their earnings in the Plan.  Participant contributions may be made on a pre-tax or post-tax basis or in a combination of both.  Prior to January 1, 2004, participants could invest up to 17% of their earnings in the Plan.  Prior to 2005,  GE provided a matching contribution of 50% of the participant's contribution for up to 7% of the participant's earnings.  Effective in 2005, GE provided for a matching contribution of 50% of the participant's contribution up to 8% of the participant's earnings.  According to the SPD, participant's are immediately vested in their contributions, Company matching contributions and any earnings on their Plan account balance.

129.   As of December 31, 2005, the Plan held 462,328,382 shares of GE Stock with a fair market value of $16,204,609,772.  GE Stock represented 65.9% of the total invested assets of the Plan.  As of December 31, 2004, the Plan held 460,622,391 shares of GE Stock with a fair market value of $16,812,913,000.  This immense holding represented 67.28% of the total invested assets of the Plan.

IV.    **CLASS ACTION ALLEGATIONS**

130.    Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and a class consisting of all current and former participants (and beneficiaries thereof) of the Plan, whose individual accounts included investments in GE Stock during the Class Period of March 23, 2001 through the present.  Excluded from the Class are Defendants, members of the Defendants' immediate families, any officer, director, or partner of any Defendant, any entity in which a Defendant has a controlling interest, and the heirs, successors, or assigns of any of the foregoing.

131.    This action is properly maintainable as a class action because:

(a)    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown by Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe that there are, at a minimum, thousands of members of the Class.

(b)    Plaintiffs' claims are typical of those of the Class because Plaintiffs, members of the Class and the Plan suffered similar harm and damages as a result of Defendants' systematic unlawful conduct described herein.  Absent a class action, the Plan and/or members of the Class may not receive restitution or other appropriate relief, will continue to suffer losses, and these violations of law will proceed without remedy.

(c)    Plaintiffs are representative parties who will fairly and adequately protect the interests of the other members of the Class and have retained counsel competent and experienced in class action litigation.  Plaintiffs have no interests antagonistic to, or in conflict with, the Class they seek to represent.

(d)    A class action is superior to other available methods for the fair and efficient adjudication of the claims asserted herein.  Prosecution of separate actions by members

of the Class would create a risk of inconsistent adjudications with respect to individual members of the Class, which would then establish incompatible standards of conduct for Defendants.  As the damages suffered by the individual Class members, direct or indirect through their participation in the Plan may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members individually to redress the wrongs done to them and/or the Plan.  The likelihood of individual Class members prosecuting separate claims is remote.  Furthermore, Defendants' conduct affected and affects all Class members in a similar manner making declaratory and injunctive relief to the Class as a whole appropriate.

132.    The questions of law and fact common to the members of the Class predominate over any questions affecting individual members of the Class.  The questions of law and fact which are common to Plaintiffs and the Class include, among others:

(a)      Whether ERISA applies to the claims at issue;

(b)      Whether Defendants owe and owed fiduciary duties to the members of the Class;

(c)      The nature of the fiduciary duties Defendants owe or owed to members of the Class;

(d)      Whether Defendants breached their fiduciary duties; and

(e)      The extent of losses sustained by the Plan, and thereby members of the Class, and the appropriate measure of relief.

133.    Plaintiffs anticipate no unusual difficulties in the management of this action as a class action.

## V.    DEFENDANTS' FIDUCIARY STATUS

134.    During the Class Period, upon information and belief, Defendants had discretionary authority with respect to the management of the Plan and/or management or disposition of the Plan's assets.

135.    During the Class Period, all of the Defendants acted as fiduciaries of the Plan pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

136.    **Named Fiduciaries.**  ERISA requires every plan to provide for one or more named fiduciaries of the Plan pursuant to ERISA § 402(a)(1)-(2), 29 U.S.C. § 1102(a)(1) and (2). The Committee Defendants, Plan Trustees Defendants, Pension Board Defendants, and Fund Trustees Defendants are all Named Fiduciaries under the Plan.  In addition the GE Defendants are Named Fiduciaries since they were appointed the Plan's Administrator.

137.    **De Facto Fiduciaries.**  ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who act in fact as fiduciaries, *i.e.*, perform fiduciary functions (including a juridical person such as GE).   ERISA § 3(2 E)(A)(i), 29 U.S.C. § 1002(21)(A)(i), makes a person a fiduciary "to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets . . . or . . . has any discretionary authority or discretionary responsibility in the administration of such plan." During the Class Period, all of the Defendants performed fiduciary functions under this standard, and thereby also acted as fiduciaries under ERISA, by, among other things, the conduct alleged in ¶¶18-22, 97-98, 100, 103, 106, 109, 112, 115.

## VI.     DEFENDANTS' FIDUCIARY DUTIES UNDER ERISA

138.     ERISA is a comprehensive statute covering virtually all aspects of an employee benefit plan, including retirement savings plans, such as the Plan.  The goal of ERISA is to protect the interests of Plan participants and their beneficiaries:

> It is hereby declared to be the policy of this chapter to protect interstate commerce and the interests of participants in employee benefit Plan and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit Plan, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.

ERISA § 2(b), 29 U.S.C. § 1001(b).

139.     Under ERISA, those responsible for employee benefit plan management stand in a fiduciary relationship to plan participants.  Pursuant to ERISA, a "fiduciary" is defined broadly to include all persons or entities that are able to exercise discretionary authority over the management of a plan or the payment of benefits.  29 U.S.C. § 1002(21)(A).  ERISA requires strict fidelity and loyalty in the execution of the plan's management.

140.     ERISA imposes on Defendants, who are responsible for the Plan, the requirement to "discharge his [or her] duties with respect to a plan solely in the interest of the participants and their beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

141.     ERISA also imposes on Defendants responsible for the Plan a duty of loyalty, requiring these Defendants to "discharge his [or her] duties with respect to a plan solely in the interest of the participants and their beneficiaries and . . . for the exclusive purpose of . . .

providing benefits to the participants and their beneficiaries."  ERISA § 404 (a)(1)(A)(i), 29 U.S.C. § 1104(a)(l)(A)(i).

142.   Other duties imposed upon Defendants who are fiduciaries under ERISA by virtue of their exercise of authority or control respecting the management of the Plan or disposition of Plan assets, include but are not limited to:

(a)   The duty to investigate and evaluate the merits of decisions affecting the use and disposition of Plan assets;

(b)   The duty to evaluate all investment decisions with "an eye single" to the interests of Plan participants and beneficiaries;

(c)   The duty to avoid placing themselves in a position where their acts as officers, directors, or employees of the Company will prevent their functioning with the complete loyalty to participants demanded of them as plan fiduciaries and, if they find themselves in such a position, to seek independent, unconflicted advice;

(d)   To the extent that a party is responsible for appointing and removing fiduciaries, the duty to monitor those persons who have been named which includes, among other things: 1) the duty to ensure that the appointed fiduciary possesses the needed credentials to fulfill his or her duties, 2) the duty to make sure that the appointed fiduciary has adequate knowledge to fulfill his or her duties,  3) the duty to insure that the appointed fiduciary has access to and retains impartial advisers when needed; 4) the duty to require that the appointed fiduciary report regularly to the monitoring fiduciary; and 5) the duty to remove a fiduciary if that fiduciary has

breached his or her fiduciary duty or is not performing his or her fiduciary functions in accordance with ERISA;

(e)     The duty to disclose and inform of any material adverse information about the Plan which duty entails, among other things: (1) a duty not to make materially false statements or misinform Plan participants concerning any aspect of the Plan including its investments; (2) an affirmative duty to inform Plan participants about material adverse factors that were affecting the Plan or its investments at any time the fiduciary knew or should have known, pursuant to his duty to investigate, that failing to make such a disclosure might be harmful; and (3) when a plan is composed of various investment funds, the duty to inform and disclose also includes the duty to impart to plan participants material information that the fiduciary knows or should know is sufficient to appraise the average plan participant of the comparative risks associated with investing in any particular investment;

(f)     a duty to insure that investments were not purchased at a price above what the Defendants, but not the participants and beneficiaries, knew or should have known to be in excess of fair market value as defined in the relevant Treasury regulations and in most instances at a price which renders it improbable that the investments will bring a fair return commensurate with the prevailing rates;

(g)     a duty to diversify the Plan's investments to minimize the risk of large losses to the Plan and its participants; and

31

(h)     The duty to not blindly follow plan documents if it leads to an imprudent result.   A fiduciary may not avoid fiduciary responsibility by relying solely on the language of plan documents.

143.     ERISA permits the fiduciary function to be shared among various individuals and entities.   Given ERISA's functional concept of a fiduciary, absent formal discovery it is impossible to know the full extent of which fiduciaries exercised which fiduciary functions.

144.     Insofar as the Plan was not a properly diversified fund and therefore more risky to the Plan participants, the Defendants had heightened fiduciary duties to the Plan participants with respect to the Plan's investment in GE Stock, including heightened duties to disclose all material information relevant to investments in GE Stock.

145.      A fiduciary is liable not only for the fiduciary's own breach, but is also liable as a co-fiduciary if:

(a)     the fiduciary participates knowingly in, or knowingly undertakes to conceal, an act or omission of another  fiduciary, knowing such act or omission is a breach; or

(b)     if, by  the fiduciary's failure to comply with ERISA § 404(a)(1), 29 U.S.C. § 1104 (a)(1) in the administration of his specific responsibilities that gives rise to fiduciary status, the fiduciary enables another fiduciary  to commit a breach; or

(c)     the fiduciary knew or should have known of a breach by such other fiduciary and does not make reasonable efforts under the circumstances to remedy the breach.

## VII.   GE STOCK WAS AN IMPRUDENT INVESTMENT FOR THE PLAN

146.    During the Class Period, the Plan was heavily loaded with Company Stock. Company Stock amounted to approximately 66% of the Plan's assets at year-end 2005, 67.3% of the Plan's assets at year-end 2004, 65.6% of the Plan's assets at year-end 2003, 62.8% of the Plan's assets at year-end 2002; 73% of the Plan's assets at year-end 2001; 77.1% of the Plan's assets at year-end 2000.  This investment strategy proved to be disastrous and continues to be so. During the Class Period, the price of Company Stock has already declined by approximately fifty percent and is in jeopardy of further decline.  Information emerged publicly on November 18, 2005 concerning material facts necessary to partially understand the reasons for the significant decline;  the negative impact of the under-reserving at Employers Reinsurance Corporation ("ERC") on GE, GE Stock and/or Plan assets.  This has caused hundreds of millions of dollars, if not billions of dollars, in losses to the Plan.  Moreover, there is additional information regarding GE's continued under-reserving practices which remain undisclosed to participants, which will cause additional losses to the Plan.

147.    At all relevant times, GE operated through 11 segments, including an insurance division, GE Insurance Solutions, Inc. ("GEIS").   GEIS was formerly the Employers Reinsurance Corporation and included all of GE's insurance subsidiaries.  GEIS is a wholly-owned entity by GE and currently has approximately $40 billion in assets.  Prior to June 2006, GEIS operated several insurance companies, including ERC, Employers Reassurance Corporation ("ERAC"), GE Reinsurance Corporation, United Fidelity Life Insurance Company ("UFLIC") and GE Life.  Prior to May 2004, Genworth Financial Inc. f/k/a General Electric Financial Assurance ("Genworth") was a wholly-owned subsidiary of GE.  As of December 31, 2005, most of GEIS and Genworth was classified by GE as discontinued operations.

148.     At all relevant times, Defendant Pressman acted as the Chief Executive Officer of GEIS and reported directly to Defendant Immelt.  Mark Meiches was the Chief Financial Officer of GEIS and reported directly to Defendant Pressman.   Prior to May 2004, Genworth management reported directly to Defendant Immelt.

149.     Until June 2006, GE's insurance division operated in two main sectors: (1) life and health and (2) property and casualty ("P&C").  P&C is defined as including all lines of insurance other than life and health, including for example, insurance for medical malpractice, excess workers compensation, automobile, hurricanes and directors and officers.

150.     During the Class Period and continuing to the present, GE misstated its earnings through material under-reserving in its insurance division.  During the period 1997 through the time ERC was sold to Swiss Re in June 2006, the P&C lines of business, which were predominately within ERC (as discussed below) were under-reserved by as much as $9.4 billion. The Life and Health lines of GE's insurance business, which were not sold to Swiss Re, continue to be materially under-reserved by at least $5 billion and as much as $10 billion.

### A.     Loss reserves

151.     Insurance companies are required to maintain adequate loss reserves. Loss reserves are an amount established by an insurer and recorded on its balance sheet to reflect the estimated cost of future payments for claims for which the insurer ultimately will be required to indemnify policyholders in the future.

152.     In the insurance industry, loss reserves are established through the use of generally accepted actuarial principles and practices such that an insurer's reserves may be tested or confirmed by an outside auditor, actuarial expert or third-party analysis of the same data available to the insurer.  An insurer's reported financial results are directly affected by the size of loss reserves which are treated as liabilities or expenses.  In addition, insurance companies are

required to file the assumptions used in the calculation of loss reserves with the respective state department of insurance where it is registered.  The state department of insurance must approve those assumptions.  However, insurance companies are required to update those assumptions on at least an annual basis, if not more, to take into account certain impacts on recoverability such as actual experience, current trends and changes in market conditions. If the recoverability margin based on current analysis fails, then the insurance company must either write down certain deferred acquisition costs or increase its loss reserves.

153.    At all times relevant to the Class Period, loss reserves at GE were set by senior reserving actuaries under pressure from the most senior executives at GE.  The various business units within GE would submit information to GE management and GE management would create a finance plan (the "Finance Plan") that all its business units were required to meet.  The Finance Plan was called the "S-1" and would reflect projections for the immediate year and up to three years.  Mid-year, the "S-2" was issued by the finance group, which was a re-estimate for the S-1 projections issued for the year.  Once the Finance Plan was issued, GE management did not want any deviation from the Finance Plan.  The only way to deviate from the Finance Plan was to find a way to offset deviating results.  Even if adverse results did arise, and there was no positive result to offset the adverse result, GE management did not want to deviate from the Finance Plan.  As a result, GE management strong-armed its reserving actuaries in its insurance unit into changing its reserve calculations for purposes of hitting the Finance Plan.

154.    Marc Meiches and Defendant Pressman were both involved in managing the earnings of the Company's insurance division in order to hit the Finance Plan.  As the CFO for GEIS, all financial results would go through Meiches.  One of the ways in which Defendant Pressman and Meiches managed earnings was to take gains on certain high yielding investments

for the sole purpose of showing increased net income for the insurance division.   However, taking gains would cause the average interest rates on the remaining investments to be lower. Meiches and Pressman would then pressure actuaries to sign off on reserve calculations using the old interest rates.   For example, in 2005, Meiches and Pressman took $200 million in gains from investment portfolios to help hit the Finance Plan because of poorly performing business on the P&C side.   Thereafter, Meiches and Defendant Pressman pressured actuaries to increase interest rate assumptions on the investment portfolio even though it was not justifiable.   This practice led to materially inaccurate calculation and testing of reserves.   Meiches earned the nickname "Mr. Gains" as a result of taking gains from the investment portfolio in order to hit the Finance Plan. In addition, GEAM managed the investments for GEIS and upon information and belief, assisted GEIS in taking the gains from the investment portfolio in order to hit the Finance Plan.

155.    GE influences its reserves in a number of other ways.   One of the ways it chooses to do so is through the manipulation of actuarial assumptions used in the reserve calculations. Such assumptions include, without limitation, lapse rates, incidence rates, interest rates, mortality (the relative incidence of death occurring among a given group of people) and morbidity (the relative incidence of sickness and injury occurring among a given group of people) rates.   In addition, the lines of business where GE manipulates its reserves are usually in the lines of business with "long tails."   A long tail means that at least 50% of the policyholders will still be around after 10 years (meaning 50% of the reserves will be around for 10 years or longer).   For example, a workers compensation claim has an average tail of 30 to 50 years, meaning an insurance company will likely be making payments for that time period.   By manipulating the assumptions of lines of business with long tails, GE is able to mask the subtle effects of changes in the actuarial assumptions over a lengthy period of time.

156.    In addition, GE masks its under-reserving as reported to the state departments of insurance by making subtle changes in assumptions.   However, the collective effect of these subtle changes has caused GE's insurance unit to be under-reserved by billions of dollars during the Class Period.

157.    At all relevant times during the Class Period, defendants represented that GE's financial statements when issued were prepared in conformity with GAAP, which are recognized by the accounting profession and the SEC as the uniform rules, conventions and procedures necessary to define accepted accounting practice at a particular time.   However, in order to hit its Finance Plan, GE used improper accounting practices in violation of GAAP and SEC reporting requirements to understate the Company's liabilities and inflate its stockholders' equity and earnings during the Class Period.

158.    GE's materially false Financial Statements issued in its SEC Forms 10-K filed with the SEC on March 23, 2001, March 8, 2002, March 7, 2003, March 1, 2004, March 1, 2005 and March 3, 2006; and SEC Form 10-Q filed with the SEC on April 19, 2001, July 23, 2001, November 2, 2001, May 13, 2002, July 31, 2002, October 29, 2002, May 2, 2003, August 1, 2003, October 31, 2003, May 4, 2004, July 30, 2004, October 26, 2004, may 6, 2005, July 29, 2005, October 24, 2005, April 26, 2006 and July 24, 2006 (which were incorporated by reference in the SPDs) resulted from serious corporate misconduct which concealed the truth regarding the gravity of the Company's understated insurance reserve liability.   Specifically, as discussed in ¶¶206-214, Defendants caused the Company to violate GAAP by influencing its insurance liabilities and reserves.

159.    GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a

particular time.  As set forth in Financial Accounting Standards Board ("FASB") Statements of

Concepts ("Concepts Statement") No. 1, one of the fundamental objectives of financial reporting

is that it provide accurate and reliable information concerning an entity's financial performance

during the period being presented.  Concepts Statement No. 1, paragraph 42, states:

> Financial reporting should provide information about an
> enterprise's financial performance during a period.  Investors and
> creditors often use information about the past to help in assessing
> the prospects of an enterprise.  Thus, although investment and
> credit decisions reflect investors' and creditors' expectations about
> future enterprise performance, those expectations are commonly
> based at least partly on evaluations of past enterprise performance.

160.     As set forth in SEC Rule 4-01(a) of SEC Regulation S-X, "[f]inancial statements

filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be

misleading or inaccurate."  17 C.F.R. § 210.4-01(a)(1).  Management is responsible for preparing

financial statements that conform with GAAP.  As noted by the AICPA professional standards:

> financial statements are management's responsibility . . . . [M]anagement
> is responsible for adopting sound accounting policies and for establishing
> and maintaining internal control that will, among other things, record,
> process, summarize, and report transactions (as well as events and
> conditions) consistent with management's assertions embodied in the
> financial statements.  The entity's transactions and the related assets,
> liabilities and equity are within the direct knowledge and control of
> management . . . .  Thus, the fair presentation of financial statements in
> conformity with Generally Accepted Accounting Principles is an implicit
> and integral part of management's responsibility.

## B.     Under-reserving at ERC

161.     ERC primarily dealt with P&C.  During the period 1997 until the sale to Swiss Re

in June 2006, GE materially under-reserved ERC.

162.     In 2001, and continuing until the sale of ERC to Swiss Re, GE took charges of

billions of dollars purportedly to correct its chronic material under-reserving for ERC.  On

November 18, 2005, GE publicly revealed that it is poised to add an additional $3.4 billion to its reserves in connection with a sale of ERC to Swiss Re, the world's second largest reinsurer.

163.    GE announced its sale of ERC to Swiss Re on November 18, 2005.  The sale originally called for Swiss Re to acquire all of GE's insurance business.  However, as Swiss Re conducted its due diligence, GE was forced to take out its poorly performing business from the sale.  GE diverted the poorly performing business into one of the insurance units that were ultimately not part of the sale because Swiss Re would not agree to acquire it.  This poorly performing business still remains within GE and is under-reserved by billions of dollars (as discussed below).

164.    In connection with the announcement of the sale to Swiss Re, the true nature and extent of GE's material under-reserving at ERC and its connection to pre-2001 periods began to come to light.

165.    During a November 18, 2005 conference call with stock market analysts to discuss the sale of ERC to Swiss Re, Defendant Immelt discussed the material negative financial impact that ERC has had on GE for the past few years.  Moreover, with the sale of ERC to Swiss Re fully negotiated, Defendant Immelt finally addressed that GE would have continued to take tremendous additional charges to attempt to rectify the previous under-reserving for ERC.  Defendant Immelt stated on the call:

> This just shows you kind of the situation with [ERC] and kind of the drag it has had on the Company.  We have lost $700 million over the last five years in the business.  We have had to put in $3.2 billion of capital above and beyond the parent supported debt in the business over the last five years.  We have dealt with adverse development; we've strengthened reserves on an ongoing basis, we haven't received any dividends.  The five-year return on equity has been negative and it's just added volatility to the Company.  The third quarter of this year we would have been above consensus and dealt with hurricanes and things like that, so this has been a

> business that has been a drag, has been a real weight on the
> Company and so we have been very focused on how to execute
> and how to achieve throughout that.

166.    The under-reserving practices at ERC were discussed at internal GE annual

planning meetings where GE management pressured ERC reserving actuaries to engage in

under-reserving in order to reach unrealistic income targets.  As a result of such pressure, ERC

routinely set its reserves lower than called for by its own actuarial forecasts, which created the

baseless impression of increased net income.

167.    However, ERC should have forecast the loss reserves for its individual business

lines and set those reserves in accordance with its own forecasts and accepted actuarial practice.

Yet, during the late 1990s and continuing to November 18, 2005, as a result of pressure from GE

management, ERC set the reserves for its various business lines lower than that called for by its

forecasts and accepted actuarial standards.

168.    For example, ERC should have set "dials" on the reserves for its various business

lines, to correspond to the anticipated loss ratio for those business lines.  A dial is an internal GE

term referencing the percentage of the premiums earned in order to maintain adequate loss

reserves for a particular line of business.  During the relevant time period, ERC set the dial for its

reserves on its umbrella policy line in the 60s (out of a possible 100), when the actuarial

forecasts necessitated that the dial be set in the 80s, which inflated net income.

169.    In addition, at a meeting held in the late 1990s, Hoyt Wood, Chief Underwriting

Officer for ERC, specifically stated that ERC would not set its reserves according to actuarial

forecasts, because if it did so, "we would not make our numbers," meaning ERC would not meet

the Finance Plan.

170.    Moreover, in mid 2003, ERC management, including Defendant Pressman,

Meiches, and Richard Smith, met with GE officers, including Defendants Sherin and

Dammerman, and outside auditors, who upon information and belief was Milliman, Inc., to discuss the adequacy of the ERC reserves.  Upon information and belief, Tony Hill, Andrea Pearson, John Narvell, and Bill Styllman were also at this meeting.  When the outside auditors recommended that ERC strengthen its reserves, Defendants Sherin and Dammerman instructed ERC management that the meeting never took place and to remove all evidence of the meeting from their calendars.  GE management directed ERC not to increase the ERC reserves as recommended by the outside auditors because such an increase would reduce net income to the Company.

171.   In addition, during the Class Period, actuaries at ERC advised GE management that the loss reserves were inadequate.  For example, Bill Faltas, a senior vice president and chief actuary of GE Reinsurance was advised that ERC was materially under-reserved.  In one situation during the relevant time period, Faltas reviewed reserving studies done for the Company's Excess Workers Compensation line of business.  While  workers compensation typically has a tail of 30 to 50 years, GE's reserving studies only showed tail development for a 10 year period, meaning that GE only had sufficient reserves for 10 years, not 30 to 50 as required under actuarial standards.

172.   For GE to hit its earnings targets, GE put intense pressure on its reserving actuaries.  Also, the higher level actuaries were required to hit the Finance Plan in order to receive bonuses.

173.   Joe Levin was the chief actuary for ERC in the late nineties and both Meiches and Defendant Pressman put a lot of pressure on him to hit plan.  At other times, actuaries would advise Meiches what the reserve estimates should be, however, they were told in return by Meiches that they needed to get their estimates down to a certain number in order to hit the

Finance Plan.  Many actuaries would not sign off on the revised estimates.  However, given the intense pressure, some actuaries, including Levin, ultimately signed off on the revised, understated reserves.

174.   After Levin retired in 2000, Tony Hill was the chief actuary in charge of ERC's calculation of the adequacy of the reserves.  However, when Hill took over, the reserves were already materially inadequate as a result of years of under-reserving.  Hill had approached GE management and advised them that the reserves had to be increased.  However, he was told that increasing reserves was not acceptable and thereafter, ERC was forced by GE management to cut reserves.  In an attempt to make up some of the short fall in the reserves and still appease ERC management, Hill was able to add about a billion dollars a year to the reserves for a couple of years, which was the maximum amount GE management would ever allow.  However, ERC still remained severely under-reserved to the tune of several billion dollars.  As a result, Hill took reassignment and John Narvell became the chief actuary for ERC.  ERC continued to be underreserved and became increasingly so year after year as a result of the intense pressure from GE management to not miss their earnings forecasts.

175.   GE management would also provide the actuaries with a planned reserve number or "stretch goal" that they were required to hit.  The actuaries would compare the planned number with the real reserve numbers and come up with a deviation.  Accordingly, the actuaries and GE management knew or should have known that losses were going to come in higher than the planned number and knew that the business needed to be reserved at a different level.  However, GE management refused to put it at that level.

176.   In addition, GE knew that specific lines of business within ERC were severely under-reserved.  For example, Medical Professional a/k/a MedPro was an insurance company

within ERC that underwrote medical malpractice insurance.  Medpro, located in Fort Wayne, Indiana used uncommon actuarial procedures and methodologies.  Such uncommon procedures would not be accepted by credentialed actuaries and the actuarial work being done at MedPro was not even being done by a credentialed actuary.  As part of its reserve analysis, MedPro was assuming medical inflation at 4.5%, however, medical inflation was running in the double digits. This inaccurate assumption caused MedPro to be under-reserved by 25-35%.  This information was known to GEIS, specifically by Samira Baraka, the chief risk officer and underwriting and risk management leader, who reported directly to Defendant Pressman.

177.    GE management benefited from the foregoing under-reserving practices in ERC, and the inflated net income generated thereby, in the form of increased salaries and bonuses. As a result of the billions of dollars in charges taken to correct the under-reserving at ERC, GE's financial performance has been negatively impacted and GE Stock has declined in value significantly during the Class Period.  Although Defendants knew, or should have known, about the material under-reserving for ERC and the billions of dollars necessary to correct it, Defendants never accurately disclosed to Plaintiffs or Plan participants the true nature, extent, and risks of these problems until at least November 18, 2005.

178.    Rather, Defendants failed to timely communicate accurate information to Plan participants concerning GE's true financial condition, including its material under-reserving in prior periods and its continuing need to materially bolster those reserves during the Class Period as a result thereof.  Additionally, Defendants repeatedly omitted full, complete and material information concerning its financial performance, including GE's under-reserving, from its SEC filings, which were incorporated by reference into the SPD and other information provided to Plan participants.

179.    It was not until November 18, 2005 that Plan participants had actual knowledge of material facts necessary to partially understand the negative impact of the under-reserving at ERC on GE, GE Stock and/or Plan assets.   Upon acquiring this knowledge, Plan participants understood that the Plan fiduciaries had breached their duties or otherwise violated ERISA with respect to ERC.   As discussed below, however, Plan participants do not have actual knowledge of GE's continued material under-reserving in its Life and Health insurance business.

180.    Additionally, during the Class Period, Defendants conveyed the public impression that GE had, in fact, adequately addressed its loss reserve problems at ERC and admitted to making historical underwriting mistakes.   By way of example, on March 1, 2004, the Company filed with the SEC its 2003 Form 10-K, which was incorporated into the SPD and contained the following language:

> In 2003, we continued to monitor our reported claims activity compared with our revised expected loss levels. In a majority of our lines of business, reported claims activity in 2003 was reasonably close to expected amounts. In a few lines-principally medical malpractice, product liability and certain director and officer related coverage-reported claims volumes exceeded our revised loss expectations. Accordingly, we increased our loss reserves to the newly-indicated ultimate levels in 2003, recording adverse development of $0.9 billion pretax. ***We are confident we have worked through our historical underwriting mistakes.***

(Emphasis added.)

181.    Thus, while on March 1, 2004 the Company revealed $0.9 billion in under-reserving it failed to disclose that ERC remained under-reserved in excess of  $3.4 billion and indeed assured Plan participants that they were "confident" that no further under-reserving existed.   Plan participants did not know and had no method of discovering that ERC remained significantly under-reserved.

182.   A December 26, 2005, article published in *Barron's,* entitled *Jack's Magic,* discusses GE's under-reserving and states that "[w]hat was most remarkable about those years [when Defendant Welch served as the Company's CEO], however, wasn't apparent to anyone outside the company until recently.   The bar might have been set artificially high.   Under-reserving can pump up earnings.   But, eventually, sometimes years later, the piper must be paid." The article also stated:

> During the last five years of the Welch era, ended in 2001, GE's reported earnings jumped from 72 cents a share to $1.37, a rise of 65 cents a share, or 90.2% -- spectacular for a behemoth like GE. But without a massive under-reserving at its reinsurance unit, the company would have shown a cumulative earnings gain of just four cents, or 5.6%.

> The under-reserving is expected to be completely corrected early next year, clearing the way for the unit's sale to Swiss Re.   By the time that occurs, General Electric (ticker: GE) will have pumped in $9.4 billion in pretax dollars since 2001 to raise the reserves to an adequate level.   When taxes are taken into consideration, the tab will come to $6.1 billion, or about 61 cents a share.   And 61 cents would have all but torched the 65 cents of earnings gains in Welch's last five years.

> * * *

> In the Welch era, the reinsurance unit was known as Employers Reinsurance; later, it was renamed GE Insurance Solutions.   Swiss Re announced last month that it is buying the bulk of Insurance Solutions for $6.8 billion in cash and stock.   In a conference call, Swiss Re officials described both the $6 billion in reserve hits that GE had taken since 2001 and the additional $3.4 billion GE had agreed to add to finalize the transaction.

> Swiss Re's Jacques Aigrain said the needed additions were "more or less entirely related to pre-2001 years, in both what they have done during the last few years [the $6 billion] and what we are asking them to do [adding $3.4 billion]....During the late 'Nineties, they had indeed gone into relatively large amounts of underwriting in business lines, which have been unpleasantly developing.   Those include   the   traditional   mix   of   some   workers'   comp,   the developments   related   to   various   financial   institutions   and

pharmaceuticals type of activities, and a variety of other accident-related activities."

Reserving includes an important time dimension. When a policy is issued, most of the first year's premium goes into reserves, because, for companies that reinsure "long-tail" policies like ERC, most claims probably won't show up for years. Such insurers provide coverage for risks -- such as those stemming from workers' exposure to potentially harmful substances like asbestos -- that are long-term.…

* * *

ERC has long been part of GE Capital, a financial unit whose businesses included everything from equipment leasing and insurance to consumer and commercial finance. Under Welch, GE Capital delivered double-digit earnings gains, year in and year out, regardless of what was going on in the financial markets. At its peak in the 'Nineties, the unit was generating about 45% of GE's earnings.

To some observers, GE Capital was always something of a black box during its glory years. It sailed through the late 'Eighties-early 'Nineties' collapse in commercial real estate with nary a scratch, despite having to foreclose on a number of properties. The story was much the same for its onetime huge leveraged-buyout loan portfolio. The collapse of Montgomery Ward in 2000 caused not a hiccup in GE Capital's earnings, even though it had loaned hundreds of millions of dollars to the retailer. And GE Capital, a major aircraft lessor, has flown unscathed through the airline industry's crisis. Nonrecurring capital gains from GE Capital's insurance and equity portfolios always seemed to make up for any tough quarter.

Analysts covering GE, mostly manufacturing geeks, didn't delve deeply into GE Capital, even though it was the top contributor to its parent's earnings, because it was outside their sphere of expertise.

183.    On January 20, 2006, GE publicly announced that the Company's earnings for the fourth quarter of 2005 rose by less than 1 percent. An article published by *Bloomberg* on the same day noted that this was the smallest increase since 2004 after GE exited the insurance business and that GE had recorded a loss of $2.7 billion on the sale of the insurance unit

resulting in net income of $3.1 billion (a decline of 46 percent from $5.6 billion a year earlier). According to the article, "General Electric had about $3 billion in costs to bolster reserves at its reinsurance unit after agreeing to sell the business to Swiss Reinsurance Co., the last step in Chief Executive Office Jeffrey Immelt's plan to exit the industry."  Mary Anne Sudol, an analyst at Caris & Co., is quoted in the *Bloomberg* article as stating:  "The exit from the insurance business is the last piece that investors were waiting for. . . .  They want to see it playing out in the earnings and other parts of the business coming through before they really become convinced that this story has legs."

<strong>C.      Under-reserving in the Life and Health Insurance Business</strong>

184.    In May 2004, GE sold off 30% of Genworth to the public in an initial public offering that raised $2.83 billion.  Since that time, GE has divested its ownership in Genworth. While Genworth was still owned by GE, it was materially under-reserved by billions of dollars. In preparation of the public offering of Genworth shares, GE moved much of the poorly performing, under-reserved business out of Genworth and into UFLIC (the "Genworth run-off business"), which was at that time a subsidiary company within Genworth.  GE then moved UFLIC out of Genworth and into ERC.  UFLIC was not sold off as part of the Genworth initial public offering or as part of the sale to Swiss Re, and still remains within GE.

185.    During the Class Period, Genworth and GE continue to have a business relationship because much of Genworth's business is reinsured through UFLIC.   While Genworth was still part of GE, Genworth acquired certain long term care business from Travelers in the 2000-01 timeframe.  Travelers still maintains about 10% of the risk on that business but will novate its share of the risk to Genworth by no later than July 2008.  The acquired Travelers business turned out to be a horrible acquisition for Genworth because purchase GAAP assumptions were too aggressive when priced.  As a result, for purposes of

making the Genworth IPO more financially sound, GE had UFLIC reinsure 100% of Genworth's risk on the Travelers business.   UFLIC currently reinsures 90% of the overall risk on the Travelers business and will reinsure the remaining 10% once the business is novated to Genworth.   This arrangement had GE assume $250 million of deferred acquisition costs that could not be written down.   Therefore, UFLIC has actually assumed all the risk in connection with the poorly performing Travelers business.   As discussed further below, UFLIC is under-reserved by $2 billion to $2.5 billion as a result of the former Travelers business.

186.   GE's Life and Health business currently has about $20 billion in assets.   It is made up of several lines of business, including, life, long term care ("LTC"), structured settlement annuities, variable annuities and other accident and health ("A&H").   The structured settlement annuities, variable annuities and LTC lines of business are currently part of UFLIC and the majority of it is made up of the Genworth run-off business.   During the Class Period and continuing into the present, GE has materially under-reserved its Life and Health business.

187.   The under-reserving in Life and Health is the result of the manipulation of certain assumptions used in the reserve calculations and a failure to use actual experience.   Accordingly, GE's GAAP reserves for Life and Health are deficient.   GAAP reserves constitute the total amount of reserves that GE has booked as reserves.   Deferred Acquisition Costs ("DAC") are policy acquisition costs such as commissions, underwriting expenses and policy issuance costs. DAC is usually amortized over the life of the policy.   Generally, actuarial standards require an insurer to write-off the DAC until it hits zero, if it fails loss recognition testing.   Once the DAC is written down, and it still remains under-reserved, then the insurer needs to increase reserves. Present Value of Future Profits ("PVFP") is the present value of anticipated profits to be realized on the policy.   The PVFP should be based on an actuarial determination of future premium

collection, morbidity, mortality, yield on assets and operating expense. "Net GAAP Reserves" are the total GAAP Reserves less the DAC and PVFP. This is the true amount of Life and Health reserves that GE is holding. A "Loss Recoverability Margin" references a best estimate of the present value of all future profits.

188.    The UFLIC "Core" portfolio consists of two separate units within UFLIC, the GE Partnership Marketing Group ("PMG") and the Employee Benefits Group ("EBG"). At PMG, based on GE's current estimates, the GAAP reserves are currently around $313 million, the DAC balance is $83 million and PVFP is $64 million, making the Net GAAP reserves equal to $176 million. The PMG portfolio shows a Loss Recoverability Margin of $148.3 million, which means that only $27.7 million of the reported $313 million in GAAP reserves are for future claims. In the EBG portfolio, based on GE's current estimates, the GAAP reserves are currently at or about $27.4 million; the DAC balance is $6.3 million and the PVFP balance is $1.5 million. Therefore, the Net GAAP reserves are equal to $19.6 million. The EBG portfolio shows a Loss Recoverability Margin of -$8.6 million. Therefore, UFLIC needs to increase the total GAAP reserves by $8.6 million or write off the DAC and PVFP balances and increase the GAAP reserves by $0.8 million.

189.    However, there are problems with the UFLIC Core portfolio. For example, overhead expenses of approximately $17 million that UFLIC pays for the PMG and EBG portfolios are not included. The present value of the overhead expenses is $136.7 million. Therefore, recoverability including overhead expenses is only $3 million (PMG Loss Recoverability Margin ($148.3 million) minus present value of overhead expenses ($136.7 million)). Finally, based on actual experience, the recoverability assumptions used in the UFLIC

Core portfolio are too aggressive.  For example, actual experience shows that trends in morbidity are improving while the assumptions assume a level trend.

190.    With regard to the UFLIC Structured Settlement Annuity portfolio, based  on GE's current estimates, GAAP reserves are $11.8 billion; DAC balance is $ $66 million; PVFP balance is $0.  Therefore, Net GAAP reserves equal $11.75 billion.  However, there is a Loss Recoverability Margin of -$284 million based on GE's current estimates.  Accordingly, UFLIC needs to increase the total GAAP reserves by $284 million, or write off the DAC and increase the GAAP reserves by $218 million.

191.    However, there are problems with the structured settlement annuity portfolio because of unreasonable assumptions being used to calculate reserves.   These unreasonable assumptions have caused the structured settlement annuity portfolio to be materially under-reserved by approximately $1 billion to $1.5 billion.  This was done under pressure from GE management in order for GE to hit its Finance Plan despite the fact that the portfolio was under-reserved.  For examples, the unreasonable assumptions used in the reserve calculations include, without limitation, the following:

- the current mortality trend had been running at 83% of assumptions used for GAAP reserves.  UFLIC is unreasonably assuming that the mortality trend is currently running at 93% with the expectation that it will move up to 97% in 30 years.  However, most other insurance companies are assuming mortality improvements (meaning going from the current 83% down to 70%) rather than mortality degeneration;

- the current gross investment yield on the structure settlement annuity portfolio is approximately 6.86%.   However, the current Loss Recoverability Margin assumes an average internal rate of return of 7.15%. This means that the discount rate currently being used is too high. Also, UFLIC is using the default assumption of 18 basis points ("bps") for A-rated bonds for purposes of the Loss Recoverability testing, however, UFLIC's portfolio has average ratings of BBB or less and therefore should be using something in the range of 49.84 bps;

- UFLC currently assumes 7 bps for investment expenses when they are actually running at 7.6 bps and originally priced at 9 bps. However, it would be reasonable to expect inflation in investment expenses since this is a run off block of business, meaning the block of business is going to decrease over time;

- UFLIC shows that the overall Loss Recoverability Margin improved from the third quarter of 2005 to the fourth quarter of 2005 from -$304 million to -$284 million. However, mortality ran at 47% of expected, meaning an increase in future payments; yet, somehow UFLIC's expected reserves to cover future benefits decreased by $20 million; and

- The interest rate projections used in the calculation of reserves change significantly each quarter. For example, 50 years out, interest rates change by 100 bps in just one quarter.

192.   Based on GE's current estimates, the GAAP reserves in the UFLIC variable annuities portfolio are currently $2.2 billion and there is a Separate Account Value (which references the amount held in investments by policyholders that have not annuitized) of $7.2 billion; DAC balance is $525.7 million; PVFP balance is $11.9 million; therefore, Net GAAP reserves equal $1.66 billion. Given that there is a Loss Recoverability Margin of -$3 million, UFLIC needs to increase total GAAP reserves by $3 million or write off $3 million of the DAC.

193.   However, there are serious problems with the assumptions used in the calculation of reserves for the variable annuities portfolio, and GE should write-off the DAC by approximately $500 million, rather than continuing to increase it. For example, the following problems currently exist:

- the variable annuities portfolio had lost $46 million in 2005 and is expected to lose $25 million in 2006;

- the variable annuities portfolio has significant expenses associated with it. In 2005, UFLIC paid $21.8 million to GEAM and Genworth in connection with a Business Services Agreement and an additional $4.5 million of overhead expenses. Upon information and belief, these expenses are not used in the current calculation of UFLIC's Loss Recoverability Projection, but should be;

- UFLIC unreasonably assumes that the Guaranteed Minimum Death

51

Benefit risk is small since they have been running under 100% for the Mortality Actual to Expected ("A/E") ratio. UFLIC was assuming a 53% A/E ratio in 2000, however, the A/E ratio had steadily grown to 79.7% for the first half of 2005.  Given that UFLIC assumes that 1% of policy holder will die in a given year and this is closed block of business, one would reasonably expect the overall mortality rate to increase.  However, UFLIC does not;

- UFLIC uses an unreasonable assumption of 8.5% net return in its Loss Recoverability model.  This is unreasonable because UFLIC pays out 2% for expenses and therefore, it is really assuming a 10.5% net return. (Other insurance companies assume 8.5% gross, meaning 6.5% net return); and

- UFLIC assumes an A/E Lapse ratio (which compares the number of policies that have lapsed (expired) within a specified period of time to those in force at the start of that same period of time) of 100% of pricing, however it has actually been running at 131%.

194.    Similarly, the UFLIC LTC portfolio is materially under-reserved.   In this portfolio, based on GE's current estimates, the GAAP reserves are $1.769 billion; DAC balance is $18 million; and PVFP balance is $239 million.  Therefore, Net GAAP reserves equal $1.512 billion.  Since UFLIC has a Loss Recoverability Margin of -$36 million, it needs to increase the total GAAP reserves by $36 million.

195.    However, there are significant errors in the LTC portfolio related to Loss Recoverability and the Cash Flow Testing models used to test the adequacy of the reserves. While these errors increase the overall margins on the portfolio, they also cause the portfolio to be under-reserved by at least $2.5 billion.  For example, the following problems currently exist:

- the Commission and Premium Tax Projections are incorrect.  The Commission projection should include the Premium Tax of 1.9%, however, it does not;

- ULFIC'S modeling does not include any assumptions for remaining business that is to be novated by July 2008 to Genworth by Travelers;

- the current assumptions do not account for the purchase of "Slice Riders," which are held by 43% of policyholders.  A Slice Rider is an option to

purchase additional coverage at a lower, locked-in premium without going through additional underwriting;

- current assumptions include a rate increase in 2008 for loss recognition testing, however, it is impossible for this to happen by 2008 because (i) UFLIC cannot put together information needed for this rate increase to be filed because it must wait 3 or 4 years before it can file for a rate increase; (ii) other companies, such as Genworth and Travelers must sign off on the rate increase; and (iii) the business to be novated by July 2008 to Genworth and the rate increase cannot be filed until it is actually novated in 2008;

- the modeling includes a waiver of premium in the premium projection, however UFLIC does not include the benefit of waiver of premium in the claims projection.  The two should off-set each other because one is an asset and one is a liability.  By not including the liability (the claim payment), UFLIC is artificially increasing the margins; and

- the modeling projects future claim expenses to be about 3.7% of total paid claims yet UFLIC only holds 3% of the claim reserves to cover this expense.  This understates the claim liabilities by .7% of the claim reserves.

196.    In addition, certain other assumptions used in the loss recoverability and Cash Flow Testing models are too aggressive under actuarial standards.  By using these overly aggressive assumptions UFLIC is able to keep the overall margins close to zero.  For example:

- ***Lapse rate projections***: UFLIC assumes that lapse rates are going to increase by 50 bps in the next few years due to policyholders starting to max out their benefit periods.  However, this is an unreasonable assumption because (i) 33% of policyholders have lifetime benefits and can never max out their benefit periods; (ii) only 36% of policyholders have benefit periods less than 5 years -- these are the majority of policyholders that would be maxing out; (iii) policyholders with shorter benefit periods are already lapsing at a higher rate; (iv) the lifetime benefit period policyholders have increased (as a percent of the total block of business) from 32-33% in the past 18 months and this is expected to continue into the future, which would minimize the chance of someone maxing out their benefit period; and (v) current experience already shows policyholders maxing out their benefit periods, so it is unreasonable to assume that it will increase in the future;

- ***Calculation of Incurred But Not Reported ("IBNR") claims***: The way UFLIC calculates IBNR is unreasonable because (i) IBNR is supposed to be linked to pending claims; and (ii) UFLIC uses the prior 12 months of claim experience to estimate IBNR.  This will underestimate IBNR if you

use average utilization.  Average utilization is a look at several prior years experience to determine how much is needed to estimate claims.  If open and pending claims are starting to increase, past experience will not produce a reasonable estimate of the future;

- *Morbidity*:  **This is the most aggressive assumption of all.**  UFLIC assumes that claim experience will improve by 2.5% compounded annually for the next 20 years, meaning it is assuming a decrease in morbidity.  However, actual claim experience has increased from 180%-200% in the past 18 months.   Therefore, if morbidity experience is increasing, it is not reasonable to assume a decrease in the future;

- *Mortality*: UFLIC assumes mortality experience will increase back to original purchase GAAP assumptions, when in reality, current experience has been running at 61% of the purchase GAAP assumptions.  This is due to the fact that the original 83IAM table used by UFLIC was published in 1983 and is considered out-of-date by today's actuarial standards because people are living longer.  The mortality table that should be used is the 94GAM or the 2000 Annuity table because both estimate current mortality better than the 83IAM table;

- *Continuance table:* A continuance table is a table used in premium rate calculations that depicts the probability that a claim will continue by time and amount.  UFLIC's continuance table for the LTC portfolio assumes no claimant can be on claim for more than 12 years.  While this assumption may be sufficient for 99% of policyholders, it is not reasonable for the other 1%.  This 1% accounts for 15-20% of all claim dollars.  By ending the continuance table at 12 years, reserves will be understated for the worse 1% of the policyholders.  The under-reserving increases as more policyholders come close to being on claim for 12 years.  Currently, claim reserves should be increased by about $17 million to cover this under-reserving;

- *Interest rate projections*: UFLIC assumes future net interest rates will be the same as today's overall net interest rate return on the LTC portfolio.  However, this assumption is unreasonable because (i) reserves are expected to grow over the next 15 years and UFLIC assumes that new money can be invested at a 6.45% net return even though current gross investment yield on the LTC portfolio is about a 6.15% net return.

197.  The A&H Portfolio is also materially under-reserved.  Based  on GE's current estimates, the GAAP reserves are currently $1.4 billion; the DAC balance is $200 million; the PVFP balance is $43 million.  Therefore, Net GAAP reserves equal $1.157 billion.  Moreover,

GE expects the A&H portfolio to lose $24 million in 2006 and shows a Loss Recoverability Margin of $51 million as of the third quarter of 2005.

198.    However, the A&H portfolio is under-reserved by at least $1 billion because of errors in the calculation of the reserves.  There is currently a $170 million issue with the A&H portfolio related to a certain reinsurance arrangement where GE has agreed to payout 50% more than it receives, however, GE has not done anything about it.  Moreover, the $170 million issue does not take into account the continued worsening pricing experience, *i.e.,* the lapse rates, incidence rates, length of stays, interest rates, premium distributions, and mortality.  This indicates that current reserves are under-reserved based on the failure to use actual experience in the actuarial assumptions.

199.    In addition, there are other insurance lines of business within GE that are materially under-reserved, including without limitation, certain term and whole life insurance lines purchased from American United Life and group disability.  Upon information and belief, those lines of business are under-reserved by as much as $5 billion.

200.    GE management benefits from the foregoing under-reserving practices in its insurance business, and the inflated net income generated thereby, in the form of increased salaries and bonuses. As a result of the billions of dollars in under-reserving, GE's financial health is being negatively impacted and GE Stock will continue to decline in value.

D.    **General Electric's Influence on Reserves and Violations of GAAP**

201.    General Electric misstated its earnings by (1) not timely recognizing requisite reserves and compounded its misstatements by (2) the release of requisite reserves into income in order to meet its earnings objectives. The Company's improper use of these reserves violated GAAP.

202.    GAAP requires the establishment and accrual of reserves for expenses, losses and liabilities, even though payment of the expense, or realization of the loss, may be contingent upon future events.  Pursuant to Statement of Financial Accounting Standards No. 5 ("FAS 5"), Accounting for Contingencies (March 1975), ¶8:

> An estimated loss from a loss contingency . . . shall be accrued by a charge to income if both of the following conditions are met [emphasis in original]:
>
> a. Information available prior to the issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements . . . [and]
>
> b. The amount of loss can be reasonably estimated [footnotes omitted].

203.    If the reasonable estimate of a particular loss contingency is a range, an amount shall be accrued for the loss.  When some amount within the range appears at the time to be a better estimate than any other amount within the range, that amount shall be accrued.  When no amount within the range is a better estimate than any other amount, however, the minimum amount in the range shall be accrued.  See FASB Interpretation No. 14, Reasonable Estimation of the Amount of a Loss (September 1976).  If there is at least a reasonable possibility that an additional loss has been incurred, beyond the amount accrued, disclosure of the nature of the contingency and an estimate of the possible loss or range of loss shall be made.  See FAS 5, ¶10.

204.    Pursuant to FAS 5, companies may establish reserves for identifiable, probable and estimable risks.  GAAP specifically forbids the accrual of "general" reserves.  See FAS 5, ¶14:  Some enterprises have in the past accrued so-called "reserves for general contingencies." General or unspecified business risks do not meet the conditions for accrual in paragraph 8, and no accrual for loss shall be made.

205.    Any reserves that do not meet the accrual requirements of FAS 5, when identified, should be immediately released into income.  A systematic or timed release of excess reserves into income violates GAAP.  In this regard, accounting estimates, including estimates for loss contingencies, may change as new events occur, as more experience is acquired, or as additional information is obtained.  A change in an accounting estimate should be accounted for in (a) the period of change if the change affects that period only, or (b) the period of change and future periods if the change affects both.  If the effect on income is material, disclosure is recommended for changes in estimates made each period in the ordinary course of accounting.  Materiality should be considered in relation to both the effects of each change separately and the combined effect of all changes.  *See* APB Opinion No. 20 ("APB 20"), <u>Accounting Changes</u> (July 1971).

206.    A change in estimate made in an interim accounting period should be accounted for in the interim period in which the estimate is changed.  The effect on earnings should be reported in the current period and in subsequent interim periods, if the effect of the change is material in relation to any period presented.  *See* APB 28, <u>Interim Financial Reporting</u> (May 1973).

207.    As these provisions make clear, GAAP does not allow for the deferral of accounting adjustments arising from a change in estimate or the correction of error.  If a change in estimate affects one period only, the change may not be accounted for over two or more periods in order to diminish the effect of the change on income, or for any other purpose.  A correction of an error may not be accounted for prospectively, or over two or more periods, in order to diminish the effect of the correction on any one period.

208.     As the following chart illustrates, GE materially understated its insurance liabilities and, as a result, materially overstated its Net Earnings throughout the Class Period by approximately 10%, with overstatements in certain reporting periods soaring as high as 34%:

**General Electric**
**Insurance Liabilility Understatement**
**Effect on Earnings**

| (in millions) | 12/31/2005 | 12/31/2004 | 12/31/2003 | 12/31/2002 | 12/31/2001 | 12/31/2000 | Class Period Total |
|---|---|---|---|---|---|---|---|
| Insurance Liability Reported in Respective SEC Filing | $45,722 | $63,136 | $136,264 | $135,853 | $114,223 | $106,150 | |
| Understatement | $800 | $1,165 | $1,166 | $1,726 | $2,120 | $4,214 | $11,190 |
| Effective Tax Rate | 23.1% | 19.0% | 26.7% | 20.2% | 22.9% | 23.0% | |
| Understatement Effect on Net Earnings | $615 | $944 | $854 | $1,377 | $1,634 | $3,245 | $8,670 |
| Reported Net Earnings | $16,353 | $16,593 | $15,002 | $14,118 | $13,684 | $12,735 | $88,485 |
| Adjusted Net Income | $15,738 | $15,649 | $14,148 | $12,741 | $12,050 | $9,490 | $79,815 |
| Net Earnings Overstatement % | 3.9% | 6.0% | 6.0% | 10.8% | 13.6% | 34.2% | 10.9% |

209.     GE's pattern and practice of managing earnings by influencing reserves is partially evident in the quarter ended December 31, 2003.  In sharp contrast to its increasing ERAC LTC Statutory Reserves, the Company actually reduced its corresponding GAAP reserves by more than $39 million.

## VIII.   CONDUCT CONSTITUTING DEFENDANTS' FIDUCIARY BREACHES.

210.     ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan.  The Defendants breached their duties to prudently and loyally manage the Plan's assets because, during the Class Period, Defendants knew or should have known that Company Stock was not a prudent investment for the Plan and knew or should have known that the value of Company Stock was exposed to an unacceptable risk of loss.

211.    Defendants' knowledge that the Company Stock was imprudent is based on the fact that Defendants knew or should have known of the under-reserving, accounting irregularities, misstatement of liabilities, misstatements of earnings, GAAP violations and other misrepresentations detailed in ¶¶146 - 209 of this Complaint.  Defendants failed to take adequate steps to prevent the Plan, and indirectly the participants, from suffering losses as a result of the Plan's investment in Company Stock.

212.    Upon information and belief, not one of the Defendants conducted an appropriate investigation into whether Company Stock was a prudent investment for the Plan in light of the Company's under-reserving, GAAP violations, misstatement of liabilities, misstatements of earnings, and other related serious corporate misconduct and given the fact that the Plan held an enormous investment in Company Stock.  Moreover, not one of the Defendants provided the Plan's participants with information regarding the true nature these business practices and the extraordinary risks that they presented to GE such that the Plans' participants could make informed decisions regarding the Company Stock in the Plan.  Indeed, not one of the Defendants took any meaningful action to protect the Plan against the risk of enormous losses as a result of the Company's very risky and inappropriate corporate misconduct.

213.    On a Class-wide and Plan-wide basis the risk of an undiversified investment in Company Stock imposes a greater risk than that of other undiversified investments

214.    The risk associated with the investment in Company Stock during this time of chronic under-reserving was an extraordinary risk, far above and beyond the normal, acceptable risk associated with investment in company stock.  This abnormal investment risk could not have been known by the Plan's participants, and the Defendants knew or should have known

that it was not known by them because the Defendant fiduciaries never disclosed it. This extraordinary risk made any investment in Company stock inappropriate and imprudent.

215.    Participants, even before placing any retirement savings in Company Stock, relied on the stability and financial viability of GE as the basis for their standard of living. The participants' salaries, healthcare and other benefits, as well the participants' pension (if any) and retirement health insurance depended upon GE's continued solvency and viability.

216.    Thus, one of the risks that could impair the participant's investment in Company Stock – the failure or insolvency of the employer – would also cause the loss of current income and benefits and future non-Plan related retirement benefits. The risks are correlated and, if realized, would financially devastate most employees and Plan participants. Therefore, the Defendants had a heightened duty with regard to both the decision to continue investing in Company Stock as well as the duty to inform participants concerning the imprudence of investing in Company Stock.

217.    The GE Defendants, Board Defendants, Committee Defendants, and Plan Trustees Defendants breached their fiduciary duties when they failed to conduct an appropriate investigation into whether GE Stock was a prudent investment for the Plan; failed to develop appropriate investment guidelines for GE Stock; failed to divest the Plan of GE Stock; failed to discontinue further Plan contributions to GE Stock; failed to remove GE Stock as a Plan investment option; failed to both consult or appoint independent fiduciaries regarding the appropriateness of an investment in GE Stock; and failed to resign as fiduciaries of the Plan if as a result of their employment by GE they could not loyally serve the Plan and its participants. In addition, these Defendants as well as the Pension Board Defendants breached their fiduciary duties when they failed to prohibit any participant from making an "investment switch" into GE

Stock.  In fact, the GE Defendants, Board Defendants, Committee Defendants, Plan Trustee Defendants and Pension Board Defendants continued to invest and to allow investment of the Plan's assets in Company Stock even though they knew or should have known that GE would be taking billions of dollars in charges to earnings to correct the under-reserving resulting in a decrease in the value of GE Stock.  No other Defendant fiduciary took any action to remedy the breaches set forth in this paragraph.

218.    The GE Defendants, Board Defendants and Pension Board Defendants breached their fiduciary duties by direct and indirect communications with Plan participants, made in their fiduciary capacity, which contained statements concerning Company Stock that these Defendants knew or should have known were untrue and inaccurate. These communications included Class-wide and Plan-wide affirmative and materially misleading statements as to GE's insurance liabilities, GE's earnings, and GE's profitability as detailed in this Complaint, that were contained in the following documents which were specifically incorporated into the SPD:  SEC S-8 statements, SEC Form 10-K annual reports and interim periodic reports, GE's Annual Report, and the Plan's annual report on SEC Forms 11-K.  In particular the following documents incorporated into the SPD contained such affirmative and materially misleading  statements: SEC Forms 10-K filed with the SEC on March 23, 2001, March 8, 2002, March 7, 2003, March 1, 2004, March 1, 2005 and March 3, 2006; and SEC Form 10-Q filed with the SEC on April 19, 2001, July 23, 2001, November 2, 2001, May 13, 2002, July 31, 2002, October 29, 2002, May 2, 2003, August 1, 2003, October 31, 2003, May 4, 2004, July 30, 2004, October 26, 2004, may 6, 2005, July 29, 2005, October 24, 2005, April 26, 2006 and July 24, 2006.  In addition, the foregoing documents omitted, and continue to omit, material information concerning GE's financial performance, including GE's under-reserving.  In the SPD, participants were instructed

that they "should read" GE's annual report to fully understand what they were "investing in." GE's annual report for the years 2000-2005 contained affirmative misrepresentations and omissions concerning GE's insurance liabilities and GE's earnings, as detailed in this Complaint. No Defendant took any action to remedy the breaches set forth in this paragraph.

219.    Moreover, Defendants knew or recklessly disregarded certain basic facts about the characteristics and behavior of the Plan's participants, well-recognized in the 401(k) industry and trade press:

(a)     Out of loyalty, employees tend to invest in company stock;

(b)     Employees tend not to change their investment option allocations in the plan once made;

(c)     Lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk; and

(d)     Many employees do not recognize their exposure to massive loss from failing to diversify their investment

220.    As a result of Defendants' knowledge of and implication in creating and maintaining public misconceptions concerning the true financial health of the Company, any warnings of market and diversification risks that Defendants made to the Plan's participants regarding the Plan's investment in GE Stock did not effectively inform the Plan's participants of the past, immediate, and future dangers of investing in Company Stock.

221.    Based on their actual or constructive knowledge as set forth in ¶¶210-211, Defendants knew about the material under-reserving and the billions of dollars necessary to correct it.  Defendants knew or should have known of the affirmative misrepresentations made to Participants in the SEC documents and annual reports incorporated into the SPD.  Defendants

knew that Plan participants lacked the knowledge that Defendants had or should have had concerning the material under-reserving and knew or should have known that Plan participants would be harmed by this lack of knowledge. Defendants on a Plan-wide and Class-wide basis, never accurately disclosed to Plaintiffs or Plan participants the true nature, extent, and risks of these problems. Rather, Defendants failed to timely communicate accurate information to Plan participants concerning GE's true financial condition, including its material under-reserving in prior periods and its continuing need to materially bolster those reserves during the Class Period as a result thereto, when they knew or should have known that Plan participants needed this information. Defendants and/or their individual fiduciary delegates, on a Class-wide and Plan-wide basis, failed to provide Plan participants with complete and accurate information regarding GE Stock, such that the participants could appreciate the true risks presented by investments in GE Stock and could make informed decisions thereby avoiding the unreasonable and entirely predictable losses incurred as a result of the Plan's investment in GE Stock. No Defendant took any action to remedy the breaches set forth in this paragraph.

222.    Plan participants still do not have full knowledge of all material facts necessary to understand the negative impact of the under-reserving on GE, GE Stock and/or Plan assets. Only upon acquiring this knowledge will Plan participants fully understand how the Plan fiduciaries have breached their duties or otherwise violated ERISA.

223.    The GE Defendants and Board Defendants failed in their fiduciary responsibilities in monitoring the Committee Defendants and Pension Board Defendants. The GE Defendants and Board Defendants breached their fiduciary duties because they did not have procedures in place so that they could review and evaluate on an ongoing basis whether the Committee Defendants or Pension Board Defendants were performing their duties adequately

and in accordance with ERISA's fiduciary provisions. The GE Defendants and Board Defendants breached their fiduciary duty to remove the Committee Defendants and Pension Board Defendants when they knew the Committee Defendants and Pension Board Defendants had breached their fiduciary duties. The GE Defendants and Board Defendants failed to adequately review the performance of the Committee Defendants and Pension Board Defendants to: ensure that they were fulfilling their fiduciary duties under the Plan and ERISA; ensure that they had adequate information to do their job of overseeing the Plan's investments; ensure that they adequate access to and use of impartial advisors when needed; and ensure that they reported regularly to the Board.

224. The GE Defendants, Board Defendants and Committee Defendants failed in their fiduciary responsibilities in monitoring the Plan Trustee Defendants. The GE Defendants, Board Defendants and Committee Defendants breached their fiduciary duties because they did not have procedures in place so that they could review and evaluate on an ongoing basis whether the Plan Trustees were performing their duties adequately and in accordance with ERISA's fiduciary provisions. The GE Defendants, Board Defendants and Committee Defendants breached their fiduciary duty to remove the Plan Trustee Defendants when they knew those Defendants had breached their fiduciary duties. The GE Defendants, Board Defendants and Committee Defendants failed to adequately review the performance of the Plan Trustee Defendants to: ensure that they were fulfilling their fiduciary duties under the Plan and ERISA; ensure that they had adequate information to do their job of overseeing the Plan's investments; ensure that they adequate access to and use of impartial advisors when needed and ensure that they reported regularly to the Committee.

## IX.    DEFENDANTS SUFFERED FROM CONFLICTS OF INTEREST.

225.    GE's SEC filings, including GE's Form DEF 14A Proxy Statement filed on April 27, 2005, make clear that a significant percentage of GE's officer and director compensation is in the form of stock grants or stock option grants.  In addition, GE requires its senior officers and directors to maintain ownership levels of GE stock.

226.    Specifically, the Form DEF 14A Proxy Statement notes that GE's CEO, Vice Chairmen, and Senior Vice Presidents are required to maintain an ownership level of GE Stock that is a multiple of between four and six times their salary.  In addition, the Form DEF 14A Proxy Statement notes that the Officers and Directors are partially compensated in GE Stock or restricted stock units ("RSUs").  GE's RSUs permit GE executives to purchase GE stock at any time over a ten year period at the price of the stock on the date that the RSUs were granted. Thus, RSUs only have value to the extent that the GE Stock price exceeds the price of GE stock on the date of the grant.

227.    GE's Form DEF 14A indicates that in 2004, many of the Defendants were granted hundreds of thousands of stock options, exercisable only if the price of GE Stock increased from the date of the grant.  Moreover, GE's Form DEF 14A reveals that numerous GE directors and officers own or were compensated in GE stock in 2004 and in prior years.

228.    Because the compensation of many of the Defendants was significantly tied to the price of GE Stock, Defendants had an incentive to keep the Plan's assets heavily invested in GE Stock on a regular, ongoing basis.  Elimination of Company Stock as a Plan investment option would have reduced the overall market demand for GE Stock and sent a negative signal to Wall Street analysts, which would have adversely affected the price of GE Stock, resulting in lower compensation for the Defendants.

229.    Some Defendants may have had no choice in tying their compensation to GE stock (because compensation decisions were out of their hands), but Defendants did have the choice in what information to disclose to Plan participants and whether to keep the Plan participants' and beneficiaries' retirement savings invested in GE Stock.

230.    These conflicts of interest put the Defendants in the position of having to choose between their own interests and the interests of the Plan participants and beneficiaries.

## X.    CAUSATION

231.    The Plan suffered massive losses because a substantial amount of Plan assets were imprudently invested by the Plan in GE Stock during the Class Period, and in breach of Defendants' fiduciary duties.

232.    Had Defendants properly discharged their fiduciary duties, including the provision of full and accurate disclosure of material facts concerning GE Stock and divesting the Plan from Company Stock offered by the Plan when such investment became imprudent, the Plan would have avoided losses suffered in Company Stock.

233.    As a result of Defendants' actions, Plaintiffs and the Class, which invested in GE Stock through the Plan, were wrongfully damaged, as the Plan suffered substantial losses from Defendants' failure to fulfill their fiduciary responsibilities as described herein.  Had the fiduciaries acted prudently and in accordance with their fiduciary duties, they would have taken steps to eliminate or reduce the amount of GE Stock held by the Plan, eliminated the option for participants to place funds in GE Stock, or fully disclosed the material adverse facts concerning GE Stock described herein.  Plaintiffs and the Class are entitled to the best alternative investment available to them under the circumstances, and the Plan would have achieved gains and avoided losses but for Defendants' breach of fiduciary duty as described herein.

234.    The Plan and the Plan fiduciaries do not qualify for any affirmative defense based on ERISA Section 404(c) as the Plan did not satisfy the numerous stringent requirements of Section 404(c) and the Department of Labor Regulations promulgated thereunder, as set forth in 29 C.F.R. § 2550.404c-1.  This is because Defendants, among other ERISA § 404(c) disclosure failures, failed to ensure effective participant control by providing complete and accurate material information to participants regarding Company Stock.  *See 29* C.F.R. § 2550.404c-1(b)(2)(i)(B) (the participant must be provided with "sufficient information to make informed decisions").  As a consequence, participants in the Plan did not have informed control over the portion of the Plan's assets that were invested in Company Stock as a result of their investment directions, and the Defendants remained entirely responsible for losses that result from such investment.

235.    Furthermore, under ERISA, fiduciaries - not participants - exercise control over the selection of investment options made available to participants.  Thus, whether or not participants are provided with the ability to select among different investment options, and whether or not participants exercised effective control over their investment decisions (which was not the case here), liability attaches to the fiduciaries if an imprudent investment option is selected by the fiduciaries and presented as an option to participants, and as a result of such action the Plan suffer a loss.  Because this is precisely what occurred in this case, Defendants are liable for the losses incurred by the Plans and are not entitled to any protection under ERISA § 404(c).

236.    The Plan Document recites that "the portion of the Program which consist of Stock shall also constitute an 'employee stock ownership plan' within the meaning of section 4975(e)(7) of the Code and such plan shall be designed to invest primarily in qualifying employer securities."   On information and belief, the portion of the Plan that invested in

Company Stock does not qualify as an employee stock ownership plan ("ESOP") under the numerous requirements set forth in both ERISA and the Internal Revenue Code. Upon information and belief, the SPD is silent with regard to the Plan's purported status as an ESOP.

237.   Under the Plan Document, there was no requirement that any of the Plan be invested in Company Stock. The requirement was simply that if a portion of the Plan were invested in Company Stock that portion would be an ESOP. Thus, the Plan is not "designed" to invest primarily in qualifying employer securities and the Plan's purported ESOP status did not, in fact, require the investment in Company Stock at all, or place any constraints on Plan fiduciaries forcing them to invest in Company Stock.

238.   Similarly, the Plan could have held one share of Company Stock and still been an ESOP under the language of the Plan Document since that "portion" of the Plan -- the one share -- would have been primarily invested in Company Stock.

239.   Finally even if the portion of the Plan invested in Company Stock constituted an ESOP, Plan fiduciaries may not invest in employer securities regardless of the circumstances. While the duty of diversification may not apply to certain aspects of investment of qualified employer securities in an ESOP, Plan fiduciaries remain bound by their other core ERISA fiduciary duties including the duties to act loyally, prudently and honestly.

240.   The losses suffered by the Plan and Plan participants and beneficiaries, including Plaintiffs and the Class, were the direct and necessary result of the misconduct of Defendants alleged herein. Plaintiffs and the Class were unaware, and in the exercise of reasonable diligence could not have been aware, of the true and accurate extent of GE's under-reserving, as well as Defendants' continuing breaches of fiduciary duty in failing to disclose such material facts.

## XI.   REMEDIES FOR DEFENDANTS' BREACH OF THEIR FIDUCIARY DUTIES

241.   Defendants breached their fiduciary duties in that they knew or recklessly disregarded the facts as alleged above, and therefore knew or recklessly disregarded that the Plan's assets should not have been so heavily invested in Company stock.  As a consequence of the Defendants' breaches, the Plan suffered significant losses.

242.   ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan."  Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate."

243.   With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available.  In this way, the remedy restores the values of the Plan's assets to what they would have been if the plan had been properly administered.

244.   Plaintiffs and the Class are therefore entitled to relief from the Defendants in the form of: (1) a monetary payment to the Plan in the amount of the losses to the Plan resulting from the breaches of fiduciary duties alleged above and to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA § 409(a) and 502(a)(2)-(3), 29 U.S.C. § 1109(a) and 1132(a)(2)-(3); (3) reasonable attorneys' fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common

fund doctrine, and other applicable law; (4) taxable costs; (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

## COUNT I.

### For Failure to Prudently Manage the Plan's Assets
### Breach of Fiduciary Duties In Violation of ERISA §404
### (Against the GE Defendants, Board Defendants, Committee Defendants, Plan Trustee
### Defendants and Pension Board Defendants )

245.    Plaintiffs incorporate the foregoing paragraphs herein by reference.

246.    The Plan is governed by the provisions of ERISA, 29 U.S.C. §1001, *et. seq.,* and Plaintiffs and the Class are participants and/or beneficiaries in the Plan.  The GE Defendants, Board Defendants, Committee Defendants, Plan Trustee Defendants, and Pension Board Defendants are all fiduciaries with respect to the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  They were thereby bound by the duties of loyalty, exclusive purpose, and prudence.

247.    Defendants named in this Count were each responsible, in different ways and degrees, for the Plan's investment in Company Stock.

248.    Under ERISA, fiduciaries who exercise discretionary authority or control over the management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to plan participants are prudent.   Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested.

249.    The fiduciary duty of loyalty likewise entails a duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with *single-minded* devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

250.    Defendants named in this Count were responsible for ensuring that investment in Company Stock was prudent and consistent with the purpose of the Plan.  Defendants are liable for any and all losses incurred as a result of such investments being imprudent.

251.    During the Class Period, the Defendants named in this Count knew or should have known that Company Stock was not a suitable, prudent or appropriate investment for the Plan as described herein irrespective of any duty of diversification that may exist.  Notwithstanding this knowledge, these Defendants offered and continued to offer Company Stock as an investment option for the Plan and/or offered and continued to offer to direct and approve the investment in Company Stock.

252.    Moreover, during the Class Period, despite their knowledge of the imprudence of the investment, the Defendants named in this Count failed to take any meaningful steps to prevent the Plan, and indirectly the Plan's participants and beneficiaries, from suffering losses as a result of the Plan's investment in Company Stock.  The Defendants named in this Count knew or should have known that a prudent fiduciary acting under similar circumstances would have made different investment decisions with respect to the Company Stock and that continued investment in Company Stock was not in keeping with the Plan settlors' expectation on how a prudent fiduciary would operate.

253.    The Defendants named in this Count had actual or constructive knowledge of the Company's serious mismanagement, accounting irregularities, misstatement of liabilities, misstatements of earnings, GAAP violations and other misrepresentations that impacted Company Stock as alleged in this Complaint.  Despite this knowledge, they participated in each other's failures to prudently manage the Plan's assets and knowingly concealed such failures by not informing Plan participants that Company Stock was not a prudent investment.

254.    In addition to other breaches of fiduciary duty alleged in this Count, the GE Defendants, Board Defendants, Committee Defendants, and Plan Trustee Defendants committed the following fiduciary breaches: (a) failed to conduct an appropriate investigation into whether Company Stock was a prudent investment for the Plan; (b) failed to develop appropriate investment guidelines for Company Stock; (c) failed to divest the Plan of Company Stock; (d) failed to discontinue further Plan contributions to Company Stock; (e) failed to remove Company Stock as a Plan investment option; (f) failed to both consult or appoint independent fiduciaries regarding the appropriateness of an investment in Company Stock; (g) failed to notify appropriate federal agencies, including the Department of Labor, of the facts and circumstances that made Company Stock an unsuitable and imprudent investment for the Plan; and (h) failed to resign as fiduciaries of the Plan if, as a result of their employment by GE or its affiliates, they could not loyally serve the Plan and its participants.  In addition, these Defendants as well as the Pension Board Defendants, breached their fiduciary duty when they failed to prohibit any Plan participant from making an "investment switch" into Company Stock.

255.    As a result of the breach of fiduciary duties of the Defendants named in this Count, the Plan, and indirectly Plaintiffs and the Plan's other participants and beneficiaries, suffered damages, the exact amount of which will be determined at trial.

256.    Pursuant to ERISA §502(a)(2), 29 U.S.C. §1132(a)(2) and ERISA §409, 29 U.S.C. §1109(a), Defendants named in this Count are personally liable to restore the losses to the Plan caused by their breach of fiduciary duty as alleged in this Count.

## COUNT II.

### Failure to Provide Complete and Accurate Information to Participants and Beneficiaries
### Breaches of Fiduciary Duties in Violation of ERISA §404
### (Against All Defendants)

257.    Plaintiffs incorporate the foregoing paragraphs herein by reference.

258.    At all relevant times herein, Defendants were fiduciaries within the meaning of ERISA §3(21)(A), 29 U.S.C. §1002(21)(A).

259.    During the Class Period, Defendants knew or should have known that Company Stock was not a suitable, prudent or appropriate investment for the Plan.

260.    As alleged herein, the scope of the GE Defendants', Board Defendants', and Pension Board Defendants' fiduciary duties and responsibilities included drafting and disseminating Plan documents, SPDs and information to participants regarding the assets of the Plan.

261.    All Defendants had a duty to provide participants with information they possessed that they knew or should have known would have material impact on the Plan.

262.    The duty of loyalty under ERISA requires the Defendants to speak truthfully to Plan participants, not to mislead them regarding the Plan or the Plan's assets, and to disclose information that participants need in order to exercise their rights and interests under the Plan. The Defendants' duty of loyalty included not only the negative duty not to misinform, but also an affirmative duty to inform when the Defendants' knew or should have known that silence might be harmful.  If a fiduciary knows that a material misrepresentation has been made to a Participant, that fiduciary, without regard to the functions which make that person a fiduciary, has an affirmative duty to correct that misrepresentation.   Moreover, the Plan Document affirmatively requires the Plan Trustees to provide each participant with sufficient information to make informed decisions with regard to investment alternatives available under the Plan, including Company Stock.

263.    The fiduciary duty of loyalty likewise entails a duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with

*single-minded* devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

264.   This duty to inform participants included the Defendants' obligation to provide participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing false information or concealing material information regarding the Plan's investment options such that participants can make informed decisions with regard to investment options available under the Plan.  This duty applies to all of the Plan's investment options, including the Company Stock.

265.   Because a substantial percentage of the Plan's assets was invested in Company Stock, such investment carried with it an inherently high degree of risk.  This inherent risk made the Defendants' duty to provide complete and accurate information particularly important with respect to Company Stock.

266.   Because of the disparity in knowledge between Defendants and Plan participants, the participants relied on Defendants to provide them with accurate and complete information about GE, which was material to the suitability of Company Stock as a prudent investment option.

267.   The fiduciary duty to honestly communicate with participants is designed not merely to inform participants and beneficiaries of conduct, including illegal conduct, bearing on their retirement savings, but also to forestall such illegal conduct in the first instance.  By failing to discharge their disclosure duties, the Defendants facilitated the illegal conduct in the first instance.

268.   The GE Defendants, Board Defendants, and Pension Board Defendants breached their fiduciary duties by direct and indirect communications with Plan participants, made in their

fiduciary capacity, which contained statements concerning Company Stock which these Defendants knew or should have known were untrue and inaccurate. These communications included Class-wide and Plan-wide affirmative and materially misleading statements as to GE's insurance liabilities, GE's earnings, and GE's profitability as detailed in this Complaint, that were contained in the following documents which were specifically incorporated into the SPD: GE's SEC S-8 statements, GE's SEC Form 10-K annual reports and interim periodic reports, GE's Annual Report, and the Plan's annual report on SEC Form 11-K. In the SPD, the GE Defendants, Board Defendants, and Pension Board Defendants instructed participants to read GE's annual report that contained affirmative misrepresentations as well as omissions concerning GE's insurance liabilities and GE's earnings as detailed in this Complaint.

269. The GE Defendants, Board Defendants, and Pension Board Defendants breached their fiduciary duties not only with regard to the affirmative misrepresentations contained in the documents referenced in ¶218, but also because those documents omitted, and continue to omit, material information concerning GE's serious mismanagement, financial performance, including GE's under-reserving and GAAP violations. In addition, the GE Defendants, Board Defendants, and Pension Board Defendants breached their fiduciary duties by conveying inaccurate information regarding the soundness or security of Company Stock and the prudence of investing retirement contributions in Company Stock.

270. All Defendants breached their fiduciary duty when they failed to provide Plan participants, on a Class-wide and Plan-wide basis, information regarding the imprudence of investing in Company Stock. All Defendants knew or should have known that Plan participants lacked the knowledge that Defendants possessed concerning the imprudence of investing in Company Stock; knew or should have known that Plan participants would be harmed by this lack

of knowledge; and knew or should have known that material misrepresentations regarding Company Stock were made to Plan participants. All Defendants, on a Plan-wide and Class-wide basis, never accurately disclosed to Plaintiffs or Plan participants the true nature, extent, and risks of investing in Company Stock when they knew or should have know that investment in Company Stock was imprudent. Rather, all Defendants failed to timely communicate accurate information to Plan participants concerning GE's true financial condition, including its material under-reserving in prior periods and its continuing need to materially bolster those reserves during the Class Period when they knew or should have known that Plan participants needed this information.

271.   As a consequence of Defendants' breaches of fiduciary duty alleged in this Count, the Plan suffered tremendous losses. If the Defendants had discharged their disclosure obligations prudently and in the sole interests of Plan participants and beneficiaries, then losses suffered by the Plan would have been avoided or greatly minimized. Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the other Class members, lost hundreds of millions of dollars, if not billions of dollars, of retirement savings.

272.   Pursuant to ERISA §502(a)(2), 29 U.S.C. §1132(a)(2) and ERISA §409, 29 U.S.C. §1109(a), the Defendants are personally liable to the Plan for these losses incurred as a result of Defendants' misrepresentations to Plan participants as well as their breach of the fiduciary duty to disclose and inform.

### COUNT III.

### Failure in Appointing and Monitoring Plan Fiduciaries' Breaches of Fiduciary Duties in Violation of ERISA §404 (Against GE Defendants, the Board Defendants, and the Committee Defendants)

273.   Plaintiffs incorporate the foregoing paragraphs herein by reference.

274.    At all relevant times herein, Defendants were fiduciaries within the meaning of ERISA §3(21)(A), 29 U.S.C. §1002(21)(A).

275.    At all relevant times herein, the fiduciary duties of the GE Defendants and Board Defendants included the power and responsibility to appoint, and the duty to oversee and thereby monitor the performance of the Committee and the Pension Board.

276.    At all relevant times herein, the scope of the fiduciary duties of the GE Defendants, Board Defendants, and Committee Defendants included the oversight and the power and responsibility to appoint, and thereby monitor the performance of the Plan Trustees.

277.    During the Class Period, Defendants knew or should have known that Company Stock was not a suitable, prudent or appropriate investment for the Plan, as described herein.

278.    Under ERISA, a fiduciary with appointment powers must ensure that the appointed fiduciaries are performing their fiduciary obligations, including those obligations with respect to handling, holding and investing plan assets; and must take prompt and effective action to protect the plan and participants when the appointed fiduciaries are not meeting their fiduciary obligations.

279.    The appointing fiduciary must have procedures in place so that they may review and evaluate on an ongoing basis whether the appointed fiduciaries are doing an adequate job (including, for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining information and resources they need).  In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for (1) promptly and prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants; or (2) deciding whether to retain or remove their appointees.

77

280.   An appointing fiduciary must provide the appointed fiduciaries with all the information that they have or reasonably should have in order to prudently manage the plan and the plan assets or that may have a material impact on the plan and the fiduciaries' investment decisions regarding the plan.

281.   The GE Defendants, Board Defendants, and Committee Defendants breached their fiduciary appointing and monitoring duties by, among other things: (1) failing to appoint persons with the requisite knowledge, skill, and expertise to properly administer the Plan and manage its assets; (2) failing to adequately monitor their appointees, evaluate their performance, or have an adequate system in place for doing so, (and standing idly by as the Plan suffered enormous losses as a result of the appointees' imprudent action); (4) failing to ensure that the appointed fiduciaries (although possessing actual knowledge of accounting irregularities, misstatement of liabilities, misstatements of earnings, GAAP violations and other misrepresentations concerning Company Stock as alleged herein) understood the true extent of GE's under-reserving problems and its impact on the value of Company Stock and the Plan's concomitant investment in Company Stock.

282.   In the alternative, if any Committee Defendant or Pension Board Defendant did not have actual knowledge of GE's serious mismanagement, accounting irregularities, under-reserving practices, misstatement of liabilities, misstatements of earnings, GAAP violations and other misrepresentations concerning Company Stock, then the GE Defendants and GE Board Defendants breached their fiduciary duty by failing to provide the Committee Defendants and Pension Board Defendants with such information and by failing to provide complete and accurate information to the appointed fiduciaries so that they could make sufficiently informed decisions with respect to the Plan's assets including Company Stock.

283.    In the alternative, if any Plan Trustee Defendant did not have actual knowledge of GE's serious mismanagement, accounting irregularities, misstatement of liabilities, misstatements of earnings, GAAP violations and other misrepresentations concerning Company Stock, the GE Defendants, GE Board Defendants and GE Committee Defendants breached their fiduciary duty by failing to provide the Plan Trustee Defendants with such information and by failing to provide complete and accurate information to the appointed fiduciaries so that they could make sufficiently informed decisions with respect to the Plan's assets including Company Stock.

284.    The GE Defendants, Board Defendants, and Committee Defendants breached their fiduciary duty by failing to remove the appointed fiduciaries, as named herein, whose performance was inadequate.    The GE Defendants, Board Defendants, and Committee Defendants knew that the appointed fiduciaries: (a) failed to conduct an appropriate investigation into whether Company Stock was a prudent investment for the Plan; (b) failed to develop appropriate investment guidelines for Company Stock; (c) failed to divest the Plan of Company Stock; (d) failed to discontinue further Plan contributions to Company Stock; (e) failed to remove Company Stock as a Plan investment option; (f) failed to consult with or appoint independent fiduciaries regarding the appropriateness of an investment in Company Stock; (g) failed to prohibit any participant from making an "investment switch" into Company Stock; (h) failed to notify appropriate federal agencies, including the Department of Labor, of the facts and circumstances that made Company Stock an unsuitable or imprudent investment for the Plan; and (i) failed to inform Plan participants that investment in Company Stock would not be prudent.

285.     As a consequence of the Defendants' breaches of fiduciary duty, the Plan suffered tremendous losses.  Had Defendants named in this Count discharged their fiduciary duties as described above, the losses suffered by the Plan would have been averted or, at a minimum, lessened.  Therefore, as a direct and proximate result of the breaches of fiduciary and co-fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the other Class members, lost hundreds of millions of dollars, if not billions of dollars, of retirement savings.

286.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's other participants and beneficiaries, suffered damages, the exact amount of which will be determined at trial.

287.     Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. §1109(a), the GE Defendants, Board Defendants, and Committee Defendants are personally liable to restore the losses to the Plan caused by their failure to monitor and remove fiduciaries as alleged in this Count.

## COUNT IV.

### Co-Fiduciary Liability
### Breaches of Fiduciary Duties in Violation of ERISA § 405
### (Against all Defendants)

288.     Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

289.     At all relevant times, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

290.     ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if: (i) he participates in, or undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission

is a breach; (ii) he fails to comply with ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, by enabling such other fiduciary to commit a breach; or (iii) he knew or should have known of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

291.    During the Class Period, Defendants knew that Company Stock was not a suitable, prudent or appropriate investment for the Plan as described herein.

## A.    Failure to Remedy

292.    ERISA § 405(a)(3), 29 U.S.C. § 1105(3) imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if, he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

293.    The Fund Trustee Defendants and GEAM Defendants were aware that the GE Defendants, Board Defendants, Committee Defendants and Pension Board Defendants breached their fiduciary duties as alleged in the Count I of the Complaint.  Despite this knowledge, the Fund Trustee Defendants and GEAM Defendants failed to undertake any effort to remedy their co-fiduciaries' failures to prudently and loyally manage the Plan's investment in Company Stock, as well as other fiduciary breaches alleged in the Count I.  Instead, they allowed the harm to continue and contributed to it throughout the Class Period in violation of ERISA § 405(a)(3). The actions which the Fund Trustee Defendants and GEAM Defendants could have taken, included but are not limited to: (1) objecting to the conduct of the other fiduciaries and insisting that their objections and any response to the objections be made part of the minutes of a meeting of the Board, Committee, Pension  Board, or Plan Trustees; (2) disclosing the imprudence of the

investment in Company Stock to Plan participants; (3) notifying the U.S. Department of Labor of their co-fiduciaries actions; or (4) preparing to obtain an injunction from a Federal District Court.

294.    To the extent that it is determined that any GE Defendant and/or Board Defendant and/or Committee Defendant and/or Plan Trustee Defendant and/or Pension Board Defendant did not breach his fiduciary duty as alleged in the Count I of the Complaint, that Defendant was still aware that the remaining Defendants in Count I did, in fact, breach their fiduciary duties. Despite this knowledge, the Defendant(s) named in this paragraph breached their fiduciary duties by failing to undertake any effort to remedy their co-fiduciaries' failures to prudently and loyally manage the Plan's investment in Company Stock and other fiduciary breaches alleged in the Count I.  Instead, they allowed the harm to continue and contributed to it throughout the Class Period in violation of ERISA § 405(a)(3).  The actions which the Defendant(s) could have taken included but are not limited to: objecting to the conduct of the other fiduciaries and insisting that their objections and any response to the objections be made part of the minutes of a meeting of the Board, Committee, Pension Board, or Plan Trustees; disclosing the imprudence of the investment in Company Stock to Plan Participants; notifying the U.S. Department of Labor of their co-fiduciaries' conduct; or preparing to obtain an injunction from a Federal District Court.

295.    To the extent that it is determined that any Defendant did not commit any of the fiduciary breaches as alleged in Count II of the Complaint, any such Defendant was still aware that the remaining Defendants named in Count II breached their fiduciary duties.  Despite this knowledge, the Defendant(s) named in this paragraph breached their fiduciary duty by failing to undertake any effort to remedy the fiduciary breaches alleged in Count II, including the duty to remedy their co-fiduciaries' misrepresentations and their co-fiduciaries' breach of the affirmative duty to inform Plan participants regarding the imprudence of investing in Company Stock.

Instead, they allowed the harm to continue and contributed to it throughout the Class Period in violation of ERISA § 405(a)(3). The actions which the Defendant(s) could have taken included but are not limited to: (1) objecting to the conduct of the other fiduciaries and insisting that their objections and any response to the objections be made part of the minutes of a meeting of the Board, Pension Board, or Plan Trustees; (2) disclosing the imprudence of the investment in Company Stock to Plan Participants; (3) notifying the U.S. Department of Labor of their co-fiduciaries' conduct; or (4) preparing to obtain an injunction from a Federal District Court.

### B.   Enabling A Breach

296.   ERISA § 405(a)(2), 29 U.S.C. § 1105(2) also imposes co-fiduciary liability on a fiduciary if by failing to comply with ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(l), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

297.   To the extent that it is determined that any GE Defendant, Board Defendant, Committee Defendant, Pension Board Defendant or Plan Trustee Defendant lacked knowledge of the circumstances rendering the Plan's investment in Company Stock imprudent, then all other Defendants enabled the imprudent asset management decisions of that Defendant by failing to provide that Defendant with complete and accurate information regarding serious mismanagement, accounting irregularities, misstatement of liabilities, misstatements of earnings, GAAP violations and other misrepresentations concerning Company Stock. In failing to inform their co-fiduciaries, who lacked knowledge, if any, these Defendants breached ERISA § 405(a)(2).

298.   Through their failure to properly and effectively monitor their appointees, including the removal of those whose performance was inadequate as alleged in this Complaint,

the GE Defendants and Board Defendants enabled the Committee Defendants imprudent management of Company Stock in the Plan.

299.    Further, through their failure to properly and effectively monitor their appointees, including the removal of those whose performance was inadequate as alleged above, the GE Defendants and Board Defendants and Committee Defendants enabled the Plan Trustee Defendants imprudent management of Company Stock in the Plan.

300.    The GE Defendants' and Board Defendants' failure to monitor the Committee Defendants enabled the Committee Defendants to breach their duties.

301.    The GE Defendants', Board Defendants', and Committee Defendants' failure to monitor the Plan Trustees Defendants enabled Plan Trustee Defendants to breach their fiduciary duties.

302.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's other participants and beneficiaries, suffered damages, the exact amount of which will be determined at trial.

303.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), ERISA § 409, 29 U.S.C. § 1109(a), and ERISA §405, 29 U.S.C. §1105, Defendants are liable to restore the losses to the Plan caused by their co-fiduciary breaches of fiduciary duties alleged in this Count.

## COUNT V.

### For Breach of Duty to Avoid Conflicts of Interest
### (Against the GE Board Defendants and the GE Management Defendants)

304.    Plaintiffs incorporate the foregoing paragraphs herein by reference.

305.    At all relevant times, as alleged above, the GE Board Defendants and the GE Management Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

306.     ERISA § 494(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A) imposes on a plan fiduciary a duty of loyalty, that is, a duty to discharge his or her duties with respect to the plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

307.     These Defendants were heavily invested in GE Stock and had an interest in ensuring that the Plan's assets were also heavily invested in GE Stock on a regular, ongoing basis.  Elimination of Company Stock as an investment option for the Plan would have reduced the overall market demand for GE Stock and sent a negative signal to Wall Street analysts, which would have adversely affected the price of GE Stock, resulting in losses for the Defendants named in this Count.

308.     The Defendants named in this Count placed their own interest in investing the Plan's assets in GE Stock over the Plan participants' interest in maintaining a diversified and prudently invested 401(k) plan.

309.     The Defendants named in this Count breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*: failing to engage an independent fiduciary who could make independent judgments concerning the Plan's investment in GE Stock; failing to take such other steps as were necessary to ensure that participants' interests were loyally and prudently served; and by failing to otherwise place the interests of the Plan's participants above the interests of themselves and the Company with respect to the Plan's investment in GE Stock.

310.     As a result of these Defendants' breach of their duty to avoid conflicts of interest, the Plan, and indirectly Plaintiffs and the Plan's other participants and beneficiaries suffered damages, the exact amount of which will be determined at trial.

311.   Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), the Defendants named in this Count are personally liable to restore the losses to the Plan caused by their breach of the duty to avoid conflicts of interest as alleged in this Count.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

i.     Determining that this is a proper class action to be certified under Rule 23 and appointing Plaintiffs class representatives on behalf of the Class;

ii.     Declaring that Defendants, and each of them, are not entitled to protection under ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

iii.     Declaring that Defendants have violated the duties, responsibilities, and obligations imposed upon them as fiduciaries and co-fiduciaries and that they violated the ERISA disclosure and monitoring requirements as described above;

iv.     Compelling Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, and to restore to the Plan all profits Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made had Defendants fulfilled their fiduciary obligations;

v.     Awarding actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

vi.     Enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

vii.     Requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plan's investment in GE Stock;

viii.     Awarding extraordinary, equitable, and/or injunctive relief as permitted by law, equity, and the federal statutory provisions set forth herein, pursuant to Fed. R. Civ. P. 64 and 65;

ix.     Awarding the Plan and/or Plaintiffs and members of the Class, restitution, disgorgement, and/or other remedial relief;

x.      Awarding the Plan and/or Plaintiffs and members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert witness fees, and other costs; and

xi.     Awarding such other relief as this Court may deem just and proper.

Dated: October 16, 2006
       Albany, New York

                        Respectfully submitted,

                        _____/s/_____
                        Jeffrey J. Sherrin (Bar Roll No. 102601)
                        **O'CONNELL & ARONOWITZ**
                        54 State Street
                        Albany, New York 12207-2501
                        (518) 462-5601 (telephone)
                        (518) 462-2670 (facsimile)

                        **MILBERG WEISS BERSHAD
                          & SCHULMAN LLP**
                        Lori G. Feldman (Bar Roll No. 513863)
                        Arvind Khurana (Bar Roll No. 513864)
                        One Pennsylvania Plaza
                        New York, New York 10119
                        (212) 594-5300 (telephone)
                        (212) 868-1229 (facsimile)

                        **LERACH COUGHLIN STOIA GELLER
                          RUDMAN & ROBBINS LLP**
                        Samuel H. Rudman
                        Evan J. Kaufman
                        Mark S. Reich (Bar Roll No. 511263)
                        58 South Service Road, Suite 200
                        Melville, New York 11747
                        Phone:  (631) 367-7100
                        Fax:  (631) 367-1173

                        **LERACH COUGHLIN STOIA GELLER
                          RUDMAN & ROBBINS LLP**
                        Nancy M. Juda
                        1100 Connecticut Avenue, N.W., Suite 730
                        Washington, DC  20036
                        Phone:  (202) 822-6792
                        Fax:  (202) 828-8528

Alfred G. Yates, Jr.
Gerald L. Rutledge
**LAW OFFICE OF**
  **ALFRED G. YATES JR., PC**
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219
(412) 391-5164 (telephone)
(412) 471-1033 (facsimile)

*Counsel for Plaintiffs*