**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

───────────────────────────────────────────

IN RE GENERAL ELECTRIC COMPANY        No. 06-CV-315
ERISA LITIGATION                                  (GLS/DRH)
                                                       (Lead Case)

───────────────────────────────────────────

## DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF THEIR SECOND MOTION TO DISMISS THE ENTIRE COMPLAINT FOR FAILURE TO STATE A CLAIM

William J. Dreyer (Bar Roll #101539)
April M. Wilson (Bar Roll #105797)
DREYER BOYAJIAN LLP
75 Columbia Street
Albany, NY 12210
(518) 463-7784

Jeffrey G. Huvelle
John M. Vine
Thomas L. Cubbage III
Christian J. Pistilli
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202) 662-6000

John J. Buckley, Jr.
Dane H. Butswinkas
Jonathan M. Landy
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000

Dated:  July 16, 2007                            Attorneys for Moving Defendants

# **TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION ........................................................................................................... 1

I.   PLAINTIFFS CONCEDE THAT ERISA CONTAINS A CAUSATION
     REQUIREMENT. ................................................................................................. 5

II.  PLAINTIFFS FAILED TO RESPOND TO DEFENDANTS' ARGUMENTS
     REGARDING GE'S LIFE AND HEALTH INSURANCE BUSINESSES ...................... 7

III. PLAINTIFFS' ALLEGATIONS REGARDING ERC'S INSURANCE
     BUSINESS ALSO MUST BE DISMISSED. .................................................. 13

     A.   Plaintiffs Have Tacitly Conceded that They Have Not Properly Pled Loss
          Causation for Their Misrepresentation Claim....................................... 16

     B.   Plaintiffs' Proposed Measure of Loss for Their Prudence Claim Is
          Inapplicable to This Case. ..................................................................... 17

     C.   Even Accepting Plaintiffs' Proposed Measure of Loss, They Have Still
          Failed To Allege A Plausible Theory of Loss Causation. .................... 24

IV.  THIS MOTION IS WHOLLY CONSISTENT WITH DEFENDANTS' MOTION
     FOR SUMMARY JUDGMENT. .................................................................... 27

CONCLUSION.............................................................................................................. 29

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Amron v. Morgan Stanley Investment Advisors Inc.*, 464 F.3d 338 (2d Cir. 2006)...........11

*Babcock v. Computer Associates International*, 186 F. Supp. 2d 253
(E.D.N.Y. 2002)..................................................................................19

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007) ...........................................*passsim*

*In re Cardinal Health, Inc. ERISA Litigation*, 424 F. Supp. 2d 1002
(S.D. Ohio 2006).................................................................................10

*Chao v. Moore*, No. AW-99-1283, 2001 WL 743204 (D. Md. June 15, 2001)................19

*In re Coca-Cola Enterprises, Inc. Erisa Litigation*, No. 06-CV-953 (TWT),
2007 WL. 1810211 (N.D. Ga. June 20, 2007).......................................................11, 17

*Crowley v. Corning, Inc.*, 234 F. Supp. 2d 222 (W.D.N.Y. 2002) ...................................15

*Dardaganis v. Grace Capital, Inc.*, 889 F.2d 1237 (2d Cir. 1989)...................................19

*Davidson v. Cook*, 567 F. Supp. 225 (E.D. Va. 1983) ......................................................19

*DiFelice v. U.S. Airways, Inc.*, 397 F. Supp. 2d 758 (E.D. Va. 2005)..............................19

*Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270 (2d Cir. 1992).....................5

*Donovan v. Bierwirth*, 754 F.2d 1049 (2d Cir. 1985)...........................................18, 21, 22

*Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005) ................................... *passim*

*In re Electronic Data Systems Corp. Securities Litigation*,
226 F.R.D. 559 (E.D. Tex. 2005)..............................................................10

*Ford v. Bierwirth*, 636 F. Supp. 540 (E.D.N.Y. 1986) ....................................................18

*Harley v. Minnesota Mining and Manufacturing Co.*, 42 F. Supp. 2d 898 (D.
Minn. 1999).......................................................................................19

*Harris Trust and Savings Bank v. John Hancock Mutual Life Insurance Co.*, 302
F.3d 18 (2d Cir. 2002)..........................................................................19

*Harzewski v. Guidant Corp.*, No. 06-3752, __ F.3d __, 2007 WL 1598097 (7th Cir. June 5, 2007).................................................................................20, 26

*Kane v. United Independent Union Welfare Fund*, No. CIV. A. 97-1505, 1997 WL 411208 (E.D. Pa. July 22, 1997)..........................................................13

*Langbecker v. Electronic Data System, Inc.*, 476 F.3d 299 (5th Cir. 2007).......................7

*Leeds v. Meltz*, 85 F.3d 51 (2d Cir. 1996)..........................................................12

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005)...............................14, 22, 23

*Loomis v. Exelon*, No. 06-C-4900 (slip op.) (N.D. Ill. Feb. 21, 2007) .............................11

*Martin v. Feilen*, 965 F.2d 660 (8th Cir. 1992) ..................................................7

*O'Brien v. National Property Analysts Partners*, 719 F. Supp. 222 (S.D.N.Y. 1989) ................................................................................15

*Pietrangelo v. NUI Corp.*, No. Civ. 04-3223 (GEB), 2005 WL. 1703200 (D.N.J. July 20, 2005)......................................................................11, 12

*Roth v. Sawyer-Cleator Lumber Co.*, 61 F.3d 599 (8th Cir. 1995)....................................19

*Semerenko v. Cendant Corp.*, 223 F.3d  165 (3d Cir. 2000) .......................................22-23

*Silverman v. Mutual Benefit Life Insurance Co.*, 138 F.3d 98 (2d Cir. 1998)..............5, 25

*Toussaint v. James*, No. 01 Civ. 10048, 2003 WL 21738974 (S.D.N.Y. July 25, 2003) .............................................................................19

*United States v. Northern Trust Co.*, 372 F.3d 886 (7th Cir. 2004) ................................12

*Willett v. Blue Cross & Blue Shield of Ala.*, 953 F.2d 1335 (11th Cir. 1992) ....................5

## FEDERAL STATUTES

29 U.S.C. §1109(a) .................................................................................5, 9-10

## OTHER AUTHORITIES

*Restatement (Third) of Trusts: Prudent Investor Rule* § 210 (1992) ................................22

# <u>INTRODUCTION</u>

The Supreme Court recently held that, in order to survive a motion to dismiss, Plaintiffs must plead facts that render plausible every element of their claim.  *See Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007).  This motion presents the basic question whether Plaintiffs have adequately pled causation, *i.e.*, whether the alleged fiduciary breaches caused the losses that Plaintiffs claim.  Because Plaintiffs' allegations regarding causation are wholly implausible, and because Plaintiffs have the burden of proving causation, proper exercise of the Court's gate-keeping function mandates dismissal of the case.

Plaintiffs' Complaint asserts that undisclosed under-reserving in certain GE insurance businesses led to a drop in the price of GE stock from $50 to $35.  This oft-repeated claim is central to the Complaint:

> As a result of Defendants' fiduciary breaches, as hereinafter enumerated and described, the [GE] Plan has suffered substantial damages …. *<u>Plan participants have seen their retirement savings accounts devastated as Company Stock plummeted from a high of approximately $50 per share in the months preceding the Class Period to its current price of approximately $35 per share.</u>*  Under ERISA, the breaching fiduciaries are obligated to restore to the Plan the losses resulting from these fiduciary breaches.

(Compl. ¶ 8 (emphasis added).)  But the asserted causal link between the alleged under-reserving and the decline in GE's share price is implausible because, as the Complaint itself asserts, the under-reserving either was never revealed at all or was not revealed until years *after* the drop in share price.  Causes necessarily precede their effects.  Damaging information about a company cannot influence the company's share price if that information has not been disclosed to the market.

Plaintiffs' failure to plead causation is particularly blatant insofar as they allege that GE's life and health insurance businesses were under-reserved.  Plaintiffs actually allege that the

under-reserving in the life and health insurance businesses has *never* been disclosed to the market. As a matter of pure logic, paying too dearly for stock due to an alleged misrepresentation does not, by itself, create or cause a loss. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). It is only when the alleged misrepresentation is revealed that the misrepresentation can impact the share price and cause a loss to occur. Plaintiffs' Opposition fails to address, much less refute, this fatal deficiency in their Complaint, or to offer any plausible causal theory linking the alleged under-reserving to the stock price decline that is central to their Complaint. By alleging that the under-reserving in the life and health businesses remains undisclosed, Plaintiffs have pled themselves out of court, and any and all claims relating to these businesses should be dismissed.

Plaintiffs' allegations concerning under-reserving in the ERC insurance business are similarly flawed. While the Complaint alleges that the ERC reserve deficiencies were disclosed to the market, the Complaint alleges that such disclosure occurred years *after* the share price decline that is the focus of the Complaint. It is simply not plausible that a disclosure made in 2005 could have caused a price decline that occurred at least three years earlier. When the alleged under-reserving in the ERC insurance business was, according to the Complaint, first revealed to the market, GE's stock price went up – not down. It is therefore inconceivable that any alleged misrepresentation relating to ERC caused the GE Savings & Security Program ("GE Plan") to suffer any losses.

Recognizing the unassailable logic of Defendants' argument, Plaintiffs attempt to recast their claim by essentially abandoning their $15 drop theory. (*See* Opp., p. 17 (Plaintiffs are not required "to plead a decline in stock price.").) Plaintiffs' Opposition instead relies almost exclusively on an alternative investment theory. This theory is premised on the speculative and

implausible notion that, if the fiduciaries had at some unspecified moment of time – in violation of the terms of the collectively bargained GE Plan and the directions of its participants – sold all of the Plan's more than $16 billion in GE stock and invested those funds in an alternative investment, the Plan would have performed better.  This allegedly higher return, Plaintiffs contend, is their measure of damages.  This new damages theory, however, cannot save Plaintiffs' Complaint.

First, this alternative prudent investment theory does not apply to Plaintiffs' misrepresentation claim (Count II).  Plaintiffs' Opposition tacitly recognizes this, for it does not mention their misrepresentation claim even once, arguing only that Plaintiffs have adequately pled a loss on their prudence claim (Count I).  (*See* Opp., p. 18 ("Defendants should have known that GE stock was an *imprudent* investment and that the Plan did not earn what it would have earned had it been invested in *prudent* investments" (emphasis added)).)  Undoubtedly, Plaintiffs are silent as to their misrepresentation claim because Second Circuit and Supreme Court authority make clear that the alternative prudent investment theory does not properly measure damages in cases alleging misrepresentations in financial statements.

Second, Plaintiffs are simply not entitled to this asserted measure of damages where, as here, their prudence claim depends entirely on alleged misrepresentations.  If the alleged under-reserving at ERC had been publicly disclosed at an earlier date, the share price would have adjusted to reflect such information, and there would have been no basis for asserting that it was imprudent to invest in GE stock thereafter.  Stated otherwise, according to the Complaint, it was imprudent to invest in GE stock only because of the undisclosed facts regarding the reserves maintained by GE's insurance subsidiaries.  While Plaintiffs are trying to fold the financial statement concealment charge into their prudence action, this manipulation should be recognized

for what it is:  an attempt by Plaintiffs to disguise a misrepresentation claim as a prudence claim in order to remedy the fatal flaw of pleading a breach with no causal connection to any loss.

Third, even accepting for a moment that Plaintiffs are entitled to their newly asserted measure of damages on their prudence claim, *i.e.*, the allegedly higher return on some hypothetical alternative investment, Plaintiffs are still required to plead causation, and they have not done so.  As Plaintiffs concede, pleading a breach plus a measure of damages does not eliminate the need to plead a causal link between the two.  (Opp., p. 2.)  Yet Plaintiffs' Opposition argues only that they have adequately pled "a loss" in the form of reduced returns. Nowhere have Plaintiffs pled any facts demonstrating how these allegedly higher returns could have been achieved.  If the GE Plan's fiduciaries had sold all of the GE stock in the Plan – as Plaintiffs contend they were obligated to do – the Plan would have incurred massive losses from the disclosure of the alleged under-reserving and the subsequent liquidation of the Plan's GE stock holdings.  Absent a plausible causal theory indicating that higher overall returns might have been achieved in light of the massive losses this disclosure and sell-off would have created, Plaintiffs' prudence claim must be dismissed.

By asking this Court to adopt a rule excusing Plaintiffs from pleading and proving causation, Plaintiffs seek to cause fiduciaries to become the guarantors of the employer stock held by the GE Plan.  On their theory, Plaintiffs can defeat a motion to dismiss merely by alleging a breach of fiduciary responsibility, without alleging any plausible causal connection between the alleged breach and any harm to the GE Plan.  This far-fetched theory contravenes both common sense and the plain language of ERISA, and the Court should reject it.

## I.   PLAINTIFFS CONCEDE THAT ERISA CONTAINS A CAUSATION REQUIREMENT.

Plaintiffs are compelled to recognize that a plaintiff must plead a "causal link between the breach of the fiduciary duty and the harm suffered by the Plan."  (Opp., p. 2.)  They had no alternative:  Section 409(a) of ERISA states explicitly that a plaintiff must establish not only a breach of fiduciary duty but the existence of "*losses … resulting from*" that breach in order to recover monetary damages.  29 U.S.C. § 1109(a) (emphasis added).[1]

Thus, the requirement that Plaintiffs plead and prove proximate causation is not, as Plaintiffs suggest, an idiosyncrasy of the securities law.  It is not enough to plead a breach plus a measure of damages without pleading that the breach caused the damages being sought.  Causation is a separate requirement imposed by the text of the very statute under which Plaintiffs bring their claim.

The Supreme Court has emphasized that courts play an important gate-keeper function at the motion to dismiss stage.  *See Twombly*, 127 S. Ct. 1955.  In *Twombly*, the Court reaffirmed that even under the pleading standards of Rule 8, "plaintiff[s'] obligation to provide the grounds of [their] entitle[ment] to relief requires more than labels and conclusions" – plaintiffs must plead facts that, taken as true, render their ability to prove each element of their claim not merely conceivable but plausible.  *Id.* at 1959; *see id.* at 1960 ("Because the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be

---

[1]     *Accord Silverman v. Mutual Benefit Life Ins. Co.*, 138 F.3d 98, 104 (2d Cir. 1998) (holding that ERISA Section 409(a) "requires a plaintiff to demonstrate … some causal link" between the breach and the plaintiff's loss); *Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 279 (2d Cir. 1992) ("[P]roof of a causal connection … is required between a breach of fiduciary duty and the loss alleged."); *Willett v. Blue Cross & Blue Shield of Ala.*, 953 F.2d 1335, 1343 (11th Cir. 1992) ("Section 409 of ERISA establishes that an action exists to recover losses that 'resulted' from the breach of fiduciary duty; thus, the statute does require that the breach of the fiduciary duty be the proximate cause of the losses claimed ....").

dismissed.").  The Supreme Court instructed that this burden is not to be taken lightly and must be assessed seriously at the motion to dismiss stage, noting that "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, 'this basic deficiency should … be exposed at the point of minimum expenditure of time and money by the parties and the court.'"  *Id.* at 1966; *see id.* at 1967 ("[A] district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed.").

In particular, "something beyond the mere possibility of loss causation must be alleged, lest a plaintiff with a largely groundless claim be allowed to take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value."  *Id.* at 1966 (internal quotation marks omitted)).  Here, that "something" is a plausible causal connection between the alleged breach and the alleged loss to the GE Plan.  Plaintiffs simply have failed to plead such a connection.[2]

By seeking to recover damages based on a loss of share value that was *not* caused by the alleged breaches, Plaintiffs impermissibly seek to turn ERISA into a "partial downside insurance policy" for plan participants.  *See generally Dura*, 544 U.S. at 342 ("allowing a plaintiff to forgo giving any indication of the … proximate cause that the plaintiff has in mind would … tend to transform a private securities action into a partial downside insurance policy").  But ESOP

---

[2]      Significantly, in *Twombly* the Supreme Court explicitly rejected the previously "accepted rule," on which Plaintiffs rely in this case, "that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  (Opp., p. 5.)  The Court noted that, if the previously accepted pleading standard was applied literally, "a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery."  *Twombly*, 127 S. Ct. at 1968.  The Court rejected this pleading standard, holding that this phrase "is best forgotten as an incomplete, negative gloss on an accepted pleading standard."  *Id.*

fiduciaries are not guarantors of plan investments.  *See generally Langbecker v. Electronic Data Sys., Inc.*, 476 F.3d 299, 312 (5th Cir. 2007) ("[I]n participant-directed plans, the plan sponsor cannot be a guarantor of outcomes for participants."); *Martin v. Feilen*, 965 F.2d 660, 666 (8th Cir. 1992) (rejecting "rule [that] would make ESOP fiduciaries virtual guarantors of the financial success of the plan").

## II.   PLAINTIFFS FAILED TO RESPOND TO DEFENDANTS' ARGUMENTS REGARDING GE'S LIFE AND HEALTH INSURANCE BUSINESSES.

Defendants' opening brief pointed out that Plaintiffs had pled themselves out of court by alleging that the claimed under-reserving in GE's life and health insurance businesses has not been disclosed to the market.  Facts unavailable to the market cannot cause a decline in the price of a company's stock.  Plaintiffs' Opposition fails to address, much less refute, this argument. Instead of offering an explanation of how undisclosed under-reserving in the life and health insurance businesses could have resulted in a loss in share price and thereby caused a loss to the GE Plan, Plaintiffs' Opposition attacks Defendants' argument for relying on the Supreme Court's decision in *Dura*, on the ground that it is a securities case.

Plaintiffs attack a straw man.  Defendants relied on *Dura* not for any proposition unique to the securities laws, but for a proposition that the Supreme Court itself described as a matter of "pure logic."  *See* 544 U.S. at 342.  As Justice Breyer explained for the unanimous Court, at the moment when shares of stock are purchased at an inflated price, the purchaser "has suffered no loss" because "the inflated purchase payment is offset by ownership of a share that at that instant possesses equivalent value."  *Id.*  In other words, paying too dearly for stock due to an alleged misrepresentation does not, by itself, create a loss.  "[I]f, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any

loss." *Id.*  A loss might occur later, but only "after the truth makes its way into the marketplace" and the price of the stock is thereby affected.  *Id.*

The unassailable logic set out in *Dura* squarely applies to Plaintiffs' allegations of under-reserving in the life and health insurance businesses.  Plaintiffs specifically allege that this under-reserving "remain[s] undisclosed."  (Compl. ¶ 146.)  At most, Plaintiffs have alleged that the GE Plan has purchased shares of GE stock at inflated prices due to the market's ignorance of under-reserving in the life and health insurance businesses.  Unless and until the purported truth regarding those businesses is disclosed to the market (and the market reacts negatively), the GE Plan's purchase of GE stock at allegedly inflated prices has not, as a matter of "pure logic," caused the Plan to suffer a loss.  Thus, Plaintiffs have pled facts affirmatively establishing that the alleged under-reserving in GE's life and health businesses could *not* have caused any losses to the GE Plan during the so-called Class Period.

Rather than address this common sense proposition, Plaintiffs argue that *Dura* has not been explicitly extended to the ERISA context.  This argument is answered by the Supreme Court's statement that its decision in *Dura* was based, first and foremost, on "pure logic," the application of which is not limited to the securities laws.  Further, the Supreme Court in *Twombly* applied the teachings of *Dura* outside of the securities law context.  *See Twombly*, 127 S. Ct. at 1966 (observing that *Dura* dealt with the "practical significance of the Rule 8 entitlement requirement" in evaluating the sufficiency of Sherman Act allegations).  And in *Dura* itself, the Supreme Court's holding was plainly based *not* on any heightened pleading requirements or requirements unique to the securities laws, but rather on the basic pleading requirements of Rule 8 and what the Court deemed to be "traditional" elements of causation.  *See* 544 U.S. at 346 ("We concede that the Federal Rules of Civil Procedure require only a short and

plain statement of the claim showing that the pleader is entitled to relief …. But it should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection.").

While purporting to dispute the applicability of *Dura,* Plaintiffs themselves are forced to admit that the Supreme Court in *Dura* merely "adopted a *pragmatic*, *classic* common-law" approach to loss causation (Opp., p. 21 (emphasis added)), and that what the *Dura* Court called "loss causation" is nothing more than traditional proximate causation (*id.* ("the Supreme Court explained that the element of loss causation requires the plaintiff to plead that the defendants' misrepresentations 'proximately caused the plaintiff's economic loss'").) Thus, the Supreme Court in *Dura* did not articulate a special rule of causation that was applicable only under the securities laws; the Court simply applied logic and everyday concepts of causation to a claim of misrepresentation in connection with the sale of a publicly traded security.

Plaintiffs' reliance, in a footnote, on a putative distinction between ERISA and the law of trusts, on the one hand, and the securities laws, on the other, is unexplained. In pertinent part, both seek to protect investments and remedy harms *caused by* breaches of duty. The fact that the securities laws protect public investors while ERISA protects participants' retirement savings hardly changes the fact that both require proof of causation. Moreover, while the *Dura* Court looked to the requirements of the securities law, the Court simply noted that the securities statutes embody the "traditional elements of causation and loss," *see* 544 U.S. at 346, elements that are also incorporated in the "resulting from" clause of Section 409(a) of ERISA.[3]

---

[3]     *Compare Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005) ("the statute expressly imposes on plaintiffs 'the burden of proving' that the defendant's misrepresentations '*caused the loss* for which the plaintiff seeks to recover'" (emphasis added)), *with* ERISA, 29 U.S.C. (continued…)

Plaintiffs' argument that *Dura* is inapplicable simply because few district courts have had occasion to apply its principles in the context of an ERISA suit likewise carries no weight. Because *Dura* was decided just two years ago, it is unsurprising that few subsequent ERISA decisions have had occasion to cite *Dura* when considering whether a cognizable loss occurs when a plan owns securities that do *not* go down in value as a result of alleged improprieties. Plaintiffs themselves cite only one district court decision refusing to apply *Dura* to an ERISA suit. *See In re Cardinal Health, Inc. ERISA Litig.*, 424 F. Supp. 2d 1002 (S.D. Ohio 2006). That decision, however, is premised on the erroneous understanding that *Dura* is uniquely founded on "the law of fraud," and otherwise fails to articulate any principled basis for concluding that *Dura*'s compelling logic would not apply with equal force to misrepresentation claims brought under ERISA.[4]

Furthermore, the court in *Cardinal* Health did not question the logic of *Dura* about what constitutes a loss or loss causation, and it did not question that an ERISA plaintiff *eventually* must prove loss causation in a manner consistent with *Dura*'s logic. It simply, and erroneously, excused the plaintiffs in that case from properly *pleading* loss causation in their complaint. In light of *Twombly*, however, it is especially clear that, even under Rule 8, and even outside the

§1109(a) (permitting financial recovery only for "*losses to the plan resulting from* each such breach" of fiduciary duty (emphasis added)).

[4]     Plaintiffs also purport to rely on *In re Electronic Data Systems Corp. Securities Litigation*, 226 F.R.D. 559, (E.D. Tex. 2005), *aff'd, Feder v. Electronic Data Systems Corp.*, 429 F.3d 125, 136 (5th Cir. 2005), as support for the proposition that *Dura*'s "concept of 'loss causation' does not apply to ERISA claims." (Opp., p. 11.) Neither of the two opinions in that case, however, so much as mentions *Dura*. Rather, the district court merely concluded, and the Fifth Circuit agreed, that "potential conflicts of interest between the proposed class of plaintiffs in the securities case and the plaintiffs in the ERISA class" did not render the proposed class representative inadequate for purposes of certifying a class action. *In re Elec. Data Sys. Corp. Secs. Litig.*, 226 F.R.D. at 568. Moreover, the footnote cited by Plaintiffs merely recited an argument made by defendants in that case; it manifestly was not a holding, or even the dicta, of the court. *See id.* at 569 n.8.

context of the securities laws, plaintiffs must plead facts sufficient to render plausible every element of their claim, including causation. *See Twombly*, 127 S. Ct. at 1966 ("something beyond the mere possibility of loss causation must be alleged"); *see also Amron v. Morgan Stanley Inv. Advisors Inc.*, 464 F.3d 338, 343 (2d Cir. 2006) ("A plaintiff must allege … those facts necessary to a finding of liability.").

Moreover, other district courts have applied *Dura* to ERISA actions. *See In re Coca-Cola Enters, Inc. Erisa Litig.*, No. 06-CV-953 (TWT), 2007 WL 1810211 (N.D. Ga. June 20, 2007); *Loomis v. Exelon*, No. 06-C-4900 (slip op.) (N.D. Ill. Feb. 21, 2007). In ruling on a motion to dismiss, the *Coca-Cola* court held that, because "[l]oss causation is an element of the claim, … Plaintiffs should be required to allege facts that show it"; "[i]f they cannot do so, the case is doomed to fail." *Id.* at 17. In so holding, the court observed that it was particularly appropriate to apply *Dura*'s requirements to the claims before it because that case, like this one, was nothing more than "a securities fraud case masquerading as an ERISA case." *Coca-Cola*, 2007 WL 1810211, at *8. When their reasoning is considered in the context of the pure logic employed in *Dura*, decisions such as *Coca-Cola* are more persuasive than the *Cardinal Health* decision.

Also instructive is *Pietrangelo v. NUI Corp.*, No. Civ. 04-3223 (GEB), 2005 WL 1703200 (D.N.J. July 20, 2005), which Plaintiffs disingenuously purport to distinguish. It is true that the *Pietrangelo* court stated that it "need not determine whether an ERISA plaintiff must demonstrate loss causation." *Id.* at 12. It did not, however, state that such a showing was not required. Rather, it held that the plaintiffs' complaint suffered from a more critical and basic infirmity that rendered the loss causation inquiry unnecessary: the Complaint "failed to allege that … the Plan suffered damages as a result of the practice" that allegedly resulted in the over-

statement of the employer's earnings.  *Id.*  As the *Pietrangelo* court explained, in reasoning

equally applicable here:

> Because the alleged [improper] reterminating practice has never
> been disputed [(*i.e.*, publicly disclosed)], earnings were never
> restated to account for the alleged inflation.  Thus, the Plan has not
> yet been harmed by the alleged … practice ….

*Id.*

Ultimately, however, the "pure logic" of *Dura* speaks for itself and cannot rationally be

disputed.  No harm is caused by the purchase of shares at an allegedly inflated price based on

undisclosed information unless and until that information is disclosed to the market and the share

price declines *as a result* of disclosing the information.  The Complaint in this case alleges, at

most, that Defendants continue to breach their fiduciary duties by permitting GE Plan

participants to acquire GE stock, notwithstanding the alleged fact that Defendants know that the

stock is over-priced because of undisclosed under-reserving in GE's life and health insurance

businesses.  Defendants vigorously contest the truthfulness of these allegations.  However, even

assuming *arguendo* that these allegations are true, Plaintiffs have failed to plead any facts that

render plausible their wholly conclusory – and wholly implausible – assertion of a causal

connection between this alleged breach and any losses to the GE Plan.  *See Twombly*, 127 S. Ct.

at 1959 ("a formulaic recitation of the elements of a cause of action will not do"); *Leeds v. Meltz*,

85 F.3d 51, 53 (2d Cir. 1996) ("bald assertions and conclusions of law will not suffice").  Indeed,

fatal to their claim, *Plaintiffs have affirmatively pled the absence of any such causal connection*

by alleging the market's ignorance of the alleged under-reserving.  *See United States v. Northern*

*Trust Co.*, 372 F.3d 886, 888 (7th Cir. 2004) (observing the possibility that a plaintiff may plead

itself out of court by alleging facts that are devastating to its claim).

The defect in Plaintiffs' allegations is highlighted by their efforts to distinguish *Kane v. United Independent Union Welfare Fund*, No. CIV. A. 97-1505, 1997 WL 411208 (E.D. Pa. July 22, 1997).  According to Plaintiffs, the complaint in *Kane* demonstrated that "there was no present injury to the plan and pled only a possibility of future injury."  (Opp., p. 9.)  But Plaintiffs' Complaint suffers from precisely the same infirmity.  Secret, undisclosed under-reserving, of which the market is alleged to be unaware, cannot have caused a present injury to the GE Plan, even if the Plan bought GE stock at "inflated" prices.  This reality warrants dismissal of Plaintiffs' allegations insofar as they relate to GE's life and health businesses.

## III.   PLAINTIFFS' ALLEGATIONS REGARDING ERC'S INSURANCE BUSINESS ALSO MUST BE DISMISSED.

Plaintiffs also allege that Defendants breached fiduciary duties by failing to disclose under-reserving in another insurance business, ERC, which GE sold in 2005.  As a result, the Complaint alleges, Plaintiffs' retirement accounts have been "devastated" as GE's stock price has "plummeted" from $50 to $35 during the so-called Class Period.  (Compl. ¶ 8.)  As shown by the facts alleged in the Complaint and facts of which the Court may take judicial notice, however, no plausible causal connection can be established between the alleged under-reserving and the $15 decline in GE's stock price.

In March 2001, at the beginning of the so-called Class Period, GE's stock traded for approximately $50 per share.  The only substantial drop in the price of GE stock during the so-called Class Period occurred between March 2001 and late 2002/early 2003, when GE's stock price declined to lows around $22 per share.  According to the allegations in the Complaint, this decline in share price could not have been caused by the alleged under-reserving at ERC.  This is because the Complaint does not allege that the purported under-reserving at ERC – the alleged basis for the drop in the price of GE stock – was disclosed or became known to the market in

2002 or 2003.  *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 n.4 (2d Cir. 2005)

(concealment "could not have caused a decrease in the value of [the] companies before the

concealment was made public").

The Complaint expressly states that GE's alleged misrepresentations did not become

known to the market until November 18, 2005.  (Compl. ¶ 177 ("Defendants never accurately

disclosed to Plaintiffs or Plan participants the true nature, extent, and risks of these problems

until at least November 18, 2005."); *id.* ¶ 179 ("It was not until November 18, 2005 that Plan

participants had actual knowledge of material facts necessary to partially understand the negative

impact of the under-reserving at ERC....").)  By November 2005, however, GE stock was

already trading at approximately $35 per share.  It did not decline further and in fact rose during

the days and weeks following the November 18, 2005 disclosure.  The disclosure of the alleged

ERC under-reserving – which the Complaint claims to have occurred in November 2005 –

cannot possibly have caused the $15 decline in the price of GE stock between March 2001 and

early 2003.[5]  The effect cannot precede the cause.

Plaintiffs seek to trivialize Defendants' argument, asserting that Defendants "quibble

over the nature and extent of the November 2005 disclosure" and arguing that "there is no

question that the price and value of GE stock materially declined *throughout* the Class Period."

(Opp., p. 22; *but see* Defs' Opening Mem., p. 6 (fig. 2).)  But Defendants do far more than

"quibble" when they point out the allegations of the Complaint seek to reverse the normal

---

[5]     Moreover, in light of GE's overall size and strength, it is wholly implausible that
revelation of the alleged under-reserving in GE's insurance businesses might have caused a
decline of $15, or approximately 30%, in the value of a share of GE stock.  *See* Defendants'
Opening Memo, pp. 13-14; 49-50 (setting out the overall size of GE as well as the potential
effect of the under-reserving).

sequence of cause followed by effect.[6]  And it is simply inaccurate to state that the stock price

declined throughout the so-called Class Period, as the decline ceased (and began to reverse itself)

in early 2003 – well before the alleged November 2005 disclosure.  (*See* Defs' Opening Mem., p.

6 (fig. 2).)

In the face of Defendants' argument, Plaintiffs now shift position and instead rely almost

exclusively on the argument that the GE Plan suffered a loss because "it would have *earned*

*more* had it been invested in a prudent investment as opposed to … GE stock."  (Opp., p. 20

(emphasis added).)  In short, Plaintiffs claim that they need not plausibly allege that the Plan lost

money as a result of the alleged breach, but merely that the Plan might have earned even more

through a different investment.

Plaintiffs' alternative theory – that they may establish a loss to the GE Plan by showing

that there was a hypothetical, "prudent" investment that out-performed GE stock during the so-

called Class Period – also is badly mistaken.  First, it is clear that Plaintiffs have implicitly

conceded that this alternative investment theory does not apply to their misrepresentation claim,

as their Opposition does not mention that claim even once.  Second, Plaintiffs are simply not

entitled to this asserted measure of damages where, as here, their prudence claim is entirely

dependent upon alleged misrepresentations.  Third, even assuming that this measure of damages

applies, Plaintiffs still have not pled loss causation:  They have not pled any facts demonstrating

---

[6]      In their opposition, Plaintiffs state in passing that "allegations that the true financial
condition of a corporate defendant … was gradually revealed to the market" are sufficient to
state a claim.  (Opp., p. 21.)  But their Complaint alleges that the truth was first revealed to the
market only on November 18, 2005, and does not claim that the alleged under-reserving at ERC
was gradually revealed to the market during an earlier period.  Plaintiffs may not amend their
Complaint in their opposition to Defendants' motion to dismiss.  *See, e.g., O'Brien v. National
Prop. Analysts Partners*, 719 F. Supp. 222, 229 (S.D.N.Y. 1989) ("It is axiomatic that the
Complaint cannot be amended by the briefs in opposition to a motion to dismiss."); *Crowley v.
Corning, Inc.*, 234 F. Supp. 2d 222, 224 (W.D.N.Y. 2002) (same).

how the allegedly higher returns could have been achieved.  And, given the massive losses to the

GE Plan that would have resulted from the sale of more than $16 billion worth of GE stock that

Plaintiffs' alternative investment theory necessarily would have involved, Plaintiffs' assertion

that implementing their alternative investment theory would have resulted in a higher return is

wholly implausible.[7]

### A.  Plaintiffs Have Tacitly Conceded that They Have Not Properly Pled Loss Causation for Their Misrepresentation Claim.

The two principal causes of action in Plaintiffs' Complaint are that Defendants violated

fiduciary duties by (1) imprudently investing GE Plan assets in GE stock and (2) misleading GE

Plan participants.  Plaintiffs, however, discuss only their prudence claim in their Opposition and

argue only that they have pled facts sufficient to survive a motion to dismiss with respect to their

prudence claim.  (*See, e.g.*, Opp., p. 1 ("this case concerns Defendants' repeated breaches of their

fiduciary duties to the Plan by continuing to allow the Plan to be invested in GE stock when

GE's under-reserving activities made the investment imprudent"); *id.* p. 18 ("Defendants should

have known that GE stock was an *imprudent* investment and that the Plan did not earn what it

would have earned had it been invested in *prudent* investments" (emphasis added)).)  Moreover,

Plaintiffs rely *exclusively* on arguments and cases dealing with allegations of imprudence.

Nowhere do they argue any plausible causal theory for their misrepresentation claim, and at no

point do they cite any authority establishing that their asserted measure of loss applies to a

misrepresentation claim.  Therefore, Plaintiffs have tacitly conceded that they have not satisfied

---

[7]     As discussed further in Part III.C, *infra*, such losses would have resulted not only from
the GE Plan's sale of GE stock but also from, among other things, the disclosure of the alleged
under-reserving that would have been required under the securities laws prior to any such sale.

their burden of properly pleading loss causation with respect to their misrepresentation claim.  At a minimum, therefore, their misrepresentation claim (Count II) must be entirely dismissed.

**B.**   **Plaintiffs' Proposed Measure of Loss for Their Prudence Claim Is Inapplicable to This Case.**

Plaintiffs' prudence claim fails because, while they rely on a measure of damages applicable to some prudence claims, in this case their claim is premised entirely on alleged misrepresentations.  This mismatch between their factual allegations and their theory of liability requires dismissal of their prudence claims.

Unlike each of the cases relied upon by Plaintiffs, this is not a case in which investment in GE stock was forbidden by the plan documents or inherently improper.  Plaintiffs do not and could not allege that GE Plan fiduciaries violated any term of the GE Plan or that there is anything *inherently* imprudent about investing in GE stock – an investment in one of the world's largest, most profitable, and most diversified companies.[8]  Rather, they allege only that it was imprudent to invest in GE stock because its price was inflated due to alleged misrepresentations. *See Coca-Cola*, 2007 WL 1810211, at *6 ("None of the Plaintiffs' claims can succeed if this fraudulent scheme cannot be proven.").  Where, as Plaintiffs allege here, a plan has purchased stock at a price that was inflated because the company had concealed material information that, if made public, would have reduced the stock price, loss is measured in the traditional securities law sense, by the difference between what was paid for the stock and what the stock was in fact worth.  Here, when GE's November 18, 2005, reserve adjustment announcement was made, its

---

[8]      Even if Plaintiffs had asserted that the Complaint should be read to make the astonishing claim that investing in GE was imprudent irrespective of the alleged misrepresentations, that assertion would have been wholly unsupported by any specific factual allegations and could not have saved Plaintiffs' prudence claim on a motion to dismiss.  *See Twombly*, 127 S. Ct. at 1959-60.

stock price rose, which demonstrates that there was no loss.  Because it is clear that Plaintiffs have not alleged and could not allege a loss to the GE Plan, their claims must be dismissed in their entirety.

The principal case relied upon by Plaintiffs in support of their alternative investment theory is *Donovan v. Bierwirth*, 754 F.2d 1049 (2d Cir. 1985).  In that case, the Second Circuit considered the appropriate measure of damages where plan trustees violated their duties by using plan assets to purchase company stock as part of their effort to defeat a hostile takeover.  *Id.* at 1051.  That plan paid a premium for the company stock, not because of misrepresentations, but because of the pending tender offer that the fiduciaries sought to defeat for personal gain.  The Second Circuit held that the proper measure of loss under those circumstances "requires a comparison of what the Plan actually earned on the … investment [in company stock] with what the Plan would have earned had the funds been available for other Plan purposes."  *Id.* at 1056. Thus, on the facts of that case, it held that the plan *might* have suffered a loss despite the fact that the plan's investment in company stock had a positive return.[9]

Importantly, however, *Bierwirth* did not involve misrepresentation claims, or allegations of what *Bierwirth* described as "fraud, or the withholding of information."  *Id.* at 1055.  Indeed, *none* of the cases relied on by Plaintiffs in support of their proposed measure of damages involved allegations of misrepresentations or the artificial inflation of stock.  Rather, like *Bierwirth*, each involved the legally and factually distinct context of claims alleging that

---

[9]      Notably, while the Second Circuit in *Bierwirth* held that plaintiffs were entitled to a *presumption* that the plan's investment in company stock would have instead been invested in the most profitable of equally likely alternative investments, 754 F.2d at 1056, the later course of the litigation makes clear that this presumption may be overcome.  *See Ford v. Bierwirth*, 636 F. Supp. 540, 542 (E.D.N.Y. 1986) (defendants prevailed by proving that plan would have been invested in less profitable alternative).

defendants used plan assets for inherently improper purposes, such as in violation of the plan's terms or for the benefit of themselves or their employers, or made inherently imprudent investments.[10]  In *Dardaganis v. Grace Capital, Inc.*, 889 F.2d 1237, 1239 (2d Cir. 1989), for instance, defendant fiduciaries violated the terms of the plan and invested a greater percentage of plan assets in common stock than the plan permitted.  On the facts of that case, the court held that the appropriate measure of damages was the difference between the gain realized by the plan though its investment in common stock and the greater gain that would have been realized had the fiduciaries followed the plan's terms and invested in non-equity securities.  *Id.* at 1243.[11] Similarly, *Harris Trust and Savings Bank v. John Hancock Mutual Life Insurance Co.*, 302 F.3d 18 (2d Cir. 2002), involved allegations of fiduciary self-dealing and not allegations of misrepresentations that artificially inflated the price of a stock.

---

[10]     *See Toussaint v. James*, No. 01 Civ. 10048, 2003 WL 21738974, at *3 (S.D.N.Y. July 25, 2003) (plaintiffs alleged that fiduciaries failed to follow plan documents); *Babcock v. Computer Assocs. Int'l*, 186 F. Supp. 2d 253, 261 (E.D.N.Y. 2002) (plaintiffs alleged that fiduciaries failed to follow the terms of the plan); *Roth v. Sawyer-Cleator Lumber Co.*, 61 F.3d 599, 601 (8th Cir. 1995) (plaintiffs alleged that trustees breached their fiduciary duties by securing deferred payments of participants' retirement benefits under ESOP with company stock); *Chao v. Moore*, No. AW-99-1283, 2001 WL 743204, at *1 (D. Md. June 15, 2001) (plaintiffs alleged that trustees breached their fiduciary duties by causing the plan to enter a series of imprudent real estate transactions); *DiFelice v. U.S. Airways, Inc.*, 397 F. Supp. 2d 758, 771-73 (E.D. Va. 2005) (plaintiffs alleged that fiduciaries should have closed the company stock fund in light of company's slide toward bankruptcy – not because of any undisclosed facts); *Harley v. Minnesota Mining and Mfg. Co.*, 42 F. Supp. 2d 898, 901 (D. Minn. 1999) (plaintiffs alleged that fiduciaries imprudently invested in a hedge fund containing collateralized mortgage obligations), *aff'd*, 284 F.3d 901 (8th Cir. 2002); *Davidson v. Cook*, 567 F. Supp. 225, 232 (E.D. Va. 1983) (plaintiffs alleged that fiduciaries imprudently loaned funds to union), *aff'd sub nom. Davidson on behalf of Local 666 Ben. Trust Fund v. Cook*, 734 F.2d 10 (4th Cir. 1984).

[11]     Unlike the plan involved in *Dardaganis*, the GE Plan does not forbid the activity undertaken by fiduciaries here.  Indeed, to the contrary, it *requires* Plan fiduciaries to allow participants to direct the investment of Plan assets in GE stock, and the fiduciaries almost certainly would have been sued had they failed to do so.

Moreover, in the principal cases relied on by Plaintiffs, the alleged breaches of defendants' fiduciary duties involved making investments that never should have been made – for example, the fiduciaries in *Dardaganis* should not have invested the additional funds in equities in the first place.  Under such circumstances, it may well be that a proper measure of loss is based upon what would have been gained if the funds in question had instead been invested, from the outset, in a permissible alternative.  And it is at least possible to conceive of how this measure might be applied in a non-speculative fashion.

Here, by contrast, the allegation is not that the GE Plan should never have invested in GE stock – nor could it be, since the collectively-bargained Plan requires fiduciaries to offer GE stock and to acquire GE stock as directed by participants.  Rather, Plaintiffs allege that GE stock became imprudent (and Defendants' learned of this alleged fact) at some later point – presumably the March 23, 2001, start of the so-called Class Period.  According to Plaintiffs, the GE Plan's fiduciaries should have at this time liquidated the Plan's holding of more than $16 billion worth of GE stock and re-invested those funds elsewhere.  In this context, it is far too glib to say that the fiduciaries should have simply switched to an alternative investment.

As discussed in Part III.C, *infra*, this massive sell-off would necessarily need to have been preceded by a disclosure to the market of the basis for the sale – that is, the "truth" regarding the alleged under-reserving.[12]  After a drop in stock price relating to this disclosure, the GE Plan would also have suffered a substantial drop as a result of the sell-off's market

_____

[12]     *See Harzewski v. Guidant Corp.*, No. 06-3752, __ F.3d __, 2007 WL 1598097, at *7 (7th Cir. June 5, 2007) ("It probably would have been unlawful, moreover, for Guidant to sell the Guidant stock held by the pension plan on the basis of inside knowledge of the company's problems. If so, there are no damages, and indeed no breach of fiduciary duty; for the fiduciary's duty of loyalty does not extend to violating the law.").

effects.[13]  In light of this reality, even assuming that GE's stock price was artificially inflated and

that Defendants learned of this fact, it is absurd to suggest that the prudent course of conduct

would have been to liquidate the GE Plan's holdings of GE stock, and it would be unreasonable

to apply a measure of damages that is expressly premised upon the absurd notion that the

fiduciaries of the GE Plan should have engaged in such conduct.  Moreover, it is plain that – in

cases where this massive sell-off would be a necessary first step in calculating loss – any such

model would be hopelessly speculative.  This, however, is precisely the premise underlying the

alternative investment measure of damages, which further demonstrates its inapplicability in

cases such as this.[14]

In *Bierwirth*, the Second Circuit was at pains to stress that different measures of loss are

appropriate depending upon the nature of the fiduciary breach alleged.  Indeed, the Second

Circuit recognized that the alternative investment measure of loss was likely inappropriate in a

case like this one where the plaintiff alleged misrepresentation and, where "the market price of

securities was manipulated by the defendants or information that would affect the market price

was improperly withheld from the plaintiffs."  754 F.2d at 1054.  Rather, in *Bierwirth*, the

Second Circuit made clear that "the best measure of damages" in such cases likely is "the

difference between what was paid for the stock, and what would have been paid had the plaintiff

---

[13]     It is also worth noting that any drop resulting from a Plan fiduciary's revelation of the under-reserving upon learning of the under-reserving would not itself be a result of a breach of fiduciary duty, and therefore could not give rise to damages.

[14]     To the extent Plaintiffs argue that GE Plan fiduciaries might have satisfied their duty of prudence merely by disclosing the alleged under-reserving once it became known to them, this further illustrates the inapplicability of the alternative investment measure of damages.  If the fiduciaries might have satisfied their duty of prudence without liquidating the GE Plan's holding of GE stock, it makes no sense to apply a measure of damages premised upon the idea that a prudent fiduciary would have liquidated the GE stock portion of the Plan.

21

been aware of the concealed information, or had the market price not been manipulated." *Id.* at 1055.

The measure of loss suggested by *Bierwirth* for cases involving alleged manipulations of stock prices is consistent with trust law. Under the common law of trusts, if a "trustee is authorized to purchase property for the trust, but in breach of trust he pays more than he should pay, he is chargeable with the amount he paid in excess of its value." *Restatement (Third) of Trusts: Prudent Investor Rule* § 210, cmt. e (1992). In other words, even at common law, a fiduciary is liable only for the excess (if any) of the price that the fiduciary paid for an asset over the price that the fiduciary would have paid if all of the information needed to value the asset accurately had been available to the market.

Unsurprisingly, this measure of damages, rooted in basic common sense, is also employed in securities cases. In *Dura*, for example, the Supreme Court approvingly acknowledged the "judicial consensus … that a person who 'misrepresents the financial condition of a corporation in order to sell its stock' becomes liable to a relying purchaser 'for the loss' the purchaser sustains 'when the facts … become generally known' and 'as a result' share value 'depreciate[s].'" 544 U.S. at 344 (quoting *Restatement (Second) of Torts* § 548A). The Second Circuit likewise has stated that "to establish loss causation" on a claim for misrepresentation, a plaintiff must allege "that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005).

A necessary corollary of this rule is that, "[w]here the value of the security does not actually decline as a result of an alleged misrepresentation, it cannot be said that there is in fact an economic loss attributable to that misrepresentation." *Semerenko v. Cendant Corp.*, 223 F.3d

22

165, 185 (3d Cir. 2000).  Indeed, the absence of a plausible allegation that "that the market

reacted negatively to a corrective disclosure" is "fatal under Second Circuit precedent."  *Lentell*,

396 F.3d at 175.  This is because, in order to establish a causal link between an alleged

misrepresentation that is claimed to have inflated the price of a stock and a loss resulting from

the alleged misrepresentation, the market must react negatively when it learns of the previously

concealed information.

Here, undisputed facts of which the Court may take judicial notice refute any contention

by Plaintiffs that there was any difference between what the GE Plan paid for GE stock and what

the Plan would have paid if the alleged under-reserving at ERC had been made known to the

public.  This is because, when the market learned of the alleged under-reserving on November

18, 2005, the disclosure did not have a negative impact on GE's stock price.  (*See* Pistilli Decl.

(Jan. 16, 2007), ¶ 3 & Ex. A.)  In fact, GE's stock price went up in the days following the

disclosure.  (*See id.*; *but see* Defs' Opening Mem., p. 5 (fig. 1).)  In light of the fact that GE's

stock price did not drop when the November 18, 2005, announcement was made, Plaintiffs' bare

assertion that the announcement nevertheless resulted in a loss to the GE Plan is not "enough to

raise [their] right to relief above the speculative level."  *Twombly*, 127 S. Ct. at 1959.

Plaintiffs take umbrage with this inescapable conclusion, arguing that "the *Dura* court …

did not delineate exactly what allegations would be sufficient" to show loss causation.  (Opp., p.

7 n.3.)  However, the Supreme Court indisputably identified those allegations that would *not* be

sufficient to show loss causation, holding that the "complaint's failure to claim that Dura's share

price fell significantly after the truth became known" mandated dismissal.  *Dura*, 544 U.S. at

347; *accord Lentell*, 396 F.3d at 175 ("There is no allegation that the market reacted negatively

to a corrective disclosure regarding the falsity of Merrill's 'buy' and 'accumulate'

recommendations …. This is fatal under Second Circuit precedent."). Plaintiffs' inability here to plead that GE's share price fell significantly after the November 18, 2005, disclosure is similarly fatal to their claim.

* * *

In their opposition, Plaintiffs implicitly abandoned their misrepresentation claim, failing to discuss how they might possibly have established loss causation with respect to it. Instead, they focused entirely on their prudence claim and the argument that the alternative investment measure of damages applies in this case. However, the Second Circuit has made clear that this measure of damages is not applicable in cases involving only alleged misrepresentations – whether or not the cause of action is for "misrepresentation" or for an alleged violation of the duty of prudence. According to the Complaint, GE stock was an imprudent investment *only* because of the misrepresentations regarding GE's insurance businesses. Plaintiffs should not be permitted to seek a measure of damages that they cannot obtain on their misrepresentation claim simply by re-characterizing it as a prudence claim. Rather, this manipulation should be recognized for what it is: an attempt by Plaintiffs to disguise a misrepresentation claim as a prudence claim in order to remedy the fatal flaw of pleading a breach with no connection to any loss. Because Plaintiffs' prudence claim here is nothing more than a re-packaged version of their misrepresentation claim, it too should be dismissed.

### C.   Even Accepting Plaintiffs' Proposed Measure of Loss, They Have Still Failed To Allege A Plausible Theory of Loss Causation.

Even accepting *arguendo* that Plaintiffs are entitled to the newly asserted alternative investment measure of damages on their prudence claim, they are still required to plead causation, and they have not. Beyond the assertions that *Dura* does not apply to ERISA cases (Point I), Plaintiffs' Opposition argues *only* that they have adequately pled "a loss" in the form of

24

reduced returns.  (Opp., p. 12 (Point II:  "THE COMPLAINT SUFFICIENTLY STATES A CLAIM FOR LOSS UNDER ERISA").)  Pleading a breach plus a measure of damages, however, does not eliminate the need to plead a causal link between the two.  Yet Plaintiffs have not pled *any* facts demonstrating how allegedly higher returns from an alternative investment might plausibly have been achieved.  If GE Plan fiduciaries actually were obligated to sell off the Plan's holding of over $16 billion worth of GE stock and invest the resulting funds elsewhere, as Plaintiffs suggest, it is implausible to suggest that this would have resulted in a better return for the Plan.  Therefore, the Complaint should be dismissed.

ERISA plainly requires "a causal link between the breach of the fiduciary duty and the harm suffered by the Plan." (Opp., p. 2.)  In *Silverman v. Mutual Benefit Life Ins. Co.*, 138 F.3d 98, 104 (2d Cir. 1998), for instance, where plan assets were indisputably lost through embezzlement and there was a factual issue regarding breach, the Second Circuit nonetheless granted judgment based on a lack of causation:  "This statute therefore requires a plaintiff to demonstrate in a suit for compensatory damages that the plan's losses 'resulted from' [defendants'] breach ….  Specifically, [plaintiffs] must show some causal link between the alleged breach of [defendants'] duties and the loss plaintiff seeks to recover."  Similarly here, even assuming that Plaintiffs have properly pled a breach and a loss, Plaintiffs must still plead a "causal link" between the two.[15]

---

[15]    *Silverman* also makes plain that Plaintiffs' suggestion (in footnote 12 of their Opposition) that Defendants have the burden of proving the amount of any loss and loss causation is disingenuous at best.  *See* 138 F.3d at 106 ("Congress has placed the burden of proving causation on the plaintiff by requiring him to prove that the losses 'resulted from' the defendant's inaction."); *see also id.* (The Second Circuit "ha[s] held that it is the plaintiff's burden to 'prov[e] an amount of damages caused by the fraud'").

It is beyond peradventure that if the GE Plan's fiduciaries were, as Plaintiffs contend, obligated to sell all of the GE stock in the Plan based on information about the alleged under-reserving, the sale of more than $16 billion worth of GE stock would have led to massive losses to the GE Plan.  Plaintiffs essentially recognize as much, although they soft-pedal the dramatically adverse impact that such a massive sell-off would have on the price that the Plan received for its shares.  (*See* Compl. ¶ 228 (alleging that "[e]limination of Company Stock as a Plan investment option would have reduced the overall demand for GE Stock and sent a negative signal to Wall Street analysts, which would have adversely affected the price of GE Stock …."].)

As an initial matter, the securities laws plainly would have required GE – prior to the GE Plan's liquidation of the GE stock fund – to inform the market generally of the facts underlying the alleged under-reserving.  *See, e.g.*, *Harzewski v. Guidant Corp.*, No. 06-3752, __ F.3d __, 2007 WL 1598097, at *7 (7th Cir. June 5, 2007).  This, assuming that there was in fact material under-reserving, would have caused an initial decline in GE's stock price.  Next, according to Plaintiffs' theory, GE would have had to liquidate more than $16 billion in stock which, the law of supply and demand suggests, would have caused a further substantial decline in share price. And, finally, it is likely that the announcement by the GE Plan that it was liquidating its holdings of GE stock would have motivated other GE stockholders also to sell, thereby reducing GE's share price still further.  Plaintiffs' suggestion that anything approximating the more than $16 billion in value that the GE stock investment option represented prior to the sell-off would be available to be placed in an alternative investment entirely ignores this reality.  In fact, any "better" alternative investment would not only need to have exceeded the actual performance of GE stock – which rose $15 in price from the middle to the end of the so-called Class Period even

while distributing substantial dividends – but would also need to make up for the initial loss that the GE Plan's liquidation of GE stock would have generated.

In sum, Plaintiffs have failed to plead any facts rendering plausible the assertion that the GE Plan would have been better off engaging in this massive sell-off, thereby substantially diminishing the share price of GE stock at precisely the time the Plan was selling, than it was by holding GE stock (even at an inflated price). Indeed, it is a near-certainty that the Defendant fiduciaries would have been sued for engaging in the massive sell-off that Plaintiffs now claim was required. Moreover, this brief exploration of the consequences of Plaintiffs' alternative investment theory makes plain that Defendants' principal argument is correct: the alternative investment measure simply does not apply in a case like this. Plaintiffs' proposed measure is unrealistic, highly speculative, extraordinarily complicated, and bears no relation to the economic reality of the harm that may occur when the price of a stock is artificially inflated. The Complaint, therefore, should be dismissed.

## IV.     THIS MOTION IS WHOLLY CONSISTENT WITH DEFENDANTS' MOTION FOR SUMMARY JUDGMENT.

Plaintiffs erroneously suggest that the pendency of Defendants' Motion for Summary Judgment somehow undermines this motion to dismiss on loss causation grounds. The instant motion, however, is premised on the simple fact that the drop in GE's stock price during the so-called Class Period – the loss alleged in Plaintiffs' Amended Complaint – could not have been caused by the breaches of fiduciary duty that the Amended Complaint alleges. In other words, it argues that the losses alleged cannot be connected to the alleged breach, and therefore that Plaintiffs have failed to state a claim.

Defendants' summary judgment motion, by contrast, focuses on the reality that, in fact, the GE Plan did not suffer any loss as a result of Defendants' alleged breaches. That motion,

which goes beyond the pleadings only to point to the incontrovertible fact that the GE Plan sold more GE stock than it bought during the so-called Class Period, maintains that even if the alleged inflation and subsequent drop in GE's stock price during the so-called Class Period were the result of Defendants' alleged breaches, Plaintiffs nonetheless would be unable to prove that the GE Plan suffered any economic loss.  (The summary judgment motion does not concede that Plaintiffs have adequately pled causation of the non-existent loss.)  Thus, while each motion is independently sufficient to require dismissal of Plaintiffs' claims, the two motions are not at all inconsistent.

The Court, however, need not reach the issues presented by Defendants' summary judgment motion because, for the reasons set forth above, Plaintiffs' pleadings do not state a claim upon which relief may be granted.  No discovery, and no facts beyond the pleadings, are required to discern that Plaintiffs have failed adequately to plead loss causation.

# <u>CONCLUSION</u>

For these reasons, and for the reasons set forth in Defendants' opening memorandum, the motion to dismiss for failure to state a claim should be granted.

Respectfully submitted,

/s/
_____
William J. Dreyer (Bar Roll #101539)
April M. Wilson (Bar Roll #105797)
DREYER BOYAJIAN LLP
75 Columbia Street
Albany, New York 12210
(518) 463-7784

Jeffrey G. Huvelle
John M. Vine
Thomas L. Cubbage III
Christian J. Pistilli
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
(202) 662-6000

John J. Buckley, Jr.
Dane H. Butswinkas
Jonathan M. Landy
WILLIAMS & CONNOLLY LLP
725 Twelfth St., N.W.
Washington, DC 20005
(202) 434-5000

Attorneys for Moving Defendants

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

IN RE GENERAL ELECTRIC COMPANY                No. 06-CV-315
ERISA LITIGATION                                 (GLS/DRH)
                                               (Lead Case)

_____

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on the 16th day of July, 2007, I caused to be electronically filed the foregoing memorandum with the Clerk of the District Court using the CM/ECF system, which sent notification of such filing to the following:

Jeffrey J. Sherrin                         Lori G. Feldman
O'Connell, Aronowitz Law Firm              Milberg, Weiss Law Firm
54 State Street                            One Pennsylvania Plaza
9th Floor                                  Suite 4915
Albany, NY 12207-2501                      New York, NY 10119-0165
518-462-5601                               212-594-5300
Fax: 518-462-6486                          Fax: 212-273-4457
Email: jsherrin@oalaw.com                  Email: lfeldman@milbergweiss.com


James A. Shannon                           Evan J. Kaufman
O'Connell, Aronowitz Law Firm              Lerach, Coughlin Law Firm
54 State Street                            58 South Service Road
9th Floor                                  Suite 200
Albany, NY 12207-2501                      Melville, NY 11703
518-462-5601                               631-454-7733
Fax: 518-462-6486                          Fax: 631-367-1173
Email: jshannon@oalaw.com                  Email: ekaufman@lerachlaw.com


                                           Mark S. Reich
                                           Lerach, Coughlin Law Firm
                                           58 South Service Road
                                           Suite 200
                                           Melville, NY 11703
                                           631-367-7100
                                           Fax: 631-367-1173
                                           Email: Mreich@lerachlaw.com


Dated:  July 16, 2007


                                    /s/ <u>CHRISTIAN J. PISTILLI</u>