**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE GENERAL ELECTRIC COMPANY ERISA LITIGATION | No. 06-CV-315 (GLS/DRH)<br><br>(Lead Case) |

**JOINT DECLARATION OF EVAN J. KAUFMAN AND LORI G. FELDMAN IN SUPPORT OF FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION OF SETTLEMENT PROCEEDS, AWARD OF ATTORNEYS' FEES AND EXPENSES, AND AWARD OF SERVICE AWARDS TO THE NAMED PLAINTIFFS**

EVAN J. KAUFMAN and LORI G. FELDMAN declare:

1.      Evan J. Kaufman is a partner at Coughlin Stoia Geller Rudman & Robbins LLP ("Coughlin Stoia") and Lori G. Feldman is a partner at Milberg LLP.  Coughlin Stoia and Milberg LLP,  together with the law firms O'Connell & Aronowitz and the Law Office of Alfred G. Yates Jr., P.C., are counsel for Plaintiffs (collectively, "Plaintiffs' Counsel") in the above-captioned action (the "Action").  We have personal knowledge of the matters set forth herein based on our active participation in the material aspects of the prosecution and settlement of this Action.

2.      We submit this declaration in support of Plaintiffs' motion, pursuant to Rule 23 of the Federal Rules of Civil Procedure, for (a) final approval of the settlement of this Action and the plan of allocation of settlement proceeds; (b) an award of attorneys' fees and reimbursement of expenses to Plaintiffs' Counsel; and (c) an award of Service Awards to Named Plaintiffs Umberto Cavalieri, Floyd Miklic, and Robert R. Bezio ("Named Plaintiffs" or "Plaintiffs").  The settlement, reached by the parties following extensive and vigorous arm's-length negotiations taking place over the course of several months, contains a number of valuable components as set forth in the Class Action Settlement Agreement dated as of December 19, 2008 ("Settlement Agreement"): (i) structural changes ("Structural Changes") to the General Electric Savings and Security Program (the "Plan"), including an addition of online guidance tools and a Roth 401(k) feature for each member of the Class, that have a present-value cost to General Electric Company ("GE" or the "Company") of approximately $30 million; and (ii) $10,150,000 in cash in an interest-bearing qualified settlement fund to be distributed among each member of the Class who no longer participates in the Plan ("Former Participants") (the "Settlement Fund") (collectively, the "Settlement").  The Settlement resolves all claims asserted by Plaintiffs and the Class in this Action against defendants GE, GE Asset Management Incorporated ("GEAM") and certain current and former officers, directors, and

employees of GE and GEAM[1] (collectively, the "Defendants").  Plaintiffs' claims in the Action arise from Defendants' alleged breaches of their fiduciary duties under the Employee Retirement Income Security Act of 1974 ("ERISA") by selecting and maintaining GE common stock ("GE Stock" or "Company Stock") as an investment alternative for Participants[2] in the Plan and the Company matching contributions when it was no longer prudent to do so during the period from March 23, 2001 to February 5, 2009 ("Class Period").

---

[1]      The Individual Defendants are Philip D. Ameen, Barbara A. Beckmann, Eugene K. Bolton, Christopher D. Brown, David B. Carlson, Lawrence S. Caruso, William H. Cary, James I. Cash, Jr., William M. Castell, Silas Cathcart, Alfredo Chang, Paul Colonna, William J. Conaty, Tom Conway, Leslie G. Cook, Michael J. Cosgrove, Dennis D. Dammerman, Mark Delaney, Shane Fitzsimons, Paolo Fresco, Ann M. Fudge, Claudio X. Gonzalez, M. J. Gorman, Eric H. Gould, Wiley L. Harris, William M. Healey, Robert Herlihy, Brian Hopkinson, Jeffrey R. Immelt, Daniel Janki, Lawrence R. Johnston, Andrea Jung, Kathryn D. Karlic, Mark Krakowiak, John Krenicki, Jr., Alan G. Lafley, Robert W. Lane, Kenneth G. Langone, Jeanne M. LaPorta, Ralph S. Larsen, Ralph R. Layman, Rochelle B. Lazarus, T.F. Leonard, Alan M. Lewis, John D. Lockton, William J. Lucas, Robert A. MacDougall, Edward H. Malone, Scott G. McNealy, Lee Meyer, Gertrude G. Michelson, John H. Myers, Sam Nunn, Jonathan L. Passmore, Roger S. Penske, Susan P. Peters, Robert E. Pfenning, Ronald R. Pressman, Frank H. T. Rhodes, Gary L. Rogers, Allan O. Rowe, John M. Samuels, Marc J. Saperstein, Keith S. Sherin, Andrew C. Sigler, Judith A. Studer, Robert J. Swieringa, Donald W. Torey, J. Wald, John J. Walker, Douglas A. Warner, Diane M. Wehner, John F. Welch, and Robert C. Wright.

The Officer Defendants are Philip Ameen, Lawrence Caruso, Jeffrey Immelt, Ralph Layman, Keith Sherin, John Welch, and Robert Wright.  The Director Defendants are James Cash, Jr., William Castell, Dennis Dammerman, Paolo Fresco, Ann Fudge, Claudio Gonzalez, Jeffrey Immelt, Andrea Jung, Alan Lafley, Robert Lane, Kenneth Langone, Ralph Larsen, Rochelle Lazarus, Scott McNealy, Gertrude Michelson, Sam Nunn, Roger Penske, Frank Rhodes, Gary Rogers, Andrew Sigler, Robert Swieringa, Douglas Warner, John Welch, and Robert Wright.

On October 23, 2007, the Court entered an Order granting the voluntary dismissal of claims against defendants Catchcart, Lockton and Pfenning.  *See* Docket No. 88.

[2]      "Participant" means any individual who is (1) a "participant," as defined in 29 U.S.C. §1002(7); (2) a "beneficiary," as defined in 29 U.S.C. §1002(8), of a deceased participant; or (3) an alternate payee under a qualified domestic relations order, as defined in 29 U.S.C. §1056(d)(3).

3.      This declaration sets forth the nature of the claims asserted by Plaintiffs, the principal proceedings to date, the legal services provided by Plaintiffs' Counsel, the participation of the Named Plaintiffs, the settlement negotiations, and also sets forth the reasons why the Class should be certified, the Settlement is fair and in the best interests of the Class, the grant of Service Awards to the Named Plaintiffs is justified, and the application for attorneys' fees and expenses to be paid by GE over and above the Settlement consideration is reasonable and should be approved by the Court.

## I.     PRELIMINARY STATEMENT

4.      This complex case was vigorously litigated since its commencement.  Over the last two plus years, Plaintiffs' Counsel have thoroughly reviewed and analyzed a significant amount of publicly available information regarding GE, interviewed numerous former GE employees, and drafted a detailed amended complaint.  Plaintiffs also vigorously opposed three motions to dismiss and a motion for summary judgment filed by Defendants.

5.      Plaintiffs' Counsel consulted with experts in ERISA, thoroughly researched ERISA statutory and case law pertinent to the claims and defenses asserted, analyzed and reviewed additional Plan documents that Plaintiffs' Counsel requested from GE pursuant to ERISA §104(b), and engaged in ongoing communications with the Plaintiffs, who have actively participated in the litigation and have been extremely helpful to Plaintiffs' Counsel.

6.      On February 28, 2008, after a day-long arm's-length mediation session overseen by the Honorable Daniel B. Weinstein (Ret.), a former California state court judge and now with JAMS, a provider of alternative dispute resolution services, the Parties reached an agreement-in-principle to resolve the litigation.  During settlement negotiations, Plaintiffs' Counsel made it very clear that, while they were prepared to fairly assess the strengths and weaknesses of their case, they would continue to litigate rather than settle for less than fair value.  Plaintiffs' Counsel refused several settlement offers and persisted until they achieved a settlement they thought was in the best interest

of the Class, given the claims alleged. Despite diametrically opposed views on the merits, the Parties arrived at a settlement only after extensive negotiation between counsel for the Parties. Once this agreement-in-principle was reached, the Parties negotiated the specific terms of the Settlement for more than eight months.

7.  Thereafter, U.S. Trust, in its capacity as the Independent Fiduciary to the Plan, reviewed the terms of the Settlement, and concluded, *inter alia*, that the settlement consideration provided by the Settlement (including $10.15 million in cash for former Plan participants and the Structural Changes) is reasonable, in light of the Plan's likelihood of full recovery, the risks and costs of litigation, and the value of the claims foregone. U.S. Trust has authorized the Plan to enter into the Settlement.

8.  In sum, this Settlement, outstanding by any measure, is the product of extensive investigation, and aggressive litigation and negotiation, and takes into account the remedies available under ERISA and the risks specific to this case. It was negotiated on both sides by experienced counsel with a firm understanding of the strengths and weaknesses of their clients' respective claims and defenses. The Settlement confers an immediate and substantial benefit on the Class and eliminates the risk of continued litigation. Plaintiffs' Counsel respectfully submit that under these circumstances the Settlement is in the best interest of the Class and should be approved as fair, reasonable, and adequate. The Court should also approve the proposed Plan of Allocation of Settlement proceeds, award attorneys' fees and expenses in the amount of $10,000,000 in cash, to be paid by GE for Plaintiffs' Counsel's efforts in creating this substantial benefit for the Class, and Service Awards in the amount of $5,000 to each of the three Named Plaintiffs.

## II.    SUMMARY OF PLAINTIFFS' ALLEGATIONS

9.    The Action involves claims against Defendants under ERISA Sections 405, 409, 502(a)(2) and (3), 29 U.S.C. §§1105, 1109 and 1132(a)(2) and (3), for relief on behalf of the Plan and Plan Participants during the Class Period (the "Class").[3]

10.    The Plan is an employee pension benefit plan within the meaning of ERISA §3(2)(A), 29 U.S.C. §1002(2)(A).  GE has informed its employees that the Plan is a good means through which to save for retirement because it "makes it easy for [participants] to save toward [their] financial goals."  Eligible employees were able to participate in the Plan by investing up to 30% of earnings in one of several investment options provided by the Plan, but matching contributions by GE could only be made in one investment option.  GE Stock comprised one of the Plan's investment options.  Complaint[4] at ¶128.

11.    ERISA requires every plan to have one or more named fiduciaries and requires that those fiduciaries "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries."  ERISA §404(a)(1)(A)(i), 29 U.S.C. §1104 (a)(1)(A)(i).  Here, the Benefits Plan Investment Committee, the Plan Trustees, the Pension Board, and the Fund Trustees are the named fiduciaries.  The Company is also named in a fiduciary capacity.

---

[3]    The "Settlement Class" (or the "Class") is defined as: All Participants in the Plan during the Class Period on whose behalf the Plan held Company Stock during the Class Period, but excluding Defendants (and members of their immediate families, any officer, director, or partner of any Defendants, any entity in which a Defendant has a controlling interest, and the heirs, successors, or assigns of any of the foregoing).  *See* Order Preliminarily Approving Settlement dated February 5, 2009, at ¶4 (Docket No. 102).

[4]    The "Complaint" refers to the Consolidated Class Action Complaint for Violations of the Employee Retirement Income Security Act of 1974, filed on October 16, 2006.  "Complaint at ¶__" refers to paragraphs of the Complaint.

12.    Throughout the Class Period, Company Stock comprised a very substantial portion of the Plan.  As of December 31, 2005, the Plan held 462,328,382 shares of GE Stock with a fair market value of $16,204,609,772; GE Stock represented 65.9% of the total invested assets of the Plan.  Complaint at ¶129.  As of December 31, 2004, the Plan held 460,622,391 shares of GE Stock with a fair market value of $16,812,913,000; this represented 67.28% of the total invested assets of the Plan.  *Id.*

13.    The Complaint alleges that the fiduciaries of the Plan breached their fiduciary duties to the Plan and its Participants under ERISA, by, *inter alia*, selecting and maintaining GE Stock as an investment alternative for participant contributions and Company matching contributions, when it was no longer a prudent Plan investment option.  The basic prudence allegations arise from the fact that Defendants knew or should have known that GE was engaging in risky and improper conduct in connection with its insurance business, including material under-reserving practices that violate GAAP, which have rendered GE Stock an imprudent, inappropriate and extraordinarily risky investment for Plan Participants' retirement savings.  *Id*. at ¶¶7, 211-212.

14.    Plaintiffs allege that throughout the Class Period Defendants knew or should have known that GE was grossly under-reserving its liabilities of its insurance businesses and failed to take steps to protect the Plan's assets, causing losses to the Plan, and thereby to Participants' retirement savings.  Significantly, certain Defendants who were fiduciaries of the Plan were also intimately involved in the practices that led to the under-reserving.  During the Class Period, GE operated through 11 segments, including an insurance division, GE Insurance Solutions, Inc. ("GEIS"), formerly the Employers Reinsurance Corporation ("ERC").  *Id*. at ¶147.  Insurance companies are required to maintain adequate loss reserves which are established through the use of Generally Accepted Accounting Principles ("GAAP").  Loss reserves are treated as liabilities or

expenses and directly affect an insurer's financial results.  Plaintiffs allege that GE management willfully refused to heed outside auditor warnings with respect to the inadequate loss reserves, and instead pressured the actuaries to hit the Finance Plan, a plan reflecting projections for the immediate year, up to three years, and made receipt of their bonuses contingent on this.  *Id*. at ¶172.  Plaintiffs allege that there was significant pressure on the chief actuary at ERC to hit the Finance Plan, such that some actuaries refused to sign off on the estimates while others, under pressure, signed off on reserves which had been revised to hit the Finance Plan.  *Id*. at ¶173.  After years of chronic under-reserving, GE management knew that the reserves must be increased because the situation was getting out of control.  However, GE management did not do so and instead ERC cut reserves even further than their already drastically understated level.  *Id.* at ¶174.

15.    Additionally, Plaintiffs allege that throughout the Class Period, GE manipulated actuarial assumptions used in the reserve calculations, resulting in the material under-reserving of its Life and Health Insurance Business.  Under pressure from GE management to hit the Finance Plan, unreasonable assumptions were used to calculate reserves in certain portfolios, such that it was materially under-reserved by approximately $1 billion to $1.5 billion.  *Id*. at ¶191.

16.    As a result, GE was able to enhance net earnings and income in order to meet Wall Street's expectations and Defendants were able to reap the rewards of increased salaries and bonuses flowing to them as a result of the artificially inflated net income.  *Id*. at ¶228.

17.    The breaches arose out of Defendants' continuing duties to review, evaluate, and monitor the suitability of the Plan's investment in GE Stock, and to provide accurate material information to enable Participants to make informed investment decisions concerning their holdings invested in Company Stock.  *Id*.

18.    As a result of Defendants' fiduciary breaches, the Plan suffered damages, including the erosion of retirement savings and anticipated retirement income for Plan Participants. *Id*. at ¶¶8, 271, 285.

## III.    PLAINTIFFS' PROSECUTION OF THE CASE

### A.    Pre-Suit Investigation

19.    Milberg LLP began its investigation of this Action several months prior to the filing of the initial complaint. It is very important to note that no concurrent securities fraud, derivative or governmental cases existed at the time that could assist in the investigation or formulation of the theories of the case. The pre-filing investigation was the product of counsel's hard work, including analyses of the Plan, potential claims under ERISA, and the complex actuarial and accounting issues surrounding the alleged under-reserving in GE's insurance business.

### B.    The Filing of the Action

20.    On March 13, 2006, Plan participants Umberto Cavalieri and Floyd Miklic filed a class action alleging violations of ERISA in the United States District Court for the Northern District of New York on behalf of the Plan for class periods between March 23, 2001 and the present, under the caption *Cavalieri, et al. v. General Electrical Company, et al*., No. 1:06-CV-315 (GLS-DRH). On March 24, 2006, Plan participant Robert R. Bezio filed a class action under the caption *Bezio v. General Electric Company, et al.*, No. 1:06-CV-381 (GLS-DRH).

### C.    Consolidation of Actions

21.    On June 5, 2006, Plaintiffs' Counsel moved the Court for appointment of interim lead plaintiffs, interim lead counsel and consolidation of the two actions. *See* Docket No. 12. Coughlin Stoia joined the action as co-counsel on or about June 1, 2006. On July 12, 2006, the Court consolidated the actions as *In re General Electric Company ERISA Litigation*, No. 06-CV-315 (GLS/DRH) (Lead Case) but did not make any interim lead appointments. *See* Docket No. 26.

**D.      Intensive Investigation and the Complaint**

22.      In anticipation of filing the Complaint, Plaintiffs' Counsel spent a substantial amount of time performing an intensive factual investigation and legal analysis.  Over a period of nearly six months, as part of their substantial and comprehensive investigatory efforts, Plaintiffs' Counsel interviewed more than 25 former employees of GE and other persons with knowledge of the alleged wrongdoing.  These efforts included the review and analysis of critical Plan documents that Plaintiffs' Counsel requested from GE pursuant to ERISA §104(b).  Plaintiffs' Counsel thoroughly analyzed ERISA statutory and case law and also consulted with ERISA law consultants, given the complexity of the claims.

23.      On October 16, 2006, Named Plaintiffs filed the Complaint alleging violations of ERISA Sections 405, 409, 502(a)(2) and (3), 29 U.S.C. §§1105, 1109 and 1132(a)(2) and (3).  *See* Docket No. 34.

24.      The Complaint alleges that Defendants (i) failed to prudently manage the Plan's assets in violation of ERISA §404; (ii) failed to provide complete and accurate information to Plan participants and beneficiaries in violation of ERISA §404; (iii) failed to properly appoint and monitor Plan fiduciaries in violation of ERISA §404; (iv) were liable under ERISA §405 for alleged breaches of fiduciary duties by their co-fiduciaries; and (v) failed to avoid conflicts of interest in breach of their duty of loyalty under ERISA §494.

**E.      Defendants' Motions to Dismiss and Motion for Summary Judgment**

25.      On January 16, 2007, Defendants filed three separate motions to dismiss the Complaint which raised numerous complex  legal issues.  *See* Docket Nos. 43-45.

26.      Defendants' first motion to dismiss argued that Plaintiffs failed to sufficiently allege claims under each of the five counts in the Complaint.  *See* Docket No. 45.  Defendants asserted, *inter alia*, that (i) Plaintiffs' "prudence" claim is barred by ERISA §404(a)(2) and that Defendants

are entitled to a "presumption of prudence" under *Moench v. Robertson*, 62 F.3d 553 (3d Cir. 1995); (ii) Defendants cannot be liable for imprudent investments because Plan documents require the Plan to offer employer stock as an investment option and follow participants' directions to acquire and dispose of employer stock; (iii) Plaintiffs have failed to state a disclosure claim because ERISA does not impose a duty on plan fiduciaries to make disclosures, or to correct disclosures by others, regarding employer stock; and (iv) allegations of under-reserving in the Complaint are immaterial as a matter of law because they were too small a percentage of annual company-wide revenue, and because the Company's disclosure of GE's insufficient reserves had no significant impact on GE's stock price. *Id.*

27.    Defendants' second motion to dismiss asserted that Plaintiffs did not adequately plead loss causation. *See* Docket No. 44. Defendants argued that Plaintiffs failed to specifically allege a drop in GE's stock resulting from the November 2005 corrective disclosure concerning the inadequate reserves at both Employers Reinsurance Corporation and the Life and Health Insurance Business. According to Defendants, akin to securities litigation, the lack of causal connection between a corrective disclosure and a stock decline meant that there was no loss to the Plan (relying generally on *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005) and *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005)). *Id.*

28.    Defendants' third motion to dismiss asserted that Plaintiffs did not adequately allege the fiduciary status of certain Defendants, that the Complaint did not state a claim for co-fiduciary liability, and that Plaintiffs did not sufficiently plead a claim for conflict of interest on the part of the Officer and Director Defendants. *See* Docket No. 43.

29.    Plaintiffs filed three separate opposition briefs totaling 113 pages on April 16, 2007, in which Plaintiffs set forth comprehensive responses to each argument raised by Defendants. *See*

Docket Nos. 60-62.  In response to Defendants' first motion to dismiss, Plaintiffs argued, *inter alia*, that (i) the "prudence" claim is not barred by ERISA §404(a)(2) because §404(a)(2) only bars diversification claims under ERISA §404(a)(1)(C), the presumption of prudence is inapplicable for multiple reasons, and even if the presumption did apply, the allegations of the Complaint are sufficient to rebut it; (ii) Defendants had a duty to act prudently, notwithstanding any Plan provision that could be read as requiring an imprudent investment; (iii) Plaintiffs have sufficiently alleged a disclosure claim under ERISA, as they allege Defendants had an affirmative duty to inform beneficiaries of circumstances that threaten the funding of benefits; and (iv) the allegations of under-reserving in the Complaint are material because GE's overstated net earnings were used to deceive Plan participants into believing that earnings expectations were met and to portray a pattern of strength and stability at GE, and the true negative stock price impact of the under-reserving announcement was obscured by other concurrent disclosures by GE.  *See* Docket No. 62.

30.    In response to Defendants' second motion to dismiss, Plaintiffs argued, *inter alia*, that analyses of "damages" in securities and ERISA cases are separate and distinct, and thus, loss causation under *Dura* (and the like) has no bearing to this litigation.  Plaintiffs argued that the proper measure of damages in an ERISA litigation is the difference between the plan's value and the value it would have been absent the alleged breach.  Because Plaintiffs alleged that Defendants caused the value of the Plan to decrease and that the Plan would have had greater earnings absent Defendants' imprudent investment in GE's stock, Plaintiffs argued that the Complaint sufficiently states a claim for loss under ERISA.  *See* Docket No. 61.

31.    In response to Defendants' third motion to dismiss, Plaintiffs argued, *inter alia*,  that (i) the GEAM Defendants were ERISA fiduciaries because they "exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of

the Plan's assets," the Officer Defendants were fiduciaries based on their positions with GE and that the Officer Defendants "exercised discretionary authority with respect to the administration, control and/or management of the Plan," and the Director Defendants were fiduciaries based on their authority with respect to all aspects of the administration of the Plan and management of Plan assets, their direct control and management over certain aspects of the operation and administration of the Plan, their responsibility for communicating with participants regarding the Plan, and their power to appoint the members of the Benefits Plan Investment Committee and the Pension Board; (ii) the Complaint adequately pled Defendants' co-fiduciary liability because it alleges that each Defendant knowingly participated in and concealed other fiduciaries' breaches, enabled the other Defendants' breaches through his or her own failure to satisfy his or her own fiduciary duties, or had knowledge of the other fiduciaries' breaches yet did not make any effort to remedy them; and (iii) the Complaint properly alleges that the Director and Officer Defendants violated their duty to avoid conflicts of interest by allowing the Plan to invest in GE Stock when the GE Stock was over-valued due to the Company's publication of false financial statements. *See* Docket No. 60.

32.    Defendants filed their reply memoranda on July 16, 2007. *See* Docket Nos. 73-76. On October 4, 2007, Plaintiffs filed a letter in sur-reply to Defendants' motions to dismiss, addressing the United States Supreme Court's then-recent decisions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Credit Suisse Securities (USA) LLC v. Billing*, 551 U.S. 264 (2007). *See* Docket No. 84.

33.    Prior to the completion of the briefing on the motions to dismiss, on April 13, 2007, Defendants filed an unanticipated motion for summary judgment seeking dismissal of the claims on the basis that the Plaintiffs could not demonstrate that the Plan suffered a loss during the proposed Class Period. *See* Docket No. 59. Defendants' motion for summary judgment asserted that they are

entitled to summary judgment because Plaintiffs cannot establish that the Plan suffered a "loss" resulting from Defendants' misconduct, as Defendants contended that the Plan had a net gain during the relevant time period. *Id.* In support of Defendants' motion for summary judgment, Defendants submitted evidence through the Declaration of Thomas A. Conway. *Id.*

34.     On April 17, 2007, Plaintiffs filed a motion to adjourn Defendants' motion for summary judgment until after the disposition of Defendants' motions to dismiss. *See* Docket No. 64. Plaintiffs' motion to adjourn was denied on April 27, 2007. *See* Docket No. 66.

35.     Plaintiffs filed their opposition to Defendants' motion for summary judgment on June 18, 2007. *See* Docket No. 67. Plaintiffs argued, *inter alia*, that Defendants' method for ascertaining a loss to the Plan was entirely misplaced, because a fiduciary breach does not need to correspond with a decrease in a plan's value in order to establish a "loss" under ERISA. Instead, Plaintiffs argued, courts will look at what a plan could have earned had the funds been invested in, or available for, alternate purposes; simply stated, a net gain to a plan does not automatically mean that the Plan did not suffer a "loss." Likewise, Plaintiffs argued that a net gain to a plan does not automatically mean that the Plaintiffs here did not suffer damages; to the contrary, and as plead in the Complaint, the Plan did suffer a loss as defined under ERISA and Plaintiffs have suffered damages. Plaintiffs' opposition was supported by the Affidavit of Professor Steven P. Feinstein, Ph.D, CFA, in which Professor Feinstein rebutted Defendants' arguments regarding the appropriate measure of damages. Plaintiffs' opposition was also supported by the Affidavit of David A. Pratt, in which Professor Pratt rebutted Defendants' argument that because GE was purportedly a "net seller" of GE Stock during the relevant period (*i.e.*, the Plan sold more GE Stock than it bought during that period) any inflation in GE's stock price would have resulted in a net gain for the Plan rather than a net loss.

36.     In addition, Plaintiffs sought the deposition of Thomas Conway and the production of documents concerning the evidence that Defendants submitted in support of the motion for summary judgment.  However, Defendants refused to provide any discovery.  Thereafter, Plaintiffs moved to strike the Conway Declaration.  *See* Docket No. 67.

37.     The Action was settled prior to the Court's decisions on Defendants' motions to dismiss and motion for summary judgment.

### F.     Retention of Experts/Consultants

38.     Plaintiffs' Counsel consulted with, among others, experts in ERISA law in connection with their analysis of the facts of the Action and the numerous legal issues presented.  As discussed above, Plaintiffs' Counsel retained Professor Steven P. Feinstein of Babson College and Professor David A. Pratt of Albany Law School in opposing Defendants' motion for summary judgment. Plaintiffs' Counsel worked with The Michel-Shaked Group, a financial consulting firm, throughout the case on issues relating to, among others, Plan damages.  The information and expertise provided by these experts assisted in formulating the Structural Changes to the Plan and other terms of the Settlement.

### G.     Settlement Negotiations

39.     Over a period of several months, GE's in-house counsel and Plaintiffs' Counsel met numerous times, both in person and by telephone, to explore the possibility of settlement.  The parties prepared, exchanged, and discussed proposals for structural changes to the Plan as part of a possible settlement.  Plaintiffs' Counsel dedicated substantial resources to these negotiations in an attempt to obtain the extremely valuable proposed structural relief and cash benefits contained in the Settlement.   Additionally, Plaintiffs would not settle the Action without a meaningful cash component for former Plan Participants because they would not be able to benefit from the Structural Changes to the Plan.  After continuing negotiations on this subject, GE agreed that it would consider

a cash component.  The Parties then agreed that it would be in their respective interests to use a private mediator in an attempt to progress settlement talks.

40.     On February 21, 2008, the Parties exchanged detailed mediation statements in anticipation of mediation.  Defendants submitted a single-spaced, fourteen page mediation statement asserting the strength of their arguments to defeat the Complaint.  Plaintiffs' thirty-four page mediation statement contained highly-detailed analyses of the strengths of their claims and the anticipated defenses thereto, accompanied by an appendix of twelve exhibits.

41.     On February 28, 2008, the Parties and Defendants' insurance carriers attended a mediation conducted by the Honorable Daniel B. Weinstein (Ret.), a former California Superior Court Judge and experienced neutral mediator affiliated with JAMS.  Judge Weinstein has extensive experience with cases such as the one before this Court.  During mediation, the Parties exchanged their respective views regarding the merits of the action and the various issues relating to establishing liability, causation, and damages.  The settlement negotiations were vigorous, thorough and well-informed, further demonstrating their arm's-length nature and the tenacity with which they were conducted.  The Plaintiffs actively participated in the negotiations by telephone and insisted on specific additional benefits that became part of the Settlement.  Specifically, the Plaintiffs insisted that the Structural Changes in the Settlement include (a) an improved communications feature, and (b) the establishment of a call center that provides Plan participants with reasonable access to Plan information.  After a full day of negotiations, the Parties reached an agreement-in-principle to settle the Action.  The attorneys' fee and expense arrangement agreed upon by the Parties, up to $10.0 million, subject to Court approval, was reached only after the principal terms of the Settlement were agreed upon.

42.    Following the mediation, counsel for the Parties spent another eight months negotiating the specific terms of the comprehensive Settlement Agreement, including the forms of the Class Notice, the Preliminary Approval Order, and a Final Order and Judgment. Plaintiffs' Counsel fought hard for obtaining the most favorable terms for their clients. Numerous exchanges via e-mail and telephone followed so that the settling parties could reach an agreement on the necessary settlement documentation. The Parties executed the Settlement Agreement on October 17, 2008.

43.    After execution of the Settlement Agreement, Plaintiffs' Counsel continued to engage in numerous discussions with defense counsel over issues involving the Settlement, including the valuation of the proposed Structural Changes by Mercer LLC ("Mercer"), prepared for GE in September 2008. Mercer describes itself as a leading global provider of consulting, outsourcing, and investment services and works with clients to solve benefit and human capital issues, and design and help manage health, retirement and other benefits. Mercer valued the addition of on-line investment guidance tools, such as the Fidelity Portfolio Review and Retirement Income Planner, and estimated that the investment results would improve from $88.3 million to $441.5 million (in the form of expected increases in future retirement assets) for Participants that utilized them. Mercer also valued the addition of a Roth 401(k) feature to the Plan. The base case, which assumed no increase in tax rates over the next few decades and a 7% investment return, would save between $10 million and $189 million, depending on utilization. Thus, as of September 2008, Mercer valued the benefits of just two of the various Structural Changes as between $107 million to more than $2 billion in increased retirement assets depending on utilization rate by the Plan Participants.

44.    As noted above, Plaintiffs' Counsel thereafter worked with their own valuation consultant, The Michel-Shaked Group, to determine whether the valuation conducted by Mercer was

reasonable.  Counsel posed a number of questions to Mercer, which were satisfactorily answered.  Following their own analysis, The Michel-Shaked Group confirmed the reasonableness of the Mercer valuation.

45.    Thereafter, the Independent Fiduciary to the Plan, Bank of America, N.A., acting through U.S. Trust, Bank of America Private Wealth Management ("U.S. Trust"), in its capacity as the Independent Fiduciary to the Plan, reviewed the terms of the Settlement, and held a number of discussions with counsel for the Parties.  U.S. Trust concluded that (1) the consideration provided by the Settlement (including $10.15 million in cash for former Plan Participants and the Structural Changes) is reasonable, in light of the Plan's likelihood of full recovery, the risks and costs of litigation, and the value of the claims foregone; (ii) the terms and conditions of the transaction are not less favorable to the Plan than comparable arm's-length terms and conditions that would have been agreed to by unrelated parties under similar circumstances; and (iii) the transaction is not part of an agreement, arrangement, or understanding designed to benefit a part interest.[5]  U.S. Trust authorized the Plan to enter into the Settlement.  In arriving at its conclusions about the Settlement, U.S. Trust held multiple telephonic interviews with Plaintiffs' Counsel and Defendants' counsel on key issues of the Action and the Settlement, including the factual and legal theories of the case, the risks of proceeding with continued litigation, the proposed Settlement terms for Current and Former Participants, the parties' competing positions with regard to causation and damages, the proposed plan of allocation of the Cash Settlement Amount and the decision to distribute that cash to Former Participants on a per capita basis, administrative issues and the cost-prohibitive nature of alternate

---

[5]    *See* letter from U.S. Trust dated December 9, 2008, attached as Exhibit J to the Compendium of Exhibits in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation of Settlement Proceeds, Award of Attorneys' Fees and Expenses, and Award of Service Awards to the Named Plaintiffs (the "Compendium"), filed concurrently herewith.

allocation plans. U.S. Trust also undertook a review of the proposed attorneys' fee and expense award, and Plaintiffs' Counsel's estimated fees and expenses (as of December 2008) that would form the basis of the fee application.

46.     Pursuant to the Independent Fiduciary's direction and approval, the Parties made minor modifications to the Settlement Agreement and the Class Notice.  The Settlement Agreement was re-executed on December 19, 2008.

47.     In view of Plaintiffs' extensive investigation into the facts underlying the allegations in the Complaint, the issues raised by Defendants in their motions to dismiss and motion for summary judgment, and the discussions that occurred during the mediation and in subsequent negotiations, Plaintiffs' Counsel have been able to identify the issues that are critical to a successful outcome of this case.  Plaintiffs' Counsel have considered the risks of litigation, the likelihood of obtaining strong evidence in support of their claims, the substantial risk, expense and length of time to prosecute the Action through trial and the inevitable subsequent appeals.  Plaintiffs' Counsel have also considered the substantial benefit provided by the Settlement in light of the risk of taking the case to trial.  Plaintiffs participated in this assessment and were consulted with and kept apprised concerning the settlement negotiations.  They support the Settlement before the Court.

48.     Plaintiffs' Counsel respectfully submit that the Settlement represents an excellent result for the Class under the particular circumstances of this Action.  The Settlement will provide Class members with a substantial benefit without the very real risk of a less beneficial result or even no recovery if litigation were to continue.

**H.     Preliminary Approval of Settlement and Mailing of Notice of Settlement**

49.     On February 5, 2009, the Court preliminarily approved the terms of the Settlement Agreement and the certification of the Settlement Class (or the "Class") under Federal Rule of Civil

Procedure 23(b)(1). *See* Order Preliminarily Approving Settlement dated February 5, 2009 ("PAO," Docket No. 102) at ¶¶4, 8. In the PAO, the Court preliminarily determined that this Action may proceed as a non opt-out class action under Federal Rules of Civil Procedure 23(a) and 23(b)(1). *Id.* at ¶7. Additionally, the Court directed that Plaintiffs' Counsel cause the mailing of the Notice of Proposed Settlement of Class Action (the "Class Notice") and approved the selection of The Garden City Group, Inc. as the Administrator. *Id.* at ¶¶9-11. The Court further ordered that on or before February 27, 2009, the Administrator shall (1) send the Class Notice, by first class mail, postage prepaid, to all potential Class members who can be identified with reasonable effort at each such Class member's last known address; and (2) place the Class Notice on a web page accessible by all Class members. *Id.* at ¶11.

50.    Attached as Exhibit I to the Compendium is the Declaration of Jennifer M. Keough Regarding Notification, dated May 4, 2009 (the "Keough Declaration" or "Keough Decl."), which attests that, on February 27, 2009, the Class Notice was mailed by the Administrator to over 318,000 potential Class members, and that on February 27, 2009, the Class Notice was placed on the following website: www.SavingsandSecurityProgramSettlement.com. *See* Keough Decl. at ¶5. Additionally, the Class Notice includes a telephone number established by the Administrator for Class members to call for information concerning the Settlement. *See* Class Notice at ¶7 (attached as Exhibit A to the Keough Decl.); Keough Decl. at ¶6.

51.    The Class Notice informed Class members of the terms of the Settlement, the Structural Changes to the Plan and the Plan of Allocation of the Settlement proceeds and the amount of attorneys' fees for which Plaintiffs' Counsel would ask the Court for an approval, the amount of the Service Awards to the Named Plaintiffs, and how any member of the Class could contact

Plaintiffs' Counsel or Defendants' counsel in the event they had questions regarding the Settlement. *See* Class Notice at ¶¶9-11, 15.

52.      The Class Notice also provided that any objections to the Settlement, the Structural Changes to the Plan, Plan of Allocation of the Settlement Fund, the application for attorneys' fees had to be filed by April 29, 2009. *See* Class Notice at ¶16. As of the date of this Declaration, to our knowledge, forty (40) objections have been filed by members of the Class to the Settlement, the Plan of Allocation, Plaintiffs' Counsel's application for attorneys' fees and expenses, and/or the application for Service Awards. These objections represent 0.01 percent of the total Class. However, none of the objections raise sufficient grounds to reject approval of this important Settlement. Many of the objections are one page letters contending, without support, that the lawsuit should be dismissed because the lawsuit has no merit. Some objectors assert that the Plan was voluntary and Participants were aware of the risks in investing in the Plan. Other objectors claimed that other investment options were available to Participants. Several of the letters contain insults directed at Plaintiffs' Counsel and most were written without a full understanding of (1) the nature of the Action; (2) the circumstances leading Plaintiffs' Counsel to bring the Action; (3) the effort Plaintiffs' Counsel undertook to achieve the significant settlement result for the Class and create Structural Changes to the Plan; (4) the significant risks in pursuing the Action; and (5) the substantial value of the benefits stemming from the Structural Changes.[6] The small number of objectors as compared to the size of the Class suggests that the vast majority of the Class

---

[6]      The objections are addressed in more detail in Plaintiffs' Memorandum of Law in Support of Motion for Final Approval of Class Action Settlement and Plan of Allocation of Settlement Proceeds, Award of Attorneys' Fees and Reimbursement of Expenses, and Award of Service Awards to the Named Plaintiffs, filed concurrently herewith.

overwhelmingly supports the Settlement, which weighs heavily in favor of this Court's approval of the Settlement.

53.    Additionally, Defendants' counsel have informed us that on January 5, 2009, pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §1715, Defendants' counsel sent notices to the United States Attorney General, and the attorneys general of the fifty states and the District of Columbia via overnight mail, informing them of the proposed Settlement.  As of May 4, 2009, Defendants' counsel had not received any responses to those notices other than acknowledgments of receipt.

## IV.    FACTORS TO BE CONSIDERED IN SUPPORT OF SETTLEMENT

### A.    The Class Satisfies the Requirements of Class Certification

54.    The Court preliminarily certified the Class on February 5, 2009.  *See* PAO at ¶4.  The Court held that the Class is sufficiently well-defined and cohesive to warrant certification as a non-opt-out class under Federal Rule of Civil Procedure 23(a) and 23(b)(1).  The Court also approved Plaintiffs as the representatives of the Class.  *Id.*

55.    The Class satisfies the criteria for class certification under Federal Rule of Civil Procedure 23(a): (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation.

56.    <u>Rule 23(a)(1) - Numerosity</u>.  Rule 23(a)(1) permits class treatment where "the class is so numerous that joinder of all members is impracticable."  Here, there are thousands of members of the Class, evident by the large number of GE Stock shares held in the Plan during the Class Period.  *See* Complaint at ¶131.  Defendants have estimated that there are approximately 314,000 Class members; of that number, Defendants estimate that roughly 25% of Class members are Former

Participants, and that roughly 75% of Class members are Current Participants.[7]   Accordingly, numerosity is satisfied.

57.    <u>Rule 23(a)(2) – Commonality</u>.  The commonality requirement of Rule 23(a)(2) is met "if plaintiffs' grievances share a common question of law or of fact."  *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997).   Common questions exist among the Class such as questions concerning Defendants' alleged breaches of fiduciary duty under ERISA, the alleged issuance of materially misleading statements and their inflationary impact on the price of common stock that predominate over any individual issues of law and fact.  Here, common questions of law and fact predominate, and a class action is the superior (if not the only) method available to fairly and efficiently litigate this Action.

58.    <u>Rule 23(a)(3) – Typicality</u>.  As required by Rule 23(a)(3), Plaintiffs' claims are typical of the claims of the Class.  Typicality "'requires that the claims of the class representatives be typical of those of the class, and is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'"  *Central States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 245 (2d Cir. 2007) (citation omitted).  However, typicality "does not require that the situations of the named representatives and the class members be identical."  *In re Oxford Health Plans, Inc.*, 191 F.R.D. 369, 375 (S.D.N.Y. 2000).  Plaintiffs' claims arise from their

---

[7]      "Former Participants" means those members of the Class on whose behalf the Plan held Company Stock at some point during the Class Period but, as of the Effective Date, no longer have account balances in the Plan.  The "Effective Date" means the date on which all of the conditions to Settlement, according to the Settlement Agreement, have been satisfied or waived and the Settlement becomes Final and unconditional.

holdings and acquisition of GE Stock in their respective Plan accounts during the Class Period, and thus are typical of the Class they seek to represent.

59. <u>Rule 23(a)(4) – Adequacy of Representation and Rule 23(b)(1)</u>. Rule 23(a)(4) requires that the class representatives will "fairly and adequately protect the interests of the class." In assessing adequacy, courts consider whether "'1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation.'" *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 176 (S.D.N.Y. 2008) (citation omitted). Both requirements are met here. The Plaintiffs' interests are fully aligned with those of absent Class members because they bring the same claims for the same remedies under the same legal theories. There is no antagonism between the Plaintiffs and the Class. As for the adequacy of counsel, Plaintiffs' Counsel have vigorously prosecuted the Action. Plaintiffs' Counsel have extensive experience in class actions on behalf of employees based on alleged violations of ERISA. Accordingly, the adequacy requirement is satisfied.

60. Under Rule 23(b)(1), a class may be certified if:

(1) prosecuting separate actions by or against individual class members would create a risk of:

(A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

(B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

Fed. R. Civ. P. 23(b)(1). Certifications under both sub-sections of Rule 23(b)(1) are common in ERISA breach of fiduciary duty cases because of the defendants' alleged "unitary treatment" of putative class members. *See In re WorldCom, Inc. ERISA Litig.*, No. 02 Civ. 4816(DLC), 2004 U.S. Dist. LEXIS 19786, at *8 (S.D.N.Y. Oct. 5, 2004).

61.    This Action seeks remedies arising from breaches of fiduciary duties under ERISA Sections 502(a)(2) and (3) for relief on behalf of the Plan.  Plan Participants seek Plan-wide relief, namely the restoration of alleged losses to the Plan and the Plan Participants.  *See Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 139-40 (1985); *see also* 29 U.S.C. §1109 (liability for breach of fiduciary duty is "to the plan"); 29 U.S.C. §1132(a)(2) (authorizing plan participant to sue for breach of fiduciary duty under §409(a)).  This Action for breach of fiduciary duty under ERISA is by law a representative action seeking to impose on the Defendants obligations applicable to all Plan Participants.  *See Koch v. Dwyer*, No. 98-5519, 2001 U.S. Dist. LEXIS 4085 (S.D.N.Y. Mar. 22, 2001).  Additionally under Rule 23(b)(1), members of the Class cannot opt-out of the Settlement, but can object to the Settlement and ask the Court not to approve the Settlement.  *See In re AOL Time Warner ERISA Litig.*, No. 02-8853-, 2006 U.S. Dist. LEXIS 70474 (S.D.N.Y. Sept. 27, 2006).  Accordingly, the requirements of Rule 23(b)(1) are satisfied.

### B.    The Settlement Was Fairly and Aggressively Negotiated by Counsel

62.    As set forth above, the terms of the Settlement were negotiated by the Parties at arm's length through adversarial but good faith negotiations.  The Settlement was the product of numerous conferences and phone calls occurring over several months, including an intensive day-long mediation with a retired judge, involving Plaintiffs' Counsel, Defendants' counsel and counsel for the Defendants' insurance carriers.  Throughout the course of those negotiations, all parties were represented by counsel with extensive experience in complex litigation like this case, and Plaintiffs' Counsel were well-apprised of the strengths and weaknesses of the Plaintiffs' claims and of Defendants' defenses.  The Settlement was the result of an adversarial process designed to produce a fair, reasonable, and adequate compromise.

C.    **Serious Questions of Law and Fact Placed the Outcome of the Class Action in Significant Doubt**

63.    Another factor considered in assessing the merits of class action settlements -- whether serious questions of law and fact exist -- supports the conclusion that this Settlement is fair, reasonable, and adequate to the Class. As in every complex ERISA case of this kind, Plaintiffs and the Class faced formidable obstacles to recovery, both with respect to liability and damages. While Plaintiffs and their counsel believe that Plaintiffs' allegations have substantial merit, Defendants have denied liability and assert that they posses absolute defenses to Plaintiffs' claims.

64.    During the course of the Action, Plaintiffs believed that they developed significant evidence in support of their allegations. At the same time, however, they came to realize that equally significant hurdles existed such that prevailing at trial or even earlier, including in connection with disposition motions, would be very difficult.

65.    Some of the major issues raised by Defendants were that (i) Plaintiffs' prudence claim is barred by ERISA; (ii) Plaintiffs failed to state a disclosure claim; (iii) Plaintiffs did not adequately plead loss causation; (iv) Plaintiffs did not adequately allege the fiduciary status of numerous defendants; (v) the Complaint did not state a claim for co-fiduciary liability; and (vi) Plaintiffs did not sufficiently plead a claim for conflict of interest on the part of the Officer and Director Defendants. Additionally, Defendants claim that Plaintiffs cannot establish that the Plan suffered a loss resulting from Defendants' misconduct, as Defendants contended that the Plan had a net gain during the Class Period.

1.    **Questions re: Whether the Plan Suffered a Loss**

66.    Defendants argued that they are entitled to summary judgment because Plaintiffs cannot establish that the Plan suffered a loss. Defendants argued that Plaintiffs were required to plead that the Plan as a whole suffered a net loss; however, Defendants argued that the Plan had a net

gain during the Class Period and thus the Plan suffered no loss. Defendants argued that because GE was a "net seller" of GE Stock during the Class Period (*i.e.*, the Plan sold more GE Stock than it bought during that period), any alleged artificial inflation in GE's stock price would have resulted in a net *gain* for the Plan rather than a net loss.

67.    In response, Plaintiffs argued, *inter alia*, that Defendants' method for ascertaining a loss to the Plan was entirely misplaced, because a fiduciary breach does not need to correspond with a decrease in the Plan's value in order to establish a "loss" under ERISA. Instead, Plaintiffs argued, courts must look at what a plan could have earned had the funds been invested in a prudent alternative investment; simply stated, a net gain to a Plan does not automatically mean that the Plan did not suffer a "loss." Plaintiffs' opposition was supported by the Affidavit of Steven P. Feinstein, Ph.D, CFA, in which Professor Feinstein rebutted Defendants' arguments regarding the appropriate measure of damages in ERISA breach of fiduciary duty cases. Plaintiffs' opposition was further supported by the Affidavit of David A. Pratt, in which Professor Pratt rebutted Defendants' argument that because GE was purportedly a "net seller" of GE stock during the relevant period (*i.e.*, the Plan sold more GE Stock than it bought during that period) any inflation in GE's stock price would have resulted in a net gain for the Plan rather than a net loss.

68.    Although Plaintiffs' Counsel believe that Plaintiffs had strong arguments that the Class members had suffered compensable losses from Defendants' violations alleged in the Complaint, there is a serious risk that the Court or a jury would accept Defendants' "net seller" argument. If the Court or a jury was to accept that argument, Plaintiffs' claims would be dismissed in their entirety and Class members would not recover anything on their claims.

### 2.    Questions re: Whether Plaintiffs' Prudence Claim Is Barred by ERISA

69.    Plaintiffs claimed that Defendants failed to prudently manage the Plan's assets in violation of ERISA.  Defendants, however, asserted in their motions to dismiss that Plaintiffs' prudence claim is barred by ERISA §404(a)(2) and that Defendants are entitled to a "presumption of prudence" under *Moench v. Robertson*, 62 F.3d 553 (3d Cir. 1995).  Plaintiffs asserted that the prudence claim is not barred by ERISA §404(a)(2) because §404(a)(2) only bars diversification claims under ERISA §404(a)(1)(C).  Plaintiffs brought their prudence claim under ERISA §404(a)(1)(B), and not §404(a)(1)(C), so the prohibition set forth in §404(a)(2) does not apply.  Plaintiffs further argued that the presumption of prudence is inapplicable for three reasons: (1) it cannot apply at the pleading stage; (2) it applies only in cases which, unlike this one, mandates investment in company stock; and (3) it does not apply where, as here, the Complaint alleges that the fiduciaries have imprudently overpaid for Plan assets.

70.    Plaintiffs may not be able to overcome Defendants' arguments on this claim.  Relying on cases such as *In re McKesson HBOC, Inc. ERISA Litig.*, No. C00-20030 RMW, 2002 WL 31431588, at *5 (N.D. Cal. Sept. 30, 2002), which recognizes unfairness caused by any rule that allows suits against fiduciaries for offering employer stock in accordance with plan documents, Defendants contended that it is legally invalid to base prudence claims on a failure to diversify.  Additionally, Defendants argued that a prudence claim fails as a matter of law unless Plaintiffs allege that the Company was facing impending collapse.  Defendants asserted that Plaintiffs have not sufficiently plead facts to overcome the *Moench* presumption.

### 3.    Questions re: Defendants' Failure to Provide Complete and Accurate Information to Participants

71.    Plaintiffs believe that they have sufficiently alleged a disclosure claim under ERISA and that Defendants' argument that such a claim must be alleged under the securities laws fails for at

least two reasons (1) the claim for breach of their disclosure duties is not based upon GE's communications to the public, but only on the dissemination of Plan documents that expressly incorporated by reference GE's SEC filings; and (2) the claim is based not only on SEC filings incorporated into Plan documents, but also upon Defendants' failure to inform Plan Participants that the price of GE Stock was improperly inflated by accounting violations. Moreover, where misrepresentations in SEC filings are incorporated into plan documents, as is the case here, such statements are deemed to have been made in a fiduciary capacity by plan fiduciaries.

72.    Defendants asserted that it is inappropriate for the Court to interpret ERISA's fiduciary duty provisions to impose disclosure obligations regarding employer stock when the securities laws already impose comprehensive disclosure requirements regarding securities, including employer stock that is available as an investment option under a retirement plan. Defendants rely on the Supreme Court decision, *Credit Suisse Securities (USA) LLC v. Billing*, 551 U.S. 264 (2007), that securities law foreclosed judicial rule-making under ERISA.

73.    Defendants also argued that allegations of misrepresentation are immaterial as a matter of law. Defendants argued that understated reserves in GE's insurance subsidiaries were not material to the market since GE's stock price increased following the reserve adjustment disclosure on November 18, 2005. Plaintiffs asserted that Defendants' true negative stock price impact of the under-reserving announcement was obscured by GE's concurrent disclosure of a 14% dividend increase and an additional $10 billion stock buyback. Nevertheless, Defendants maintained the idea that the disclosure of under-reserving would have caused a decline in market value of GE Stock is mere speculation which can not constitute adequate pleading of materiality.

### 4.    Questions re: Loss Causation

74.    Defendants argued that Plaintiffs failed to specifically allege a drop in GE's stock resulting from the November 2005 corrective disclosure concerning the inadequate reserves at both

ERC and the Life and Health Insurance Business. According to Defendants, akin to securities litigation, the lack of a causal connection between a corrective disclosure and a stock decline meant that there was no loss to the Plan.

75.     Plaintiffs responded that the analyses of damages in securities and ERISA cases are separate and distinct, and that securities fraud loss causation concepts have no bearing to this Action. Corrective disclosures and immediate stock declines likewise have no application to ERISA cases. Plaintiffs asserted that the proper measure of damages in an ERISA breach of fiduciary duty action is the difference between the Plan's value and the value it would have had, absent the alleged breach.

76.     Defendants do not agree with Plaintiffs' measure of damages and asserted that Plaintiffs are required to plead causation under *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342 (2005). Defendants argued that Plaintiffs rely on a measure of loss that does not apply to this case. Additionally, Defendants asserted that the Second Circuit has recognized that in order to establish loss causation on a claim for misrepresentation, the misstatement or omission must have concealed something from the market, that when disclosed negatively, affected the value of the security. Defendants stated that there was no difference between what the Plan paid for GE Stock and what the Plan would have paid if the alleged under-reserving had been known to the public because there was no negative impact on GE's stock price following the November 18, 2005 disclosure of the alleged under-reserving. It is uncertain how the Court would have ultimately ruled on this threshold damage issue.

### 5.     Questions re: the Fiduciary Status of Certain Defendants

77.     Defendants asserted that Plaintiffs would fail in establishing that the Complaint sufficiently alleged the fiduciary status of certain Defendants because the Complaint contained only conclusory allegations of the alleged authority. Defendants claimed that they did not owe a fiduciary duty and did not have actual knowledge of the alleged breaches.

### a.    Fiduciary Status of the Fund Trustee Defendants

78.    Defendants claimed that the Fund Trustee Defendants were not fiduciaries and that Plaintiffs did not establish that the Fund Trustee Defendants had actual knowledge of breaches by other fiduciaries or that they enabled any breaches by other fiduciaries.  Plaintiffs argued that the Fund Trustee Defendants are fiduciaries because (1) they "exercised discretionary authority or discretionary responsibility in the administration of the Plan"; (2) they "exercised discretionary authority or control with respect to the management of the Plan's assets"; and (3) they "exercised discretionary authority and control with respect to the appointment of other Plan fiduciaries." However, Defendants denied that the Fund Trustee Defendants exercised *de facto* discretionary authority.  Defendants asserted that Plaintiffs have not alleged sufficient facts demonstrating that the Fund Trustee Defendants are fiduciaries.  Defendants have continued to maintain that the Fund Trustee Defendants did not have the power to exercise any control over the GE stock option.

### b.    Fiduciary Status of the GEAM Defendants

79.    Plaintiffs argued that they specifically pleaded that GEAM was an investor manager which is a specific type of fiduciary as defined under ERISA §3(38).  Additionally, Plaintiffs argued that the Complaint alleged that "GEAM is a fiduciary of the Plan within the meaning of ERISA in that it exercises discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets."  Complaint at ¶16.

80.    Defendants stated that the GEAM Defendants should be dismissed from the litigation because, according to the GEAM investment management agreement, GEAM was not an investment advisor as to GE Stock.  Additionally, Defendants contended that the GEAM Defendants had no power to exercise any control over the GE stock options, a power which was affirmatively denied to them by the Plan documents.  Defendants asserted that Plaintiffs have not alleged sufficient facts demonstrating that the GEAM Defendants are fiduciaries.

### c.    Fiduciary Status of Officers and Directors

81.    Plaintiffs argued that the Officer Defendants carried out GE's fiduciary responsibilities under the Plan as well as influenced and controlled GE in its role as Plan fiduciary. Additionally, Plaintiffs argued that the Director Defendants had (1) ultimate discretionary decisional authority with respect to all aspects of the administration of the Plan, management, and disposition of the Plan's assets, and appointment and removal of fiduciaries; (2) direct control and management over any aspect of the operation, or administration of the Plan that was not specifically delegated to the named fiduciaries in addition to functioning as the Plan's "Administrator"; (3) responsibility for communicating with Participants regarding the Plan, and providing Participants with information and materials required by ERISA including the Plan's Summary Plan Description ("SPD") and documents incorporated into the SPD; (4) the power to appoint the members of the Benefits Plan Investment Committee, and the Pension Board; and (5) management or control over the Benefits Plan Investment Committee, the Plan Trustees, the Fund Trustees, and the Pension Board.

82.    Defendants asserted that Plaintiffs failed to plead sufficient facts demonstrating that the Officer and Director Defendants are fiduciaries because the Plan documents make it clear that they are not fiduciaries at all.  Defendants argued that the Plan limits the authority of the Officer and Director Defendants such that these Defendants do not exercise any control over the GE Stock option and are not responsible.  Defendants claimed that even if *de facto* fiduciary duty existed, Plaintiffs failed to allege any facts showing that the Officer Defendants actually exercised authority regarding the GE stock option.  Defendants claimed that signing certain SEC filings did not signify that the Officer Defendants are ERISA fiduciaries.  Furthermore, the Plan documents demonstrated that the only fiduciary function that the Director Defendants performed is the appointment and removal of other fiduciaries.  Defendants contend that Plaintiffs alleged no specific facts that the

Director Defendants breached this power and that the Officer and Director Defendants will be dismissed.

### 6.    Questions re: Defendants' Co-Fiduciary Duty

83.    Plaintiffs asserted that they sufficiently pled that each Defendant (1) knowingly participated in and concealed other fiduciaries' breaches; (2) enabled the other Defendants' breaches through his or her own failure to satisfy his or her own fiduciary duties; or (3) had knowledge of the other fiduciaries' breaches yet did not make any effort to remedy them. Further, Plaintiffs stated that they alleged that each Defendant enabled one another's breaches of fiduciary duties by (1) failing to provide necessary information to other fiduciaries; and (2) failing to properly monitor those fiduciaries. Plaintiffs believe that their allegations of co-fiduciary liability are more than sufficient.

84.    Defendants, however, maintained that Plaintiffs did not sufficiently allege that some of the Defendants were fiduciaries. Defendants contend that even if some of the Defendants were fiduciaries, no fiduciary was aware of a breach by another fiduciary or enabled in any capacity a breach of a fiduciary duty by another. Defendants asserted that Plaintiffs' allegations were conclusory and wholly insufficient to allege co-fiduciary liability.

### 7.    Questions re: Defendants' Conflicts of Interest

85.    Plaintiffs argued that the Director and Officer Defendants violated their duty to avoid conflicts of interest by allowing the Plan to invest in GE Stock when the GE Stock was over-valued due to the Company's publication of false financial statements. Plaintiffs alleged that Defendants acted in their own interests and to the detriment of Plan Participants in administering the Plan's investment in GE Stock.

86.    Defendants, however, argued that Plaintiffs' claim, which alleges that Director and Officer Defendants as fiduciaries created a conflict of interest by their receipt of equity-based compensation under ERISA, must be dismissed because under established law a fiduciary's receipt

of equity-based compensation from the corporation sponsoring the Plan does not create an impermissible conflict of interest under ERISA. Additionally, Defendants stressed that Officer Defendants were not ERISA fiduciaries for any purpose and not subject to ERISA provisions.

87.    Plaintiffs believe that discovery would continue to provide evidence that all of the Defendants acted as fiduciaries of the Plan due to either their explicit position as a fiduciary or as a *de facto* fiduciary due to their performance of fiduciary functions, and that Defendants are liable as set forth in the Complaint. However, there is a risk that Plaintiffs' claims would be dismissed as a result of dispositive motions or that a jury would disagree with Plaintiffs' interpretation of the facts. Particularly, in light of Defendants' "net seller" argument, Plaintiffs faced the very real risk that the Court or a jury would conclude that Plaintiffs suffered no compensable losses as a result of Defendants' alleged violations of ERISA. As a result, a real risk exists that Plaintiffs would not be able to take their claims to trial or, if they did, win.

**D.    The Judgment of the Parties that the Settlement Is Fair and Reasonable Provides Additional Support for Approval of the Settlement**

88.    Another factor for the Court in considering whether to approve class action settlements is the judgment of the parties that the settlement is fair and reasonable. As outlined above, the Settlement was the product of vigorous and lengthy arm's-length negotiations between adversaries with significant experience in ERISA and securities class action litigation.

89.    Plaintiffs' Counsel believe strongly that the Settlement represents a very good resolution for the Class under the circumstances present in this case. The Settlement was only reached after Plaintiffs reviewed Plan documents, extensively researched and briefed numerous legal issues, engaged in a formal mediation session, and participated in numerous frank discussions with the mediator about the strengths and weaknesses of Plaintiffs' claims. The involvement of the

Named Plaintiffs and the mediator in the settlement negotiations reinforced Plaintiffs' Counsel's view that this Settlement provides substantial benefits to the Class.

90.     Additionally, U.S. Trust, in its capacity as the Independent Fiduciary to the Plan, reviewed the terms of the Settlement and stated that (i) the consideration provided by the Settlement (including $10.15 million in cash for former Plan participants and the Structural Changes) is reasonable, in light of the Plan's likelihood of full recovery, the risks and costs of litigation, and the value of the claims foregone; (ii) the terms and conditions of the transaction are not less favorable to the Plan than comparable arm's length terms and conditions that would have been agreed to by unrelated parties under similar circumstances; and (iii) the transaction is not part of an agreement, arrangement, or understanding designed to benefit a part interest.  *See* Compendium Exh. J.  In fulfilling its responsibilities and in evaluating the reasonableness of the Settlement, U.S. Trust (1) reviewed Court documents; (2) interviewed lead counsel for the parties; (3) evaluated the strengths and weaknesses of the legal and factual arguments on which the Action was based; (4) reviewed the proposed Settlement Agreement and Plaintiffs' Confidential Summary; and (5) reviewed and analyzed the scope of the Settlement release.  Accordingly, the Settlement is fair, reasonable, and adequate in all respects and should be approved by the Court.

91.     Furthermore, copies of the Class Notice have been mailed to over 318,000 potential members of the Class.  *See* Keough Decl. at ¶3 (Compendium Exh. I).  The date for objection expired on April 29, 2009, and as of the date of this Declaration, we are aware of 40 objections to the Settlement which represents less than 1% of the estimated Class.

## V.     THE PROPOSED STRUCTURAL CHANGES AND THE PLAN OF ALLOCATION

92.     Pursuant to the Class Notice, the Settlement would result in a number of significant Structural Changes to the Plan which will provide substantial enhancements to Class members who,

after the date the order approving the Settlement becomes final, have account balances in the Plan. GE has represented that the present value of the cost of implementing the Structural Changes to the Plan is estimated to be approximately $30 million, and the benefit of just a few of the changes is estimated to be between $107 to more than $2 billion in increased retirement benefit assets.  The Structural Changes will, among other things, make available to Plan Participants (1) an *Investment Education Benefit*; (2) *Allocation Rights for Matching Contributions*; (3) *Additional Investment Options*; and (4) the right to make *Roth 401(k) Contributions*.  Each of these enhancements will remain in place for at least ten (10) years.  The Settlement would also result in cash payments to Former Participants of the Plan (that is, members of the Class who, as of the date the Settlement becomes final, will not have accounts in the Plan).  Because these Class members will be unable to realize the substantial benefits of the Structural Changes, a cash component was agreed upon which will be distributed *per capita*.

### A.    Structural Changes for Current Participants

93.    The Settlement will result in a number of Structural Changes to the Plan for Participants who have account balances in the Plan.  The Structural Changes are as follows:

94.    <u>Investment Education Benefit</u> - Under the proposed Settlement, the Company will make available to Plan Participants, at its own expense, a new, state-of-the-art investment education program that includes (a) a sophisticated on-line investment tool to give investment and diversification guidance for Plan investments (the Fidelity Portfolio Review and Retirement Income Planner or a comparable tool to be selected by the Company will be used for this purpose); (b) on-line investment education materials explaining the Plan's investment options and the benefits of diversification; (c) a call center providing reasonable access to Plan information, including the investment recommendations and information described in (a) and (b) above; (d) periodic mailings containing print materials on the need for diversification; and (e) Internet-based "Webinars."

95.    <u>Fiduciary Training</u> - Under the proposed Settlement, the Company will provide periodic training (at least once each calendar year) by an independent third party for GE's Benefit Plans Investment Committee regarding its fiduciary obligations, any relevant developments in the law and any other relevant developments.

96.    <u>Allocation Rights for Matching Contributions</u> - Under GE's current Plan, a Plan Participant is required to initially allocate the matching contributions that the Company makes for the Participant's benefit to a single investment option that the Participant chooses.   Under the proposed Settlement, Participants will be able to allocate Company matching contributions made on their behalf among any investment options then available for such contributions under the Plan.

97.    <u>Additional Investment Options</u> - Currently, the only investment options under the Plan are GE Stock or funds managed by firms affiliated with GE.  Under the proposed Settlement, however, three new investment options will be added to the Plan.  The new investment options, which will be selected by Plan fiduciaries, will be managed by a firm or firms that are not affiliated with GE.

98.    <u>Roth 401(k) Option</u> - Unlike traditional 401(k) contributions, which are made on a *before-tax* basis, Roth 401(k) contributions are made on an *after-tax* basis.  This means that a Participant's traditional 401(k) contribution is excluded from his or her taxable income for federal income tax purposes, while a Participant's Roth 401(k) contribution is included in the Participant's current taxable income for federal income tax purposes.  However, while Plan distributions that are attributable to traditional 401(k) contributions are included in taxable income, qualifying distributions attributable to Roth 401(k) contributions may be excluded from taxable income.  Under the Settlement, Plan Participants will be able to make Roth 401(k) contributions (to the extent

permitted by applicable law) in addition to traditional (before-tax) 401(k) contributions, which could result in significant savings to many members of the Class.

99.    <u>Communications Improvements</u> - Under the Settlement, if a Plan Participant takes a partial distribution from the Plan after the Participant ceases to be employed by the Company, the Participant will be notified of the Participant's right to re-allocate the amount remaining in his or her account among the investment options then available under the Plan.

### B.    Former Participants

100.    The Settlement, if approved, will result in cash payments to members of the Class who, as of the date the order approving the Settlement becomes final, do not have account balances in the Plan.  The Former Participants will receive payment as follows:

> The amount to be paid to each Former Participant (the "Per Capita Cash Settlement Amount") shall be calculated by the Administrator by dividing, on the latest practicable date identified by the Administrator, the Cash Settlement Amount ($10,150,000), plus any interest earned thereon (net of estimated taxes), by the number of individuals on the Former Participant List, rounded down to the nearest penny ($0.01), except:
>
>> (1) if two or more Former Participants are the beneficiaries (as the term is defined in 29 U.S.C. §1002(8)) of a deceased Plan Participant (as the term is defined in 29 U.S.C. §1002(7)), the Per Capita Cash Settlement Amount shall be calculated by treating such beneficiaries as a single Plan Participant and such beneficiaries shall jointly be entitled only to the Per Capita Cash Settlement Amount, which shall be allocated among them in equal shares, and
>>
>> (2) the Per Capita Cash Settlement Amount shall be calculated by treating alternate payees (as that term is defined in 29 U.S.C. §1056(d)(3)) and any Former Participants associated with them as a single Plan Participant and they shall jointly be entitled only to the Per Capita Cash Settlement Amount, which shall be allocated among them in equal shares.

101.    Pursuant to the Settlement Agreement, Defendants are responsible for any administrative costs involved in the distribution of the Cash Settlement Amount.

C.    **Plan of Allocation**

102.    The complete terms of the Plan of Allocation of the Settlement consideration are set forth in paragraph 10 of the Settlement Agreement and in paragraphs 9-11 of the Class Notice.  The Class Notice explains that under the Plan of Allocation, Class Members who have account balances in the Plan at the time the Settlement is finally approved ("Current Participants") will enjoy the benefits of the Structural Changes to the Plan, which will remain in place for at least ten years.  *See* Class Notice at ¶10.  The Class Notice further explains that Former Participants will each receive an amount of cash equal to the Cash Settlement Amount (plus any interest net of applicable taxes) divided by the number of Former Participants (and rounded down to the nearest penny); the Class Notice states that the parties estimate that the cash payment to each Former Participant will be approximately $100.  *Id*. at ¶11.[8]  Class Members are not required to complete any claim forms in order to receive an allocation from the Settlement.  *Id*.

103.    The Plan of Allocation in this Action was formulated by Plaintiffs' Counsel and Defendants' counsel, who are experienced and competent practitioners in the area of ERISA law. Counsel formulated the Plan of Allocation based on their informed understanding of the legal and factual issues involved in the Action, the remedies available under ERISA Sections 502(a)(2) and (3) for breaches of fiduciary duty, their consideration of the comparative strengths of the various claims asserted in the Action, their consideration of the losses suffered by Class members as a result of the alleged violations by Defendants, and their consideration of the costs associated with the administration of the Plan of Allocation (as well as the potential administrative costs associated with other alternative allocation plans).

---

[8]    Under the proposed Plan of Allocation here, GE was required to use its best efforts to identify the names and contact information of Former Participants.

104.    Further, as noted above, U.S. Trust, in its role as the Independent Fiduciary of the Plan, has approved the fairness of the Settlement.  *See* Compendium Exh. J at 3 ("U.S. Trust has concluded that: (i) the consideration provided by the Settlement (including $10.15 million in cash for former Plan participants and the structural changes outlined in Article 8 of the Settlement) is reasonable, in light of the Plan's likelihood of full recovery, the risks and costs of litigation, and the value of the claims foregone").  The opinion of U.S. Trust concerning the fairness of the Settlement, which necessarily includes the Plan of Allocation, further supports a finding that the Plan of Allocation is fair, reasonable, and adequate and should be approved.

105.    Among other reasons, the Plan of Allocation is fair, reasonable, and adequate because the value of the Settlement consideration provided to each Former Participant is comparable to the value of the Settlement consideration provided to each Current Participant.  Defendants have estimated that roughly 25% of Class members are Former Participants, and that roughly 75% of Class members are Current Participants.  As discussed above, the Structural Changes have a cost to GE of approximately $30 million (reduced to present value).  If one values the Structural Changes by reference to the actual cost to GE to implement that relief, the total Settlement value is approximately $40 million ($10.15 million in cash prior to the addition of any accrued interest, plus approximately $30 million in Structural Changes).  Therefore, Current Participants, who comprise approximately 75% of the Class, will receive approximately 75% of the total Settlement value; Former Participants, who represent approximately 25% of the Class, will receive approximately 25% of the total Settlement value.  The comparability of the proposed allocations to each Class Member supports a finding that the Plan of Allocation is fair, reasonable, and adequate.  The comparability of

the proposed allocations to each Class member supports a finding that the Plan of Allocation is fair, reasonable, and adequate.[9]

106.    Plaintiffs' Counsel believe that the Plan of Allocation is fair, reasonable, and adequate, although it does not provide any cash consideration to Current Participants.  This aspect of the Plan of Allocation is fair, reasonable, and adequate for at least two reasons.  First, the Cash Settlement Amount must be allocated to the Former Participants because, as they are no longer participants in the Plan, they *cannot* enjoy any benefit from the Structural Changes to the Plan. Accordingly, if Former Participants are to receive some benefit from the Settlement, that benefit must take another form, and the Cash Settlement Amount is the only other form of consideration provided by the Settlement.  Second, as discussed above, the value of the non-cash Settlement consideration provided to each Current Participant under the Plan of Allocation is comparable to (and could potentially be greater than) the amount of cash that will be allocated to each Former Participant.

107.    Plaintiffs' Counsel believe that the distribution of the Cash Settlement Amount on a *per capita* basis is fair, reasonable, and adequate because such an allocation guarantees that *all* Former Participants who have suffered alleged losses from Defendants' allegedly improper conduct will receive a recovery in the Settlement, and because such an allocation will avoid the reduction of the Cash Settlement Amount which would result from the imposition of a complex and time-consuming administrative allocation process that would attempt to calculate the precise extent of each Former Participant's loss.  An alternative plan of allocation that would attempt to calculate the

---

[9]    At the time that the parties agreed on the Plan of Allocation, the parties estimated that there were approximately 250,000 Current Participants and 90,000 Former Participants.  Since that time, the parties have obtained more current information about the number of Current and Former Participants.

extent of each Former Participant's loss would require the Parties to agree to an allocation formula. It would also likely require substantial administrative costs, including, for instance, costs associated with the gathering of data on Former Participants' Plan investments and costs to verify that data, costs for the creation and programming of a mathematical formula that would calculate the amount of each Former Participant's alleged losses, costs for the application of such a formula to each Former Participant's Plan investments during the Class Period, and costs of a subsequent process for Class members to contest such determinations. Plaintiffs' Counsel have no reason to believe that Defendants would have been willing to bear the costs of such a claim calculation process. The *per capita* distribution of the Cash Settlement Amount avoids the need for such a costly and time-consuming claim calculation process that, if paid from the Cash Settlement Amount, would substantially reduce the pool of cash available to go to Former Participants, and would necessarily reduce the cash payout to *each* Former Participant.

108.    Finally, although over 318,000  potential Class Members were provided with the Class Notice containing the proposed Plan of Allocation and informing potential Class members of their right to object to the Plan of Allocation, only three (3) potential Class Members have objected to that Plan of Allocation.  *See* Docket Nos. 121, 125 and 141.  In contrast, *there has been no objection to the Plan of Allocation by over 99.99% of the Class*.  The overwhelmingly positive reaction of the Class to the Plan of Allocation lends further support to a finding that the Plan of Allocation is fair, reasonable, and adequate.

### D.    Service Awards

109.    The Named Plaintiffs are seeking a cash award, to be approved by the Court, not to exceed $5,000 per Plaintiff (the "Service Awards").  The Service Awards are apart from and in addition to any payments to members of the Class or Plaintiffs' Counsel.  If not awarded, the amount

set aside for the Service Awards will not be added to the Settlement Fund, but will instead return to Defendants.

110.     The Named Plaintiffs have served as representative plaintiffs for the duration of this litigation and have been involved throughout in several ways, such as providing Plan-related documents and other information supporting Plaintiffs' claims; reviewing the complaints filed on behalf of the Class and approving their filing; conferring with counsel regularly about the Action, including with regard to Plaintiffs' opposition to Defendants' dispositive motions; and helping to make strategic decisions, including the negotiation and approval of the terms of the Settlement.

111.     Named Plaintiffs Cavalieri, Miklic, and Bezio estimate that they each spent 30.0 hours in connection with the prosecution of this Action.  *See* the Affidavits of Umberto Cavalieri, Floyd Miklic, and Robert R. Bezio, submitted as Compendium Exhibits F-H.

### E.     Expert Evaluation

112.     As discussed above, GE retained Mercer to value the benefits of some of the Structural Changes to the Plan and to quantify the potential value of adding tools, such as the online guidance tools and the Roth 401(k) feature to the Plan.

113.     Mercer conducted a study of the Investment Education Benefit for GE in September 2008 in order to quantify the potential benefit value of adding Fidelity's guidance tools to the existing Plan for the next ten (10) years.  Mercer noted that by "encouraging participants to invest in more efficient and appropriate portfolios, the guidance tool can add value to both by increasing the account balance at retirement *and* by lowering the downside risks from poor investments."  In conducting their analysis of the educational tools, Mercer considered a number of factors including, *inter alia*, a participant's company stock exposure, age, and savings rates.  In so doing, Mercer determined that if one percent (1%) of the Plan's participants utilize the educational tools, then investment result will improve by $88.3 million dollars at the median (in the form of expected

increases in future retirement assets).  Although Named Plaintiffs cannot predict the number of participants who will actually take advantage of the Investment Education Benefit, arguably, especially in light of current economic conditions, it is likely that more than one percent (1%) of Plan participants will use this new feature.

114.     Similarly, Mercer conducted a study for GE in September 2008 to quantify the potential value of adding a Roth 401(k) feature to the existing Plan for the next ten years.  At the outset, Mercer noted that the addition of the Roth 401(k) creates the following two significant advantages: (1) "the ability to contribute funds today, on an after tax basis, and receive tax-free treatment of the investment earnings withdrawn during retirement (assuming certain withdrawal provisions are met during their pre-retirement)"; and (2) "reduced taxable income for purposes of determining taxability of Social Security benefits."  In conducting their analysis of the Roth 401(k), Mercer consider a number of factors including, *inter alia*, the number of participants currently contributing on an after tax basis, who have the potential to increase their tax favored contribution rate, and whose retirement income will limit the taxable portion of their Social Security benefits.  Mercer determined that if ten percent (10%) of the Plan's participants utilize the Roth 401(k) feature, the savings created by, or value of, this benefit would equal $19 million in increased retirement assets.  Similar to the Investment Education Benefit, as utilization increases, so does the value of the benefit.

115.     Plaintiffs' Counsel retained their own expert, The Michel-Shaked Group, to assess Mercer's analysis regarding the Structural Changes to the Plan.  The Michel-Shaked Group spent hours reviewing hundreds, if not thousands, of pages of documents, including the Plan documents, the parties' respective briefs, SEC filings, securities analyst reports, news articles, and price indices in arriving at their opinions.  Additionally, The Michel-Shaked Group, through Plaintiffs' Counsel

asked Mercer several follow up questions as to Mercer's utilization rates, discount rates, portfolio allocation considerations, and contribution rates, among others, and received satisfactory responses. Thereafter, The Michel-Shaked Group confirmed the reasonableness of the Mercer valuation.

## VI.  FACTORS TO BE CONSIDERED IN SUPPORT OF THE REQUESTED ATTORNEYS' FEE AWARD

116.    The Class Notice provides that Plaintiffs' Counsel may apply for an award of attorneys' fees and expenses to be paid by General Electric in an amount not to exceed $10,000,000.

117.    Plaintiffs' Counsel achieved this excellent result for the Class at great risk and substantial expense to themselves.  They were unwavering in their dedication to the interests of the Class and their investment of the time and resources necessary to bring this Action to a successful conclusion.  Additionally, the fee arrangement was negotiated by Plaintiffs' Counsel and GE.  The requested fee award of $10.0 million is particularly reasonable in light of Plaintiffs' Counsel expending more than 7,190 hours prosecuting this Action and using a customary lodestar multiplier of approximately 3.0.  The Parties evaluated the fee arrangement based on the remarkable results that were obtained for the Class after extensive negotiations in creating the Settlement.  The fee award will be paid by GE over and above the Settlement obtained, subject to Court approval.  If any of the $10 million is not awarded, any remaining amount set aside for the fee award will not be added to the Settlement Fund, but will return to GE.  The requested fee is reasonable based on the quality of Plaintiffs' Counsel's work and the substantial benefit obtained for the Class.

118.    Attached as Exhibits B-E to the Compendium are declarations from each of the firms that served as Plaintiffs' Counsel in this Action.  The declarations from Plaintiffs' Counsel firms include a description of the work they performed, the amount of time spent by each attorney and paraprofessional employed by Plaintiffs' Counsel, and the firms' lodestar calculations based on their billing rates in use as of December 5, 2008 (the billing rates provided to U.S. Trust).  For attorneys

or paraprofessionals who are no longer employed by Plaintiffs' Counsel, the lodestar calculations are based upon the billing rates for such person in his or her final year of employment.

119.    As set forth in their declarations, Plaintiffs' Counsel have expended 7,194.50 hours in the prosecution of this Action.  The resulting lodestar (*i.e.*, the value of the hours spent in connection with the litigation if paid at normal hourly rates) is $3,168,196.25.  *See* Compendium Exh. A (summary chart of Plaintiffs' Counsel's lodestar and expenses).  The number of hours expended by Plaintiffs' Counsel is reasonable in light of the length of the Action, the hard-fought nature of the litigation, and the complexity of the issues involved.

120.    The schedules were prepared from contemporaneous daily time records regularly prepared and maintained by Plaintiffs' Counsel, which are available at the request of the Court.  The hourly rates for attorneys and paraprofessionals included in these schedules are commensurate with the hourly rates charged by lawyers and paraprofessionals performing similar services in New York, New York.

121.    Under the lodestar approach, the requested fee of approximately $9.6 million would result in a multiplier of approximately 3.0 to Plaintiffs' Counsel's lodestar.[10]  This multiplier is fully justified given the effort required by Plaintiffs' Counsel, the risks faced and overcome and the results achieved for the Class.

A.    **Extent of Litigation**

122.    As described above, this case was settled only after Plaintiffs' Counsel had conducted an investigation into the Class's claims, filed opposition briefs to Defendants' motions to dismiss and motion for summary judgment, thoroughly researched the facts and law applicable to the Class'

---

[10]    Because the requested $10 million award includes expenses, those expenses should be subtracted from the $10 million amount prior to computing the multiplier.

claims and Defendants' defenses, consulted with experts, considered the risks of continued litigation, and engaged in mediated settlement negotiations with Defendants' counsel, resulting in a settlement for the Class.

### B. The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk, Contingent Cases

123.    The Action was undertaken by Plaintiffs' Counsel on a wholly contingent basis. From the outset, we understood that we were embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the enormous investment of time and money that the case would require.  In undertaking that responsibility, we were obligated to assure that sufficient attorney and para-professional resources were dedicated to the prosecution of the Action and that funds were available to compensate staff and to pay for the considerable out-of-pocket costs which a case such as this entails.

124.    As discussed in paragraphs 63-87 *supra*, there were serious questions of fact and law that created significant risks in this litigation.  Defendants filed three motions to dismiss, as well as a motion for summary judgment, and if any of these motions were granted, Plaintiffs' claims would have been dismissed in whole or in part.  Particularly, Defendants' argument that the Plan was a "net seller" of GE Stock created the very real risk that Plaintiffs' claims would be dismissed for the failure to demonstrate any compensable losses.  Plaintiffs' Counsel vigorously litigated this Action despite the significant risks of litigation which could have prevented any recovery by the Class (and which, correspondingly, could have prevented any recovery of fees by Plaintiffs' Counsel).

125.    Because of the nature of a contingent practice where cases are predominantly "big cases" lasting several years, not only do contingent litigation firms have to pay regular overhead, but they also must advance the expenses of the litigation.  With this case having already taken more than

three years, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis.

126.    In addition to advancing litigation expenses and paying overhead, Plaintiffs' Counsel faced the possibility of no recovery.  It is wrong to presume that a law firm handling complex contingent litigation always wins.  Tens of thousands of hours have been expended in losing efforts. The factor labeled by the courts as "the risks of litigation" is not an empty phrase.

127.    There are numerous cases where plaintiffs' counsel in contingent cases such as this, after the expenditure of thousands of hours, have received no compensation.  It is only because defendants and their counsel know that the leading members of the plaintiffs' bar are prepared to, and will, force a resolution on the merits and go to trial, or pursue appeals if necessary, that meaningful settlements in actions such as this can occur.

128.    We are aware of many hard-fought lawsuits where, because of the discovery of facts unknown when the case was commenced, changes in the law during the pendency of the case, or a decision of a judge or jury following a trial on the merits, excellent professional efforts of members of the plaintiffs' bar produced no fee for counsel.  Indeed, federal appellate reports are filled with opinions affirming dismissals with prejudice.  *See, e.g.*, *Goldstein v. MCI Worldcom*, 340 F.3d 238 (5th Cir. 2003); *Rosenzweig v. Azurix Corp.*, 332 F.3d 854 (5th Cir. 2003); *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424 (5th Cir. 2002); *ABC Arbitrage v. Tchuruk*, 291 F.3d 336 (5th Cir. 2002); *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079 (9th Cir. 2002); *Lipton v. PathoGenesis Corp.*, 284 F.3d 1027 (9th Cir. 2002); *Ronconi v. Larkin,* 253 F.3d 423 (9th Cir. 2001); *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194 (11th Cir. 2001); *Suna v. Bailey Corp.*, 107 F.3d 64 (1st Cir. 1997); *Chill v. GE*, 101 F.3d 263 (2d Cir. 1996); *Glassman v. Computervision Corp.*, 90 F.3d 617 (1st Cir. 1996); *Lovelace v. Software Spectrum*, 78 F.3d 1015 (5th Cir. 1996); *San Leandro Emergency Med. Group Profit*

*Sharing Plan v. Philip Morris Cos*., 75 F.3d 801 (2d Cir. 1996); *Acito v. IMCERA Group*, 47 F.3d 47 (2d Cir. 1995); *Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204 (4th Cir. 1994); *Melder v. Morris*, 27 F.3d 1097 (5th Cir. 1994); *Kowal v. MCI Commc'ns Corp*., 16 F.3d 1271 (D.C. Cir. 1994); *Shields v. Citytrust Bancorp.*, 25 F.3d 1124 (2d Cir. 1994); *Tuchman v. DSC Commc'ns Corp*., 14 F.3d 1061 (5th Cir. 1994); *Arazie v. Mullane*, 2 F.3d 1456 (7th Cir. 1993); *In re Donald J. Trump Casino Sec. Litig*., 7 F.3d 357 (3d Cir. 1993); *Mills v. Polar Molecular Corp.*, 12 F.3d 1170 (2d Cir. 1993); *Raab v. Gen. Physics Corp*., 4 F.3d 286 (4th Cir. 1993).

129.    The many recent appellate decisions affirming summary judgments and directed verdicts for defendants show that surviving a motion to dismiss is no guaranty of recovery.  *See Shuster v. Symmetricom, Inc.*, 35 Fed. Appx. 705 (9th Cir. 2002); *In re Digi Int'l, Inc. Sec. Litig.*, 14 Fed. Appx. 714 (8th Cir. 2001); *Geffon v. Micrion Corp*., 249 F.3d 29 (1st Cir. 2001); *Oran v. Stafford*, 226 F.3d 275 (3d Cir. 2000); *In re Comshare Inc. Sec. Litig*., 183 F.3d 542 (6th Cir. 1999); *Greebel v. FTP Software, Inc.*, 194 F.3d 185 (1st Cir. 1999); *Longman v. Food Lion, Inc.*, 197 F.3d 675 (4th Cir. 1999); *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609 (4th Cir. 1999); *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970 (9th Cir. 1999); *Levitin v. PaineWebber, Inc.*, 159 F.3d 698 (2d Cir. 1998); *Silver v. H&R Block*, 105 F.3d 394 (8th Cir. 1997).  Moreover, even plaintiffs who succeed at trial may find their judgment overturned on appeal.  *See, e.g.*, *In re Apollo Group, Inc. Sec. Litig*., 509 F. Supp. 2d 837 (D. Ariz. 2007) (reversing plaintiffs' verdict because plaintiffs did not establish loss causation); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning plaintiffs' verdict obtained after two decades of litigation); *Backman v. Polaroid Corp*., 910 F.2d 10 (1st Cir. 1990) (en banc) (reversing plaintiffs' verdict for securities fraud and ordering entry of judgment for defendants); *Ward v. Succession of Freeman*, 854 F.2d 780 (5th Cir. 1988) (reversing plaintiffs' jury verdict for securities fraud); *Robbins v. Koger Props.*, 116 F.3d 1441 (11th Cir. 1997) (same).

130.     Losses such as those cited above are exceedingly expensive.  The fees that are awarded are used to cover enormous overhead expenses incurred during the course of the litigation and are taxed by federal, state and local authorities.  Moreover, changes in the law through legislation or judicial decree can be catastrophic, frequently affecting all of contingent-fee counsel's pending cases.

131.     Courts have repeatedly held that it is in the public interest to have experienced and able counsel enforce ERISA and laws and regulations pertaining to the duties of officers and directors of public companies.  Vigorous private enforcement of ERISA, the federal securities laws and state corporation laws can occur only if private plaintiffs can obtain parity in representation with that available to large corporate interests.  If this important public policy is to be carried out, the courts must award fees which will adequately compensate private plaintiffs' counsel, taking into account the enormous risks undertaken with a clear view of the economics of a class action.

132.     Plaintiffs' Counsel undertook to act for Plaintiffs and the Class in this matter aware that they would be compensated only by obtaining a successful result.  The benefits conferred on the Class by this Settlement are particularly noteworthy in that Structural Changes to the Plan and a cash Settlement Fund worth $10.15 million (plus accrued interest) was obtained for the Class.

### C.     Standing and Expertise of Counsel

133.     The expertise and experience of Plaintiffs' Counsel is described in the declarations of Plaintiffs' Counsel submitted herewith.  They are well-known among their peers and courts across the country as among the most experienced and skilled practitioners in ERISA and the securities litigation field.  Plaintiffs' Counsel's skill and determination in pursuing their clients' claims have

been noted by many courts.[11]  In addition, as detailed in their respective firm résumés, Plaintiffs'

Counsel were willing and able to take complex cases such as this to trial.  This willingness and

ability added valuable leverage in the Settlement negotiations.

134.    The principal attorneys serving as Plaintiffs' Counsel are skilled and experienced in

the fields of ERISA and securities litigation:

- •    Lori G. Feldman is a daughter of retired public employees and understands the importance of protecting the investments of all workers and their families against corporate fraud.  In 2002-2003 and 2004-2005, she was named a "Rising Star of Washington Law" by practitioners in Seattle.

  In addition to lecturing on class action practice, she has served as Co-Chair of the Continuing Legal Education Committee of the Federal Bar Association for the Western District of Washington.  Recently, Ms. Feldman has participated as panel faculty in continuing legal education programs on ERISA and securities fraud class actions arising from the subprime and liquidity crisis.

  Ms. Feldman's representative recoveries exceed $150 million.  Recently, she recovered millions of dollars for class members in litigation involving Rhythms NetConnections, Inc. (D. Colo.); ConAgra Foods, Inc. (D. Neb.), Amazon.com (W.D. Wash.), Paradigm Medical Industries (D. Utah), SpectraLink Corporation (D. Colo.); Cutter & Buck (W.D. Wash.); and Select Medical (E.D. Pa).  She is currently representing Bernard Madoff victims, as well as representing shareholders in litigation involving, among several others, Beazer Homes (N.D. Ga.), Washington Mutual, Inc. (W.D. Wash.), and Gilead Sciences, Inc. (N.D. Cal.).  She is also

---

[11]    *See, e.g.*, *Cooper v. Pac. Life Ins. Co.*, 229 F.R.D. 245, 266 (S.D. Ga. 2005) (in a class action litigation where Milberg LLP served as class counsel, the court stated that "it would be difficult to find a better qualified group of lawyers to serve as class counsel in this particular type of case"); *In re Tyco Int'l, Ltd.*, 535 F. Supp. 249, 270 (D.N.H. 2007) (in a class action litigation where Milberg LLP served as co-lead counsel, the court stated that: "But for Co-Lead Counsel's enormous expenditure of time, money, and effort, they would not have been able to negotiate an end result so favorable for the class. . . .  Co-Lead Counsel's continued, dogged effort over the past five years is a major reason for the magnitude of the recovery[.]"); *See In re Enron Corp. Sec. Derivative & "ERISA" Litig.*, 529 F. Supp. 2d 644, 675 (S.D. Tex. 2006) (in a derivative and ERISA class action litigation where Coughlin Stoia served as lead counsel, the court stated: "The firm is comprised of probably the most prominent securities class action attorneys in the country.  It is not surprising that Defendants have not argued that counsel is not adequate.  Counsel's conduct in zealously and efficiently prosecuting this litigation with commitment of substantial resources to that goal evidences those qualities is evident throughout this suit.")

currently representing participants of defined contribution retirement plans in ERISA litigation involving, among others, American International Group, Inc. (S.D.N.Y), Boston Scientific Corp. (D. Mass.), Citigroup, Inc. (S.D.N.Y.), Constellation Energy Group, Inc. (D. MD), First American Corp. (C.D. Cal.), Fremont General Corp. (C.D. Cal.), Hartford Financial Services Group Inc. (D. Conn), KeyCorp (N.D. Ohio), Lehman Brothers Holdings, Inc. (S.D.N.Y), Macy's, Inc. (S.D. Ohio), Merrill Lynch & Co., Inc. (S.D.N.Y.), Morgan Stanley & Co., Inc. (S.D.N.Y.), and WellPoint, Inc. (S.D. Ind.).

Ms. Feldman graduated from Albany Law School in 1990, where she served as an Executive Editor of the *Albany Law Review*. She has interned at the Civil Division of the United States Attorney's Office in Brooklyn, New York. She is admitted to the Bars of the States of Washington and New York and federal district and appellate courts throughout the country.

- Arvind Khurana of Milberg LLP received his B.A. from State University of New York at Albany in 1993, and a J.D. from St. John's University School of Law in 1999 as a Dean's List Graduate. While in law school, Mr. Khurana was on the Dean's List from 1995-1999 and a member of the *American Bankruptcy Institute Law Review*. Mr. Khurana focuses his practice primarily on class actions on behalf of defrauded investors and 401(k) participants, as well as complex commercial litigation. Mr. Khurana is admitted to practice in the state and federal courts of New York.

- Evan J. Kaufman of Coughlin Stoia has extensive experience with complex litigation actions in federal and state courts, including securities class actions, derivative actions, consumer fraud actions, and Delaware shareholder actions. Mr. Kaufman has served as lead counsel, or played a significant role in many class actions alleging violations of securities laws, and represents shareholders in connection with going-private transactions and derivative actions. Mr. Kaufman earned his Bachelor of Arts degree from the University of Michigan in 1992. Mr. Kaufman earned his Juris Doctor degree from Fordham University School of Law in 1995, where he was a member of the *Fordham International Law Journal*. Mr. Kaufman is admitted to practice before the courts of the State of New York, as well as the United States District Courts for the Southern, Eastern, and Northern Districts of New York. Mr. Kaufman is a member of the Nassau County Bar Association.

- Jeffrey J. Sherrin is President, a senior partner, and co-chair of the health law department of O'Connell and Aronowitz, P.C. in Albany. Mr. Sherrin is admitted to practice before the United States Supreme Court, the Second Circuit Court of Appeals, and all United States District Courts situated within New York State. He has successfully represented clients before the United States Supreme Court in two ERISA litigations, *New York State Conf. of Blue Cross & Blue Shield Plans v. The Travelers Ins. Co.*, 514 U.S. 645 (1995) (as Counsel of Record for the plaintiff Hospital Association of New York State) and *DeBuono v. NYSA-ILA Medical and Clinical Serv. Fund,* 520 U.S. 806 (1997) (as Counsel of Record for *amici* Healthcare Association of New York State and American Hospital Association). Mr. Sherrin has been admitted to practice since 1976 having graduated from Albany Law School,

where he was Editor-in-Chief of the Albany Law Review. He clerked at the Appellate Division, Third Department, from 1975-1976, and was an adjunct professor at Union College for approximately 10 years, and selected for Best Lawyers in America for the past 17 years.

- Alfred G. Yates, Jr. received his A.B. from the College of William and Mary in 1968. He was with the U.S. Army from 1968-1970. He received his J.D. from the University of Pittsburgh in 1973. He has a broad range of experience in class action litigation including securities, derivative, consumer, antitrust, ERISA and FLSA actions. He has an AV Rating from Martindale-Hubbell and is admitted to the bar of the Commonwealth of Pennsylvania, to the U.S. District Court for the Western District of Pennsylvania and to the U.S. Court of Appeals for the Third Circuit.

### D.    Standing and Caliber of Opposition Counsel

135.    The Defendants are represented by counsel from Covington & Burling LLP, Williams and Connolly LLP and Dreyer Boyajian LLP, in addition to GE's in-house counsel, all of which possess substantial experience, expertise, and resources in the defense of complex litigation. In the face of this formidable opposition, Plaintiffs' Counsel developed their case so as to persuade Defendants to settle the case on a basis favorable to the Class.

136.    Plaintiffs' Counsel's compensation for the services rendered is wholly contingent on obtaining a favorable result for the Class, and the expenses incurred in the prosecution of the Action are set forth in the accompanying declarations and were advanced by Plaintiffs' Counsel on a purely contingent basis. Plaintiffs' Counsel have declared that the expenses reflected in the books and records maintained by the firms are an accurate recording of the expenses incurred.

137.    Included in this amount are the fees paid to the consultants, investigators, experts and the mediator, all of whom provided Plaintiffs' Counsel with extensive assistance during this Action. The remaining expenses are attributable to the costs of computerized research, copying documents and other incidental expenses incurred in the course of litigation. These expenses were critical to Named Plaintiffs' success in achieving the proposed Settlement. We respectfully submit

that all of these expenses are reasonable and were necessarily incurred in connection with the prosecution of this Action.

## VII.    CONCLUSION

138.    For the reasons set forth above and in the accompanying Memorandum of Law in Support of Final Approval of Settlement and Plan of Allocation of Settlement Proceeds, Award of Attorneys' Fees and Expenses, and Award of Service Awards to the Named Plaintiffs, we respectfully submit that (a) the Settlement is fair, reasonable, and adequate and should be approved; (b) the Structural Changes and Plan of Allocation represents a fair method for distribution of the Settlement Fund among Class members and should also be approved; (c) the application for attorneys' fees should be granted; and (d) the application for Service Awards to the Named Plaintiffs should be granted.

We declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  If called as a witness, we could and would competently testify thereto.

*/s/ Evan J. Kaufman*
_____
EVAN J. KAUFMAN


*/s/ Lori G. Feldman*
_____
LORI G. FELDMAN
