## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE GENERAL ELECTRIC COMPANY ERISA LITIGATION | No. 06-CV-315 (GLS/DRH)<br><br>(Lead Case) |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT
AND PLAN OF ALLOCATION OF SETTLEMENT PROCEEDS,
AWARD OF ATTORNEYS' FEES AND EXPENSES,
AND AWARD OF SERVICE AWARDS TO THE NAMED PLAINTIFFS**

**MILBERG LLP**
Lori G. Feldman
Arvind Khurana
One Pennsylvania Plaza
New York, New York 10119
(212) 594-5300 (telephone)
(212) 868-1229 (facsimile)

**O'CONNELL AND ARONOWITZ**
Jeffrey J. Sherrin
54 State Street
Albany, New York 12207-2501
(518) 462-5601 (telephone)
(518) 462-2670 (facsimile)

**LAW OFFICE OF ALFRED G. YATES JR.**
Alfred G. Yates
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, Pennsylvania 15219
(412) 391-5164 (telephone)
(412) 471-1033 (facsimile)

**COUGHLIN STOIA GELLER
 RUDMAN & ROBBINS LLP**
Ellen Gusikoff Stewart
655 West Broadway, Suite 1900
San Diego, CA 92101
(619) 231-1058 (telephone)
(619) 231-7423 (facsimile)

**COUGHLIN STOIA GELLER
 RUDMAN & ROBBINS LLP**
Samuel H. Rudman
Evan J. Kaufman
58 South Service Road, Suite 200
Melville, New York 11747
(631) 367-7100 (telephone)
(631) 367-1173 (facsimile)

*Counsel for Plaintiffs*

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................. 1

STATEMENT OF FACTS .................................................................................................... 7

    A.   Procedural and Litigation History.............................................................................. 7

    B.   Settlement Negotiations and Related Proceedings .................................................. 10

    C.   Review of the Settlement by U.S. Trust .................................................................. 11

    D.   Notice Was Provided in Accordance With the Class Action Fairness Act.................. 16

    E.   Overview of the Settlement Terms ........................................................................... 16

        1.   The Structural Changes to the Plan........................................................... 16

            a.   Investment Education Program........................................................... 17
            b.   Fiduciary Training ............................................................................. 17
            c.   Allocation Rights for Matching Contributions ................................... 18
            d.   Additional Investment Options ........................................................... 18
            e.   Roth 401(k) Contributions ................................................................. 18
            f.   Plan Communications ........................................................................ 19

        2.   The Cash Settlement Amount ..................................................................... 19

        3.   Attorneys' Fees and Expenses .................................................................... 19

    F.   Preliminary Approval Order ..................................................................................... 20

ARGUMENT ....................................................................................................................... 21

    I.   FINAL CERTIFICATION OF THE CLASS IS APPROPRIATE AND
        WARRANTED .............................................................................................. 21

    A.   Certification of a Class is Appropriate and Warranted Under Rule 23(a).................. 22

        1.   Numerosity.................................................................................................. 22

        2.   Commonality................................................................................................ 22

        3.   Typicality.................................................................................................... 23

        4.   Adequacy .................................................................................................... 23

B.     Certification of a Class is Appropriate and Warranted Under Rule 23(b)(1) ........... 25

II.    THE SETTLEMENT EXCEEDS APPLICABLE STANDARDS FOR
JUDICIAL APPROVAL ........................................................................ 26

A.   The Standards for Settlement Approval ........................................... 26

B.   The Settlement Was Fairly Negotiated ........................................ 27

C.   The Terms of the Settlement are Fair ........................................ 28

    1.    The Complexity, Expense and Likely Duration of the Litigation
Supports Approval of the Settlement ........................................ 29

    2.    The Reaction of the Class to the Settlement Supports Its Approval ........................ 31

        a.    The Settlement Consideration is Fair, Reasonable and Adequate ........................ 33
        b.    ERISA Supports a Non-Opt-Out Class ........................................ 34
        c.    Objections by Those Who Generally Disapprove of the Litigation
Should Not Preclude Settlement ........................................ 35
        d.    The Remaining Objections Lack Merit ........................................ 36

    3.    The Stage of Proceedings Supports Approval of the Settlement ........................ 37

    4.    The Risks of Prevailing Support Approval of the Settlement ........................ 38

    5.    The Ability of Defendants to Withstand a Greater Judgment is
Neutral and Does Not Militate Against Approval of the Settlement ........................ 42

    6.    The Reasonableness of the Settlement Consideration Supports
Approval of the Settlement ........................................ 42

D.   The Notice to Class Members Satisfied Rule 23 and Due Process Requirements ....... 45

E.   The Plan of Allocation is Fair, Reasonable and Adequate and Should be Approved .. 46

III.   THE REQUESTED AMOUNT OF ATTORNEYS' FEES AND
EXPENSES SHOULD BE APPROVED ........................................ 52

A.   Negotiated Fee Arrangements Are Favored ........................................ 52

B.   Other Factors Confirm that the Requested Fee Is Reasonable ........................ 58

    1.    The Time and Labor Expended by Counsel ........................................ 58

2.  The Risks of the Litigation ....................................................................... 59

    a.  The Contingent Nature of Class Counsel's Representation
       Supports the Requested Fee .......................................................... 59

    b.  Litigation and Damage Risks ...................................................... 61

3.  The Magnitude and Complexity of the Litigation ................................... 63

4.  The Quality of Representation ................................................................. 64

C.  The Requested Attorneys' Fees are Also Reasonable Under the
    Lodestar Cross-Check ....................................................................................... 64

D.  The Class's Reaction to the Fee Request ....................................................... 68

E.  Class Counsel's Expenses Were Reasonably Incurred and
    Necessary to the Prosecution of This Action ............................................... 69

IV.  THE SERVICE AWARDS TO THE NAMED PLAINTIFFS
    SHOULD BE APPROVED ............................................................................. 70

CONCLUSION ...................................................................................................................... 74

# TABLE OF AUTHORITIES

## FEDERAL CASES

**Page**

*In re AOL Time Warner ERISA Litig.*,
No. 02-8853, 2006 U.S. Dist. LEXIS 70474 (S.D.N.Y. Sept. 278, 2006)...................... *passim*

*In re "Agent Orange" Prod. Liab. Litig.*,
818 F.2d 179 (2d Cir. 1987)..........................................................................................47, 48

*In re Am. Bank Note Holographics, Inc. Sec. Litig.*,
127 F. Supp. 2d 418 (S.D.N.Y. 2001)............................................................................32, 59

*Anixter v. Home-Stake Prod. Co.*,
77 F.3d 1215 (10th Cir. 1996) ............................................................................................60

*In re Apollo Group, Inc. Sec. Litig.*,
No. 04-2147, 2008 U.S. Dist. LEXIS 61995 (D. Ariz. Aug. 4, 2008)....................................60

*In re Aquila ERISA Litig.*,
No. 04-00865, 2007 U.S. Dist. LEXIS 87830 (W.D. Mo. Nov. 29, 2007) ......................34, 72

*Banyai v. Mazur*,
205 F.R.D. 160 (S.D.N.Y. 2002) .........................................................................................25

*In re Bausch & Lomb Inc. ERISA Litig.*,
No. 06-6297, 2008 U.S. Dist. LEXIS 106269 (W.D.N.Y. Dec. 12, 2008)..............................39

*Boeing Co. v. Van Gemert*,
444 U.S. 472 (1980).............................................................................................................55

*In re Broadwing, Inc. ERISA Litig.*,
252 F.R.D. 369 (S.D. Ohio 2006) ........................................................................................73

*In re Brown Co. Sec. Litig.*,
355 F. Supp. 574 (S.D.N.Y. 1973).......................................................................................64

*In re CMS Energy ERISA Litig.*,
No. 02-72834, 2006 U.S. Dist. LEXIS 55836 (E.D. Mich. June 27, 2006) ...........................73

*In re Cendant Corp., Derivative Action Litig.*,
232 F. Supp. 2d 327 (D.N.J. 2002) ......................................................................................57

*Chatelain v. Prudential-Bache Secs., Inc.*,
805 F. Supp. 209 (S.D.N.Y. 1992)........................................................................................63

*City of Detroit v. Grinnell Corp.*,
   495 F.2d 448 (2d Cir. 1974)...................................................................................... *passim*

*Cohn v. Nelson*,
   375 F. Supp. 2d 844 (E.D. Mo. 2005)...................................................................55

*Consolidated Rail Corp. v. Town of Hyde Park*,
   47 F.3d 473 (2d Cir. 1995)....................................................................................22

*In re Cont'l Ill. Sec. Litig.*,
   962 F.2d 566 (7th Cir. 1992) ...........................................................................54, 59

*Cook v. Niedert*,
   142 F.3d 1004 (7th Cir. 1998) .........................................................................71, 73

*Cosgrove v. Sullivan*,
   759 F. Supp. 166 (S.D.N.Y. 1991).......................................................................67

*D'Amato  v. Deutsche Bank*,
   236 F.3d 78 (2d. Cir. 2001)........................................................................27, 28, 32

*In re Delphi Corp. Sec., Derivative and ERISA Litig.*,
   248 F.R.D. 483 (E.D. Mich. 2008) ......................................................................72

*Donovan v. Bierwirth*,
   680 F.2d 263 (2d Cir. 1982)..................................................................................12

*Donovan v. Bierwirth*,
   754 F.2d 1049 (2d Cir. 1985)............................................................................9, 40

*Dura Pharmaceuticals, Inc. v. Broudo*,
   544 U.S. 336 (2005)................................................................................................9

*In re EVCI Career Colleges Holding Corp. Sec. Litig.*,
   No. 05-10240, 2007 U.S. Dist. LEXIS 57918 (S.D.N.Y. July 27, 2007)..............47

*Eslava v. Gulf Tel. Co.*,
   No. 04-297, 2007 U.S. Dist. LEXIS 85011 (S.D. Ala. Nov. 16, 2007)..................15

*Feerer v. Amoco Prod. Co.*,
   No. 95-0012, 1998 U.S. Dist. LEXIS 22248 (D.N.M. May 28, 1998)...................71

*In re Ferro Corp. ERISA Litig.*,
   No. 05-1594, 2007 U.S. Dist. LEXIS 71929 (N.D. Ohio Sept. 27, 2007)..............72

*Frank v. Eastman Kodak Co.*,
    228 F.R.D. 174 (W.D.N.Y. 2005).....................................................................71, 72

*In re Gilat Satellite Networks, Ltd.*,
    No. 02-1510, 2007 U.S. Dist. LEXIS 29062 (E.D.N.Y. Apr. 19, 2007) ................................51

*In re Global Crossing*,
    225 F.R.D. 436 (S.D.N.Y. 2004) ................................................................... *passim*

*Goldberger v. Integrated Resources, Inc.*,
    209 F.3d 43 (2d Cir. 2000)...........................................................................58, 64

*Gruby v. Brady*,
    838 F. Supp. 820 (S.D.N.Y. 1993)........................................................................25

*Gulino v. Symbol Techs.*,
    No. 06-2810, 2007 U.S. Dist. LEXIS 76915 (E.D.N.Y. Oct. 17, 2007)...........................25, 71

*In re Harrah's Entm't Inc. Sec. Litig.*,
    No. 95-3925, 1998 U.S. Dist. LEXIS 18774 (E.D. La. Nov. 25, 1998) ...............................67

*Harris v. Koenig*,
    No. 02-618, 2009 U.S. Dist. LEXIS 19757 (D.D.C. Mar. 12, 2009) ...............................13, 14

*In re HealthSouth Corp. ERISA Litig.*,
    No. 03-1700, 2006 U.S. Dist. LEXIS 50196 (N.D. Ala. June 28, 2006)...............................73

*Hensley v. Eckerhart*, 461 U.S. 424 (1983) ................................................................53, 56

*In re Independent Energy Holdings PLC Sec. Litig.*,
    302 F. Supp. 2d 180 (S.D.N.Y. 2003)......................................................................69

*In re Indep. Energy PLC Sec. Litig.*,
    No. 00-6689, 2003 U.S. Dist. LEXIS 17090 (S.D.N.Y. Sept. 29, 2003)...............................47

*Ingram v. Coca-Cola Co.*,
    200 F.R.D. 685 (N.D. Ga. 2001)..........................................................................53

*In re Ivan F. Boesky Sec. Litig.*,
    888 F. Supp. 551 (S.D.N.Y. 1995)........................................................................65

*Kirschbaum v. Reliant Energy, Inc.*,
    526 F.3d 243 (5th Cir. 2008) ............................................................................39

*Koch v. Dwyer*,
    No. 98-cv-5519, 2001 U.S. Dist. LEXIS 4085 (S.D.N.Y. Mar. 23, 2001)...............................26

*Lindy Bros. Builders, Inc. v. Am. Radiator & Standard Sanitary Corp.*,
 487 F.2d 161 (3d Cir. 1973)................................................................65

*Lindy Bros. Builders v. Am. Radiator & Standard Sanitary Corp.*,
 540 F.2d 102 (3d Cir. 1976)................................................................65

*In re Lloyd's American Trust Fund Litig.*,
 No. 96-1262 (RWS), 2002 U.S. Dist. LEXIS 22663 (S.D.N.Y. Nov. 26, 2002) ...................47

*In re Lorazepam & Clorazepate Antitrust Litig.*,
 205 F.R.D. 369 (D.D.C. 2002)................................................................68

*Lucas v. Kmart Corp.*,
 No. 99-01923, 2006 U.S. Dist. LEXIS 51420 (D. Colo. July 27, 2006) ...............................65

*In re Lucent Techs., Inc. Sec. Litig.*,
 327 F. Supp. 2d 426 (D.N.J. 2004) ...............................73

*M. Berenson Co. v. Faneuil Hall Marketplace, Inc.*,
 671 F. Supp. 819 (D. Mass. 1987) ...............................53

*Maher v. Zapata Corp.*,
 714 F.2d 436 (5th Cir. 1983) ...............................56

*Maley v. Del Global Techs. Corp.*,
 186 F. Supp. 2d 358 (S.D.N.Y. 2002)................................................................46, 52, 66

*Mathes v. Roberts*,
 85 F.R.D. 710 (S.D.N.Y. 1980) ...............................63

*McBean v. City of New York*,
 233 F.R.D. 377 (S.D.N.Y. 2006) ...............................53

*McDaniel v. County of Schenectady*,
 No. 04-0757, 2007 U.S. Dist. LEXIS 81889 (N.D.N.Y. Nov. 5, 2007) ...............................40

*In re McNeely v. Nat'l Mobile Health Care, LLC*,
 No. 07-933, 2008 U.S. Dist. LEXIS 86741 (W.D. Okla. Oct. 27, 2008) ...............................47

*Mehling v. New York Life Ins. Co.*,
 248 F.R.D. 455 (E.D. Pa. 2008)................................................................72

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
 02 MDL 1484, 2007 U.S. Dist. LEXIS 9450 (S.D.N.Y. Feb. 1, 2007)...................................66

*Mills v. Elec. Automobile-Lite Co.*,
    396 U.S. 375 (1970)..................................................................................................55

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
    187 F.R.D. 465 (S.D.N.Y. 1998) ....................................................................67, 68

*Newman v. Stein*,
    464 F.2d 689 (2d Cir. 1972)...................................................................42, 43, 44

*In re PaineWebber Ltd. P'ships Litig.*,
    171 F.R.D. 104 (S.D.N.Y. 1997) ..................................................................... *passim*

*In re Polaroid ERISA Litig.*,
    240 F.R.D. 65 (S.D.N.Y. 2006) ...............................................................................26

*In re Polaroid ERISA Litig.*,
    No. 03-8335, 2007 U.S. Dist. LEXIS 51983 (S.D.N.Y. July 19, 2007)................................72

*In re Prudential Sec. Ltd. P'ships Litig.*,
    164 F.R.D. 362 (S.D.N.Y. 1996) .............................................................................45

*In re Prudential Sec. Ltd. P'ships Litig.*,
    985 F. Supp. 410 (S.D.N.Y. 1997).................................................................59, 68

*Rabin v. Concord Assets Group, Inc.*,
    No. 89-6130, 1991 U.S. Dist. LEXIS 18273 (S.D.N.Y. Dec. 19, 1991) ................................67

*In re RJR Nabisco Sec. Litig.*,
    No. 88-7905, 1992 U.S. Dist. LEXIS 12702 (S.D.N.Y. Aug. 24, 1992)................................67

*Rankin v. Rots*,
    No. 02-71045, 2006 U.S. Dist. LEXIS 45706 (E.D. Mich. June 28, 2006) ..........................15

*Ressler v. Jacobson*,
    149 F.R.D. 651 (M.D. Fla. 1992)...........................................................................64

*In re Rite Aid Corp. Sec. Litig.*,
    396 F.3d 294 (3d Cir. 2005).................................................................................68

*Robbins v. Koger Props.*,
    116 F.3d 1441 (11th Cir. 1997) ............................................................................60

*Roberts v. Texaco, Inc.*,
    979 F. Supp. 185 (S.D.N.Y. 1997)....................................................................67, 71

*In re SPX Corp. ERISA Litig.*,
No. 3:04-192, 2007 U.S. Dist. LEXIS 28072 (W.D.N.C. Apr. 13, 2007) .............................72

*In re Schering-Plough Corp. S'holders Derivative Litig.*,
No. 01-1412, 2008 U.S. Dist. LEXIS 2569 (D.N.J. Jan. 14, 2008).........................................55

*Smith v. AON Corp.*,
238 F.R.D. 609 (N.D. Ill. 2006)..........................................................................................25

*In re Sony SVRD Rear Projection Television Class Action Litig.*,
No. 06-5173, 2008 U.S. Dist. LEXIS 36093 (S.D.N.Y. May 1, 2008) ...................................53

*Strougo v. Bassini*,
258 F. Supp. 2d 254 (S.D.N.Y. 2003).....................................................................................31

*Teachers' Ret. Sys. v. A.C.L.N., Ltd.*,
No. 01-11814, 2004 U.S. Dist. LEXIS 8608 (S.D.N.Y. May 14, 2004) ...........................37, 59

*Tittle v. Enron Corp.*,
No. 01-3913, 2005 U.S. Dist. LEXIS 34076 (S.D. Tex. May 24, 2005)................................15

*Thornton v. E. Tex. Motor Freight*,
497 F.2d 416 (6th Cir. 1974) ................................................................................................70

*In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*,
718 F. Supp. 1099 (S.D.N.Y. 1989)........................................................................................42

*Unite Nat'l Ret. Fund v. Watts*,
No. 04-3603, 2005 U.S. Dist. LEXIS 26246 (D.N.J. Oct. 28, 2005) ...............................55, 57

*In re Veritas Software Corp. Sec. Litig.*,
No. 03-0283, 2005 U.S. Dist. LEXIS 30880 (N.D. Cal. Nov. 15, 2005) ...............................47

*In re Visa Check/Mastermoney Antitrust Litig.*,
297 F. Supp. 2d 503 (E.D.N.Y. 2003) ...................................................................................32

*In re Visteon Corp. ERISA Litig.*,
No. 05-71205, 2007 U.S. Dist. LEXIS 96023 (E.D. Mich. Mar. 9, 2007) .............................73

*Wal-Mart Stores Inc. v. Visa U.S.A., Inc.*,
396 F.3d 96 (2d. Cir. 2005).............................................................................................26, 32

*In re Warner Commc'ns Sec. Litig.*,
618 F. Supp. 735 (S.D.N.Y. 1985).........................................................................................65

*Weinberger v. Kendrick*,
   698 F.2d 61 (2d. Cir. 1982)..............................................................................26, 45

*Weiss v. Mercedes-Benz of N. Am.*,
   899 F. Supp. 1297 (D.N.J. 1995) ...............................................................67

*White v. First American Registry, Inc.*,
   No. 04-1611, 2007 U.S. Dist. LEXIS 18401 (S.D.N.Y. March 7, 2007) ..............27

*White v. NFL*,
   822 F. Supp. 1389 (D. Minn. 1993)...............................................................47

*In re Williams Co. ERISA Litig.*,
   231 F.R.D. 416 (N.D. Okla. 2005)...............................................................25

*In re Winn Dixie ERISA*,
   No. 04-194, 2008 U.S. Dist. LEXIS 21988 (M.D. Fla. March 20, 2008) ..............15

*In re WorldCom, Inc. ERISA Litig.*,
   No. 02-4816, 2004 U.S. Dist. LEXIS 20671 (S.D.N.Y. Oct. 18, 2004)..................73

*In re WorldCom, Inc. ERISA Litig.*,
   No. 02- 4816, 2004 U.S. Dist. LEXIS 19786 (S.D.N.Y. Oct. 5, 2004)..................25

*In re WorldCom, Inc. Sec. Litig.*,
   388 F. Supp. 2d 319 (S.D.N.Y. 2005)..............................................................47, 48

*In re Xcel Energy, Inc.*,
   364 F. Supp. 2d 980 (D. Minn. 2005)...............................................................67

*Zerkle v. Cleveland-Cliffs Iron Co.*,
   52 F.R.D. 151 (S.D.N.Y. 1971) .....................................................................63

## STATE CASES

*In re AXA Finance, Inc. S'holders Litig.*,
   No. 18268, 2002 Del. CH. LEXIS 57 (Del. Ch. May 16, 2002)............................54

*Fletcher v. A. J. Industrial, Inc.*,
   266 Cal. App. 2d 313 (1968) .....................................................................55

*In re Plains Res. Inc. S'holders Litig.*,
   No. 071-N, 2005 Del. Ch. LEXIS 12 (Del. Ch. Feb. 4, 2005)............................56

*Serrano v. Priest*,
   20 Cal. 3d 25 (1977) ...............................................................................56

*United Vanguard Fund, Inc. v. Takecare, Inc.*,
727 A.2d 844 (Del. Ch. 1998)................................................................56

## DOCKETED CASES

*In re Activision, Inc.  S'holder Derivative Litig.*,
No. 06-04771 (C.D. Cal. July 21, 2008) ................................................57

*In re Apple Computer, Inc. Derivative Litig.*,
No. 06-4128 (N.D. Cal. Nov. 5, 2008) ............................................53, 57

*In re BP P.L.C. Litig.*,
No. 06-11929 (Anchorage 3d Dist. Alaska May, 7, 2008) ....................57

*In re BellSouth Corp. ERISA Litig.*,
No. 02-2440 (N.D. Ga. Nov. 14, 2006) .................................................34

*City of Pontiac Gen. Employees' Ret. Sys. v. Langone*,
No. 2006-122302 (Fulton County, Ga. June 10, 2008) .........................57

*In re Doral Finance Corp. Sec. Litig.*,
No. 05-1706 (S.D.N.Y. July 17, 2007) ..................................................66

*In re Electronic Data System Corp ERISA Litig.*,
No. 03-1512 (E.D. Tex. May 2, 2008).....................................................34

*In re Federal Home Loan Mortgage Corp. Sec. and Deriv. Litig., (No. II) ERISA Litig.*,
No. 1584 (S.D.N.Y.) ..............................................................................57

*In re HCA Inc. S'holder Litig.*,
No. 06-1816 (Davidson Cty. Tenn. Chancery Ct. Dec. 20, 2007)..........57

*In re JDS Uniphase Corp. Sec. Litig.*,
No. 02-1486 (N.D. Cal. Nov. 27, 2007) ................................................60

*In re Juniper Derivative Actions*,
No. 5:06-03396 (N.D. Cal. Nov. 13, 2008) ...........................................57

*In re Rambus, Inc. Derivative Litig.*,
No. 06-3513 (N.D. Cal. Jan. 20, 2009)...................................................55

*In re Schering-Plough Corp. S'holders Derivative Litig.*,
No. 01-1412 (D.N.J. Jan. 14, 2008) .......................................................57

*In re Xcel Energy Inc. ERISA Litig.*,
    No. 02-2677 (D. Minn. Jan. 14, 2005)..................................................................................34

## FEDERAL STATUTES

29 U.S.C. § 1001(b) ..........................................................................................................17, 18

29 U.S.C. § 1132(a) ................................................................................................................70

29 U.S.C. § 1146(c)(2)......................................................................................................18, 19

Fed. R. Civ. P. 23 ........................................................................................................... *passim*

## MISCELLANEOUS

1 Alba Conte, *Attorney Fee Awards* (2d ed. 1993)........................................................67

## INTRODUCTION

Named Plaintiffs Umberto Cavalieri, Floyd Miklic, and Robert R. Bezio ("Named Plaintiffs" or "Plaintiffs") respectfully move this Court for final approval of the settlement of this litigation, brought and litigated by them pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA") (the "Action"), on behalf of themselves and a class consisting of all Participants in the General Electric ("GE" or the "Company") Savings and Security Program (the "Plan") during the period from March 23, 2001 to February 5, 2009 (the "Class Period") on whose behalf the Plan held Company Stock during the Class Period (the "Settlement Class" or the "Class").[1]

As set forth in the Class Action Settlement Agreement dated December 19, 2008 (the "Settlement Agreement"),[2] counsel for the parties have agreed to settlement of the Action, with prejudice, for important and valuable structural changes providing immediate benefits to the Plan for current Plan participants and $10.15 million in cash for former Plan participants (the "Settlement").

In its Order Preliminary Approving Settlement dated February 5, 2009 (the "PAO"), this Court preliminarily certified the Class, appointed the Named Plaintiffs as the representatives of the Class and preliminarily approved the Settlement Agreement finding it to be fair, reasonable and adequate to the Class. Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure and consistent with the PAO, Named Plaintiffs, on behalf of themselves and the Class, respectfully

---

[1] Excluded from the Class are Defendants (and members of their immediate families, any officer, director, or partner of any Defendants, any entity in which a Defendant has a controlling interest, and the heirs, successors, or assigns of any of the foregoing).

[2] The Settlement Agreement appears in the record as Exhibit 1 to the Declaration of Lori G. Feldman in Support of Plaintiffs' Unopposed Motion for Preliminarily Approval of Settlement, filed on December 19, 2008 (Docket No. 97-3). Capitalized terms not otherwise defined herein shall have the same meaning ascribed to them in the Settlement Agreement.

submit this memorandum of law in support of their motion for entry of a final order and judgment: (1) granting final approval of the proposed Settlement with all defendants on the terms and conditions reflected in Settlement Agreement; (2) granting final approval of the proposed Plan of Allocation of the net proceeds of the Settlement; (3) granting final certification of the Settlement Class; (4) awarding attorneys' fees and expenses to Class Counsel in the negotiated amount of $10 million (which are to be paid by GE, *not* from the Cash Settlement Amount) in connection with the successful prosecution of this class action; and (5) granting Service Awards to the Named Plaintiffs in light of their assistance in prosecuting this litigation.

The Court should grant final approval of the Settlement. The Named Plaintiffs submit that the Settlement is not only fair, reasonable and adequate, as the Court has already determined, but is also, in many respects, an unprecedented result for the Class, especially in light of the hazards of proceeding to trial. The Plan offered by GE was implemented in 1958, making it one of the oldest in the nation with an extraordinarily large number of participants. The Settlement broadens the goal and purpose of the Plan by requiring GE to support its employees' efforts to save for retirement, by providing for, *inter alia,* financial education, additional investment options and other improvements that will ultimately result in diversification of Plan assets and a meaningful enhancement of retirement benefits by Plan participants. As such, the Settlement furthers the goal and purpose of ERISA. *See* H.R. Rep. No. 533, 93d Cong., 2d Sess 1 (1973), reprinted in 1974 U.S.C.C.A.N. 4639, 4640. (ERISA was designed, in part, to "promote a renewed expansion of private retirement plans and increase the number of participants receiving private retirement benefits."). Furthermore, the Settlement makes a significant impact, as it affects over 300,000 members of the Class, one of the largest classes in an ERISA case such as this.

2

Thereafter, U.S. Trust, in its capacity as the independent fiduciary to the Plan, reviewed the terms of the Settlement, and concluded, *inter alia*, that the Settlement consideration provided by the Settlement (including the Structural Changes and $10.15 million in cash for former Plan participants) is reasonable, in light of the Plan's likelihood of full recovery, the risks and costs of litigation, and the value of the claims foregone. U.S. Trust has authorized the Plan to enter into the Settlement. U.S. Trust's review and approval of the Settlement further supports its final approval.

The importance, significance and value of the benefits provided by the Settlement are further highlighted by recent news concerning the trend to diminish retirement plan benefits. For instance, in January 2009, the *Wall Street Journal* reported that many prominent companies, including Northrop Grumman Corp., General Motors Corp., CSX Corp., Proctor & Gamble Co., Weyerhaeuser Co., and Pfizer, Inc., among others, have either suspended or reduced their matching-gift programs. Shelly Banjo, "Next Benefit to Face the Ax: Matching Gifts – Companies are Now Targeting Programs that Encourage Their Employees to Donate," *Wall Street Journal*, Jan. 14, 2009. *See also* Kara McGuire, "Pay Dirt - Vanishing Benefits," *Minn. Star Tribune,* Feb. 15, 2009 ("In recent weeks, several large companies including Macy's, UPS, Sprint Nextel and Starbucks have stopped contributing to their workers' 401(k) plans."). In contrast, the Settlement enhances Class member retirement benefits, and does so in an environment emphasizing education, diversification and improved communications.

Similar ERISA actions, including for instance, *In re General Motors ERISA Litig.*, No. 05-71085 (E.D. Mich.) ("*GM*"), *In re Aquila ERISA Litig.*, No. 04-00865 (W.D. Mo.) ("*Aquila*"), and *In re Royal Dutch/Shell Transport ERISA Litig.*, No. 04-1398 (D.N.J.) ("*Royal Dutch/Shell*"), have also resulted in settlements comprised of both cash and structural

components.  Named Plaintiffs submit that the Settlement here is a superior result and noteworthy for, among other things, the following reasons:  First, the Settlement affects a class consisting of over 300,000 members.  Named Plaintiffs are not aware of any other settlement in an ERISA action such as this one which impacted such a large number of plan participants.  Second, the duration of the Structural Changes, ten years, is considerably longer than the duration for structural changes in other actions.  *See GM* (duration of 4 years); *Aquila* (duration of 3 years)).  The duration of the Structural Changes is significant because it provides greater opportunity for participants in the Plan to take advantage of the features.  Furthermore, in addition to providing financial counseling, the ability to allocate matching 401(k) contributions among numerous investments, fiduciary training and three new investment options, the Settlement also provides for the addition of a Roth 401(k) investment vehicle, with distinct tax benefits for those that qualify and choose to utilize it.  For those individuals who no longer have accounts in the Plan once the Settlement becomes final ("Former Participants"), the cash component of the Settlement will be distributed such that each of the Former Participants is guaranteed recovery.

The Action was brought against GE, GE Asset Management Incorporated ("GEAM"), and certain current and former officers directors, and employees of GE and GEAM[3]

---

[3] The individual defendants are Philip D. Ameen; Barbara A. Beckmann; Eugene K. Bolton; Christopher D. Brown; David B. Carlson; Silas Cathcart; Lawrence S. Caruso; William H. Cary; James I. Cash, Jr.; William M. Castell; Alfredo Chang; Paul Colonna; William J. Conaty; Tom Conway; L. G. Cook; Michael J. Cosgrove; Dennis D. Dammerman; Mark Delaney; Shane Fitzsimons; Paolo Fresco; Ann M. Fudge; Claudio X. Gonzalez; M. J. Gorman; Eric H. Gould; Wiley L. Harris; William M. Healey; Robert Herlihy; Brian Hopkinson; Jeffrey R. Immelt; Daniel Janki; Lawrence Johnston; Andrea Jung; Kathryn D. Karlic; Mark Krakowiak; John Krenicki, Jr.; Alan G. Lafley; Robert W. Lane; Kenneth G. Langone; Jeanne M. LaPorta; Ralph S. Larsen; Ralph R. Layman; Rochelle B. Lazarus; T.F. Leonard; Alan M. Lewis; John Lockton; William J. Lucas; Robert A. MacDougall; Edward H. Malone; Scott G. McNealy; Lee Meyer; Gertrude G. Michelson; John H. Myers; Sam Nunn; Jonathan L. Passmore; Roger S. Penske;

(collectively, "Defendants").  The Consolidated Amended Complaint for Violations of ERISA filed on October 16, 2006 (the "Complaint") alleges that Defendants selected and maintained GE stock as an investment alternative for the Plan when it was no longer prudent to do so.  The Complaint further alleges that Defendants failed to inform the Plan's participants of material adverse information concerning investing in GE stock.  The Complaint alleges that these breaches of Defendants' fiduciary duties caused the value of the Plan to decrease and alleges that the Plan would have had greater earnings absent Defendants' imprudent investment in GE stock.

Defendants vigorously opposed the Named Plaintiffs at every step of the litigation. Defendants filed three separate motions to dismiss and a motion for summary judgment in an effort to have the Action summarily dismissed.  Defendants' opposition highlights the serious risks to the Named Plaintiffs' ability to prove liability and damages.  In fact, Defendants challenged nearly every aspect of Plaintiffs' Complaint, including Plaintiffs' ability to demonstrate the alleged breaches as a matter of law, the role of Defendants as fiduciaries, and losses to the Plan.  Although the Named Plaintiffs believe that they would likely prevail on these legal and factual issues, the risks associated with continued litigation favor approval of the Settlement.

The Settlement was only reached after the Named Plaintiffs litigated the case for nearly three years, thereby placing them in a position to critically assess the strengths and weaknesses of their claims.  Among other things, the Named Plaintiffs and their Counsel: (i) conducted extensive factual investigations into the events and circumstances underlying the claims asserted the Complaint; (ii) drafted a unique Complaint, in the absence of any securities or derivative

---

Susan P. Peters; Robert Pfenning; Ronald R. Pressman; Frank H. T. Rhodes; Gary, L. Rogers; Allan O. Rowe; John M. Samuels; Marc J. Saperstein; Keith S. Sherin; Andrew C. Sigler; Judith A. Studer; Robert J. Swieringa; Donald W. Torey; J. Wald; John J. Walker; Douglas A. Warner; Diane M. Wehner; John F. Welch; and Robert C. Wright.

action on the same facts; (iii) thoroughly researched the law pertinent to the claims against Defendants and potential defenses thereto; (iv) vigorously opposed Defendants' three motions to dismiss the Complaint; (v) consulted with experts concerning the theory of the action, especially with respect to damages; (vi) briefed an opposition to Defendants' motion for summary judgment in which Defendants claimed that Plaintiffs could not establish *any* compensable losses; and (vii) conducted extensive settlement negotiations.

The Settlement is the result of arm's-length negotiations by counsel for the Parties, who are well-versed in the strengths and weaknesses of the claims; was facilitated by the assistance of the Hon. Daniel B. Weinstein (Ret.), an experienced mediator; and was thereafter approved by U.S. Trust. Named Plaintiffs and their Counsel believe that the Settlement is an excellent result as it provides very valuable structural relief and cash to members of the Class. It is the informed opinion of Named Plaintiffs and their counsel that, given the potential risks and expenses of further litigation of this Action, the proposed Settlement is a very good result, is fair, reasonable, and adequate, in the best interest of the Class and should be given final approval.

The foregoing Settlement and Plan of Allocation of Settlement Proceeds appear to have the support of the vast majority of the Class. In accordance with the Court's preliminary approval of the Settlement, The Garden City Group, as the Settlement Administrator, provided the Class Notice to over 318,000 Class members, including both current and former plan participants, in the form and manner approved by the Court. The Class Notice was also posted on the Settlement website, and the Administrator established a toll-free telephone number for Class Members to call to receive information about the Settlement. The Notice described the Action, the terms of proposed Settlement, the terms of the proposed Plan of Allocation, the amount of attorneys' fees and expenses that GE has agreed to pay to Class Counsel upon Court

approval, and the proposed Service Awards to the Named Plaintiffs. The Notice also informed Class Members of their right to object. In response to the Class Notice, Counsel for the Named Plaintiffs have received forty (40) objections to the Settlement or Plan of Allocation, the proposed award of attorneys' fees and expenses, and/or the proposed Service Awards. This represents only 0.01% of the total Class; thus, the overwhelming majority (99.99%) of the Class supports the Settlement, the proposed fee award and the proposed Service Awards.

For all of these reasons, as set forth in more detail below and in the Joint Declaration of Evan J. Kaufman and Lori G. Feldman in Support of Final Approval of Settlement and Plan of Allocation of Settlement Proceeds, Award of Attorneys' Fees and Expenses, and Award of Service Awards to the Named Plaintiffs (the "Joint Declaration" or "Joint Decl.," filed concurrently herewith), the Named Plaintiffs respectfully request that the Court grant final approval of the Settlement and the Plan of Allocation of settlement proceeds, certify the Class, award attorneys' fees and expenses to Class Counsel as negotiated by the parties, and award Service Awards to the Named Plaintiffs.

## STATEMENT OF FACTS

### A.    Procedural and Litigation History

This litigation was commenced on March 13, 2006, when Plan participants and Named Plaintiffs Umberto Cavalieri and Floyd Miklic filed a class action complaint asserting breach of fiduciary duty claims under ERISA. *See* Joint Decl. at ¶20. Named Plaintiff Robert Bezio filed a related action on March 24, 2006. *Id*. On July 12, 2006, the Court entered an Order consolidating the actions and directing the Named Plaintiffs to file a consolidated complaint. *Id*. at ¶21. On October 16, 2006, following continued and thorough investigation of their claims, the Named Plaintiffs filed the Complaint. *Id*. at ¶¶22-23. The detailed allegations set forth in the Complaint were developed via thorough and lengthy investigation efforts. *Id*. at ¶22. These

efforts included reviewing and analyzing Plan-related documents and GE's federal and state regulatory filings, conducting numerous witness interviews, and examining the complex actuarial and accounting issues surrounding the alleged under-reserving of GE's insurance business. *Id*.

Specifically, the Complaint alleges that Defendants violated their fiduciary duties under ERISA by, *inter alia*, selecting and maintaining GE stock as an investment alternative for participant contributions and Company matching contributions when it was not prudent to do so. According to Named Plaintiffs, such heavy investment in GE stock was particularly improvident given the risky business conduct at GE, including the alleged material under-reserving practices of its insurance business in violation of Generally Accepted Accounting Principles (GAAP). Named Plaintiffs allege that Defendants knew or should have known that the Plan's investment in Company stock was improvident during the Class Period and that Defendants' failure to adequately inform the Plan's participants of material adverse information concerning GE's financial condition harmed the Plan and its participants when the value of GE stock declined.

The Action was hotly contested from the outset. On January 16, 2007, Defendants filed three separate motions to dismiss the Complaint. *See* Joint Decl. at ¶25. These motions raised arguments involving complex questions of law, including that: (1) the "prudence" claim fails because GE was not on the brink of collapse; (2) claims relating to the alleged misstatements fail because there was no duty to disclose the under-reserving under ERISA; (3) the alleged misstatements were not made in a fiduciary capacity; (4) the alleged misrepresentations were not material; (5) there is no causal relationship between the alleged wrongdoing and any losses to the Plan; and (6) certain Defendants were not fiduciaries of the Plan. *Id*. at ¶¶26-28.

On April 13, 2007, Defendants also filed a motion for summary judgment, generally arguing that Named Plaintiffs would be unable to demonstrate any compensable damages to the

Plan. *Id*. at ¶33. In their motion, Defendants argued that Plaintiffs were required to show that the Plan as a whole suffered a net loss; however, Defendants argued that the Plan had a net gain during the Class Period and thus the Plan suffered no loss. *Id*. Defendants argued that because GE was a "net seller" of GE stock during the Class Period (*i.e.*, the Plan sold more GE stock than it bought during that period), any alleged artificial inflation in GE's stock price would have resulted in a net *gain* for the Plan rather than a net loss. *Id*.

Named Plaintiffs responded to the motions to dismiss on April 16, 2007 and to the motion for summary judgment on June 18, 2007. *Id*. at ¶¶29, 35. With respect to issues raised in the motions to dismiss, Named Plaintiffs argued, *inter alia*, that: (1) imminent collapse is not required to establish a "prudence" claim; (2) a duty to disclose does exist under ERISA; (3) Defendants breached their disclosure duties by disseminating Plan documents that incorporated the misrepresentations of GE's SEC filings by reference and failed to inform Plan Participants that GE stock was artificially inflated while acting in a fiduciary capacity; (4) Defendants' misrepresentations were material because they had a negative impact on GE stock; (5) the proper analysis for demonstrating a causal relationship in an ERISA action was announced in *Donovan v. Bierwirth*, 754 F.2d 1049 (2d Cir. 1985), not *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), which was a securities action alleging violations of Section 10(b) of the Securities Exchange Act of 1934; and (6) Defendants were fiduciaries in that they exercised discretionary authority over the management and administration of the Plan. *Id*. at ¶¶29-31. In response to Defendants' motion for summary judgment, Plaintiffs argued that Defendants utilized the wrong loss methodology to calculate losses to the Plan. *Id*. at ¶35. Although the motions were fully briefed and presented to the Court for a ruling, the hearing on the motions was adjourned after the Parties notified the Court that settlement discussions had been initiated. *Id*. at ¶37.

B.      **Settlement Negotiations and Related Proceedings**

The settlement negotiations in this Action were particularly complex and vigorous, with each of the Parties forcefully representing and maintaining their positions.  As such, the resulting Settlement was truly the product of arm's-length bargaining.

Over a period of several months, the Parties had initial conversations concerning settlement and exchanged settlement proposals and agreed to participate in a mediation session to explore further the possibility of settling the Named Plaintiffs' claims.  *Id*. at ¶39.

On February 28, 2008, the Parties met in New York City before an experienced mediator, the Honorable Daniel B. Weinstein (Ret.), a former California state court judge, of JAMS, and convened a day long mediation with Judge Weinstein in an attempt to settle the Named Plaintiffs' claims.  *Id*. at ¶41.  Prior to the mediation, the Parties provided Judge Weinstein with extensive mediation briefs setting forth their respective positions, along with supporting exhibits. *Id*. at ¶40.  During this face-to-face mediation, the Parties exchanged their respective views with Judge Weinstein regarding the merits of the Action and the various issues with respect to establishing liability, causation, and damages.  *Id*. at ¶41.  The negotiations were extensive and hard fought, further demonstrating their arm's-length nature and the tenacity with which they were conducted.  At all times, the Parties took into account the strengths and weaknesses of the case, the risks involved with further litigation, the likely recovery at trial and on appeal, and the burden and expenses of protracted litigation.  The Named Plaintiffs actively participated in the negotiations by telephone and insisted on specific additional benefits that became part of the Settlement.  *Id*.  The Parties successfully reached an agreement-in-principle to settle the Action during the mediation and the Named Plaintiffs and Defendants entered into a Term Sheet setting forth the basic terms of a settlement.  *Id*.

10

Following the mediation, and after several more months of negotiations regarding the specific terms of the parties' agreement, the Parties agreed to the terms and conditions set forth in the Settlement Agreement, including the forms of the proposed Preliminary Approval Order, Class Notice, and the proposed Final Order and Judgment.[4]  *Id*. at ¶¶42-46.

### C.     Review of the Settlement by U.S. Trust

ERISA prohibits certain transactions between an ERISA plan and a "party in interest." *See* ERISA § 406(a) regarding prohibited transactions (the term "party in interest" is defined in ERISA § 3(14).)   For example, a transaction between an ERISA plan and a fiduciary of the plan is a prohibited transaction, irrespective of the merits of the transaction.  In the context of a proposed settlement of litigation between an ERISA plan and the company sponsor of the plan, the settlement agreement could be deemed a prohibited transaction.  This is because the ERISA plan is agreeing to release claims against the company sponsor and other parties in interest. Accordingly, the U.S. Department of Labor ("DOL") has granted Prohibited Transaction Class Exemption 2003-39, 68 Fed. Reg. 75,632 (2003) (the "Exemption"), which sets forth certain conditions for the exemption of settlements from ERISA's prohibited transaction restrictions and from the corresponding monetary sanctions of the Internal Revenue Code.  ERISA § 406(a); Internal Revenue Code § 4975.[5]   The Exemption specifically permits transactions engaged in by

---

[4]     The Settlement Agreement was originally executed by the Parties on October 17, 2008. Pursuant to the Independent Fiduciary's direction and approval, the Parties made minor modifications to the Settlement Agreement and the Class Notice.  The Settlement Agreement was re-executed on December 19, 2008.  *See* Joint Decl. at ¶¶42-46.  This Settlement Agreement was preliminarily approved by the Court on February 5, 2009.  *See* the PAO.

[5]     As noted by the Department of Labor, "the exemption is being granted in response to uncertainty expressed on the part of plan fiduciaries charged with the responsibility under ERISA for determining whether it is in the interests of a plan's participants and beneficiaries to enter in a settlement agreement with a party in interest."  *See* Exemption – Discussion of Comments Received, paragraph A.

a plan in connection with the settlement of litigation with a party in interest, provided the conditions of the Exemption are followed.

The Plan's first step in complying with the Exemption was to retain an independent fiduciary to pass upon and authorize the Settlement. *See* Exemption – Discussion of Comments Received, ¶ D.  Here, the Plan retained Bank of America, N.A. acting through U.S. Trust, Bank of America Private Wealth Management ("U.S. Trust") as the independent fiduciary.[6]  An independent fiduciary is necessary even in the case of a judicially approved class action settlement.  As noted by the DOL, this is because the Court must balance the interests of all litigants in approving the Settlement, whereas ERISA requires a fiduciary to make determinations with "an eye single to the interests of participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982), *cert. denied*, 459 U.S. 1069 (1982).  U.S. Trust, as the independent fiduciary must not and does not have any relationship to, or interest in, any of the parties involved in the Action, other than the Plan, that might influence the fiduciary's judgment.

The proposed settlement must relate to a genuine controversy involving the plan. Exemption, Section II(a).  If the litigation involving the plan has been certified by a court as a class action, a genuine controversy will be deemed to exist.  In the absence of certification, an attorney having no relationship to any of the parties, other than the plan, must make a determination that there is a genuine controversy.  In its comments to the Exemption, the DOL specifically notes that the attorney review can be performed by "the independent fiduciary's in-house attorneys."  Exemption, Discussion of Comments Received, ¶B.  If the independent

---

[6]    *See* letter from U.S. Trust dated Dec. 9, 2008, attached as Exhibit J to the Compendium of Exhibits in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation of Settlement Proceeds, Award of Attorneys' Fees and Expenses, and Award of Service Awards to the Named Plaintiffs (the "Compendium"), filed concurrently herewith.

fiduciary is a bank or trust company, the review could be made by a member of its legal staff or outside counsel. Here, U.S. Trust retained The Groom Law Group to conduct the attorney review; The Groom Law Group is one of the country's largest and most experienced employee benefits firms.

Under the Exemption, U.S. Trust, in its role as the independent fiduciary, was required to review the proposed Settlement and determine whether it is reasonable in light of the Plan's likelihood of full recovery, the risks and costs of litigation, and the value of claims foregone. Exemption, Section II(c). *See Harris v. Koenig*, No. 02-618, 2009 U.S. Dist. LEXIS 19757, at *49 (D.D.C. Mar. 12, 2009) ("To qualify for PTE 2003-39, Defendants must show, among other things, that before approving the settlement, the Plan fiduciaries engaged in a 'prudent decision-making process' which included considering 'whether additional relief may be available for the ERISA claims before agreeing to a broad release.'") (citing Exemption). This reasonableness review is the Exemption's primary substantive consideration. As noted by the DOL, how these factors are weighed by the independent fiduciary will vary depending on the type of case, but a prudent decision-making process will always be involved. In arriving at its conclusions about the Settlement, U.S. Trust held multiple telephonic interviews with Plaintiffs' Counsel and Defendants' Counsel on key issues regarding the Action, the Settlement and the fee and expense award. *See* Joint Decl. at ¶45.

In considering the likelihood of a full recovery, the independent fiduciary may review the damages claims and defenses of the parties. Here, U.S. Trust discussed with the Parties their respective analyses of damages prior to settlement, the likelihood of an adverse final judgment leaving the Plan with nothing and the parties' competing positions with regard to causation and damages, the factual and legal theories of the case, the risks of proceeding with continued

litigation, the proposed settlement terms for current and former participants, the proposed plan of allocation of the Cash Settlement Amount and the decision to distribute that cash to Former Participants on a per capita basis, administrative issues and the cost-prohibitive nature of alternate allocation plans. *Id*. In addition, based upon the conversations with Plaintiffs' Counsel, U.S. Trust conducted a review of the record leading up to the proposed Settlement; it reviewed the various pleadings, including the complaint, motion papers and supporting memoranda, and any expert analyses regarding damages. *Id*. Moreover, U.S. Trust was provided with and reviewed the mediation statements prepared by the parties. *Id.*

The Exemption also requires that the terms and conditions of the Settlement be no less favorable to the Plan than comparable arm's-length terms and conditions that would have been agreed to by unrelated parties under similar circumstances. Exemption, Section II(d). Here, the Parties are represented by experienced counsel, and have engaged in significant motion practice. Further, because the Parties have engaged in mediation to reach a settlement, this process provides assurance of the arm's length nature of the Settlement. These factors indicate that the Settlement results from a genuine adversarial process and is, therefore, an arm's-length agreement.

The Exemption further provides that the Settlement must not be part of an agreement, arrangement, or understanding designed to benefit a party in interest. Exemption, Section II(e). As noted in the comments to the Exemption, the intent of this condition is to exclude transactions that are part of a broader overall agreement, arrangement, or understanding designed to benefit parties in interest. Exemption, Description of the Exemption, ¶A. Again, the adversarial proceedings that the Parties have engaged in provide assurance that the Settlement is not part of a collusive agreement that really is for the benefit of parties other than the Plan.

14

Finally, the Exemption requires that the terms of the settlement be spelled out in a written agreement or consent decree.  Exemption – Section III(b).  Here, that requirement is easily satisfied as the parties have negotiated, drafted and executed the Settlement Agreement.

U.S. Trust, after evaluating the terms of the Settlement, provided the Parties with a summary of its conclusions: (i) the benefits provided by the Settlement are reasonable, in light of the Plan's likelihood of full recovery, the risks and costs of the litigation, and the value of the claims foregone; (ii) the terms and conditions of the transactions are no less favorable to the Plan than comparable arm's-length terms and condition that would have been agreed to by unrelated parties under similar circumstances; and (iii) the transaction is not part of an agreement, arrangement, or understanding designed to benefit any party in interest.  *See* U.S. Trust letter, Compendium Exh. J.

Additionally, in the course of its review of the Settlement, U.S. Trust suggested changes to certain aspects of the Settlement Agreement, and the parties revised and re-executed the Settlement Agreement in response to those suggested changes from U.S. Trust.  *See* Joint Decl. at ¶46.

Accordingly, U.S. Trust and the process undertaken by U.S. Trust to determine the fairness of the Settlement to the Plan, meet the requirements of the Exemption.  *See In re Winn Dixie ERISA*, No. 04-194, 2008 U.S. Dist. LEXIS 21988, at *20-21 (M.D. Fla. March 20, 2008); *Eslava v. Gulf Tel. Co.*, No. 04-297, 2007 U.S. Dist. LEXIS 85011, at *12 (S.D. Ala. Nov. 16, 2007); *Rankin v. Rots*, No. 02-71045, 2006 U.S. Dist. LEXIS 45706, at *13 (E.D. Mich. June 28, 2006); *Tittle v. Enron Corp.*, No. 01-3913, 2005 Dist. LEXIS 34076, at *19 (S.D. Tex. May 24, 2005).

**D.**       **Notice Was Provided in Accordance With the Class Action Fairness Act**

Pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1715, on Jan. 5, 2009,

Defendants' counsel sent notices to the United States Attorney General, and the attorneys general

of the fifty states and the District of Columbia via overnight mail, informing them of the

proposed Settlement. *See* Joint Decl. at ¶53. As of May 4, 2009, Defendants' Counsel had not

received any responses to those notices other than acknowledgments of receipt. *Id.*

**E.**       **Overview of the Settlement Terms**

The Settlement resolves all claims brought on behalf of all Participants in the Plan during

the Class Period on whose behalf the Plan held Company Stock during the Class Period.

**1.**       **The Structural Changes to the Plan**

Notably, the Settlement provides for significant Structural Changes with respect to the

Plan that GE has agreed to implement at its sole expense for a period of ten (10) years. The

purpose of these Structural Changes is to promote greater diversification of the Plan's

investments and to provide the Plan's participants with additional tools and resources to help

them save for retirement. The Structural Changes include an Investment Education Program,

Fiduciary Training, Allocation Rights for Matching Contributions, Additional Investment

Options, Roth Contributions, and Participant Communication Improvements. *See* Joint Decl. at

¶¶92-99.

GE has estimated that the cost to the Company of implementing the Structural Changes to

the Plan is approximately $30 million (reduced to present value). *Id.* at ¶92. According to an

analysis prepared for GE in September 2008 by Mercer LLC ("Mercer"), the independent

benefits consultant hired by GE, the benefits provided to current Plan Participants under these

Structural Changes for the next ten years have a potential benefit value of at least $107 million in

increased retirement assets (based on minimum projected utilization of the Investment Education Program and Roth 401(k) benefits by Plan participants).  *Id.*

### a.    Investment Education Program

Under this feature, GE has agreed to provide a state-of-the art investment education program that includes (i) a sophisticated on-line investment tool to give investment and diversification guidance for Plan investments; (ii) on-line investment education material explaining the Plan's investment options and the benefits of diversification; (iii) a call center providing reasonable access to Plan information; (iv) periodic mailings containing print materials on the need for diversification; and (v) Internet-based "Webinars."  *Id.* at ¶94.

Mercer has valued the Investment Education Benefit as providing in excess of $88 million in benefit value to current Plan participants (in the form of expected increases in future retirement assets), depending on variation in utilization rates.  *Id.* at ¶113.  This benefit provides previously unavailable tools that the Plan's participants will be able to utilize in planning for their retirements.  As Mercer noted, and as discussed in detail below, the potential value of the benefit increases as the number of individuals who utilize the benefit increases.  *Id.*

### b.    Fiduciary Training

This feature provides training, at least once each calendar year, to members of GE's Benefit Plans Investment Committee.  *Id.* at ¶95.  The training will be conducted by an independent third party and concern fiduciary obligations and relevant developments in the law or elsewhere that impact those obligations.  This feature furthers the goals of ERISA by reinforcing the "standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans."  29 U.S.C. § 1001(b).

17

### c.    Allocation Rights for Matching Contributions

Under the current Plan, participants are only allowed to allocate their Company matching contributions into a single investment option.  With the new Allocation Rights, each Plan Participant will now be allowed to allocate Company matching contributions among any of the investment options then available, as opposed to a single option.  *Id*. at ¶96.  This benefit encourages the important goal of diversification in investing.  *See* 29 U.S.C. § 1146(c)(2).

### d.    Additional Investment Options

This feature results in the Plan having three additional investment options, none of which will be managed by GEAM.  *Id*. at ¶97.  This feature promotes diversification by providing more investment options through which Plan participants can diversify their investments.  Given the differing investment goals of each Plan participant, broader investment options will more adequately meet the need of more participants.

### e.    Roth 401(k) Contributions

Another feature of the Structural Changes, the addition of the Roth 401(k) option, also adds considerable value to the Settlement and potentially increases in value with its use.  The availability of the Roth 401(k) allows Plan participants to invest retirement savings on an after-tax basis.  *Id*. at ¶98.  In other words, income to be contributed to a Roth 401(k) is taxed before being contributed, unlike a traditional 401(k) contribution, where the income is not taxed prior to investment.  Ultimately, this allows eligible Participants who choose to invest in the Roth to later receive distributions *without* paying federal income tax on those distributions.  Mercer has quantified the value of adding this investment option to the Plan for the next ten years to have a benefit value in excess of $19 million, depending on variation in utilization rates, investment returns and tax rates.  *Id*. at ¶114.  Again, the potential value of this benefit can only increase as the number of individuals who utilize the benefit increases.

### f.  Plan Communications

The last of the Structural Changes is directed toward enhancing the information disseminated to Plan participants.  If a Plan Participant takes a partial distribution from the Plan after termination of employment, the Plan will notify the Participant of his or her ability to reallocate the balance among available investment options.  *Id*. at ¶99.  This benefit is important, as many participants are currently unaware of their ability to reallocate their Plan investments, and this benefit will promote greater disclosure of Plan-related information.

Each of these Structural Changes is designed to protect Plan participants and assist them in successfully saving for their retirement.

### 2.  The Cash Settlement Amount

The Settlement also provides for a Cash Settlement Amount of $10.15 million.  *Id*. at ¶100.  The Plan of Allocation provides that the Cash Settlement Amount (together with accrued interest minus any applicable taxes) will be distributed on a *per capita* basis to Former Participants of the Plan.  *Id*.  Because Former Participants are, by definition, no longer participants in the Plan, these individuals are allotted cash, with comparable value to the structural relief (as discussed below), in lieu of the Structural Changes.  In exchange for this substantial relief to the Class, the Settlement provides for the release of claims, generally those that were or could have been asserted in this Action, against the Releasees.  Pursuant to the Settlement Agreement, Defendants are responsible for any administrative costs involved in the distribution of the Cash Settlement Amount.  *Id*. at ¶101.

### 3.  Attorneys' Fees and Expenses

GE has agreed to pay Class Counsel's fees and expenses up to the amount of $10.0 million, subject to Court approval.  *Id*. at ¶117.  The parties negotiated this amount after agreeing to the substantive relief, and GE has agreed to pay this amount in addition to the Settlement relief

and the cost of settlement administration. *Id.* Given the substantial work performed at significant risk, the negotiated fee and expense arrangement is reasonable and the maximum amount permitted under that arrangement should be approved. *See infra* at Section III for further discussion of this issue.

### F.    Preliminary Approval Order

On February 5, 2009, the Court held a hearing to decide whether to preliminarily approve the Settlement and authorize the Class Notice to be distributed to members of the Class. Joint Decl. at ¶49. Following the preliminary approval hearing, the Court issued the PAO in which the Court, among other things:

- Preliminarily certified the Class as a non-opt out class under Fed. R. Civ. P. 23(a) and 23(b)(1);

- Found the Named Plaintiffs to be adequate class representatives of the Class and thereby appointed them as such;

- Determined that Class Counsel had and would continue to fairly and adequately represent the Class in accordance with Fed. R. Civ. P. 23(g) and appointed Class Counsel as class lead counsel with respect to the Class;

- Found the proposed Settlement Agreement, including its Releases, sufficiently fair, reasonable, and adequate to warrant sending notice the Class members;

- Approved the form and content of the Notice of the Proposed Settlement and the methodology by which the notice would be disseminated;

- Ordered the Administrator, The Garden City Group, Inc., to provide notice by first class mail to all Class members who could be identified by reasonable efforts by February 27, 2009;

- Ordered that the Class Notice be posted on a web page accessible to all Class members; and

- Outlined the requirements for objecting to the settlement, including the objection deadline of April 29, 2009.

*See* PAO at ¶¶4-11, 17. The PAO defined the Class as:

> All Participants in the GE Savings and Security Program (the "Plan") during the period from March 23, 2001 to February 5, 2009 (the "Class Period") on whose behalf the Plan held Company Stock during the Class Period, but excluding Defendants (and members of their immediate families, any officer, director, or partner of any Defendant, any entity in which a Defendant has a controlling interest, and the heirs, successors, or assigns of any of the foregoing).

PAO at ¶4.  The Court has scheduled the final hearing on the fairness of the Settlement for May 20, 2009 (the "Fairness Hearing").  PAO at ¶14.

In accordance with the PAO, on February 27, 2009, the Settlement Administrator mailed over 318,000 copies of the Class Notice to potential members of the Class or their representatives.  *See* Joint Decl. at ¶50.  Further, the Class Notice was posted on the settlement website, www.SavingsandSecurityProgramSettlement.com, and the Settlement Administrator established a toll-free phone number for potential Class members to call with questions about the Settlement.  *Id*.  Following this extensive notice program, only forty (40) individuals filed objections.  *Id*. at ¶52.  Those objections are addressed in the sections of this memorandum concerning the particular issues to which those objections relate.

## ARGUMENT

## I.    FINAL CERTIFICATION OF THE CLASS IS APPROPRIATE AND WARRANTED

This Court preliminarily certified the Class in the PAO, and Named Plaintiffs now request final certification pursuant to Rules 23(a) and 23(b)(1) of the Federal Rules of Civil Procedure.  Under the federal rules, a proposed class must satisfy the numerosity, commonality, typicality, and adequacy requirements of 23(a) and one or more of the requirements of 23(b).  Other courts in this circuit have determined that ERISA actions such as this one are well suited to class certification.  *See In re AOL Time Warner ERISA Litig.*, No. 02-8853, 2006 U.S. Dist. LEXIS 70474, at *9-10 (S.D.N.Y. Sept. 278, 2006) ("*AOL*") (certifying class); *In re Global*

*Crossing,* 225 F.R.D. 436, 451 (S.D.N.Y. 2004) ("*Global Crossing*") (same)**.**  As explained

below, and as set forth in Named Plaintiffs' Preliminary Approval papers and the PAO, the Class

here satisfies each of the requirements for certification and, accordingly, the Court should grant

final certification of the Class.

> ### A.    Certification of a Class is Appropriate and Warranted Under Rule 23(a)

Rule 23(a) sets forth four criteria that an action must meet if it is to be certified as a class

action: numerosity, commonality, typicality, and adequacy.  This Action fulfills each of the

criteria of Rule 23(a).

> #### 1.    Numerosity

Rule 23(a)(1) allows for class certification where "the class is so numerous that joinder of

all members is impracticable."  Here, there are estimated to be over 300,000 Class members.  *See*

Joint Decl. at ¶56.  Thus, numerosity is easily established.  *See Consolidated Rail Corp. v. Town*

*of Hyde Park,* 47 F.3d 473, 483 (2d Cir. 1995) ("numerosity is presumed at a level of 40

members"); *AOL*, 2006 U.S. Dist. LEXIS 70474, at *8 (numerosity met when notices sent to

more than 65,000 potential class members).

> #### 2.    Commonality

The Class also satisfies Rule 23(a)(2), which requires "questions of law or fact common

to the class."  Actions involving breach of fiduciary duties under ERISA often present common

questions of law and fact.  *See AOL*, 2006 U.S. Dist. LEXIS 70474, at *8 ("In the context of an

ERISA action claiming breach of fiduciary duty, class members are related by virtue of their

common membership in a retirement plan.").  The common questions of law and fact that exist

for all members of the Class include: (1) whether Defendants owed fiduciary duties to members

of the Class; (2) the nature of the fiduciary duties owed by the Defendants; (3) whether

Defendants breached their fiduciary duties; and (4) whether members of the Class sustained

recoverable losses and the proper method of calculating the losses resulting from Defendants' breaches of their fiduciary duties. *See* Joint Decl. at ¶57. Thus, these common questions satisfy commonality.

### 3. Typicality

Typicality, under Rule 23(a)(3), requires that Named Plaintiffs' claims arise from the same events or course of conduct that gives rise to the claims of other class members. *See AOL*, 2006 U.S. Dist. LEXIS 70474, at *8 (typicality is satisfied where the proposed class representatives claims "arise from the same course of conduct that gives rise to the claims of other class members, where the claims are based on the same legal theory, and where the class members have allegedly been injured by the same course of conduct as that which allegedly injured the proposed representatives") (quoting *In re Oxford Health Plans, Inc. Sec. Litig.*, 191 F.R.D. 369, 375 (S.D.N.Y. 2000)). Courts have recognized that typicality is established when "the same [alleged] unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented." *Global Crossing*, 225 F.R.D. at 452.

Here, the claims asserted by the Named Plaintiffs are typical of the claims of every other potential Class member. The Complaint alleges that Defendants breached their fiduciary duties under ERISA. The Named Plaintiffs allege that they, like the rest of the Class, suffered damages as a result of the losses to the Plan caused by Defendants' alleged breaches of their fiduciary duties under ERISA. Furthermore, each of the Named Plaintiffs participated in the Plan during the Class Period and sustained injury from the alleged breaches of fiduciary duty. *See* Joint Decl. at ¶58. Thus, Named Plaintiffs' claims are typical of the Class.

### 4. Adequacy

Rule 23(a)(4) requires that the class representatives will "fairly and adequately protect the interest of the class." Courts consider "(i) whether the class representatives' claims conflict with

those of the class and (ii) whether class counsel is qualified, experienced, and generally able to conduct the litigation," in determining that adequacy is satisfied. *AOL,* 2006 U.S. Dist. LEXIS 70474, at *8 (quoting *Global Crossing*, 225 F.R.D. at 453). Relatedly, Rule 23(g) requires courts to assess the abilities and resources of class counsel to determine whether they can adequately represent class members.

Named Plaintiffs and their Counsel satisfy these criteria for adequacy. Named Plaintiffs' interests are aligned with those of absent Class members as they bring the same claims for the same remedies under the same legal theories. As discussed above, the Named Plaintiffs and all Class members share an interest in proving that Defendants acted in a fiduciary capacity with respect to the Plan, Defendants breached one or more of their fiduciary duties under ERISA, and these breaches caused losses to the Plan. Furthermore, the Named Plaintiffs have actively participated in the litigation, including in negotiation and approving the terms of the Settlement. *See* Joint Decl. at ¶¶41, 59; *see also* affidavits of the Named Plaintiffs, Compendium Exhs. F-H.

Similarly, Named Plaintiffs' Counsel has vigorously prosecuted this Action from its outset. Each of the firms selected by Named Plaintiffs to be their counsel has extensive experience in ERISA actions, class actions and complex litigation in general. *See* résumés of Plaintiffs' Counsel firms, attached to Compendium Exhs. B-E. As discussed above, Class Counsel have contributed their expertise, as well as ample time and resources, to this Action by developing a novel case theory, conducting extensive factual investigations to support the initial and operative complaints, defending against three motions to dismiss and one motion for summary judgment, and engaging in extensive settlement negotiations.

The proposed Settlement for unprecedented Structural Changes and $10.15 million in cash obtained for the Class is further evidence that the Named Plaintiffs and Class Counsel have

fairly and adequately protected the interests of the Class.  Thus, the adequacy requirement is

satisfied.

### B.    Certification of a Class is Appropriate and Warranted Under Rule 23(b)(1)

Under Rule 23(b)(1), a class may be certified if:

> (1)  prosecuting separate actions by or against individual class
> members would create a risk of:
>
> > (A)  inconsistent or varying adjudications with respect to
> > individual class members that would establish incompatible
> > standards of conduct for the party opposing the class; or
> >
> > (B)  adjudications with respect to individual class members
> > that, as a practical matter, would be dispositive of the
> > interests of the other members not parties to the individual
> > adjudications or would substantially impair or impede their
> > ability to protect their interests.

Fed. R. Civ. P. 23(b)(1).  "Class actions are generally well-suited to litigation brought pursuant

to ERISA."  *Banyai v. Mazur*, 205 F.R.D. 160, 165 (S.D.N.Y. 2002); *see also Smith v. AON

Corp.*, 238 F.R.D. 609, 615 (N.D. Ill. 2006) (claims brought on behalf of a plan are considered

"particularly well-suited for Rule 23(b)(1) certification by virtue of the substantive law of

ERISA.") (citing *In re Williams Co. ERISA Litig.*, 231 F.R.D. 416, 424 (N.D. Okla. 2005)).

Certifications under both sub-sections of Rule 23(b)(1) are common in ERISA breach of

fiduciary duty cases because of the defendants' alleged "unitary treatment" of putative class

members.  *See, e.g.*, *In re WorldCom, Inc. ERISA Litig.*, No. 02-4816, 2004 U.S. Dist. LEXIS

19786, at *8 (S.D.N.Y. Oct. 5, 2004) (certifying ERISA claims for breach of fiduciary duty

pursuant to Rule 23(b)(1) since "[a]ny adjudication with respect to individual members of the

class will as a practical matter be dispositive of the interests of the other members of the class.").

This action for breach of fiduciary duty under ERISA is by law a representative action

seeking to impose on the Defendants obligations applicable to all the Plan participants.  *Gruby v.*

*Brady*, 838 F. Supp. 820, 828 (S.D.N.Y. 1993) (holding that certification is proper for violations of ERISA is proper under Rule 23(b)(1)); *Koch v. Dwyer*, No. 98-cv-5519, 2001 U.S. Dist. LEXIS 4085, at *14 (S.D.N.Y. Mar. 23, 2001) (same); *In re Polaroid ERISA Litig.*, 240 F.R.D. 65, 78 (S.D.N.Y. 2006) (certifying class under Rule 23(b)(1)).

Under Rule 23(b)(1), members of the Class cannot opt-out of the Settlement, but can object to the Settlement and ask the Court not to approve the Settlement. *See AOL*, 2006 U.S. Dist. LEXIS 70474, at *11 (discussing appropriateness of using Rule 23(b)(1) for an ERISA class). "Due to the plan-wide nature of the relief sought here, … certification of a non-opt-out class is not only practical, but necessary." *Id.* (finding non-opt out class appropriate for ERISA breach of fiduciary duty company stock case).

## II.    THE SETTLEMENT EXCEEDS APPLICABLE STANDARDS FOR JUDICIAL APPROVAL

### A.    The Standards for Settlement Approval

Under Rule 23 of the Federal Rules of Civil Procedure, the settlement of a class action requires a determination by the court that the proposed settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(1).  In assessing the fairness of a class action settlement, courts should bear in mind the long-standing policy favoring settlement of civil actions, especially class actions. *See Wal-Mart Stores Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d. Cir. 2005) ("We are mindful of the strong judicial policy on favor of settlements, particularly in the class action context") ("*Wal-Mart*"); *see also Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d. Cir. 1982)("[t]here are weighty justifications, such as the reduction of litigation and related expenses, for the general policy favoring the settlement of litigation.") ("*Weinberger")*.  The decision to grant final approval of a settlement lies within the discretion of the district court and such

discretion should be exercised in light of the general judicial policy favoring settlement.  *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 124 (S.D.N.Y. 1997) ("*PaineWebber*").

Courts should not evaluate the merits of the case or reach unresolved legal questions in determining the appropriateness of a settlement agreement reached by the parties.  *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 462 ("The Court must eschew any rubber stamp approval in favor of an independent evaluation, yet, at the same time, it must stop short of the detailed and through investigation that it would undertake if it were actually trying the case.") ("*Grinnell*"); *see also White v. First American Registry, Inc.*, No. 04-1611, 2007 U.S. Dist. LEXIS 18401, at *7 (S.D.N.Y. March 7, 2007) (a court "should not attempt to approximate a litigated determination of the merits of the case lest the process of determining whether to approve the a settlement simply substitute one complex, time consuming and expensive litigation for another.").

Courts in the Second Circuit look at both procedural and substantive fairness determining whether the settlement is fair, reasonable, and adequate.  *AOL*, 2006 U.S. Dist. LEXIS 70474, *14 (S.D.N.Y. Sept. 27, 2006) ("Courts analyze a settlement's fairness, reasonableness and adequacy with reference to both the negotiating process leading up to settlement as well as the settlement's substantive terms.").

### B.    The Settlement Was Fairly Negotiated

The first prong of a court's inquiry into the fairness of a settlement questions its procedural fairness:  ensuring that the settlement was not reached though collusion.  *AOL*, 2006 U.S. Dist. LEXIS 70474, at *15-16.  "A court reviewing a proposed settlement must pay close attention to the negotiating process, to ensure that the settlement resulted from arm's-length negotiations and that plaintiffs' counsel have possessed the experience and ability, and have engaged in the discovery, necessary to effective representation of the class's interests."  *D'Amato*

27

*v. Deutsche Bank*, 236 F.3d 78, 85 (2d. Cir. 2001) (internal quotations omitted).  The

involvement of a mediator can help to ensure the procedural fairness of a settlement, as can the

involvement an independent fiduciary.  *Id.* (presuming procedural fairness where the settlement

was the product of multiple rounds of arm's-length negotiations between experienced counsel,

overseen by a court-appointed special master, counsel was well informed of the merits of the

claims, and sanctioned by an independent fiduciary.).

This Settlement was only reached after extensive, hard fought, and numerous arm's-

length negotiations between experienced counsel for the Parties.  In fact, although the Settlement

was first contemplated and discussed in September 2007, the current terms of the Agreement

were not finalized until December 2008, over a year and many exchanges later.  *See* Joint Decl.

at ¶39-46.  The Term Sheet that became the basis of the current Settlement resulted from the day-

long mediation session between the Parties with the assistance of an experienced mediator, the

Honorable Daniel B. Weinstein (Ret.).  *Id*. at ¶41.  In preparation for the mediation and the

continuing negotiation of the Settlement terms, counsel for the Parties continued to evaluate, and

were well informed about, the strengths and weaknesses of the legal and factual issues of the

case.  Under these circumstances, the Court should find that the Settlement was fairly negotiated.

### C.    The Terms of the Settlement are Fair

In determining the substantive fairness of a settlement, the Second Circuit, in *Grinnell*,

identified the following factors to be considered:

> (1) the complexity, expense and likely duration of the litigation, (2)
> the reaction of the class to the settlement, (3) the stage of the
> proceedings and the amount of discovery completed, (4) the risks
> of establishing liability, (5) the risks of establishing damages, (6)
> the risks of maintaining the class action through the trial, (7) the
> ability of the defendants to withstand greater judgment, (8) the
> range of reasonableness of the settlement fund in light if the best
> possible recovery, [and] (9) the range of reasonableness of the

> settlement fund to a possible recovery in light of all the attendant
> risks of the litigation.

495 F. 2d at 463. When appropriate, the court may combine multiple *Grinnell* factors for greater

efficiency in evaluating the settlement. *AOL*, 2006 U.S. Dist. LEXIS 70474, at *18.

In evaluating the *Grinnell* factors to make a determination that a settlement is fair, "not

every factor must weigh in favor of settlement, 'rather the court should consider the totality of

these factors in light of the particular circumstances.'" *Global Crossing,* 225 F.R.D. at 456.

Here, consideration of the *Grinnell* factors weighs in favor of finding substantive fairness and

granting final approval of the Settlement.

The reasonableness of the Settlement is bolstered by its approval by the independent

fiduciary, U.S. Trust, which undertook a comprehensive and lengthy process to arrive at its

conclusions. *See* Statement of Facts Section C, *supra.*

### 1.    The Complexity, Expense and Likely Duration of the Litigation Supports Approval of the Settlement

Class actions such as this, which allege that breaches of fiduciary duties caused harm to a

plan's assets, involve complex factual and legal questions. *Global Crossing,* 225 F.R.D. at 456.

Uncertainties such as fiduciary status, the scope of fiduciary responsibility, the appropriate

fiduciary response to a plan's concentration in company stock, and fiduciary liability in

connection with company stock in a 401(k) plan, only serve to increase the complexity, duration

and expense of an ERISA action. *Id; see also AOL*, 2006 U.S. Dist. LEXIS 70474, at *18

(finding that similar breach of fiduciary duty claims under ERISA, implicating questions

pertaining to fiduciary status, ERISA responsibilities, and sustainability of claims in stock drop

cases weighed in favor of settlement).

This case too, involves complex legal and factual issues under ERISA. One of the central

allegations in this Action is that Defendants engaged in risky and improper conduct in

connection with its insurance business, including material under-reserving practices in violation

of GAAP, that rendered GE stock an imprudent investment for the Plan.  Defendants disputed

these claims and the effect of GE's alleged under-reserving on the Plan in multiple motions to

dismiss and a motion for summary judgment.  *See* Joint Decl. at ¶¶25-37, 63-87.  Furthermore,

the extensive briefing submitted by the parties discussed additional complex questions under

ERISA concerning, *inter alia*, Defendants' roles as fiduciaries of the Plan, whether Defendants

acted in a prudent manner, whether Defendants properly disseminated material information

regarding the Plan, and whether Defendants' alleged breaches of their fiduciary duties caused

any compensable losses to the Plan.  *Id*.

Even without these complex underlying legal claims, the first *Grinnell* factor can and

should support approval of the Settlement.  As in the cases noted above, bringing this case to

trial would be costly and time-consuming.  This Settlement guarantees recovery and benefits for

the Class and eliminates the risk of either a less beneficial result, or worse, no recovery at all for

the Plan's participants.  Furthermore, the Settlement greatly reduces the cost of prosecuting the

Action by abbreviating the duration of litigation and eliminating the need for additional motion

practice and discovery.  For instance, were this case to continue to trial, the Parties would first

have to review and respond to the decisions of the Court on the four outstanding motions.  These

opinions could significantly alter the landscape of the litigation and potentially lead to further

amendment of the Complaint and further briefing at the appellate level.  Given that over three

years have passed since the inception of the Action, it is likely that this aspect of the Action's

procedural progression, alone, could consume a considerable amount of time.  But the case

would not end with the Parties' reactions to the Court's decisions.  Rather, assuming that the case

survived dismissal and summary judgment, the Parties would then have to set forth a schedule

for and complete briefing on class certification, and then commence formal discovery. Defendants' production of relevant materials would likely be voluminous and the review of those materials would be lengthy, as is often in the case in complex class actions such as this. This would be followed by depositions, including depositions of experts. The discovery process would not only greatly lengthen the litigation, but would also contribute to its uncertainty, as there is no telling what kind of information might be revealed in discovery.

Should the case eventually get to trial, its evaluation of complex factual and expert testimony would only add to the uncertainty of the litigation. Certainly a trial on complex issues such as fiduciary duty, liability and damages would necessitate the introduction of numerous exhibits, motion practice and further expenses. Furthermore, even if a favorable judgment could be obtained at trial, post-trial motions, and the appellate process could deny any actual recovery for years, thereby potentially reducing the value of the recovery. *See Strougo v. Bassini*, 258 F. Supp. 2d 254, 261 (S.D.N.Y. 2003) ("even if a shareholder or class member is willing to assume all the risks of pursuing the actions through further litigation . . . the passage of time would introduce yet more risks . . . and would in light of the time value of money, make future recoveries less valuable than this current recovery."). Conversely, the Settlement here provides for an immediate monetary recovery as well as the valuable benefits of the Structural Changes to members of the Class. Thus, the Settlement would "grant relief to all class members without subjecting them to the risks, complexity, duration and expense of continuing litigation." *AOL*, 2006 U.S. Dist. LEXIS 70474, at *19 (quoting *Global Crossing*, 225 F.R.D. at 456-57). Therefore, this factor weighs in favor of approval of the Settlement.

### 2.    The Reaction of the Class to the Settlement Supports Its Approval

As required by the Settlement Agreement and the PAO, The Garden City Group, Inc. distributed the Class Notice to the more than 300,000 likely Class Members via first class mail

and by maintaining the Notice on the website, www.SavingsandSecurityProgramSettlement.com.

*See* Joint Decl. at ¶50.  At the time of the deadline for the Court-approved Class Notice, April 29,

2009, forty (40) individuals, or 0.01% of the of potential Class members who received the

Notice, had lodged an objection to the Settlement or the Plan of Allocation.  *Id*. at ¶52.  In

contrast, many members of the Class have provided a positive response, including telephone

calls and emails commending the Settlement and ensuring that they would be able to participate

in the Settlement.  *See*, *e.g.*, Compendium Exh. L  (letter from Class member Anthony L. Hubert

to Class Counsel dated Apr. 17, 2009).

> As courts recognize:

>> "[A] certain number of objections are to be expected in a class
>> actions with an extensive notice campaign and a potentially large
>> number of class members.  If only a small number of objections
>> are received, that fact can be viewed as indicative of the adequacy
>> of the settlement"; *see also D'Amato v. Deutsche Bank*, 236 F.3d
>> 78, 86-87 (2d Cir. 2001) (holding that "the District Court properly
>> concluded that this small number of objections [18 where 27, 883
>> notices were sent] weighed in favor of the settlement.").

*In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 511 (E.D.N.Y. 2003).

Indeed, the receipt of only a minimal number of objections to the Settlement by Class Members

is a significant factor to be weighed in favor of the appropriateness of the Settlement.  *See Wal-*

*Mart*, 396 F.3d at 118 ("'If only a small number of objections are received, that fact can be

viewed as indicative of the adequacy of the settlement.'") (quoting 4 Newburg § 11.41, at 108);

*see also In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 127 F. Supp. 2d 418, 425 (S.D.N.Y.

2001) (the reaction of the class is "perhaps the most significant factor to weighed in considering

its adequacy" and a lack of objections "may well evidence the fairness of the Settlement.").

Although the small percentage of objections do not provide any substantive reason for the Court

to deny final approval of the Settlement, Named Plaintiffs nevertheless address them below.

### a. The Settlement Consideration is Fair, Reasonable and Adequate

Five individuals object to the Settlement on the grounds that the Settlement consideration is inadequate compensation for their losses arising from Defendants' alleged misconduct. *See* Objection of David A. Benton (Docket No. 103) ("I do not agree with this settlement. It pays the Lawyers a significant amount of monies (sic) but only puts about $1.50 in the account for each participant. It is unacceptable as to the loss each member may have lost."); Objection of Harold E. Fletcher (Docket No. 106) ("This settlement certainly is not fair - For me to get $100 is not right at all. This is way too low."); Objection of Gary Adler (Docket No. 125) ("To let GE off the hook with 10 yrs of educational training to the plan participants makes no sense. Let GE pay me my loss and I will get my own education!"); Objection of David & Elizabeth Nicholas (Docket No. 129) ("To send out more information on the GE Savings and Security Program, make slight adjustments to allocations, add more options, etc. are just useless appeasements. . . . To give $100.00 as a settlement to retirees and those who used to have accounts is a paltry and ridiculous sum."); Objection of Peggy Morse (Docket No. 139) ("I am objecting to this settlement because it is an insulting amount of money for all the reasons stated in the suit and GE's actions caused employees to lose thousands of dollars."); Objection of Arthur O'Connor, Jr. (Docket No. 141) ("these 'purported' benefits fundamentally are of no value to me").

However, the objections ignore that the monetary and non-monetary benefits of the Settlement provide substantial compensation to Class Members. As discussed above, the Settlement provides for substantial and unique Structural Changes. The cost to GE of implementing these Structural Changes approximates $30 million (reduced to present value), which is, in itself, a substantial sum; however, the Structural Changes to the Plan may be have a benefit value many times that amount depending on the level of utilization of those benefits by

Plan participants. *See* Joint Decl. at ¶¶92, 113-115. The Settlement also provides for an immediate $10.15 million in cash for Former Participants of the Plan. The Cash Settlement Amount compares favorably with the cash component of recent settlements in other ERISA stock drop cases. *See*, *e.g.*, *In re Aquila ERISA Litig.*, No. 04-865, 2007 U.S. Dist. LEXIS 87830, at *7 (W.D. Mo. Nov. 29, 2007) ($10.5 million cash component), *In re BellSouth Corp. ERISA Litig.*, No. 02-2440, slip op. at 5 (N.D. Ga. Nov. 14, 2006) (no cash component);[7] *In re Electronic Data System Corp ERISA Litig.*, No. 03-1512, slip op. at 6 (E.D. Tex. May 2, 2008) ($12.5 million cash component); *In re Xcel Energy Inc. ERISA Litig.*, No. 02-2677, slip op. at 12 (D. Minn. Jan. 14, 2005) ($8 million cash component). The Structural Changes plus the $10.15 million Cash Settlement Amount provide a total benefit to the Class of anywhere from $39.45 million to a much higher amount. As such, the Settlement is clearly within the range of reasonableness.

The settlement consideration paid by Defendants is a significant recovery for the Class. Class Counsel has weighed the certain and immediate benefits provided by the Settlement against the significant risks and uncertainties of litigation, the expense and length of time necessary to prosecute the action through trial, and the inevitable subsequent appeals. Thus, the Settlement represents a significant recovery in this case, and is unquestionably better than another possible outcome – very little or no recovery at all.

### b.    ERISA Supports a Non-Opt-Out Class

Two individuals object to the Settlement on the grounds that it does not allow Class members to opt-out. *See* Objection of Michael B. Neikirk (Docket No. 116) (objecting to the Settlement on the grounds that he is opposed to suing and considers his inability to opt-out of the

---

[7] Slip opinions cited herein are submitted as Exhibit M to the Compendium.

suit an "abridgement of [his] rights"); Objection of Ladonna J. Greiner (Docket No. 119) (objecting to the lawsuit because her "agreement is implied by [her] inaction"). However, as discussed in Section I.B *supra*, the Class is properly maintained as a non-opt-out class because of the plan-wide nature of the relief sought. Indeed, in the context of a class seeking recovery under ERISA for a breach of fiduciary duty, "a non-opt-out class is appropriate because individual relief is not contemplated by the legal protections being invoked." *AOL*, 2006 U.S. Dist. LEXIS 70474, at *36. As such, the benefit of having a non-opt-out class is its "consistency, efficiency, and fidelity to ERISA's statutory framework." *Id*. Since the rationale proffered in these objections is contrary to that provided by Congress in its enactment of ERISA, these objections should be rejected.

### c.    Objections by Those Who Generally Disapprove of the Litigation Should Not Preclude Settlement

Nineteen individuals, a large portion of the objectors to the Settlement, appear to believe that this litigation has no merit because investment in GE stock was voluntary and therefore, GE and the other Defendants should not be responsible for losses to the Plan.[8]  In other words, these objectors believe that GE is giving too much to Class members in the Settlement.

---

[8] *See* Objection of Joseph DiMattia (Docket No. 104) ("The General Electric Company presented many opportunities for me to reallocate my investment strategy."); Objection of Todd Nass (Docket No. 108) ("At no time in my program participation have I ever been led to believe that investment in GE stock was without risk…"); Objection of Stephen E. Auyer (Docket No. 111) ("The General Electric Savings and Security Program (S&SP) offered a number of investment choices."); Objection of Thomas E. Johnstone (Docket No. 110) ("GE does not advise employees on how to invest and cannot be held accountable for their failure to monitor their accounts"); Objection of Edward J. Ver Schneider (Docket No. 112) ("Participants have as much information regarding GE stock as the Defendants"); Objection of Bruce Busbey (Docket No. 114) ("General Electric should not be held responsible for the inaction of plan participants when it comes managing their own retirement accounts"); Objection of Mary Ellen Foster (Docket No. 117) (in reference to investment choices, "I don't consider any of this was the Company's responsibility."); Objection of Ladonna J. Greiner (Docket No. 119) ("the Plaintiffs should be held responsible for their own selections as to their benefit options."); Objection of Milos Nebesar (Docket No. 127) ("I have lost lots of money in the Plan recently, but it was my choice

Simply put, GE and the other Defendants have made a voluntary and fully informed choice to enter into the Settlement, which allows them to avoid the risks and costs of continued litigation and trial. In light of GE's voluntary and informed decision to enter into the Settlement, the objections raised on GE's behalf should be overruled.

### d.    The Remaining Objections Lack Merit

A number of individuals have submitted objections that are unrelated to the litigation of this Action or the terms of the Settlement. *See* Objection of Dick Miller (Docket No. 107) ("This is simply a revenue opportunity for Lori Feldman."); Objection of Ray Floyd (Docket No. 105) ("This is a frivolous lawsuit designed purely to enrich the attorneys. …"); Objection of Daniel P. Kuzma (Docket No. 113) (objects to the "unsolicited inclusion into nuisance law suite (sic)."); Objection of Terry L. Hoffman (Docket No. 115) ("When I read the complaint I thought it was a joke and continue to maintain this mindset."); Objection of Mark McCormick (Docket No. 135)

---

to keep the money invested in GE stock and other investments."); Objection of David N. Frisco (Docket No. 132) ("G.E. made us fully aware that the G.E. Stock could go down or up."); Objection of David & Elizabeth Nicholas (Docket No. 129) ("…if we are not diversified we cannot try to place the blame for that on our Savings and Security  Program."); Objection of Steven D. Ryder (Docket No. 130) ("I attribute my losses to my own investment decisions, and not due to the claims forwarded by the Named Plaintiffs."); Objection of Robert H. Blake (Docket No. 134) ("The S&S Program is entirely a voluntary program."); Objection of Matthew P. Newman (Docket No. 120) ("I believe General Electric Company did fulfill their fiduciary responsibilities by advising me that investments in securities is risky and that there was a possibility I could suffer a loss."); Objection of Raymond A. Lewis (Docket No. 124) ("My reason is because of my long relationship as an employee for G.E. for 35 years and the Company has always been good to me and they still continue to do good for me in my retirement in 1990."); Objection of Clifford T. Oram (Docket No. 131) ("I feel GE has always provided adequate investment information to Plan participants in the past."); Objection of Arnold Capstick (Docket No. 138) ("It is the responsibility of individuals to know what they are investing in and to take proper precautions with their investment choices."); Objection of Christopher R. Hennen (Docket No. 144) ("During the time of my participation in the program the information provided to me was more than adequate to help me make decisions on how I wanted to invest in my retirement."); Objection of James H. Cutler, Jr. (Docket No. 137) ("However, I do not believe that offering the purchase of stock as part of the Savings and Security Program was in prudent or inappropriate.").

("It irritates me that these types of lawsuits are brought and represent nothing more than legal

blackmail."). These objections, which do not raise legitimate objections to specific aspects of

the Settlement or Plan of Allocation, are without merit and should be disregarded.[9]

### 3.    The Stage of Proceedings Supports Approval of the Settlement

The relevant inquiry under the third *Grinnell* factor is whether the parties "have a clear

view of the strengths and weaknesses of their cases." *Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.,*

No. 01-11814, 2004 U.S. Dist. LEXIS 8608, at *10 (citation omitted). "The parties need not

have engaged in extensive discovery as long as they have engaged in sufficient investigation of

the facts to enable the Court to intelligently make an appraisal of the settlement." *AOL*, 2006

U.S. Dist. LEXIS 70474, at *21 (internal quotations omitted) (finding that extensive factual

investigation, dismissal and summary judgment motion practice, and briefing of claims for

settlement negotiations supported approval of the settlement).

The Parties in this action had the requisite knowledge to evaluate the benefits of

settlement. The Parties litigated for nearly three years before executing the Settlement

---

[9] Additionally, Lucille Pavicic (Docket No. 123) objects on the ground that the Settlement does not contemplate contributions made before March 23, 2001. This objection is misplaced, because the Class in this Settlement includes Plan participants who made contributions prior to March 23, 2001.

Another individual voiced concern over potentially losing her severance benefits if she participated in the Settlement. *See* Compendium Exh. K (letter from Lisa Ferguson to Class Counsel dated March 3, 2009) ("My concern is that with me participating in this class action that it would terminate my transition payment. . ."). However, Defendants' Counsel have confirmed that the severance agreement being referenced would not render this individual ineligible to receive settlement benefits and receipt of settlement benefits by this individual would not constitute a breach of her severance agreement.

Another individual objected on the grounds that GE had not qualified his 401(k) plan in Puerto Rico, which prevented him from taking advantage of certain tax gains. *See* Objection of Alfred D. Koren (Docket No. 145) ("GE's failure to register the PLAN prevented me from a Lump Sum Distribution of $870,000."). This issue is entirely unrelated to this Action and should not prevent approval of the Settlement.

Agreement. Named Plaintiffs' Counsel conducted an extensive factual investigation even prior to the filing of the initial complaints. *See* Joint Decl. at ¶19. Notably, there was no related securities or derivative action at the time of the filing of the initial or operative complaints and, thus, the unique allegations of the Complaint were developed solely by the factual investigative efforts of Named Plaintiffs' Counsel. *Id.* The briefing in response to the Complaint involved, as mentioned, complex legal arguments. For each of the four motions filed, Named Plaintiffs conducted continuing factual investigation and extensive legal research to support their briefing and employed the use of an expert for the purpose of responding to Defendants' summary judgment papers. The litigation of these motions caused the Parties to be thoroughly familiar with the strengths and weaknesses of the Action. The extensive settlement negotiations also provided the Parties with a thorough understanding of the litigation by not only necessitating multiple discussions evaluating the merits of the Action, but also briefing of the claims in support of the Parties' respective positions for the mediation. Thus, this factor also weighs in favor of approval of the Settlement.

### 4. The Risks of Prevailing Support Approval of the Settlement

Under *Grinnell*, courts assessing the fairness, reasonableness and adequacy of a settlement should consider such factors as the "risks of establishing liability," "the risks of establishing damages," and "the risks of maintaining the class action through the trial." 495 F.2d at 463 (citations omitted). "These inquiries require courts to consider legal theories and factual situations without the benefit of a fully developed record, thus courts must heed the Supreme Court's admonition not to decide the merits of the case or resolve unsettled legal questions." *AOL*, 2006 U.S. Dist. LEXIS 70474, at *23. (internal quotations omitted). As such, the role of the court is to weigh the risks of ongoing litigation against the certain recovery of the settlement. *Id.*

There are certain undeniable facts and risks that had to be considered by Named Plaintiffs in determining the adequacy of the Settlement. *See* Joint Decl. at ¶¶63-87. There is inherent risk in ERISA class actions because the law of these claims, breach of fiduciary duty claims brought on behalf of 401(k) plans, is complex and quickly evolving. *See, e.g.*, *Kirschbaum v. Reliant Energy, Inc.*, 526 F.3d 243, 255 (5th Cir. 2008) (affirming dismissal of ERISA breach of fiduciary duty action at summary judgment because plaintiffs could not rebut a presumption that the defendants' investments were prudent); *In re Bausch & Lomb Inc. ERISA Litig.*, No. 06-6297, 2008 U.S. Dist. LEXIS 106269 (W.D.N.Y. Dec. 12, 2008) (granting motion to dismiss complaint alleging ERISA breach of fiduciary duties). Named Plaintiffs also faced significant risks related to establishing liability. Named Plaintiffs' theory of the case is that Defendants breached their fiduciary duties under ERISA because they knew or should have known that GE was engaging in improper conduct by under-reserving its insurance business and, yet, selected and maintained GE Stock as an investment alternative for the Plan and failed to disclose material information about the risks associated with this investment. *See* Joint Decl. at ¶13. Had the Settlement not been reached, Defendants would have continued to argue, as demonstrated by their motions to dismiss, that contrary to Named Plaintiffs' assertions: (1) GE Stock was a prudent investment at all times during the Class Period because GE was not on the brink of collapse; (2) GE did not make any misstatements; (3) GE disclosed all of the risks of investing in GE Stock; (4) the alleged under-reserving was not material; (5) there is no causal relationship between the alleged wrongdoing and any losses to the Plan; and (6) certain Defendants were not fiduciaries of the Plan. *Id*. at ¶¶26-28. Although Named Plaintiffs would have vigorously maintained that Defendants were liable for the alleged breaches of fiduciary duty, success on these issues was not guaranteed. *See e.g. AOL*, 2006 U.S. Dist. LEXIS 70474, at *23-25

(settlement favored where plaintiffs faced risks of proving liability including, *inter alia*, overcoming presumption of prudence and establishing defendants' fiduciary status, discharge of their duties, prudency of the investment, and loss causation.).  The risks of being unsuccessful against Defendants' arguments on liability weigh in favor of approving the Settlement.  *See McDaniel v. County of Schenectady*, No. 04-0757, 2007 U.S. Dist. LEXIS 81889, at *7 (N.D.N.Y. Nov. 5, 2007) (approving settlement that had "the benefit of providing relief to Class Members now, without further litigation, under circumstances where the liability issues are still vigorously contested . . . .") (Sharpe, J.).

Even if liability is established, Named Plaintiffs also face risks associated with establishing the extent of damages incurred by the Plan.  Calculation of damages in ERISA actions is complex and generally requires the use of an expert to create damages models and run multiple calculations based on a variety of assumptions.  Named Plaintiffs have argued that Defendants' breaches of their fiduciary duties under ERISA resulted in losses to the assets of the Plan and that these damages should be calculated under the framework set forth in *Donovan v. Bierwirth,* 754 F.2d 1049 (2d. Cir. 1985), which provides the relevant law in this circuit on ERISA damages.  *See* Joint Decl. at ¶¶30, 67.  Specifically, Named Plaintiffs would have employed, with the help of an expert, a damages model that tracked the performance of the Plan's holdings of Company Stock and then compared this data with performance of alternative investments.  Damages would then be assessed from the difference in performance of the best performing alternative versus that of the GE's stock during the relevant time period.  *See Donovan*, 754 F.2d at 1056 ("[w]here several alternative investment strategies were equally plausible, the court should presume that the funds would have been used in the most profitable of these.").  Named Plaintiffs are well aware that Defendants would undoubtedly contest this

methodology of calculating damages and would likely challenge the credibility of such calculations by proffering multiple or different breach dates in order to lessen or defeat damages entirely. Had the Settlement not been reached, Defendants would have argued: (1) that the Court should apply the same methodology for damages as is used in securities fraud actions; (2) that no damages exist because there was no disclosure to the market of the alleged improper conduct; (3) that there is no causal link between the alleged breaches and the losses to the Plan; and (4) that the Plan actually experienced a net gain, not a net loss, during the Class Period. *See* Joint Decl. at ¶¶27, 35, 66.

Defendants' arguments regarding loss causation, especially, create a great risk that Plan Participants would have no recovery without the Settlement. Defendants have already argued that the Plan was a "net seller" because it sold more stock than it bought during the Class Period. Defendants further argued that the Plan would have gained more from sales of stock at inflated prices than it would have lost during the Class Period. *See* Joint Decl. at ¶¶66, 68. If these arguments were accepted by the Court, the Plan could have been said to suffer *no* damages, and *no* member of the Class would have been able to recover any losses or reap the benefits of the Structural Changes.

Moreover, proving damages at trial would likely involve competing experts and the risk that a jury would adopt Defendants' calculation of damages. *See In re PaineWebber, Ltd. Litig.*, 171 F.R.D. 104, 129 ("damages are a matter for the jury, whose determination can never be predicted with certainty"), *aff'd*, 117 F.3d 721 (2d Cir. 1997). "In short, the legal and factual complexities and uncertainties of proving the ERISA damages case also militate in favor of settlement." *AOL*, 2006 U.S. Dist. LEXIS 70474, at *25.

Overall, the risks related to liability and damages increase the possibility that the Class would lose its potential for recovery and, therefore weigh in favor of approval of the Settlement.

### 5.    The Ability of Defendants to Withstand a Greater Judgment is Neutral and Does Not Militate Against Approval of the Settlement

The next *Grinnell* factor – defendants' ability to withstand a greater judgment – does not militate against approval of the Settlement.  Named Plaintiffs do not dispute that GE could have paid more here; following the Settlement, GE will remain a solvent company, with considerable assets.  However, "'the fact that a defendant is able to pay more than it offers in settlement does not, standing alone, indicate that the settlement is unreasonable.'"  *AOL*, 2006 U.S. Dist. LEXIS 70474, at *26 (quoting *PaineWebber*, 171 F.R.D. at 129).  Thus, the fact that Defendants here have the ability to pay a greater judgment does not imply that the Court cannot approve the Settlement because this factor "must be weighed in conjunction with all of the *Grinnell* factors, most notably the risk of the class prevailing and the reasonableness of the settlement fund."  *Id.*

### 6.    The Reasonableness of the Settlement Consideration Supports Approval of the Settlement

The Settlement falls within the range of reasonableness in light of the best possible recovery and the risks of the litigation and, therefore, these final *Grinnell* factors favor approval of the Settlement.  In determining the reasonableness of the Settlement, the Court should consider its terms "not in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case."  *In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*, 718 F. Supp 1099, 1103 (S.D.N.Y. 1989).  Determining the reasonableness of a settlement "is not susceptible of a mathematical equation yielding a particularized sum."  *PaineWebber,* 171 F.R.D. at 130 (citations omitted).  Rather, there is "a range of reasonableness with respect to a settlement."  *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972).

Significantly, the Settlement provides for substantial and unique Structural Changes. The cost to GE of implementing these Structural Changes approximates $30 million (reduced to present value), which is, in itself, a substantial sum. However, the Structural Changes to the Plan have a potential benefit value of many times that amount; the valuations of certain Structural Changes conducted by Mercer on behalf of GE provide a range of possible higher benefit values of the Structural Changes to the Plan and the Class.

Mercer conducted a study of the Investment Education Benefit in order to quantify the potential benefit value of adding Fidelity's guidance tools to the existing Plan for the next ten (10) years. *See* Joint Decl. at ¶113. Mercer noted that by "encouraging participants to invest in more efficient and appropriate portfolios, the guidance tool can add value to both by increasing the account balance at retirement *and* by lowering the downside risks from poor investments." *Id*. In conducting their analysis of the educational tools, Mercer considered a number of factors including, *inter alia*, a participant's company stock exposure, age and savings rates. In so doing, Mercer determined that if one percent (1%) of the Plan's participants utilize the educational tools, then investment result will improve by $88.3 million dollars at the median. *Id*. Although Named Plaintiffs cannot predict the number of participants who will actually take advantage of the Investment Education Benefit, arguably, especially in light of current economic conditions, it is likely that more than one percent (1%) of Plan participants will use this new feature.

Similarly, Mercer conducted a study to quantify the potential value of adding a Roth 401(k) feature to the existing Plan for the next ten years. At the outset, Mercer noted that the addition of the Roth 401(k) creates the following two significant advantages: (1) "the ability to contribute funds today, on an after tax basis, and receive tax-free treatment of the investment earnings withdrawn during retirement (assuming certain withdrawal provisions are met during

their pre-retirement)"; and (2) "reduced taxable income for purposes of determining taxability of Social Security benefits." *Id.* at ¶114. In conducting their analysis of the Roth 401(k), Mercer consider a number of factors including, *inter alia*, the number of participants currently contributing on an after tax basis, who have the potential to increase their tax favored contribution rate, and whose retirement income will limit the taxable portion of their Social Security benefits. *Id.* Mercer determined that if ten percent (10%) of the Plan's participants utilize the Roth 401(k) feature, the savings created by, or value of, this benefit would equal $19 million. *Id.* Similar to the Investment Education Benefit, as utilization increases, so does the value of the benefit. *Id.*

As noted, the Settlement also provides for an immediate $10.15 million in cash for former Plan participants. The complexity of calculating damages in this case, as discussed above, makes it difficult at this time to predict the best possible recovery. Defendants contend that there are no damages. Thus, the cash component provides relief where there was a great risk of none. Furthermore, as discussed in Section II.B.2.a *supra*, the Cash Settlement Amount compares favorably with the cash component of recent settlements in other ERISA cases involving the alleged imprudence of investing in company stock.

Taken together, the value of these Structural Changes ranges from $30 million at the conservative end (as measured by the present day cost to GE to implement the Structural Changes) to much higher depending on utilization by Plan participants. This, plus the $10.15 million Cash Settlement Amount, provides a total benefit to the Class of at least $40.15 million. As such, the Settlement is clearly within the range of reasonableness.

Importantly, the reasonableness of the Settlement is further bolstered by its approval by the independent fiduciary, U.S. Trust. Following its review, U.S. Trust found the Settlement to

be reasonable and thereby authorized the Plan to enter into it.  *See* Statement of Facts Section C, *supra*.

Therefore, because the Settlement is both procedurally and substantively fair, the Court should approve the Settlement.

### D.    The Notice to Class Members Satisfied Rule 23 and Due Process Requirements

Due process and Rule 23(e) of the Federal Rules of Civil Procedure require that notice of a class action settlement "fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with [the] proceedings.  *Weinberger*, 698 F.2d at 70 (internal quotations and citations omitted).  "It is widely recognized that for the due process standard to be met it is not necessary that every class member receive actual notice so long as class counsel acted reasonably in selecting means likely to inform persons affected."  *In re Prudential Sec. Inc. P'Ships Litig.*, 164 F.R.D. 362, 368 (S.D.N.Y. 1996).  "For non-opt out cases such as the ERISA actions, Rule 23 requires only such unspecified 'appropriate notice' as 'the court may direct.'"  *Global Crossing*, 225 F.R.D. at 448. Here, the form and method of Class Notice satisfy the requirements of Rule 23 and due process.

In accordance with the PAO, The Garden City Group, Inc., the Settlement Administrator, sent the Class Notice by first class to mail to more than 318,000 potential Class Members, informing them of the Settlement.  *See* Joint Decl. at ¶50.  The Class Notice, in the form approved by the Court, included, among other things, information concerning the: (1) background of the Action and its pre-Settlement history; (2) parties to the Settlement; (3) benefits provided by the Structural Changes and the amount of the cash component; (4) a description of the Plan of Allocation; (5) contact information for Class Counsel; (6) attorneys' fees and expenses sought; and (6) the right of Class members, including the right to object to the

Settlement or any of its terms, the proposed Plan of Allocation and the application of Class

Counsel for fees and expenses. *Id*. at ¶51. As such, the Class Notice fairly apprised potential

members of the Class of the Settlement and their related rights. The Class Notice was also

published at www.SavingsandSecurityProgramSettlement.com, a website accessible by all Class

members. *Id*. at ¶50. As such, the content of the Class Notice as well as the distribution by mail

and internet are in compliance with the notice program set forth by the Court in the PAO. *See*

PAO at ¶¶9-12.

Thus, the Court should affirm its preliminary finding that the Class Notice program

"constitutes the best notice practicable under the circumstances, by providing individual notice to

all Settlement Class members who can be identified through reasonable effort, and constitutes

valid, due, and sufficient notice to all persons entitled thereto, complying fully with the

requirements of Fed. R. Civ. P. 23 and due process." PAO at ¶10.

**E.     The Plan of Allocation is Fair, Reasonable and Adequate and Should be
         Approved**

"To warrant approval, the plan of allocation must also meet the standards by which the ...

settlement was scrutinized -- namely, it must be fair and adequate." *Maley v. Del Global Techs.

Corp.*, 186 F. Supp. 2d 358, 367 (S.D.N.Y. 2002); *see also* Fed. R. Civ. P. 23(e)(2).

The complete terms of the Plan of Allocation of the Settlement consideration are set forth

in paragraph 10 of the Settlement Agreement and in paragraphs 9-11 of the Class Notice. The

Class Notice explains that under the Plan of Allocation, Class Members who have account

balances in the Plan at the time the Settlement is finally approved and the appeals period has run

("Current Participants") will enjoy the benefits of the Structural Changes to the Plan, which will

remain in place for at least ten years. *See* Class Notice at ¶10. The Notice further explains that

Class Members who do not have an account balance in the Plan at the time the Settlement is

finally approved and the appeals period has run ("Former Participants") will each receive an amount of cash equal to the Cash Settlement Amount (plus any interest net of applicable taxes) divided by the number of Former Participants (and rounded down to the nearest penny) (the "Per Capita Settlement Amount"); the Notice states that the parties estimate that the cash payment to each Former Participant will be approximately $100. *Id.* at ¶11.[10]  Class Members are not required to complete any claim forms in order to receive an allocation from the Settlement. *Id.*

"An allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel." *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 344 (S.D.N.Y. 2005) (quoting *Maley*, 186 F. Supp. 2d at 367).[11]  In determining whether a plan of allocation is fair, courts look primarily to the opinion of counsel.[12] Further, "[d]istrict courts enjoy broad supervisory powers over the administration of class-action settlements to allocate the proceeds among the claiming class members . . . equitably." *In re*

---

[10] Under the proposed Plan of Allocation here, GE is required to use its best efforts based on available Plan and Company data to identify the names and contact information of Former Participants. *See* Joint Decl. at ¶102.

[11] As numerous courts have held, a plan of allocation "need not be perfect." *In re EVCI Career Colleges Holding Corp. Sec. Litig.*, No. 05-10240, 2007 U.S. Dist. LEXIS 57918, *32 (S.D.N.Y. July 27, 2007). *See also In re Veritas Software Corp. Sec. Litig.*, No. 03-0283, 2005 U.S. Dist. LEXIS 30880, at *23 (N.D. Cal. Nov. 15, 2005), aff'd 446 F.3d 962 (9th Cir. 2007) (in a class action settlement, "damages need not be calculated with precision in determining a plan of allocation for settlement proceeds; the only requirement is that the allocation be fair and reasonable."); *In re McNeely v. Nat'l Mobile Health Care, LLC*, No. 07-933, 2008 U.S. Dist. LEXIS 86741, at *34, n. 3 (W.D. Okla. Oct. 27, 2008) (same).

[12] *See Paine Webber*, 171 F.R.D. at 133 ("[T]he adequacy of an allocation plan turns on whether counsel has properly apprised itself of the merits of all claims, and whether the proposed apportionment is fair and reasonable in light of that information."); *In re Indep. Energy PLC Sec. Litig.*, No. 00-6689, 2003 U.S. Dist. LEXIS 17090, at *15 (giving considerable weight to opinion of counsel in making its decision to approve plan of allocation); *In re Lloyd's American Trust Fund Litig.*, No. 96-1262 (RWS), 2002 U.S. Dist. LEXIS 22663, at *18 (S.D.N.Y. Nov. 26, 2002); *White v. NFL*, 822 F. Supp. 1389, 1420 (D. Minn. 1993) ("[t]he court . . . affords considerable weight to the opinion of experienced and competent counsel that is based on their informed understanding of the legal and factual issues involved" in approving distribution plan).

*"Agent Orange" Prod. Liab. Litig.*, 818 F.2d 179, 181 (2d Cir. 1987) (internal quotation and citation omitted).

The Plan of Allocation in this Action was formulated by Class Counsel and Defendants' counsel, who are experienced and competent practitioners in the area of ERISA law.  *See* Joint Decl. at ¶103.  Counsel formulated the Plan of Allocation based on their informed understanding of the legal and factual issues involved in the Action, their consideration of the comparative strengths of the various claims asserted in the Action, their consideration of the losses suffered by Class Members as a result of the alleged violations by Defendants, and their consideration of the costs associated with the administration of the Plan of Allocation (as well as the potential administrative costs associated with other alternative allocation plans).  *Id.*  Accordingly, because the Plan of Allocation is recommended by experienced and competent class counsel, and is based on cognizable legal theories, the Plan of Allocation has the requisite "reasonable, rational basis."  *WorldCom*, 388 F. Supp. 2d at 344 (quoting *Maley*, 186 F. Supp. 2d at 367).

Among other reasons, the Plan of Allocation is fair, reasonable and adequate because the value of the Settlement consideration provided to each Former Participant is comparable to value of the Settlement consideration provided to each Current Participant.  Defendants have estimated that roughly 25% of Class members are Former Participants, and that roughly 75% of Class members are Current Participants.  *See* Joint Decl. at ¶105.  As discussed above, the implementation of the Structural Changes has a cost to GE of $30 million (reduced to present value).  If one values the Structural Changes by reference to the actual cost to GE to implement that relief, the total Settlement value is $40.15 million ($10.15 million in cash prior to the addition of any accrued interest, plus $30 million in Structural Changes).  Therefore, Current Participants, who comprise approximately 75% of the Class, will receive approximately 75% of

the total Settlement value; Former Participants, who represent approximately 25% of the Class, will receive approximately 25% of the total Settlement value. The comparability of the proposed allocations to each Class Member supports a finding that the Plan of Allocation is fair, reasonable and adequate.[13]

One individual has objected to the Settlement on the ground that it does not provide any cash consideration to Current Participants.[14]  *See* Objection of Gary Adler (Docket No. 125) ("To let GE off the hook with 10 yrs of educational training to the plan participants makes no sense.  Let GE pay me my loss and I will get my own education!").  However, Class Counsel believe that this aspect of the Plan of Allocation is fair, reasonable and adequate for at least two reasons.  First, the Cash Settlement Amount must be allocated to the Former Participants because, as they are no longer participants in the Plan, they *cannot* enjoy any benefit from the Structural Changes to the Plan.  Accordingly, if Former Participants are to receive some benefit from the Settlement, that benefit must take another form, and the Cash Settlement Amount is the only other form of consideration provided by the Settlement.  Second, as discussed above, the value of the non-cash Settlement consideration provided to each Current Participant under the Plan of Allocation is comparable to (and could potentially be greater than) the amount of cash that will be allocated to each Former Participant.

---

[13] At the time that the Parties agreed on the Plan of Allocation, the Parties estimated that there were approximately 250,000 Current Participants and 90,000 Former Participants.  *See* Joint Decl. at ¶105.

[14] This objection can be interpreted as an objection to the Plan of Allocation because, under the Plan of Allocation, the entire Cash Settlement Amount will be allocated to Former Participants. This objection can also be interpreted as an objection to the sufficiency of the Settlement consideration as a whole, rather than an objection to the Plan of Allocation.  Challenges to the sufficiency of the Settlement consideration as a whole are addressed in Section II.B.2.a, *supra*.

Two individuals have objected to the Plan of Allocation on the basis that under the Plan of Allocation, the Cash Settlement Amount will be distributed to Former Participants on a *per capita* basis, pursuant to which each Former Participant will receive the same amount of cash consideration. These objectors state that the proposed allocation is unfair because it provides the same amount of consideration to Former Participants who may have different amounts of purported losses under the allegations of the Complaint. *See* Objection of Bernard Sonenshein (Docket No. 121) ("A proportional factor based on loss (or investment) would be more fair"); Objection of Arthur O'Connor Jr. (Docket No. 141) ("That proposed cash award itself raises many questions -- such as why the payout is per capita and not based on stock ownership."). However, Class Counsel believe that the distribution of the Cash Settlement Amount on a *per capita* basis is fair, reasonable and adequate because such an allocation guarantees that *all* Former Participants who have suffered alleged losses from Defendants' allegedly improper conduct will receive a recovery in the Settlement, and because such an allocation will avoid a significant reduction of the Cash Settlement Amount which would result from the imposition of a complex and time-consuming administrative allocation process that would attempt to calculate the precise *pro rata* share of each Former Participant's loss.

An alternative plan of allocation that would attempt to calculate the extent of each Former Participant's loss would require the Parties to agree to an allocation formula. It would also likely require substantial administrative costs, including, for instance, costs associated with the gathering of data on Former Participants' Plan investments and costs to verify that data, costs for the creation and programming of a mathematical formula that would calculate the amount of each Former Participant's alleged losses, costs for the application of such a formula to each Former Participant's Plan investments during the Class Period, and costs of a subsequent process

for Class Members to contest such determinations.  *See* Joint Decl. at ¶107.  Named Plaintiffs

have no reason to believe that Defendants would have been willing to bear the costs of such a

claim calculation process.  *Id.*

      The *per capita* distribution of the Cash Settlement Amount avoids the need for such an

expensive and time-consuming claim calculation process that, if paid from the Cash Settlement

Amount, would substantially reduce the pool of cash available to go to Former Participants, and

would necessarily reduce the cash payout to *each* Former Participant.  Courts have recognized

that the goal of reducing excessive costs to the class can be a legitimate consideration in the

formulation of a fair and adequate plan of allocation; indeed, many courts have approved plans

of allocation that deny *any* recovery to certain class members even though those class members

have suffered (minimal but real) losses, on the basis that allocating settlement proceeds to such

class members would cause the class to incur administrative costs that would outweigh the

benefits of the allocations to such class members.[15]  Accordingly, the Plan of Allocation is fair

and adequate because, in the opinion of competent and experienced counsel, it "preserve[s] the

settlement fund from excessive and unnecessary expenses in the overall interests of the class as a

whole."  *Global Crossing*, 225 F.R.D. at 463; *see also PaineWebber*, 171 F.R.D. at 133 (where

weighing the strengths and weaknesses of the claims of each class member would be an "almost

impossible task," "the requirements of efficiency and administrability undoubtedly would permit

alternative methods of disbursement.") (internal quotations and citations omitted).

---

[15] *See In re Gilat Satellite Networks, Ltd.*, No. 02-1510, 2007 U.S. Dist. LEXIS 29062, at *32 (E.D.N.Y. Apr. 19, 2007) ("*[D]e minimus* thresholds for payable claims are beneficial to the class as a whole since they save the settlement fund from being depleted by the administrative costs associated with claims unlikely to exceed those costs and courts have frequently approved such thresholds, often at $10."); *Global Crossing*, 225 F.R.D. at 463 (approving a $10 threshold and noting that "[c]lass counsel are entitled to use their discretion to conclude that, at some point, the need to avoid excessive expense to the class as a whole outweighs the minimal loss to the claimants who are not receiving their *de minimis* amounts of relief").

Finally, courts also consider the reaction of a class to a plan of allocation. See *Maley*, 186 F. Supp. 2d at 367; *Paine Webber*, 171 F.R.D. at 126. Here, although over 318,000 potential Class Members were provided with the Notice containing the proposed Plan of Allocation and informing potential Class Members of their right to object to the Plan of Allocation, only three potential Class Members have objected to that Plan of Allocation. In contrast, *there has been no objection to the Plan of Allocation by over 99.99% of the Class*. The overwhelmingly positive reaction of the Class to the Plan of Allocation lends further support to a finding that the Plan of Allocation is fair, reasonable and adequate.

## III.   THE REQUESTED AMOUNT OF ATTORNEYS' FEES AND EXPENSES SHOULD BE APPROVED

### A.   Negotiated Fee Arrangements Are Favored

Plaintiffs' Counsel's efforts in prosecuting the Action and negotiating the Settlement have conferred substantial benefits upon the Class. The Parties negotiated the maximum amount of attorneys' fees and expenses that GE would pay to Class Counsel, subject to court approval. The amount agreed upon, up to $10.0 million in attorneys' fees and expenses, was reached only after the principal terms of the Settlement were agreed upon. *See* Joint Decl. at ¶41. The maximum amount of attorneys' fees and expenses under the arrangement negotiated by sophisticated counsel familiar with complex class action litigation before a mediator reflect an appropriate fee and expense amount for the substantial benefits obtained for the Class in this case, and will be paid in addition to the settlement consideration being provided by GE.

The Parties' agreement regarding fees was appropriate. *See* Fed. R. Civ. P. 23(h). As noted above, the fees and expenses sought here will not be awarded from the common fund created for the Class as a whole. Instead, GE has agreed to pay the court-awarded fee in addition to the Class recovery. "Thus regardless of the size of the fee award, class members . . . will

52

receive the same benefit; the fee award does not reduce the recovery to the class. Under these circumstances, the danger of conflicts of interest between attorneys and class members is diminished." *In re Sony SVRD Rear Projection Television Class Action Litig.*, No. 06-5173, 2008 U.S. Dist. LEXIS 36093, at *43 (S.D.N.Y. May 1, 2008). *See also McBean v. City of New York*, 233 F.R.D. 377, 392 (S.D.N.Y. 2006) (if "money paid to the attorneys is entirely independent of money awarded to the class, the Court's fiduciary role in overseeing the award is greatly reduced, because there is no conflict of interest between attorneys and class members").

The Supreme Court has endorsed this type of consensual resolution of attorneys' fee issues in these kinds of cases as the ideal toward which litigants should strive. In *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983), the Supreme Court stated: "A request for attorney's fees should not result in a second major litigation. Ideally, of course, litigants will settle the amount of a fee." *See also M. Berenson Co. v. Faneuil Hall Marketplace, Inc.*, 671 F. Supp. 819, 829 (D. Mass. 1987) (concluding that "[w]hether a defendant is required by statute or agrees as part of the settlement of a class action to pay the plaintiffs' attorneys' fees, ideally the parties will settle the amount of the fee between themselves"). Where there is no evidence of collusion and no detriment to the parties, the court should give "substantial weight to a negotiated fee amount." *Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 695 (N.D. Ga. 2001); *In re Apple Computer, Inc. Derivative Litig.*, slip op., at 5 ("[a] court should refrain from substituting its own value for a properly bargained-for agreement"). Here the fee arrangement was only negotiated after hard-fought settlement negotiations and the parties had agreed on the substantive terms of the Settlement. Thus, there is no question that the fee arrangement was properly bargained for without collusion or "detriment" to the parties. *Ingram*, 200 F.R.D. at 695.

Indeed, the fee arrangement here was negotiated under the best of market conditions -- an arm's-length negotiation -- a process which courts have encouraged.  *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 568-70 (7th Cir. 1992) (market factors, best known by the negotiating parties themselves, should determine the quantum of attorneys' fee).  The virtue in the negotiation of a fee arrangement by the adversary parties to a settlement (the defendants who must pay the fee versus the lawyers who wish to receive it) is that "[m]arkets know market values better than judges do." *Id.* at 570.  In *Continental Illinois*¸ Chief Judge Posner of the Seventh Circuit dissected the lower court's judicial attempt to set a value on the plaintiffs' lawyers' services:

> It is apparent what the District Judge's mistake was.  He thought he knew the value of the class lawyers' legal services better than the market did. . . .  He may have been right in some ethical or philosophical sense of 'value' but it is not the function of judges in fee litigation to determine the equivalent of the medieval just price.  It is to determine what the lawyer would receive if he were selling his services in the market rather than being paid by court order.

962 F.2d at 568.  Class Counsel wished to maximize the fees to compensate them (as the case law encourages) for their risk, innovation and creativity, while the Company wished to pay the minimum.

The fee arrangement negotiated and agreed to reflects the Parties' experience.  The result is a fee arrangement which was negotiated at arm's length with adversaries who saw the efforts of Class Counsel first hand.  GE was represented by highly skilled lawyers and does not need (and has not sought) protection from the Court for the result of its own negotiations regarding the maximum amount of the fees and expenses that may need to be paid.  Where the parties in representative action have negotiated and reached an agreement on a fee arrangement, a court will give great weight to the agreement reached by the parties.  *See In re AXA Fin., Inc. S'holders Litig.*, No. 18268, 2002 Del. CH. LEXIS 57, at *24 (Del. Ch. May 16, 2002) ("Where, as here, the fee is negotiated after the parties have reached an agreement in principle on

settlement terms and is paid in addition to the benefit to be realized by the class, this court will also give weight to the agreement reached by the parties in relation to fees."). *See also Cohn v. Nelson*, 375 F. Supp. 2d 844, 861 (E.D. Mo. 2005) ("[W]here, as here, the parties have agreed on the amount of attorneys' fees and expenses, courts give the parties' agreement substantial deference.") (citation omitted).

Moreover, under the "substantial benefit" doctrine, counsel who prosecute a representative litigation which confers benefits are entitled to an award of attorneys' fees and costs. *Boeing Co. v. Van Gemert*, 444 U.S. 472, (1980); *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375 (1970); *In re Rambus, Inc. Derivative Litig.*, No. 06-3513, slip op. at 5 (N.D. Cal. Jan. 20, 2009). In *Mills*, the Supreme Court stated that "an increasing number of lower courts have acknowledged that a corporation may receive a 'substantial benefit' from a [stockholders' action], justifying an award of counsel fees, regardless of whether the benefit is pecuniary in nature." 396 U.S. at 395; *see, e.g.*, *Unite Nat'l Ret. Fund v. Watts*, No. 04-3603, 2005 U.S. Dist. LEXIS 26246, at *5 (D.N.J. Oct. 28, 2005) (awarding $9.2 million based on "the great benefit conferred upon [the company] as a result of the new corporate governance principles provided for in the settlement agreement"); *In re Schering-Plough Corp. S'holders Derivative Litig.*, No. 01-1412, 2008 U.S. Dist. LEXIS 2569, at *5 (D.N.J. Jan. 14, 2008) (granting attorneys' fees of $9.5 million for the substantial benefits the corporate governance procedures provided to the company). *See also* Ralph C. Ferrara, Kevin T. Abikoff, Laura Leedy Gansler, *Shareholder Derivative Litigation: Besieging the Board* §14.06, at 14-25 to 14-26 (Law Journal Press 2003).[16]

---

[16] *See also Fletcher v. A. J. Indus., Inc.,* 266 Cal. App. 2d 313, 320 (1968) ("Under the 'substantial benefit' rule, a variant of the common-fund doctrine as applied more recently in other jurisdictions, the successful plaintiff in a stockholder's derivative action may be awarded

Here, the Settlement provides for substantial financial benefits – over $10 million for former Plan participants – and, just as important, if not more so, significant Structural Changes to the Plan for current Plan participants. *Maher v. Zapata Corp.*, 714 F.2d 436, 461 (5th Cir. 1983) ("effects of the suit on the functioning of the corporation may have a substantially greater economic impact on it, both long- and short-term, than the dollar amount of any likely judgment"). GE is making these important changes now as a result of this Action. Courts have recognized that when changes are made in response to the filing of a lawsuit, plaintiffs are entitled to a presumption that such changes resulted from the prosecution of the action. *See, e.g., In re Plains Res. Inc. S'holders Litig.*, No. 071-N, 2005 Del. Ch. LEXIS 12, at *9 (Del. Ch. Feb. 4, 2005) (presumption lies where: (i) suit is meritorious; (ii) actions were taken by defendants before judicial resolution achieved; and (iii) benefit is causally related to action); *United Vanguard Fund, Inc. v. Takecare, Inc.*, 727 A.2d 844, 850 (Del. Ch. 1998) (same).

Indeed, courts have consistently recognized that the result achieved is a major factor to be considered in approving a fee award. *See, e.g.*, *Hensley v. Eckerhart*, 461 U.S. 424, 436 (the "most critical factor is the degree of success obtained"). Thus, in light of the substantial benefits conferred upon the Class by Named Plaintiffs' Counsel's prosecution and settlement of the Action, the maximum amount permitted under the separately negotiated attorneys' fee and expense arrangement should be approved.

---

attorneys' fees against the corporation if the latter received 'substantial benefits' from the litigation, although the benefits were not 'pecuniary' and the action had not produced a fund from which they might be paid."); *Serrano v. Priest*, 20 Cal. 3d 25, 34 (1977) ("[W]hen a class action or corporate derivative action results in the conferral of substantial benefits, whether of a pecuniary or nonpecuniary nature, upon the defendant in such an action, that defendant may, in the exercise of the court's equitable discretion, be required to yield some of those benefits in the form of an award of attorney's fees.").

The maximum amount under the negotiated fee arrangement is also consistent with other fees approved in similarly large and complex representative cases, favoring its approval. *See, e.g.*, *In re Activision, Inc. S'holder Derivative Litig.*, No. 06-04771, slip op. at 17-18 (C.D. Cal. July 21, 2008) (awarding $10.75 million fee in connection with $24.3 million backdating derivative settlement); *In re Juniper Derivative Actions*, No. 5:06-03396, slip op. at 4 (N.D. Cal. Nov. 13, 2008) (awarding $9 million in fees in connection with the $22.7 million backdating derivative settlement); *In re Apple Computer, Inc. Derivative Litig.*, No. 06-4128, slip op. at 2 (N.D. Cal. Nov. 5, 2008) (awarding $8.85 million fee in connection with $14 million backdating derivative settlement).[17]

As part of its duties in reviewing the terms of the Settlement, U.S. Trust, the independent fiduciary of the Plan, was required to review Class Counsel's fee and expense application. *See* Joint Decl. at ¶45. Specifically, U.S. Trust undertook a review of Class Counsel's estimated fees and expenses (as of December 2008) that would form the basis of the fee application. *Id.* Thereafter, U.S. Trust approved the Settlement, without any objection to Class Counsel's fee request. *Id.*

---

[17] *See also City of Pontiac Gen. Employees' Ret. Sys. v. Langone*, No. 2006-122302, slip op. at 5 (Fulton County, Ga. June 10, 2008) (awarding $14.5 million fee in connection with corporate governance stock option backdating settlement); *In re Fed. Home Loan Mortgage Corp. Sec. and Deriv. Litig., (No. II) ERISA Litig.*, No. 04-md-1584, slip op. (S.D.N.Y.) (awarding fees of $15.25 million for corporate governance improvements); *In re Cendant Corp., Derivative Action Litig.*, 232 F. Supp. 2d 327 (D.N.J. 2002) (awarding $12 million fee for corporate governance improvements); *In re BP P.L.C. Litig.*, No. 06-11929, slip op. at 11 (Anchorage 3d Dist. Alaska May, 7, 2008) (awarding $12.19 million in fees and expenses for corporate governance improvements); *Unite Nat'l Ret. Fund v. Watts*, No. 04-3603, 2005 U.S. Dist. LEXIS 26246, at *18 (D.N.J. Oct. 27, 2005) (awarding $9.2 million in fees and expenses for corporate governance improvements); *In re Schering-Plough Corp. S'holders Derivative Litig.*, No. 01-1412, slip op. at 4 (D.N.J. Jan. 14, 2008) (awarding $9.5 million in fees); *In re HCA Inc. S'holder Litig.*, No. 06-1816, slip op. at 4 (Davidson Cty. Tenn. Chancery Ct. Dec. 20, 2007) (awarding $9.2 million in fees and expenses for structural modifications to merger agreement and additional disclosures in proxy materials).

**B.    Other Factors Confirm that the Requested Fee Is Reasonable**

In determining whether the negotiated fee is reasonable, the Court should be guided by the Second Circuit's decision in *Goldberger v. Integrated Resources, Inc.*, in which the Court explained that courts should consider the following factors:

> (1)    the time and labor expended by counsel;
>
> (2)    the risks of the litigation;
>
> (3)    the magnitude and complexity of the litigation;
>
> (4)    the requested fee in relation to the settlement;
>
> (5)    the quality of representation; and
>
> (6)    public policy considerations.

209 F.3d 43, 50 (2d Cir. 2000). The reasonableness of a fee will depend upon the circumstances of the particular case in light of the relevant factors. Class Counsel respectfully submit that an analysis of these factors demonstrates that the negotiated fee is fair and reasonable.

**1.    The Time and Labor Expended by Counsel**

Class Counsel have expended substantial time and effort pursuing this Action on behalf of the Class. Since its inception over three years ago, Class Counsel and their professional support staff devoted 7,194.5 hours to this Action. *See* Compendium Exh. A (summary chart of lodestar and expenses of Class Counsel); Compendium Exhs. B-E (declarations from Class Counsel firms). As discussed more fully above, and in the Joint Declaration submitted herewith, Class Counsel conducted an extensive investigation of the issues involved in this case, which included utilization of consultants and experts, and the interviews of scores of former GE employees. Class Counsel opposed Defendants' motions to dismiss and motion for summary judgment. Class Counsel also engaged in arm's-length negotiations with Defendants, assisted by

Judge Weinstein, and analyzed hundreds of thousands of pages of documents. Moreover, Class

Counsel prepared the proposed Plan of Allocation.

Class Counsel's work on this Action will not end with the Court's approval of the

proposed Settlement. Additional hours and resources will necessarily be expended assisting

members of the Class and responding to inquiries by members of the Class. The tremendous

time and effort devoted to this case by Class Counsel to obtain this outstanding Settlement

confirm that the requested fee is reasonable.

2.      **The Risks of the Litigation**

a.      **The Contingent Nature of Class Counsel's Representation Supports the Requested Fee**

The Second Circuit has recognized that the risk associated with a case undertaken on a

contingent fee is an important factor in determining an appropriate fee award:

> No one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success. Nor, particularly in complicated cases producing large recoveries, is it just to make a fee depend solely on the reasonable amount of time expended.

*Grinnell*., 495 F.2d at 470 (citation omitted). "Little about litigation is risk-free, and class

actions confront even more substantial risks than other forms of litigation." *A.C.L.N.*, 2004 U.S.

Dist. LEXIS 8608, at *11; *Am. Bank Note*, 127 F. Supp. 2d at 433 (concluding it is "appropriate

to take this [contingent fee] risk into account in determining the appropriate fee to award"); *In re

Prudential Sec. Ltd. P'ships Litig*., 985 F. Supp. 410, 417 (S.D.N.Y. 1997) ("Numerous courts

have recognized that the attorney's contingent fee risk is an important factor in determining the

fee award."). This risk encompasses not just the risk of no payment, but also the risk of

underpayment. *See In re Cont'l Ill. Sec. Litig*., 962 F.2d 566, 569-70 (7th Cir. 1992) (reversing

district court's fee award where court failed to account for, among other things, risk of underpayment to counsel).

The reasonableness of the requested fee is also supported by an evaluation of the risks undertaken by Class Counsel in prosecuting this complex ERISA class action. Class Counsel undertook this action on a wholly contingent basis, investing a substantial amount of time and money to prosecute this action without a guarantee of compensation or even the recovery of out-of-pocket expenses. Unlike counsel for Defendants, who are paid hourly rates and reimbursed for their expenses on a regular basis, Class Counsel have not been compensated for any of their time or expenses since this case began, and would have received no compensation or even reimbursement of expenses had this case not been successful.[18]

From the outset, Class Counsel understood that they were embarking on a complex, expensive and lengthy litigation with no guarantee of ever being compensated for the enormous investment of time and money the case would require. In undertaking that responsibility, Class Counsel were obligated to assure that sufficient attorney and paraprofessional resources were dedicated to the prosecution of the Action and that funds were available to compensate staff and to pay for the considerable out-of-pocket costs which a case such as this entails. *See* Joint Decl. at ¶¶123-125. Because of the nature of a contingent practice where cases are predominantly

---

[18]   The risk of no recovery in complex cases of this type is real, and is heightened when counsel press to achieve the very best result for those they represent. There are numerous class actions in which counsel expended thousands of hours and yet received no remuneration despite their diligence and expertise. *See, e.g., In re Apollo Group, Inc. Sec. Litig.*, No. 04-2147, 2008 U.S. Dist. LEXIS 61995 (D. Ariz. Aug. 4, 2008) (on a motion for judgment as a matter of law, court overturned a jury verdict of $277 million in favor of shareholders based on insufficient evidence presented at trial to establish loss causation); *In re JDS Uniphase Corp. Sec. Litig.*, No. 02-1486, slip op. (N.D. Cal. Nov. 27, 2007); *Robbins v. Koger Props.*, 116 F.3d 1441 (11th Cir. 1997) (jury verdict of $81 million for plaintiffs against an accounting firm reversed on appeal on loss causation grounds and judgment entered for defendant); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (Tenth Circuit overturned securities fraud class action jury verdict for plaintiffs in case filed in 1973 and tried in 1988 on basis of 1994 Supreme Court opinion).

complex and last several years, not only do contingent litigation firms have to pay regular overhead, but they also must advance the expenses of the litigation. Under these circumstances, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. *Id.*

In addition to advancing litigation expenses over the past three years and paying overhead, Class Counsel faced the possibility that they would receive no attorneys' fees. It is wrong to presume that a law firm handling complex contingent litigation always wins. Tens of thousands of hours have been expended in losing efforts. The factor labeled by the courts as "the risks of litigation" is not an empty phrase. There are numerous cases where plaintiff's counsel in contingent cases such as this, after the expenditure of thousands of hours, have received no compensation. *Id.* at ¶127-129. It is only because defendants and their counsel know that the leading members of the plaintiff's bar are prepared to, and will, force a resolution on the merits and go to trial, or pursue appeals if necessary, that meaningful settlements in actions such as this can occur.

Losses in contingent fee litigations, especially those brought under ERISA, are exceedingly expensive. As a result, the fees that are awarded in successful litigations are used to cover enormous overhead expenses incurred during the course of the litigation and are taxed by federal, state and local authorities.

### b.    Litigation and Damage Risks

While Plaintiffs remain confident in their ability to prove their claims and to effectively rebut Defendants' defenses, they recognize that proving liability was far from certain.

As set forth in the Joint Declaration and in the Statement of Facts above, Defendants argued, among other things, that: (i) Plaintiffs' "prudence" claim is barred by ERIS §404(a)(2) and that they were entitled to a presumption of prudence for their actions; (ii) Plan documents

mandate that the Plan offer employer stock as an investment option and follow participants'

directions to acquire and dispose of employer stock; (iii) ERISA does not impose a duty on plan

fiduciaries to make disclosures, or correct disclosures by others, regarding employer stock; (iv)

allegations of under-reserving in the Complaint are immaterial as a matter of law because they

were too small a percentage of annual Company-wide revenue and because the Company's

disclosure of GE's insufficient reserves had no significant impact on GE's stock price; (v)

Plaintiffs failed to plead loss causation, because they failed to specifically allege a drop in GE's

stock when the Company disclosed inadequate reserves at Employers Reinsurance Corporation

and its life and health business; (vi) Plaintiffs failed to adequately allege the fiduciary status of

certain of the Defendants, co-fiduciary liability or conflict of interest on the part of the Director

and Officer Defendants; and (vii) that Plaintiffs could not demonstrate that the Plan suffered a

loss during the proposed Class Period. *See* Joint Decl. at ¶¶26-28, 33.

Whether Named Plaintiffs could even prove damages was also unsettled. Defendants

strenuously disagreed with Named Plaintiffs' damage theory, claiming that Named Plaintiffs

could not establish that the Plan suffered a loss. More specifically, Defendants argued that the

Plan had a net gain during the Class Period and thus the Plan suffered no loss. Defendants

argued that because GE was a "net seller" of GE stock during the Class Period (*i.e.*, the Plan sold

more GE stock than it bought during that period), any alleged artificial inflation in GE's stock

price would have resulted in a net gain for the Plan rather than a net loss. *Id*. at ¶¶66-68. In

addition, the damage assessments of the parties' trial experts would be sure to vary substantially,

and trial would become a "battle of experts." The outcome of such battles is never predictable,

and there existed the very real possibility that a fact-finder could be swayed by experts for the

Defendants to minimize the Class's losses. Thus, even if Named Plaintiffs prevailed as to

liability at trial, the judgment obtained could well have been but for a fraction of the damages claimed.  Despite these risks, Class Counsel obtained a substantial settlement.

### 3.    The Magnitude and Complexity of the Litigation

The complexity of the litigation is another factor examined by courts evaluating the reasonableness of attorneys' fees requested by class counsel.  *See Chatelain v. Prudential-Bache Secs, Inc.*, 805 F. Supp. 209, 216 (S.D.N.Y. 1992).  It is widely recognized that representative actions are notoriously complex and difficult to prove.  *See Mathes v. Roberts*, 85 F.R.D. 710, 713-14 (S.D.N.Y. 1980); *Zerkle v. Cleveland-Cliffs Iron Co*., 52 F.R.D. 151, 159 (S.D.N.Y. 1971).  As described in detail herein and in the accompanying Joint Declaration, this Action involved complex issues concerning alleged violations of ERISA.  Class Counsel undertook their investigation on a contingent basis.  Completing discovery, including expert discovery, would take additional time, and would have cost several hundred thousand, if not millions, more dollars.

In addition, the expense and length of the litigation would have been further exacerbated because Defendants would have undoubtedly filed additional dispositive motions following the close of fact and expert discovery.  Briefing and discovery to resolve those motions would have entailed further substantial expenditure of time and effort.  Assuming that the Named Plaintiffs survived Defendants' motions to dismiss and for summary judgment, trial preparation would have required many additional hours of work, at great expense.  The trial of liability issues alone would have involved substantial attorney and expert resources, the introduction of voluminous documentary and deposition evidence, vigorously contested motions, and the considerable expenditures of judicial resources.  The "normal" cost of litigation, including copying, travel, depositions, support services, electronic search services, and other necessary expenses, are quite high.  This Action was vigorously contested, and Defendants were represented by experienced

attorneys. *See In re Brown Co. Sec. Litig.*, 355 F. Supp. 574, 592-93 (S.D.N.Y. 1973) (standing of opposing counsel underscores complexity of litigation and challenges faced by class counsel). Accordingly, the magnitude and complexity of this ERISA class action supports the conclusion that the requested fee is reasonable and fair.

### 4. The Quality of Representation

The quality of the representation by Class Counsel and the standing of that counsel at the bar are important factors that support the reasonableness of the requested fee. *See Ressler v. Jacobson*, 149 F.R.D. 651, 654 (M.D. Fla. 1992). It took a great deal of skill to achieve this Settlement. Class Counsel are nationally known leaders in the fields of complex representative litigation. *See* Joint Decl. at ¶¶133-134; firm résumés attached to Compendium Exhs. B-E. This Settlement represents a highly favorable result for the Class, one that is attributable to the diligence, determination, hard work and reputation of Class Counsel, who developed, litigated and successfully negotiated the settlement of this Litigation, including an immediate cash recovery, without the risk of further litigation, and without any government litigation or a companion securities case to assist their efforts. In light of these facts, Class Counsel's request for a $10 million fee and expense award is fair and reasonable.

### C. The Requested Attorneys' Fees are Also Reasonable Under the Lodestar Cross-Check

To ensure the reasonableness of a proposed fee, courts may cross check the proposed award against counsel's lodestar. *Goldberger*, 209 F.3d at 50. Under the lodestar method, a court must engage in a two-step analysis: first, to determine the lodestar, the court multiplies the number of hours each attorney spent on the case by each attorney's reasonable hourly rate; and second, the court adjusts that lodestar figure (by applying a multiplier) to reflect such factors as the risk and contingent nature of the litigation, the result obtained and the quality of the

attorney's work.  *See, e.g.*, *Lindy Bros. Builders, Inc. v. Am. Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 167-69 (3d Cir. 1973), subsequently refined in *Lindy Bros. Builders v. Am. Radiator & Standard Sanitary Corp.*, 540 F.2d 102, 116-18 (3d Cir. 1976) (*en banc*).  "Calculation of the lodestar, however, is simply the beginning of the analysis."  *In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 747 (S.D.N.Y. 1985); *In re Ivan F. Boesky Sec. Litig.*, 888 F. Supp. 551, 562 (S.D.N.Y. 1995).  Performing the lodestar cross-check here confirms that the fee requested by Class Counsel is reasonable and should be approved.

Plaintiffs' Counsel and their professional support staff have spent, in the aggregate, 7,194.5 hours in the prosecution of this case.  *See* Compendium Exh. A (summary chart of lodestar and expenses of Plaintiffs' Counsel); Compendium Exhs. B-E (declarations from Plaintiffs' Counsel firms).  The resulting lodestar is $3,168,196.25, and requires a slight multiplier of approximately 3.0 to equate with the $9,612,427.00 fee.[19]  *Id.*

The hourly rates utilized by Plaintiffs' Counsel in the lodestar calculation are reasonable, as they are consistent with the prevailing market rates in the relevant community.[20]  The following data on billing rates of large law firms, taken from a survey of billing rates for large firms published by the *National Law Journal* on Dec. 8, 2008, shows that the rates utilized by Plaintiffs' Counsel are consistent with the rates charged by other New York law firms who would be equipped and able to prosecute or defend a complex class action such as this Action:

---

[19]  Because the proposed $10 million award includes expenses, Plaintiffs' Counsel's expenses ($387,572.86) should be subtracted from the $10 million amount prior to computing the multiplier.

[20]  "[T]he relevant community for purposes of determining a reasonable billing rate for Class Counsel likely consists of attorneys who litigate nationwide, complex class actions.  This rate would be significantly higher than the rate prevailing in Denver."  *Lucas v. Kmart Corp.*, No. 99-01923, 2006 U.S. Dist. LEXIS 51420, at *13 (D. Colo. July 27, 2006) (citation omitted).

| Law Firm | Range of Partners' Billing Rates | Range of Associates' Billing Rates |
|---|---|---|
| Curtis, Mallet-Prevost, Colt & Mosle | $675-$785 | $290-$575 |
| Epstein Becker & Green | $350-$850 | $175-$450 |
| Greenberg Traurig | $335-$850 | $175-$525 |
| Hughes Hubbard & Reed | $625-$875 | $270-$600 |
| Kelley Drye & Warren | $430-$850 | $255-$520 |
| Loeb & Loeb | $450-$925 | $260-$500 |
| McKee Nelson | $665-$995 | $395-$630 |
| Schulte Roth & Zabel | $695-$895 | $255-$650 |
| White & Case | $550-$1,260 | $160-$920 |
|  |  |  |
| **Named Plaintiffs' Counsel** | **$375-$925** | **$175-$575** |

In determining whether the hourly rates are reasonable, the Court should take into account the attorneys' legal reputation, experience and status. As Plaintiffs' Counsel's individual firm submissions set forth, Plaintiffs' Counsel are among the most prominent, experienced and well-regarded complex litigation practitioners in the nation. Therefore, their hourly rates are reasonable here. *See In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 02 MDL 1484, 2007 U.S. Dist. LEXIS 9450, at *73 (S.D.N.Y. Feb. 1, 2007) (approving counsel's hourly rates).

The multiplier reflected here (approx. 3.0) falls squarely within the range of multipliers found reasonable for cross-check purposes by courts in this Circuit and elsewhere and is fully justified given the effort required, the risks faced and overcome and the results achieved. *See, e.g.*, *In re Doral Fin. Corp. Sec. Litig.*, No. 05-1706, slip op. at 5 (S.D.N.Y. July 17, 2007) (awarding multiplier of 10.26 on $130 million settlement fund); *Maley*, 186 F. Supp. 2d at 371

("it clearly appears that the modest multiplier of 4.65 is fair and reasonable"); *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998) (approving multiplier of 3.97 and noting that "'[i]n recent years multipliers of between 3 and 4.5 have become common'") (citation omitted).[21]

Finally, the time expended by counsel is just one factor of many to be considered by the court in awarding a fair fee. *See In re Harrah's Entm't Inc. Sec. Litig.*, No. 95-3925, 1998 U.S. Dist. LEXIS 18774, at *15 (E.D. La. Nov. 25, 1998) ("Because counsel prosecuted this action on a contingent fee basis, the Court would rather focus on results obtained. To overly emphasize the amount of hours spent on a contingency fee case would penalize counsel for obtaining an early settlement and would distort the value of the attorneys' services."). *See also In re Xcel Energy, Inc.*, 364 F. Supp. 2d 980, 992 (D. Minn. 2005) (early settlements are consistent with the purposes of the Federal Rules of Civil Procedure, and modest lodestars are the result of efficient case prosecution). Here, Class Counsel served the Class well by effectively and efficiently litigating the case.

As discussed above and as detailed in the Joint Declaration, Class Counsel invested substantial time and effort prosecuting this Action to a successful completion. The negotiated fee, therefore, is manifestly reasonable.

---

[21] *See also*, *e.g.*, *Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 197 (S.D.N.Y. 1997) (multiplier of 5.5); *Weiss v. Mercedes-Benz of N. Am.*, 899 F. Supp. 1297, 1304 (D.N.J. 1995) (awarding fee resulting in 9.3 multiplier); *In re RJR Nabisco Sec. Litig.*, No. 88-7905, 1992 U.S. Dist. LEXIS 12702, at *22 (S.D.N.Y. Aug. 24, 1992) (approving fees of over $17.7 million, notwithstanding objection that such an award of fees represented a multiplier of 6); *Cosgrove v. Sullivan*, 759 F. Supp. 166, 167 n.1 (S.D.N.Y. 1991) (multiplier of 8.74); *Rabin v. Concord Assets Group, Inc.*, 89-6130, 1991 U.S. Dist. LEXIS 18273, at *4 (S.D.N.Y. Dec. 19, 1991) (using multiplier of 4.4); *see also* 1 Alba Conte, *Attorney Fee Awards* §2.06, at 39 (2d ed. 1993) ("When a large common fund has been recovered and the hours are relatively small, some courts reach a reasonable fee determination based on large multiples of 5 or 10 times the lodestar.").

### D.    The Class's Reaction to the Fee Request

To date, the Notice Administrator has sent over 318,000 copies of the Notice to members of the Class informing them, *inter alia*, that Class Counsel intended to apply to the Court for an award of attorneys' fees not to exceed $10 million, including expenses.  The time to object to the fee request expired on April 29, 2009.  *See* Joint Decl. at ¶¶50-52.  As of the date of this memorandum, only fourteen (14) objections to the fee request have been received.  "[S]uch a low level of objection is a 'rare phenomenon.'"  *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 305 (3d Cir. 2005) (citation omitted).  Indeed, "[i]n litigation involving a large class it would be 'extremely unusual' not to encounter objections."  *NASDAQ Market-Makers*, 187 F.R.D. at 478.  Here, the paucity of objections after an extensive notice program is strong and compelling of the fairness of the fee request.  *See In re Prudential*, 985 F. Supp. at 416 ("[N]umerous courts have [noted] that 'the lack of objection from members of the class is one of the most important'" factors in determining reasonableness of the requested fee) (citation omitted).  The objections essentially state that the negotiated fee is simply too large.  These summary objections, which lack any explanation or authority, should be overruled.  *See In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 378 (D.D.C. 2002) (rejecting broad, unsupported objections because "[they] are of little aid to the Court.")

None of the objectors makes a serious challenge to the more important point before the Court – "Is the requested fee reasonable in light of all the circumstances present in this case?" – which is the relevant inquiry mandated by the Second Circuit.  The fee here is commensurate with the recovery.  It seeks to align the interests of the lawyer and the victims, so that both have

an interest in achieving the maximum recovery for the Class.[22]  It also appropriately awards

counsel for taking risky cases on a contingent basis.  The fee will not result in a windfall for

Class Counsel, and based on the work performed and the result obtained, is quite reasonable, and

should be awarded.

Therefore, because the few objections to the requested fee award are unfounded, and do

not state any substantive reason for the fees not to be awarded, they should be overruled in their

entirety.[23]

### E.    Class Counsel's Expenses Were Reasonably Incurred and Necessary to the Prosecution of This Action

Class Counsel also respectfully request approval of the $387,572.86 in expenses incurred

while prosecuting this Action (which will not increase the total awarded to Class Counsel for

attorneys' fees and costs to an amount greater than $10 million).  Class Counsel have submitted

separate attestations regarding the accuracy of these expenses, which are properly recovered by

counsel.  *See* Compendium Exhs. B-E.  *See also In re Indep. Energy Holdings PLC Sec. Litig.*,

302 F. Supp. 2d 180, 183 n.3 (S.D.N.Y. 2003) (court may compensate class counsel for

reasonable out-of-pocket expenses necessary to the representation of the class).

---

[22]    Here, it is important to reiterate that the awarded fee and expenses are being paid by GE **in addition to** the relief it has agreed to provide.  Should any portion of the $10 million fee and expenses amount not be awarded, it will not be distributed to the Class.

[23] *See* Objection of Mark McCormick (Docket No. 135), Objection of Arnold Capstick (Docket No. 138), Objection of Stephen E. Auyer (Docket No. 111), Objection of Gary Adler (Docket No. 125), Objection of Gary Watson (Docket No. 122), Objection of Dennis W. Rocheleau (Docket No. 133), Objection of David and Elizabeth Nicholas (Docket No. 129), Objection of Milos Nebesar (Docket No. 127), Objection of Christopher J. Nagle (Docket No. 118), Objection of H.R. Kestner (Docket No. 109), Objection of Ray Floyd (Docket No. 105), Objection of James Morehead (Docket No. 140), Objection of Elizabeth Lake (Docket No. 143) and Objection of Arthur O'Connor Jr. (Docket No. 141). Each of these objectors has also objected to some aspect of the Settlement, and those objections are addressed in Section II.B.2, *supra*.

Most of Class Counsel's expenses were incurred for professional services rendered by Named Plaintiffs' investigators, experts and consultants. *See* Joint Decl. at ¶137. The remaining expenses are attributable to the costs of computerized research, copying documents and other incidental expenses incurred in the normal course of litigation. *Id.* These expenses were critical to Named Plaintiffs' success in achieving the proposed Settlement. *See Global Crossing*, 225 F.R.D. at 468 ("The expenses incurred – which include investigative and expert witnesses, filing fees, service of process, travel, legal research and document production and review – are the type for which 'the paying, arms' length market' reimburses attorneys . . . [and] [f]or this reason, they are properly chargeable to the Settlement fund."). To date, not a single objection to the expense request has been received. Accordingly, Class Counsel respectfully request that the Court approve the reimbursement of these expenses.

For the reasons set forth herein, Class Counsel respectfully submit that the maximum amount under the negotiated fee and expense arrangement should be approved by the Court.

## IV.    THE SERVICE AWARDS TO THE NAMED PLAINTIFFS SHOULD BE APPROVED

Class Counsel respectfully requests that the Court approve the payment of Service Awards in the amount of $5,000 to each of the three Named Plaintiffs: Robert R. Bezio, Umberto Cavalieri and Floyd Miklic. Pursuant to the terms of the Settlement Agreement, GE has caused $15,000 to be placed in an account for the payment of the proposed Service Awards; any portion of that amount which is not awarded by the Court to the Named Plaintiffs will be returned to GE, *not* to the Settlement Fund. *See* Settlement Agreement at ¶11.2.1.

The enforcement of ERISA by private litigants is expressly contemplated under the statute, is in the public interest and should be encouraged. *See*, *e.g.*, 29 U.S.C. § 1132(a); *Thornton v. E. Tex. Motor Freight*, 497 F.2d 416, 420 (6th Cir. 1974). "Numerous courts have

recognized that named plaintiffs in class actions are entitled to individual awards as

compensation for their time and effort in asserting the interests of the class, meeting discovery

and other litigation responsibilities, and working with counsel to advance the interests of the

class." *Feerer v. Amoco Prod. Co.*, No. 95-0012, 1998 U.S. Dist. LEXIS 22248, at *45 (D.N.M.

May 28, 1998) (citations omitted).[24]

Several factors are cited often by courts in analyzing named plaintiffs' requests for

awards in class actions, including: the personal risk (if any) incurred by the plaintiff in becoming

and continuing as a litigant, the time and effort expended by that plaintiff in assisting in the

prosecution of the litigation or in bringing to bear added value (*e.g.*, factual expertise), any other

burdens sustained by that plaintiff in lending himself or herself to the prosecution of the claim,

and of course, the ultimate recovery. *Roberts*, 979 F. Supp. at 200; *accord Frank v. Eastman

Kodak Co.*, 228 F.R.D. at 187.

In the instant Action, the Named Plaintiffs stepped forward and pursued the Class'

interests by prosecuting their claims on behalf of the members of the Class and on behalf of the

Plan, and by undertaking the responsibilities attendant with serving as named plaintiffs.  The

Named Plaintiffs have served as representative plaintiffs for the duration of this litigation and

have been involved throughout in several ways, such as providing Plan-related documents and

other information supporting Plaintiffs' claims; reviewing the complaints filed on behalf of the

---

[24] *See also Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998) ("Because a named plaintiff is
an essential ingredient of any class action, an incentive award is appropriate if it is necessary to
induce an individual to participate in the suit"); *Frank v. Eastman Kodak Co.*, 228 F.R.D. 174,
187 (W.D.N.Y. 2005) ("Incentive awards are not uncommon in class action cases and are within
the discretion of the court") (quoting *Roberts*, 979 F. Supp. at 200); *Gulino v. Symbol Techs.,
Inc.*, No. 06-2810, 2007 U.S. Dist. LEXIS 76915, at *5-6 (E.D.N.Y. Oct. 17, 2007) ("Payments
to class representatives can properly be included in class action settlements to the extent they are
needed to compensate the named plaintiffs for the efforts they have made on behalf of the class")
(citing *Sheppard v. Consol. Edison Co.*, No. 94-403, 2000 U.S. Dist. LEXIS 20629, at *14
(E.D.N.Y. Dec. 21, 2000)).

Class and approving their filing; conferring with counsel regularly about the Action, including with regard to Plaintiffs' opposition to Defendants' dispositive motions; and helping to make strategic decisions, including the negotiation and approval of the terms of the Settlement. *See* Joint Decl. at ¶¶41, 110; Affidavits of Umberto Cavalieri, Floyd Miklic, and Robert R. Bezio, submitted as Compendium Exhibits F-H. The Named Plaintiffs telephonically participated in the mediation that resulted in the agreement of the settlement terms in principle. During the mediation, the Named Plaintiffs insisted that the Structural Relief in the Settlement include (a) an improved communications feature and (b) the establishment of a call center that provides Plan participants with reasonable access to Plan information. *Id.* In short, the Named Plaintiffs contributed significantly to the prosecution of this Action. [25]

   The awards requested here are easily in line with amounts awarded to representative plaintiffs in recent analogous cases. *See*, *e.g.*, *In re Delphi Corp. Sec., Derivative and ERISA Litig.*, 248 F.R.D. 483, 507 (E.D. Mich. 2008) (approving awards of $5,000 to each of the six named plaintiffs); *Mehling v. New York Life Ins. Co.*, 248 F.R.D. 455, 467 (E.D. Pa. 2008) (approving awards of $15,000 and $7,500 to two named plaintiffs); *In re Aquila ERISA Litig.*, No. 04-00865, 2007 U.S. Dist. LEXIS 87830, at *9 (W.D. Mo. Nov. 29, 2007) (approving awards of $25,000 to one representative plaintiff and $5,000 each to seven other representative plaintiffs, based on the finding that "[w]ithout [their] participation, there would have been no case and no settlement"). [26]

---

[25] The Named Plaintiffs estimate that they each spent approximately 30 hours in connection with the prosecution of this Action. *See* Compendium Exhs. F-H.

[26] *See also*, *e.g.*, *In re Ferro Corp. ERISA Litig.*, No. 05-1594, 2007 U.S. Dist. LEXIS 71929, at *8-9 (N.D. Ohio Sept. 27, 2007) (approving award of $10,000 to the class representative as fair and reasonable); *In re Polaroid ERISA Litig.*, No. 03-8335, 2007 U.S. Dist. LEXIS 51983, at *9 (S.D.N.Y. July 19, 2007) (awarding $10,000 each to three class representatives); *In re SPX Corp. ERISA Litig.*, No. 3:04-192, 2007 U.S. Dist. LEXIS 28072, at *11 (W.D.N.C. Apr. 13, 2007)

The reaction of the Class also supports the requested Service Awards. Although over 318,000 copies of the Notice were mailed to potential Class Members, only three individuals have objected to the proposed Service Awards. Two of these objections argue that because the Named Plaintiffs suffered the same or similar losses as other Class members, the Named Plaintiffs should not receive more than any other Class members.[27] However, as discussed above, and in contrast to absent Class members, it was the Named Plaintiffs who pursued the claims in this Action for the benefit of all Class members, and the Named Plaintiffs should be rewarded for their time and efforts which resulted in the creation of the benefits of the Settlement for all Class members. *See Cook*, 142 F.3d at 1016 (where objectors appealed the award of a $25,000 incentive award in the settlement of an ERISA case, the Seventh Circuit specifically affirmed the award based upon the "benefit ... bestowed upon [the] class, the risks [the Plaintiff] faced in bringing the case, and the time…spent pursuing it."). One of the objections suggests that the proposed Service Awards were offered by GE in a collusive effort to secure the Named

---

(awarding $7,500 to the named plaintiff); *In re Visteon Corp. ERISA Litig.*, No. 05-71205, 2007 U.S. Dist. LEXIS 96023, at *9-10 (E.D. Mich. Mar. 9, 2007) (approving awards of $5,000 to each class representative); *In re Broadwing, Inc. ERISA Litig.*, 252 F.R.D. 369, 382 (S.D. Ohio 2006) (awarding a "modest" $5,000 to each of two class representatives); *In re HealthSouth Corp. ERISA Litig.*, No. 03-1700, 2006 U.S. Dist. LEXIS 50196, at *22-23 (N.D. Ala. June 28, 2006) (approving awards of $5,000 to each of three class representatives); *In re CMS Energy ERISA Litig.*, No. 02-72834, 2006 U.S. Dist. LEXIS 55836, at *11 (E.D. Mich. June 27, 2006) (approving awards to three class representatives in the amount of $15,000 each); *In re Lucent Techs., Inc. Sec. Litig.*, 327 F. Supp. 2d 426, 450 (D.N.J. 2004) (awarding $5, 000, $5,000 and $2,500 to three ERISA class representatives); *In re WorldCom, Inc. ERISA Litig.*, No. 02-4816, 2004 U.S. Dist. LEXIS 20671, at *41 (S.D.N.Y. Oct. 18, 2004) (approving awards of $5,000 to each of the three named plaintiffs).

[27] *See* Objection of Dennis W. Rocheleau (Docket No. 133) ("I do not know what losses the plaintiffs claim to have incurred and why they got 50 times more than others in the Class."); Objection of Robert H. Blake (Docket No. 134) ("The plaintiffs suffered no greater than all participants in S&S and therefore should not benefit any greater than all other participants which is pennies based on this proposed settlement.").

Plaintiffs' approval of the Settlement.[28]  However, as discussed above in Statement of Facts, the Settlement of this Action was the result of an arm's-length, non-collusive negotiation process in which both sides vigorously advocated for their respective positions.  In fact, only *after* the terms of the Settlement were approved by the Named Plaintiffs, did the Named Plaintiffs become aware that GE had agreed to pay Service Awards to the Named Plaintiffs (subject to Court approval).  *See* Compendium Exhs. F-H.

Accordingly, the proposed payment of the Service Awards to the Named Plaintiffs should be approved.

## CONCLUSION

For the foregoing reasons, Named Plaintiffs respectfully request that the Court: (1) grant final approval to the Settlement and Plan of Allocation and certify the Class to that the consideration provided by the Settlement can be distributed to Class Members; (2) approve the payment of the requested attorneys' fees and expenses to Class Counsel; and (3) approve the payment of Service Awards to the Named Plaintiffs.

Dated:  May 6, 2009                    Respectfully submitted,


                                       /s/ Jeffrey J. Sherrin
                                       Jeffrey J. Sherrin (Bar Roll. No. 102601)
                                       **O'CONNELL AND ARONOWITZ**
                                       54 State Street
                                       Albany, New York 12207-2501
                                       (518) 462-5601 (telephone)
                                       (518) 462-2670 (facsimile)

---

[28]  *See* Objection of David and Elizabeth Nicholas (Docket No. 129) ("To give up to $5,000.00 to the original 3 named plaintiffs to buy them out can be settled between GE and the plaintiffs, it doesn't need a lawyers team to do that.").

**MILBERG LLP**
Lori G. Feldman (Bar Roll No. 513863)
Arvind Khurana (Bar Roll No. 513864)
One Pennsylvania Plaza
New York, New York 10119
(212) 594-5300 (telephone)
(212) 868-1229 (facsimile)

**COUGHLIN STOIA GELLER**
 **RUDMAN & ROBBINS LLP**
Ellen Gusikoff Stewart
655 West Broadway, Suite 1900
San Diego, CA 92101
(619) 231-1058 (telephone)
(619) 231-7423 (facsimile)

**COUGHLIN STOIA GELLER**
 **RUDMAN & ROBBINS LLP**
Samuel H. Rudman
Evan J. Kaufman
58 South Service Road, Suite 200
Melville, New York 11747
(631) 367-7100 (telephone)
(631) 367-1173 (facsimile)

**LAW OFFICE OF ALFRED G. YATES JR.**
Alfred G. Yates
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, Pennsylvania 15219
(412) 391-5164 (telephone)
(412) 471-1033 (facsimile)

*Counsel for Plaintiffs*

471189v5

75